IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| GATE GUARD SERVICES, L.P. ) <br> and BERT STEINDORF, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> HILDA L. SOLIS, SECRETARY OF LABOR, ) <br> UNITED STATES DEPARTMENT OF LABOR, ) <br> ) <br> Defendant. ) <br> ) | Civil Action File No. 6:10-cv-91 <br><br> JURY |

_____

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| HILDA L. SOLIS, Secretary of Labor, ) <br> United States Department of Labor, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GATE GUARD SERVICES, LP DBA ) <br> GATE GUARD SERVICES, ) <br> BERT STEINDORF and SIDNEY L. SMITH, ) <br> ) <br> Defendants. ) <br> ) | Civil Action File No. 6:11-cv-14 |

**PLAINTIFFS' MOTION TO BIFURCATE DISCOVERY**

COME NOW Plaintiffs, Gate Guard Services, L.P. ("GGS") and Bert Steindorf ("Mr. Steindorf") (collectively, "Plaintiffs"),[1] and file their Motion to Bifurcate Discovery in each of the above captioned matters. Plaintiffs are filing only one document with both case

---

[1] This Motion requests bifurcation of discovery in <u>both</u> of the actions set forth above. For purposes of simplicity, however, this Motion shall refer to GGS and Mr. Steindorf as "Plaintiffs" and the U.S. Department of Labor as the "Defendant" or "Secretary".

captions to avoid duplication and burdening the Court with two of the exact same motions. The Secretary has informed Plaintiffs that she objects to this dual caption approach because the case has not yet been consolidated. Noting this objection, Plaintiffs show the Court as follows:

## I.     INTRODUCTION

The issue of whether GGS and Bert Steindorf are liable under the Fair Labor Standards Act ("FLSA") should be decided <u>first</u> before damages, if any, are determined. There is a compelling reason to bifurcate these two issues, at least with regard to discovery in this case. Significantly, the issue of whether the Contractor Gate Attendants are independent contractors or employees is relatively straight forward, and Plaintiffs believe that there is a high likelihood that this issue will be dispositive. If the Court determines that GGS and Mr. Steindorf are not covered by the FLSA, then this action can be disposed of fairly expeditiously and the damages issue will be moot.

To the contrary, the issue of damages is complex, and determining whether back wages will be due (and the amount) will be extraordinarily difficult, time-consuming and expensive for the parties and the Court. The reason for this is that GGS's records ("Traffic Logs"), which show the time worked by the Contractor Gate Attendants (in hardy copy format), are voluminous and spread throughout Texas in remote areas at oil field work sites. Even if a representative sample is used, there are hundreds of Traffic Log sheets that may be attributable to each Contractor Gate Attendant, which would result in thousands of documents that would need to be reviewed. Not only will review of the Traffic Logs for each Contractor Gate Attendant be arduous given the sheer number, but a significant amount of time will be spent by the parties sifting through hundreds of thousands of Traffic Logs to first locate them for each Contractor Gate Attendant in the representative sample. The Traffic Logs are not in any particularly organized fashion. Therefore, to embark on a complex and broad-based discovery period over

2

the intricate computation of overtime and back wages that GGS and Mr. Steindorf potentially owe as damages may very well be futile and wasteful if GGS and Mr. Steindorf are not covered by the FLSA in the first place.

Accordingly, Plaintiffs request that this Court bifurcate discovery such that the parties will, first, engage in discovery relating solely to the Contractor Gate Attendants' status as independent contractors or employees. After this discovery is complete, the parties may promptly seek a ruling and, if needed, proceed to discovery on damages (i.e., the amount of back wages and overtime due to the Contractors, if any). This proposed bifurcation serves the interests of Fed. R. Civ. P. 1, as it is the most "just, speedy, and inexpensive" way for Court to resolve the threshold independent contractor issue.  It will most certainly avoid the potentially wasteful time and expense of conducting damages discovery, conducting expert discovery, and addressing likely disputes arising from that discovery.

## II.     PROCEDURAL HISTORY

On or about September 2010, the Secretary commenced an investigation into the issue of whether the Contractor Gate Attendants used by GGS were covered under the FLSA as employees.   (Amended Compl. ¶ 34.) (attached hereto as Exhibit 1.)  In October 2010, David Rapstine, the lead Wage and Hour investigator issued his findings to GGS claiming that GGS was in violation of the Fair Labor Standards Act ("FLSA") because the Contractor Gate Attendants were employees, instead of independent contractors.  (*Id.* ¶ 35.)   The Secretary mandated that GGS compensate the Contractor Gate Attendants at the federal minimum wage rate for 24 hours for each day they were assigned to an oil field operation.  (*Id*.)  The Secretary advised GGS to pay a whopping **$6,192,752** in back wages and unpaid overtime to the Contractor Gate Attendants and service technicians, and issued a "Summary of Unpaid Wages" to GGS.  (*Id.*¶ 35, 38, Ex. A ¶¶ 7-8 thereto.)  These findings were later confirmed on November

19, 2010 at a final conference by Eden Ramirez, District Director and Michael Speer, Targeted Enforcement Coordinator. Colleen Nabhan, counsel from the Secretary's Office of Solicitor, was in attendance at the meeting. (*Id.* ¶ 38-39, Ex. A ¶¶ 7-8 thereto.)

GGS vehemently disputes the Secretary's determination that GGS is in violation of the FLSA and its order to pay over six million dollars in back wages. Given the Secretary's unfounded actions, on November 19, 2010, GGS was forced to file a declaratory judgment action against the Secretary. (Amended Compl. ¶ 35-39, Ex. A ¶¶ 3-4, 6-8 thereto.) In its Complaint, GGS seeks declaratory relief arising from the Secretary's flawed classification of the Contractor Gate Attendants as employees, its improper calculation totaling over six million dollars in back wages, and its allegation that GGS has not complied with recordkeeping requirements. (*Id.* ¶¶ 49-109.) On March 31, 2011, the Secretary filed a Motion to Dismiss[2] contending that this Court lacks subject matter jurisdiction over Plaintiffs' claims, that Plaintiffs' claims are not ripe for adjudication and that this Court should decline to hear Plaintiffs' request for declaratory relief. [Dkt. #21.] GGS and Mr. Steindorf timely filed their Response to the Motion to Dismiss on April 1, 2011. [Dkt. # 22], asserting that the Secretary's Motion to Dismiss is baseless and should be denied in its entirety. A scheduling conference was held on March 7, 2011 and a scheduling order was entered on the same day. [Dkt. #12.] Discovery is scheduled to end on September 16, 2011. [*Id.*]

Inexplicably, almost three months after GGS filed this action, on February 16, 2011, the Secretary initiated <u>nearly identical</u> litigation against GGS, Mr. Steindorf, and Sidney L. Smith, a manager, in the Corpus Christi Action. [Civil Action No. 6:11-cv-14, Dkt. #1-2.] In the Corpus

---

[2]The Court denied the Secretary's Motion to Dismiss filed on March 25 2011 because Plaintiffs' Amended Complaint caused the Secretary's Motion to Dismiss to become moot. [Dkt. #18.] The Secretary subsequently filed a Motion to Dismiss Amended Declaratory Judgment Complaint on March 31, 2011 [Dkt. #21] and Plaintiffs responded on April 1, 2011. [Dkt. # 22.]

4

Christi Action, the Secretary alleges the exact same claims that are the basis of this lawsuit, including: (1) that Plaintiffs owe back wages, including unpaid overtime, and (2) that Plaintiffs have violated the record-keeping requirements of the FLSA. (*Id.* at 3-4.) [3] The Corpus Christi action was transferred to this Court on March 22, 2011 ("Transferred Action") as a result of Judge Jack's granting of GGS and Mr. Steindorf's Motion to Transfer. [Civil Action No. 6:11-cv-14, Dkt. #18.] A scheduling conference was held on April 4, 2011 and a scheduling order was entered on the same day. [Dkt. #22.] Discovery is set to close on December 30, 2011. [*Id.*]

On March 31, 2011, Plaintiffs filed their Motion to Consolidate the Transferred Action with the instant Declaratory Judgment Action. [Dkt. #20.]

## III. RELEVANT BACKGROUND FACTS

GGS, founded in 2003, is a Texas limited partnership which provides services to oil field operators by contracting with gate attendants (the "Contractor Gate Attendants") who perform the job of logging in vehicles entering and departing oil field operation sites. (Amended Compl. ¶ 10.) Bert Steindorf is the founder and sole limited partner of GGS. (*Id.* ¶ 2.) GGS enters into written contracts called, "Independent Contractor Agreements" with the Contractor Gate Attendants for the performance of services at the site of oil field operations. (*Id.* ¶¶ 10, 14.) Specifically, the Contractor Gate Attendants log vehicles that enter and depart an oil field during the drilling and production phases. (*Id.*) The Contractor Gate Attendants are responsible for

---

[3] Upon information and belief, the Secretary named Mr. Steindorf and Mr. Smith as parties to the Corpus Christi Action in a misguided effort to avoid the dismissal and/or transfer of the Corpus Christi Action pursuant to the "first-to-file" rule. Notwithstanding that Mr. Steindorf is not a proper party to this litigation, for clarification purposes surrounding the Secretary's spurious contention that he is a party, on March 11, 2011, GGS filed an Amended Complaint adding Mr. Steindorf as a Plaintiff in this action. (Amended Compl. ¶ 2.) Mr. Smith, however, was not added as a party because the Secretary's addition of Mr. Smith to the Corpus Christi Action is frivolous and GGS will not perpetuate this frivolous act. Mr. Smith clearly is an improper party in both actions because he is not an "employer" under the Fair Labor Standards Act, but merely a manager who does not make operational decisions or decisions affecting payment of wages. The Amended Complaint also adds a count for declaratory relief arising from the DOL's flawed calculation of overtime allegedly owed to GGS's service technicians. (*Id.* ¶¶ 89-92.)

recording the name of the driver, company, license tag number, and date and time that each vehicle enters or departs the oil field (the "gate attendant services"). (*Id.* ¶ 11.) This information is recorded onto a document called a "Traffic Log," which can then be used to identify persons present at an oil field in the event of an emergency. (*Id.* ¶¶ 11-12.)[4]

The Contractor Gate Attendants use their own tools, equipment and supplies when performing gate attendant services, including their own recreational vehicle ("RV") which is parked at the entrance of the oil field for the duration of the assignment. (Amended Compl. ¶ 18.) The Contractor Gate Attendants reside and work from the RV during the term of their assignment. (*Id.*) GGS does not monitor or control the manner or method in which the Contractor Gate Attendants perform the gate attendant services. (*Id.* ¶ 21.) In fact, the only contact a Contractor Gate Attendant has with GGS during the course of an assignment is when GGS personnel service the septic tank or generator approximately every week or every other week. (*Id.*) When not logging vehicles in and out during an assignment, the Contractor Gate Attendants engage in personal activities such as reading, using the Internet, talking on the telephone, watching television, completing household chores, or other pursuits or hobbies. (*Id.* ¶¶ 27-28.) The Contractor Gate Attendants are permitted to hire other individuals to log vehicles; and many Contractor Gate Attendants do, in fact, hire others to assist them. (*Id.* ¶ 20.) The Contractor Gate Attendants, not GGS, pay these individuals for the work they perform. (*Id.*)

To determine the hours that any individual Contractor Gate Attendant worked, a review of the Traffic Logs completed by the Contractor Gate Attendant is necessary. This will prove to be an intensive and time-consuming process. (*See* Supplemental Declaration of Sidney Smith ("Supp. Smith Dec.") ¶¶ 10-13) (attached hereto as Exhibit 2.) This is because each individual

---

[4] GGS's service technicians visit the Contractor Gate Attendants on assignment approximately every week or every other week to service the septic tanks and/or provide fuel for the generators. (*Id.* ¶ 32.) The service technicians are paid as employees and receive W-2 forms from GGS which record their earnings. (*Id.* ¶ 33.)

Contractor Gate Attendant fills out a Traffic Log which can contain multiple sheets for each day he or she works. (*Id*. ¶ 5.) Because the volume of traffic varies at each oil field site based on whether work is in the drilling or production phase, the number of pages of each Contractor Gate Attendant's Traffic Log varies. Some days, zero vehicles enter during a 24-hour period and a Contractor Gate Attendant based there would, therefore, produce zero Traffic Log pages for those days. On average, however, a Contractor Gate Attendant fills out 2-3 Traffic Log pages per day. (*Id*. ¶ 7.) Given the hundreds of current and former GGS Contractors, GGS has collected approximately hundreds of thousands of pages of Traffic Logs. (*Id*. ¶ 11.)

These collected Traffic Logs are not maintained in any particular manner, and are not organized in any particular fashion. For example, they are not separated by date, name or location. (*Id*. ¶ 10.) Because the collected Traffic Logs are not kept in an organized manner, if a GGS representative had to locate a particular Traffic Log completed by a particular Contractor Gate Attendant on a particular day, it would likely take a considerable amount of effort and expense to locate this information. (*Id*. ¶ 12.) The Traffic Logs of Contractor Gate Attendants currently performing work for GGS are maintained either at the Contractor Gate Attendants' respective oil field work site or at other storage locations throughout the State of Texas, including Victoria. (*Id*. ¶ 8.) As a result, calculation of the hours worked is difficult and time-intensive. (*See id.* ¶¶ 10-13.)

IV.     **ARGUMENT AND CITATION OF AUTHORITY**

    A.     **Legal Standard**

While there is no rule specifically governing the bifurcation of discovery, bifurcation is a recognized procedural practice committed to the discretion of the trial court. *See* Fed. R. Civ. P. 26(d)(2); *Beattie v. Madison County School Dist.*, 254 F.3d 595, 606 (5th Cir. 2001) (" '[a] district court has broad discretion in all discovery matters, and such discretion will not be

7

disturbed ordinarily unless there are unusual circumstances showing a clear abuse.' ") (quoting *Kelly v. Syria Shell Petroleum Dev.*, *B.V.*, 213 F.3d 841, 855 (5th Cir. 2000)); *Richardson v. Henry*, 902 F.2d 414, 417 (5th Cir. 1990) ("Discovery matters are entrusted to the district court's sound discretion."); *Collum v. Oak Street Mortgage*, *LLC*, No. 4:06-cv-252, 2007 WL 580750, at *1 (E.D. Tex. Feb. 20, 2007) (recognizing that the district court has discretion to bifurcate discovery) *Niland v. Buffalo Laborers Welfare Fund*, No. 04-cv-0187F, 2007 WL 3047099, at *1 (W.D. N.Y. Oct. 18, 2007) (recognizing that district court may enter a scheduling order bifurcating discovery).

The rationale for such procedure is the same as bifurcation of issues for trial, which is governed by Rule 42(b) of the Federal Rules of Civil Procedure. Rule 42(b) provides as follows:

> Separate Trials. For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, cross-claims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

Fed. R. Civ. P. 42(b). As the language of Rule 42(b) indicates, bifurcation is discretionary and, with regard to bifurcation of discovery or trial, the court should consider factors such as: (1) convenience; (2) avoidance of prejudice; (3) expediency; and (4) economy. Bifrucating discovery in this case will benefit the parties and the court as set forth more fully herein.

### B.    There Are Compelling Reasons to Bifrucate Liability and Damages

There are two compelling reasons to bifurcate liability and damages in this case. First, the threshold issue - whether the Contractor Gate Attendants at issue are "employees" or "independent contractors" under the FLSA (the "Employee-Independent Contractor Issue") – is relatively straightforward and can be resolved expeditiously. Moreover, there is a high likelihood (at least from Plaintiffs' perspective) that this issue will be dispositive. Second, the damages issue will be extraordinarily arduous, time-consuming and complex in this case due to

the nature of the records which reveal the hours worked for each of the Contractor Gate Attendants. Therefore, it would be wasteful for the parties and the Court, not to mention prejudicial to Plaintiffs (and possibly the Secretary as well), to undertake the monumental task of deciphering damages by reviewing thousands of pages of documents if it is not necessary. Therefore, these two issues should not be lumped together, but should, instead, be separated in order to ensure the most efficient processing of this action.[5]

### 1. Courts Bifurcate Discovery Where, as Here, the Issue of Whether the Contractor Gate Attendants are Independent Contractors Versus Employees is Potentially Dispositive and Could Put an End to this Litigation

Numerous courts have recognized that bifurcation of discovery is required in the interests of the parties and the Court where the threshold issue <u>is whether the workers are employees or independent contractors</u>. *See, e.g., Maynor v. Dow Chem. Co.*, No. G-07-0504, 2008 WL 2220394, at *9 (S.D. Tex. May 28, 2008) (recognizing that courts frequently "bifurcate cases into liability and damages phases"); *Vondriska v. Cugno*, No. 8:07-cv-1322-T-24-TGW, 2010 WL 3245426, at *2 (M.D. Fla. Aug. 17, 2010) (in FLSA collective action, bifurcating discovery because "the threshold issue of whether PBS (or Cugno) qualified as an employer under the FLSA is a <u>discrete legal issue that lends itself to bifurcated discovery</u>."); *Luna v. Del Monte Fresh Produce*, No. 1:06-CV-2000-JEC, 2008 WL 754452. at *2 (N.D. Ga. Mar. 19, 2008) (because the employment issue was potentially dispositive of the case, the parties to an FLSA action agreed to a bifurcated discovery schedule, with the first stage of discovery to be focused on the issue of defendants' status as plaintiffs' employer); *Buffalo Laborers Welfare Fund*, 2007

---

[5] In seeking to bifurcate discovery on the independent contractor and damages issues, Plaintiffs do not request that this Court also bifurcate discovery on the issue of whether and how much back pay GGS's service technicians might be owed. Both parties <u>agree</u> that the service technicians are paid as employees and, indeed, receive W-2 forms from which GGS records their earnings. (*See* Amended Compl. ¶¶ 32-33.) Moreover, Plaintiffs submit that the determination of overtime will prove relatively manageable given the small number of service technicians at issue. Accordingly, discovery as to whether overtime is owed to the service technicians could be conducted during the first phase of the proposed discovery.

WL 3047099, at *1 (entering a scheduling order bifurcating discovery and dispositive motions regarding whether Defendants were "employers" under Title VII); *Robinson v. Ladd Furniture*, 872 F. Supp. 248, 249 (M.D.N.C. 1994) (in ADEA action, bifurcating discovery on the issue of whether Plaintiff was an employee or an independent contractor because "if [the plaintiff] were an independent contractor, then all claims should be dismissed."); *see also Moreau v. Klevenhagen*, 956 F.2d 516, 522 (5th Cir. 1992) (in FLSA collective action, entering scheduling order bifurcating discovery on collective action allegations and merits). This makes perfect sense because the first thing the Secretary must prove is that <u>that an employer-employee relationship exists</u>. *Reyes v. Texas Ezpawn, L.P.*, No. V-03-128, 2007 WL 3143315, at * 1 (S.D. Tex. Oct. 24, 2007) (citing *Cash v. Conn Appliances, Inc.,* F. Supp. 2d 884, 892 (E.D. Tex. 1997)).[6]

Here, the issue of whether an individual is an independent contractor versus an employee is relatively straightforward. When addressing whether a worker is an independent contractor or an employee for FLSA purposes, the Fifth Circuit looks to five factors as a guide, including: (a) the permanency of the relationship; (b) the degree of control exercised by the alleged employer; (c) the skill and initiative required to perform the job; (d) the extent of the relative investments of the worker and the alleged employer; and (e) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 332-33 (5th Cir. 2008). In the instant case, there is overwhelming evidence that the Contractor Gate Attendants are independent contractors, and if the Court agrees, this case will come to an end. For example, the Contractor Gate Attendants use their own tools, equipment and supplies when performing gate attendant services, including their own recreational vehicle ("RV") which is parked at the entrance of the oil field for the duration of the assignment.

---

[6] Similarly, only "employers" are required to pay "employees" the federal minimum wage. *See* 29 U.S.C. § 206(a).

10

(Amended Compl. ¶ 18.) GGS does not monitor or control the manner or method in which the Contractor Gate Attendants perform the gate attendant services. (*Id*. ¶ 21.) In fact, the only contact a Contractor Gate Attendant has with GGS during the course of an assignment is when GGS personnel service the septic tank or generator approximately every week or every other week. (*Id*.) When not logging vehicles in and out during an assignment, the Contractor Gate Attendants engage in personal activities such as reading, using the Internet, talking on the telephone, watching television, completing household chores, or other pursuits or hobbies. (*Id*. ¶¶ 27-28.) The Contractor Gate Attendants are permitted to hire other individuals to log vehicles and do indeed hire and pay others. (*Id.* ¶ 20.)

Accordingly, because Courts routinely bifurcate discovery, where as here, the issue of whether the individual is even covered under the FLSA must first be decided <u>and</u> because there is a high likelihood that this issue will be dispositive, the Court should grant Plaintiff's Motion to Bifurcate.

>           **2.      The Issue of Damages Should be Determined *After* Liability in the Interests of a Just, Speedy and Inexpensive Determination of this Action Because Calculation of Damages will be Arduous**

It would be wasteful for the parties and the Court, not to mention prejudicial to Plaintiffs (and possibly the Secretary as well), to undertake the monumental task of deciphering damages if the issue will ultimately be moot. In this case, the damages issue will be arduous, time-consuming and complex. The reason for this is that the Traffic Logs, which show the time worked by the Contractor Gate Attendants (in hardy copy format), are voluminous and are spread throughout Texas in remote areas at oil field work sites. Even if a representative sample is used, there are hundreds of Traffic Log sheets that may be attributable to each Contractor Gate Attendant's hours worked, which would result in thousands of documents that would need to be reviewed.

In recording their time worked, for example, each Contractor Gate Attendant fills out a separate Traffic Log sheet each day. (Supp. Smith Dec. ¶ 5.) There are an average of 2-3 sheets of paper completed per day per Contractor Gate Attendant. (*Id.* ¶ 7.) Given that the Secretary estimates that 345 "currently known" (those working from February 2009 through July 2010)[7] Contractor Gate Attendants are affected by the Transferred Action [Civil Action No. 6:11-cv-14, Dkt. # 20, p. 6], this means that the total number of Traffic Logs that she may request during discovery could amount to **690 to 1,725 pages of Traffic Logs per day**[8] from February 2009 through present. Even if only half of the 345 specified individuals[9] were working on any given day over a two-year period and were producing only two (2) Traffic Log pages per day, for example, this would still yield approximately **251,120 pages of Traffic Logs** (172 Gate Attendants x 2 pages each x 730 days (2 years)). Of course, the total number of Traffic Log pages will multiply significantly when the additional Contractor Gate Attendants and dates worked from August 2010 through the present are incorporated. Assuming the same number of Contractor Gate Attendants were working each day from February 2009 through present, for example, the number of approximate Traffic Log pages yielded would be approximately **333,680 pages of Traffic Logs** (172 Gate Attendants x 2 pages each x 970 days (2 years, 8 months)).[10] Thus, even under conservative estimates, the volume of Traffic Logs that Plaintiffs will be

---

[7] The Secretary currently has information for those Contractor Gate Attendants working from July 2008 through July 2010. [Civil Action No. 6:11-cv-14, Dkt. # 2 ¶¶ 6, 8.]

[8] These estimates are based on Plaintiffs' current good-faith knowledge respecting the Contractor Gate Attendants' logging practices. GGS reserves the right to update these numbers as discovery progresses.

[9] Plaintiffs acknowledge that each of the 345 Contactor Gate Attendants specified by the Secretary did not work every day for the relevant time period. Nonetheless, Plaintiffs submit that the amount of documents requested will inevitably amount to **hundreds of thousands of pages** of documents and prove extremely burdensome for Plaintiffs to produce.

[10] While the Secretary may argue that Plaintiffs' burden will be lessened by a "representative sample" of 20% of the Contractor Gate Attendants, in reality, requiring that Plaintiffs produce such a sample decreases their burden very little. Notwithstanding the inevitable disputes respecting how the "representative" sample shall be selected, Plaintiffs must inevitably wade through the same hundreds of thousands of handwritten documents to collect the precise "representative" sample. And, in any event, the "representative" sample Plaintiffs must produce will still be burdensome even under conservative estimates: 20% of 251,120 amounts to 50,224 pages of Traffic Logs, while 20% of 333, 680 amounts to 66,736 pages of Traffic Logs.

required to produce on the Damages Issue will be burdensome, time-consuming, and costly. Forcing Plaintiffs to collect and produce these documents <u>before</u> the Contractor Gate Attendants' status as "employees" has even been established would be putting the cart before the horse and would be entirely wasteful.

Moreover, discovery of this magnitude is likely to result in multiple disputes that could require this Court's intervention, including disputes regarding the potential use of "representative samples" and what constitutes a reasonably "representative" sample of the several hundred Contractor Gate Attendants at issue. Indeed, in the parties' Rule 26(f) Joint Planning Report, filed on March 28, 2011, the Secretary expressed its intention to take depositions and discovery respecting at least <u>62-69 Contractor Gate Attendants</u>. [Civil Action No. 6:11-cv-14 Dkt. # 20, p. 6.] The parties will also likely require expert discovery on the Damages Issue.

The time and resources that the Court and the parties spend on these issues will prove wasteful and inefficient <u>should the Employee-Independent Contractor Issue dispose of this entire action.</u> Accordingly, to provide for a prompt and orderly resolution of this threshold issue, Plaintiffs request that the Court enter an Order providing for bifurcated discovery and dispositive motion proceedings, permitting the parties to engage, first, in written discovery limited solely to issues relating to the Employee versus Independent Contractor Issue. Thereafter, the parties may promptly seek this Court's ruling as to whether the Contractor Gate Attendants are employees governed by the FLSA. If the Court determines that the Contractor Gate Attendants are "independent contractors" within the meaning of FLSA, this action must be dismissed and the Court will have <u>no need</u> to calculate the number of hours the Contractor Gate Attendants worked, the amount of damages Plaintiffs purportedly owe or whether they violated the recordkeeping requirements. Alternatively, if the Court determines that the Contractor Gate Attendants are

"employees" within the meaning of the FLSA, the parties would then proceed to conduct discovery on the Damages Issue. Bifurcation of this nature will advance the interests of both the parties and the Court in securing a "just, speedy, and inexpensive determination of this action" in accordance with Fed. R. Civ. P. 1. Bifurcation of discovery and dispositive motion proceedings also will promote the interests of judicial economy, expediency, and convenience.

## V.  CONCLUSION

In order to facilitate an expeditious and cost-effective resolution of this case, Plaintiffs respectfully request that their Motion to Bifurcate Discovery be granted.

This 8th day of April, 2011.

        **CHAMBERLAIN HRDLICKA**
        **WHITE WILLIAMS & MARTIN**

        By: */s/ Daniel D. Pipitone*
            Daniel D. Pipitone
            Texas Bar No. 16024600
            Federal I.D. 0294
            1200 Smith Street
            14th Floor
            Houston, TX 77002-4310
            Telephone: (713) 654-9670
            Facsimile: (713) 356-1070

        By: */s/ Annette A. Idalski*
            Annette A. Idalski
            Texas Bar No. 00793235
            Federal I.D. 1130754
            191 Peachtree Street, N.E.
            Thirty-Fourth Floor
            Atlanta, GA 30303-1747
            Telephone: (404) 658-5386
            Facsimile: (404) 659-1852

*Attorneys for Plaintiffs Gate Guard Services, L.P. and Bert Steindorf*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| GATE GUARD SERVICES, L.P. and ) | |
| BERT STEINDORF, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action File |
| v. ) | No. 6:10-cv-91 |
| ) | |
| HILDA L. SOLIS, SECRETARY OF LABOR, ) | JURY |
| UNITED STATES DEPARTMENT OF LABOR, ) | |
| ) | |
| Defendant. ) | |

_____

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| HILDA L. SOLIS, Secretary of Labor, ) | |
| United States Department of Labor, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action File No. 6:11-cv-14 |
| v. ) | |
| ) | |
| GATE GUARD SERVICES, LP DBA ) | |
| GATE GUARD SERVICES, ) | |
| BERT STEINDORF and SIDNEY L. SMITH, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**CERTIFICATE OF SERVICE**

This is to certify that on this date I have electronically filed the foregoing PLAINTIFFS' MOTION TO BIFURCATE DISCOVERY with the Clerk of Court via the CM/ECF system and have served a copy of the same via the CM/ECF system on:

2

UNITED STATES DEPARTMENT OF LABOR
Colleen B. Nabhan
Office of the Solicitor
525 Griffin Street, Suite 501
Dallas, Texas 75202
nabhan.colleen@dol.gov

OFFICE OF UNITED STATES ATTORNEY
Lawrence M. Ludka
800 N Shoreline Blvd, Suite 500
Corpus Christi, Texas 78401
larry.ludka@usdoj.gov

This 8th day of April, 2011.

        **CHAMBERLAIN HRDLICKA**
        **WHITE WILLIAMS & MARTIN**

        By:__*/s/ Annette A. Idalski*_____
           Annette A. Idalski
           Texas Bar No. 00793235