UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **GATE GUARD SERVICES L.P.** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. V-10-91** |
| | § | |
| **HILDA L. SOLIS, Secretary of Labor,** | § | |
| **United States Dept. of Labor,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court is a Motion to Dismiss Amended Declaratory Judgment Complaint filed by Hilda L. Solis, Secretary of Labor, United States Department of Labor (hereinafter "the DOL") (Dkt. No. 21), to which Plaintiffs Gate Guard Services, L.P. and owner Bert Steindorf (collectively "Gate Guard") have responded (Dkt. Nos. 22, 37). Also pending before the Court is Gate Guard's Motion to Consolidate (Dkt. No. 20), to which the DOL has responded (Dkt. No. 24). Having considered the motions, responses, record, and applicable law, the Court is of the opinion that Gate Guard's motion should be **GRANTED** and the DOL's motion should be **DENIED**.

**I. Factual and Procedural Background[1]**

Gate Guard is a Texas limited partnership that provides services to oil field operators by contracting with gate attendants that perform the job of logging in vehicles entering and departing oil field operation sites. (Amended Compl., Dkt. No. 14 ¶ 10.) Gate Guard classifies the gate attendants as independent contractors and pays them between $100 and $175 per day.

---

1.  For purposes of this Order only, the Court adopts the facts as set forth in Gate Guard's Amended Complaint.

(*Id.* ¶ 14.) Service technicians visit the gate attendants on assignment approximately every week or every other week to service septic tanks and/or provide fuel for generators. (*Id.* ¶ 32.) Gate Guard pays the service technicians as hourly employees. (*Id.* ¶ 33.)

In September 2010, DOL Wage and Hour Investigator David Rapstine ("Rapstine") began an investigation into the independent contractor classification of Gate Guard's gate attendants and its service technicians' wages. (*Id.* ¶ 34.) In October 2010, Rapstine informed Gate Guard of the DOL's findings. (*Id.* ¶ 35.) Specifically, the DOL found Gate Guard to be in violation of the Fair Labor Standards Act (FLSA) because the gate attendants were employees, not independent contractors. (*Id.*) The DOL also mandated that Gate Guard compensate the gate attendants at the federal minimum wage rate for 24 hours for each day they are assigned to an oil field operation. (*Id.*) Rapstine further advised Gate Guard to pay $6,192,752 in back wages and unpaid overtime to the gate attendants and service technicians, as calculated in the "Summary of Unpaid Wages Due" he issued to Gate Guard (Dkt. No. 22, Ex. A). (Amended Compl. ¶ 35; Idalski Decl., Dkt. No. 14, Ex. A ¶¶ 7—8.

On November 10, 2010, Gate Guard's counsel spoke to DOL District Director Eden Ramirez, who confirmed that litigation was imminent because Gate Guard refused to come into compliance with the FLSA. (Amended Compl. ¶ 37; Idalski Decl. ¶ 4.) In a November 15, 2010 email to Ramirez, Gate Guard's counsel stated, "We understand that this is a final conference and that the DOL intends to commence litigation in this matter in the near future." (Amended Compl. ¶ 37; Idalski Decl. ¶ 6.) Then on November 19, 2010, Gate Guard's counsel met with Ramirez, Targeted Enforcement Coordinator Michael Speer, and an attorney from the DOL's Office of the Solicitor for a final conference. (Amended Compl. ¶ 38; Idalski Decl. ¶ 7.) The DOL insisted that Gate Guard immediately come into compliance by re-

classifying the gate attendants as employees and paying over six million dollars in back wages to the gate attendants and service technicians. (*Id.*) Ramirez and Speer stated that the DOL had "finished" its decision-making process and that Gate Guard must immediately comply with the DOL's final decision. (Amended Compl. ¶ 39; Idalski Decl. ¶ 8)  They further stated, in the presence of the DOL's attorney, that the file was being referred to the Office of the Solicitor and that the filing of an enforcement action against Gate Guard was imminent. (*Id.*)

Later that same day, November 19, 2010, Gate Guard filed the above-captioned declaratory judgment action seeking a determination of whether it is in compliance with the FLSA ("Declaratory Judgment Action"). Specifically, Gate Guard seeks declaratory relief arising from the DOL's allegedly flawed classification of the gate attendants as employees instead of independent contractors, its calculation totaling over six million dollars in back wages, and its allegation that Gate Guard has not complied with recordkeeping requirements. (Amended Compl. ¶¶ 49—109.)

On February 16, 2011—before Gate Guard served the DOL with its complaint in this Declaratory Judgment Action—the DOL filed an enforcement action under the FLSA in the Southern District of Texas, Corpus Christi Division, which was assigned to U.S. District Judge Janis Graham Jack ("FLSA Enforcement Action"). *Hilda L. Solis, Secretary of Labor, United States Department of Labor v. Gate Guard Services, LP DBA Gate Guard Services, Bert Steindorf and Sidney L. Smith*, Civil Action No. 2:11-cv-41 (S.D. Tex. 2011). The FLSA Action names as co-defendants Gate Guard, owner Bert Steindorf, and manager Sidney Smith, citing them for alleged minimum wage, overtime, and record-keeping FLSA violations pertaining to at least 345 of the gate attendants, as well as for overtime and record-keeping violations regarding the service technicians. The FLSA Action seeks back wages, liquidated

damages, and injunctive relief against all three defendants. On March 22, 2011, Judge Jack granted Gate Guard's Motion to Transfer based on the first-to-file rule[2] because there was a substantial similarity and overlap of issues in the Declaratory Judgment Action and the FLSA Enforcement Action. (2:11-cv-14, Dkt. No. 18.) As a result, the FLSA Enforcement Action was transferred to the Victoria Division and was assigned Civil Action No. 6:11-cv-14.

The DOL now moves to dismiss the Declaratory Judgment Action on the grounds that the Court lacks subject matter jurisdiction over Gate Guard's Amended Complaint, and because the case is neither ripe for judicial review, nor would it resolve all of the issues between the Parties as set forth in the FLSA Enforcement Action. Gate Guard opposes dismissal and instead moves the Court to consolidate the FLSA Enforcement Action into the first-filed Declaratory Judgment Action in the interests of judicial economy and efficiency, given that substantially similar facts and law govern the two actions.

Because "[t]he requirement that jurisdiction be established as a threshold matter," *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998), the Court must first address whether it has subject matter jurisdiction over the Declaratory Judgment Action before considering Gate Guard's Motion to Consolidate. *See Walker v. Allstate Indem. Co.*, 2007 WL 2460985, * 3 (E.D. La. Aug. 24, 2007) (holding that since the court lacked jurisdiction in one case, it had no authority to consolidate).

---

2. The first-to-file rule applies "when opposing parties have filed separate lawsuits concerning the same core facts. In such instances, the district court in which the later action was filed may dismiss, stay, or transfer the suit in order to avoid duplicative litigation." *Carter v. Nicholson*, 2007 WL 3316086, *4 (5th Cir. Nov. 8, 2007) (citing *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728—31 (5th Cir. 1985)). "As a general rule, 'the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed.'" *Id.* (quoting *Save Power Ltd. v. Synteck Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997).

## II. DOL's Motion to Dismiss

### A. Subject Matter Jurisdiction

#### 1. Legal Standard

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move for dismissal of a case against it for lack of jurisdiction over the subject matter. When federal courts consider questions of subject matter jurisdiction, the precedent regarding its fundamental importance is clear: "It is a fundamental principle that federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, (1978). "[A]bsent jurisdiction conferred by statute, [federal courts] lack the power to adjudicate claims." *See Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking. 'This is the first principle of federal jurisdiction.'" *Stockman v. Federal Election Commission*, 138 F.3d 144, 151 (5th Cir. 1998) (quoting HART & WECHSLER, THE FEDERAL COURTS AND THE FEDERAL SYSTEM 835 (2d ed. 1973)).

Here, the DOL argues that the Court lacks subject matter jurisdiction over Gate Guard's Declaratory Judgment Action because the DOL is entitled to sovereign immunity. Generally, sovereign immunity protects the federal government from suit unless it waives its immunity. *Pena v. United States*, 157 F.3d 984, 986 (5th Cir. 1998) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). Waivers must be unequivocally expressed in the statutory text. *Id.*

Gate Guard has brought this action under the Administrative Procedures Act (APA), which contains an explicit waiver of the government's sovereign immunity. *See Rothe Dev. Corp. v. United States Dep't of Defense*, 194 F.3d 622, 624 (5th Cir. 1999) (recognizing that the APA waives sovereign immunity from non-monetary claims against government

agencies). Under the APA, an individual is entitled to judicial review of an agency decision if he "suffer[s] [a] legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702. "When . . . the relevant administrative agency statutory provisions do not directly provide for judicial review, the APA authorizes judicial review only of 'final agency action.'" *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999) (citing 5 U.S.C. § 704; *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 882 (1990)). "If there is no 'final agency action,' as required by the controlling statute, a court lacks subject matter jurisdiction." *Id.* (citing *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994)). Thus, because the only persons given access to the courts under the FLSA are employees and the Secretary of Labor, *see* 29 U.S.C. §§ 215—17, Gate Guard can establish jurisdiction under the APA only if the DOL's decision for which Gate Guard seeks review is "final agency action."

The Supreme Court has identified four factors that courts should consider in determining whether an agency's decision constitutes a final agency action within the meaning of the APA: "First, whether the challenged action is a definitive statement of the agency's position; second, whether the actions have the status of laws with penalties for noncompliance; third, whether the impact on the plaintiff is direct and immediate; and fourth, whether immediate compliance was expected." *Taylor–Callahan–Coleman Counties Dist. Adult Probation Dep't v. Dole*, 948 F.2d 953, 958 (5th Cir. 1991) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 150–52 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). The Supreme Court has more recently consolidated these four factors into the following two-part test:

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 177—78 (1997) (internal citations omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). This determination, which must be made in a "pragmatic way," also considers whether the agency action "has a direct effect on the day-to-day business" of the plaintiff. *Abbott Labs*, 387 U.S. at 149, 152.

Under Fifth Circuit precedent, the Court "may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Robinson v. TCI/US West Comm'cns Inc.*, 117 F.3d 900, 904 (5th Cir. 1997). As acknowledged by the DOL, when ruling upon a motion to dismiss pursuant to Rule 12(b)(1), the Court must accept as true all non-frivolous allegations in the complaint and must construe the complaint in the light most favorable to the plaintiff. Randall D. Wolcott, M.D., P.A. v. Sebelius, 635 F.3d 757, 763 5th Cir. 2011).

### 2. Analysis

#### a. Did the DOL's action mark the consummation of its decision-making process?

Gate Guard contends that the DOL's actions following its investigation into Gate Guard's employment practices marked the consummation of the DOL's decision-making process and set forth a definitive statement of its position that Gate Guard: (1) is in violation

of the FLSA; (2) owes millions in back wages to its gate attendants and service technicians; and (3) must classify and compensate its gate attendants as hourly employees going forward.

Specifically, Gate Guard's Amended Complaint alleges that after the DOL finished its investigation, on October 5, 2010 Rapstine served papers on Gate Guard stating that over $6 million in back wages was "due," advised Gate Guard that the DOL's action was final, and stated the DOL expected immediate compliance. (Amended Compl. ¶¶ 38—39.) Then, at a final conference on November 19, 2010, with counsel for both Parties in attendance, DOL representatives Ramirez and Speer advised Gate Guard that a lawsuit was imminent and that the DOL would seek not only the $6 million in backwages, but that it also intended to seek liquidated damages. (*Id.*) The DOL then ignored letters and emails from Gate Guard's counsel dated December 20, 2010 and February 14, 2011, in which Gate Guard attempted to confirm that the DOL's decision was final and sought to further discuss the issue. (Dkt. No. 22, Ex. B.) At no time did the DOL advise Gate Guard that its decision was not final. Instead, the DOL carried out its threat of litigation and filed its FLSA Action against Gate Guard in Corpus Christi on February 16, 2011.

Courts have found "final agency action" on similar facts. For example, in *Western Illinois Home Health Care, Inc. v. Herman*, the Seventh Circuit concluded that a letter from a DOL Assistant Director characterizing the declaratory judgment plaintiffs as joint employers was final and reviewable agency action, noting that:

> [The Assistant Director]'s letter is not at all tentative or interlocutory in nature. He uses a simple, declarative sentence: "At a minimum, a joint employment relationship exists in this case." That is the agency's "enforcement position" insofar as [the Assistant Director] had authority to determine it . . . . Second, this is a determination that establishes the legal obligation of [the employers] to cumulate the time their respective employees spend at each company, for purposes of computing entitlements to overtime wages. Legal consequences

> flow from it, both with respect to their obligations to their employees and with respect to their vulnerability to penalties should they disregard the DOL's determination. There is nothing hypothetical or tentative about this letter.

150 F.3d 659, 663 (7th Cir. 1998). The court further recognized that although the Assistant Director who wrote the letter was "obviously a subordinate official at the DOL, and the Supreme Court in *Franklin* [*v. Massachusetts*, 505 U.S. 788 (1992),] indicated that this might suggest tentativeness or lack of finality," the DOL "did not claim that [he] had no authority to send the letter or to communicate the Wage and Hour Division's decision to [the employer], nor could [the DOL] point [the court] to any internal method by which [the Assistant Director]'s letter ruling could be appealed." *Id.* Likewise, in *Herman v. Excel Corp.*, the court found that a letter the DOL's counsel sent to the employer's counsel stating that the matter had been referred for litigation constituted final agency action, explaining:

> [I]t is clear that [the employer] would be subjected to penalties if it did not comply with the . . . opinion letter, not the least of which would be the costs of defending against an enforcement action. It is also clear that the impact upon [the employer] was direct and immediate, *i.e.,* if it did not respond within 10 days, litigation would ensue. Finally, it is clear that the Secretary fully expected [the employer] to immediately comply with the . . . opinion letter or legal consequences would follow.

*Herman v. Excel Corp.*, 37 F. Supp. 2d 1117, 1122 (C.D. Ill. 1999). *See also See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020—23 (D.C. Cir. 2000) (holding that a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation constituted "final agency action" for the purpose of judicial review); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986) (holding that a letter from an agency official stating the agency's position and threatening enforcement action unless the company complied constituted final agency action).

The DOL argues that, unlike the letters and guidance documents in the cases cited *supra*, any statements made by Rapstine and other DOL representatives during the "alleged" final conferences[3] were "at most . . . preliminary verbal opinions" that cannot constitute "final agency action" under the APA. (Dkt. No. 21 at 15.) However, the DOL cannot escape judicial review under the APA by simply labeling its actions as "informal." *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 93 (D.C. Cir. 1986). This is especially true here, where the evidence on record shows the DOL did much more than issue a "preliminary oral opinion" that Gate Guard was in violation of the FLSA. The DOL also served Gate Guard with a 25-page document entitled "Summary of Unpaid Wages Due" totaling $6,192,752.20, which identified 397 gate attendants and service technicians by name, listed the work period covered and "gross amounts due" for each individual, and included a line for Gate Guard to sign indicating that it "agree[d] to pay the listed employees the back wages shown due and to mail proof of payment to the Wage and Hour District Office . . . ." (Dkt. No. 22, Ex. A.) The DOL has failed to provide any evidence that Gate Guard could have administratively appealed these determinations before filing its Declaratory Judgment Action, nor has the DOL even alleged that further administrative proceedings were contemplated. As the court in *National Automatic Laundry and Cleaning Council v. Shultz* recognized, "[A]n affidavit by the agency head—not a mere argument by its court counsel—that a matter is still under meaningful refinement and development, will likely provide the element of tentativeness and reconsideration that should negative finality . . . ." 443 F.2d 689, 702 (D.C. Cir. 1971).

---

3. Despite the DOL's characterization of the October 5, 2010 meeting between Rapstine and Gate Guard as "allegedly" being final, Rapstine himself referred to the meeting as the "Gate Guard Final Conference" in his October 5, 2010 email to Vincente J. Leija (Rapstine Email, 6:11-cv-14, Dkt. No. 44, Ex. B.)

Moreover, the DOL's response to Gate Guard's recent motion to bifurcate discovery confirms that the opinions of Rapstine, Ramirez, and Speer are not tentative or preliminary, and it serves to further support Gate Guard's position that the DOL has completed its investigation, analyzed the results, and reached a number of firm conclusions. For example, the DOL states:

> In the investigation underlying the instant action, [Wage and Hour Investigators] found overtime, minimum wage and recordkeeping violations of the FLSA regarding more than 330 guards employed by [Gate Guard], whom [Gate Guard] misclassified as independent contractors.
>
> [Wage and Hour Investigators] also found overtime and recordkeeping violations of the FLSA regarding [Gate Guard]'s salaried, non-exempt service technicians. . . . Specifically, the investigation revealed the [Gate Guard] service technicians' estimated hours worked varied from 44 hours per week to 96 hours per week.
>
> * * *
>
> Based on the information gathered during the investigation, as a matter of economic reality [Gate Guard]'s guards were economically dependent on [Gate Guard].
>
> * * *
>
> The investigation revealed that [Gate Guard] exercised unilateral control over the wages, hours, and work performed by the guards for [Gate Guard]'s benefit . . . .

(Dkt No. 26 at 5, 8, 10.) The DOL has never qualified these findings. Instead, throughout its various filings, the DOL has discussed its investigation and subsequent determinations as events that occurred in the past. As Gate Guard argues, and the Court agrees, "The Secretary should not be allowed to invoke the 'finality' of her investigation in an attempt to prove one argument (e.g., against bifurcation) while completely disavowing the finality of her investigation when it is not conducive to another of her arguments (e.g., that the declaratory

judgment action should be dismissed for lack of subject matter jurisdiction based on a non-final investigation)." (Pl. Supp. Response, Dkt. No. 37 at 5.)

The DOL nonetheless maintains that there had been no final agency action when Gate Guard filed this Declaratory Judgment Action because the DOL had not yet decided whether to file an enforcement action against Gate Guard at the time. According to the DOL, Gate Guard's Amended Complaint "omit[s] that at the alleged 'final meeting,' it was explained to [Gate Guard]'s counsel that referral to the Office of the Solicitor does not automatically or always result in an enforcement action, and that an investigation must go through many levels of legal review before a decision is made about whether or not to file an enforcement action." (Dkt. No. 21 at 8.) Citing *Board of Trade of City of Chicago v. SEC*, 833 F.2d 525, 529—30 (7th Cir. 1989), the DOL further contends that its decision to file an enforcement action is not reviewable under the APA. However, it is not the DOL's decision to file an enforcement action—but its post-investigation determination that Gate Guard: (1) is in violation of the FLSA; (2) owes more than $6 million in back wages to its gate attendants and service technicians; and (3) must classify and compensate its gate attendants as hourly employees going forward—that is the "final agency action" challenged here. The DOL's subsequent filing of the FLSA Enforcement Action simply serves to remove "[a]ny doubt regarding the finality of [the DOL's] decision." *See Herman v. Excel Corp.*, 37 F. Supp. 2d at 1122.

### b. Is the DOL's action one by which rights or obligations have been determined or from which legal consequences will flow?

The DOL further argues that Gate Guard cannot meet the second prong necessary to establish "final agency action" because the DOL's actions to date have had "no legal force or practical effect on the daily business operations of [Gate Guard]," and only "the judgment

actually reached in the FLSA enforcement action will determine [Gate Guard's] rights and legal obligations" under the FLSA. (Dkt. No. 21 at 16, 20.) According to the DOL, the only effect its actions had on Gate Guard at the time Gate Guard filed its Declaratory Judgment Action in November 2012 was Gate Guard's potential exposure to a lawsuit, and the financial hardship related to litigation is insufficient to constitute harm.

     The Court finds the Supreme Court's decision in *Abbott Laboratories* instructive on the issue of whether potential exposure to an enforcement action is sufficient to constitute harm. In *Abbott Laboratories*, a group of drug manufacturers and the Pharmaceutical Manufacturers Association sought a declaratory judgment that an order promulgated by the Commissioner of Food and Drugs proposing new regulations affecting labels, advertisements, and other printed matter relating to prescription drugs exceeded the Commissioner's authority under the Federal Food, Drug, and Cosmetics Act. 387 U.S. at 138. The Supreme Court granted pre-enforcement review under the APA, concluding that the labeling regulations presented a "very real dilemma" and not a "mere financial expense" because the requirements forced the affected companies "to make significant changes in their every day business practice" and "quite clearly expose[d] [them] to the imposition of strong sanctions" if "they fail[ed] to follow the Commissioner's rule." *Id.* at 153—54. The Court then concluded that this required choice between changing business practices or being sued put the affected companies "in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.*; *see also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) (finding the EPA's requirement that a declaratory judgment plaintiff fulfill record-keeping and reporting obligations or be subject to enforcement action and fines to have "legal consequences").

The DOL nonetheless maintains that "[w]hile the Amended DJ Complaint states that verbal reference was made to the agency investigation and to consideration of future action to secure FLSA compliance, [Wage and Hour Investigators] did not provide any analysis of the law or citations to any controlling authority." (Dkt. No. 21 at 15.) The DOL further states that the DOL investigators' "verbal opinions" and "preliminary backwage calculations" did not include "demands that [could] be construed as . . . forcing immediate action." (*Id.*) Contrary to this assertion, Rapstine's email to Leija commemorating his October 5, 2010 conference with Gate Guard confirms that Rapstine explained his analysis "in detail," cited controlling authority, and "require[d]" compliance "within days":

> I explained my rational in detail.
> * * *
> I explained the basis for the [minimum wage] and [overtime] calculations. I explained my rationale for calculating the [hours worked] as 24 hours a day pursuant to [29 C.F.R. §] 785.22.
> * * *
> The attorney asked if GGS would have to keep a record of [hours worked] for the guards. I explained yes that they would have to be treated like any other nonexempt [employees].
> * * *
> I said . . . . [I] would require him to evaluate my findings quickly and present us with their compliance plan/position on the matter within days.

(Rapstine Email, 6:11-cv-14, Dkt. No. 41, Ex. B.) Further, as noted *supra*, the "Summary of Unpaid Wages Due" provided a detailed breakdown of the more than $6 million in back wages the DOL had determined Gate Guard owed to its gate attendants and service technicians and included a place for Gate Guard to sign indicating that it agreed to pay that amount and provide DOL with proof of payment. There is no question that this multi-million dollar penalty constitutes a substantial fiscal hardship that possesses real consequences for Gate Guard, a fact Rapstine acknowledged in his email to Leija. "[Gate Guard's] attorney

14

stated that my findings were significant and had a severe impact on his client," Rapstine wrote. (*Id.*) "I said that I understood . . . ." (*Id.*)

Finally, the Court recognizes that besides demanding that Gate Guard pay more than $6 million in back wages to the gate attendants and service technicians, the DOL also determined that Gate Guard was obligated to alter its conduct going forward by treating its several hundred gate attendants as employees. This required change in both record-keeping and payment practices had an immediate effect on how Gate Guard conducted its daily business operations, as the DOL promised that litigation would ensue and that it would seek liquidated damages if compliance was not immediate. As the Supreme Court recognized in *Abbot Laboratories*, where an agency action:

> requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance . . . .

*Abbott Labs*, 387 U.S. at 153.

For the foregoing reasons, the Court finds that Gate Guard has demonstrated that the DOL's determination that Gate Guard: (1) is in violation of the FLSA; (2) owes more than $6 million in back wages to its gate attendants and service technicians: and (3) must classify and compensate its gate attendants as hourly employees going forward is a "final agency action" that is reviewable under the APA.

**B. Ripeness**

In the alternative, the DOL contends that even if the Court finds final agency action here, because this matter is neither ripe nor justiciable, the Court should exercise its discretion to dismiss the Amended Declaratory Judgment Complaint.

15

### 1. Legal Standard

In determining the ripeness of a case brought pursuant to the APA, the Fifth Circuit employs the following four-part test: "(1) whether the issues presented are purely legal; (2) whether the challenged agency action constitutes 'final agency action' within the meaning of the APA; (3) whether the challenged action has or will have a direct and immediate impact on the petitioner; and (4) whether resolution of the issues will foster effective enforcement and administration by the agency." *Jobs Training & Services, Inc. v. East Texas Council of Governments*, 50 F.3d 1318, 1325 (5th Cir. 1995) (citing *Merchants Fast Motor Lines, Inc. v. I.C.C.*, 5 F.3d 911, 919 (5th Cir. 1993)).

The Fifth Circuit has also identified seven non-exclusive factors that district courts must address and balance when deciding whether to exercise their discretion to decide a declaratory judgment action. *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590—91 (5th Cir. 1994). These factors include: "'1) whether there is a pending state action in which all of the matters in controversy may be fully litigated, 2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant, 3) whether the plaintiff engaged in forum shopping in bringing the suit, 4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist, 5) whether the federal court is a convenient forum for the parties and witnesses, and 6) whether retaining the lawsuit in federal court would serve the purposes of judicial economy,' and [7)] whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending." *Id.* (quoting *Travelers Ins. Co. v. Louisiana Farm Bureau Federation*, 996 F.2d 774, 778 (5th Cir. 1993)).

**2. Analysis**

With respect to the second and third factors set forth in *Jobs Training*, the Court has already concluded that the DOL's challenged decision constitutes "final agency action" within the meaning of the APA and will have a direct and immediate impact on Gate Guard. *See* Part II.A.2, *supra.* The Court further notes that factors one and seven set forth in *Trejo* are inapplicable here, as both involve parallel state court proceedings. The Court will consider the remaining factors below.

**a.  Are the issues presented purely legal?**

"FLSA claims typically involve complex mixed questions of fact and law." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981). Here, any inquiry into whether the gate attendants are employees or independent contractors depend on the application of the Fifth Circuit's five-factor test of economic dependence, which will require a factual inquiry and a full record of the applicable facts. *See Hopkins v. Cornerstone America*, 545 F.3d 338, 346 (5th Cir. 2008).[4] Then, if the fact-finder determines that the gate attendants are employees, any inquiry into whether time the gate guards spent in various activities is compensable under the FLSA will also involve mixed questions of law and fact. *See Barrentine*, 450 U.S. at 743.

Because there are questions of fact involved, the DOL argues that "[a] proper determination of the issues underlying the [Declaratory Judgment Action] must await the development of a full evidentiary record in the FLSA [E]nforcement [A]ction, upon which

---

4.  These five non-exhaustive factors include: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." *Id.* (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299, 303 (5th Cir. 1998)).

there will be an informed decision." (Dkt. No. 21 at 22.) However, because the Court has decided to consolidate the two actions, the Court will have a full record before it when deciding the factual and legal issues underlying both actions. Moreover, the term "agency action" encompasses an agency's interpretation of *law*, and "[i]t is therefore the finality of that interpretative position which is relevant for purposes of determining the ripeness of the statutory question." *Ciba-Geigy Corp.*, 801 F.2d at 435  (citing *National Automatic Laundry*, 443 F.2d at 698. Here, the DOL has made clear that under its interpretation of the FLSA: (1) Gate Guard has violated 29 U.S.C. §§ 206 and 215(a)(2) by paying the gate attendants less than the minimum hourly rates required; (2) Gate Guard has violated 29 U.S.C. §§ 207 and 215(a)(2) by failing to pay the gate attendants and service technicians time and a half for work done in excess of forty hours per week; and (3) Gate Guard has violated 29 U.S.C. §§  211(c) and 215(a)(5) by failing to make, keep, and preserve adequate and accurate records of their employees and of the wages, hours, and other conditions of employment as required under the FLSA. Thus, although the issues before the Court in the Declaratory Judgment Action are not purely legal, the Court does not find that this alone favors dismissal.

### b. Would resolution of the issues foster effective enforcement and administration by the DOL?

The DOL contends that allowing Gate Guard to pursue this preemptive Declaratory Judgment Action under the APA would improperly interfere with the DOL's effective enforcement and administration of the FLSA by substantially discouraging the DOL's litigation-avoidance strategies. However, *Abbott Laboratories* explicitly recognized that judicial consideration constitutes improper interference only before "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."

*Abbott Laboratories*, 387 U.S. at 148—49 (rejecting the contention of "interference" where no "further administrative proceedings are contemplated"). As the Court recognized in Part II.A.2.a *supra*, the DOL has failed to offer any evidence or otherwise allege that further administrative proceedings are contemplated.

The DOL further claims that "[i]t is in the interest of both the Secretary and the employer to engage in discussions during the course of the investigation, or the beginning of an enforcement action, that may result in a change of payment practices without the need for protracted litigation." (Dkt. No. 21 at 24—25.) However, Gate Guard has presented evidence that it tried to communicate with the DOL both before and after filing this Declaratory Judgment Action, but the DOL was unresponsive. For example, on December 20, 2010, counsel for Gate Guard wrote to Ramirez, stating that she was "following up on her voice mail messages during the week of November 29, 2010," and that "it appears you have finalized your decision" with regard to Gate Guard. (Idalski Email to Ramirez, Dkt. No. 22, Ex. B at 1.) Although counsel for Gate Guard requested that the DOL's counsel contact her to further discuss the matter, the DOL never responded. (Idalski Letter to Cranford, *Id.* at 2.) On February 14, 2011, Gate Guard's counsel again attempted to confer with the DOL regarding its decision. (*Id.*) Gate Guard's counsel confirmed in a letter that the DOL had "advised that [it] had finalized its decision" and sought to confer with the DOL regarding the same. (*Id.*) The DOL did not respond.

The Court finds that Gate Guard's filing of this action is not a disincentive for the DOL to seek "voluntary compliance," as the record shows the DOL informed Gate Guard of its findings, demanded compliance, and then repeatedly ignored Gate Guard's attempts to resolve the matter after it threatened litigation at the Parties' November 19, 2010 Final

Conference. "Once the agency [ ] articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986). Based on the record before the Court, here, as in *Geigy*, the Court "see[s] not the slightest danger that judicial review will disrupt the orderly process of administrative decisionmaking." *Id.* at 437.

### c. Did Gate Guard file the Declaratory Judgment Action in anticipation of a lawsuit filed by the DOL?

Gate Guard admits that it filed this lawsuit in anticipation that the DOL would make good on its threat to file an enforcement action at some point in the future. Indeed, if Gate Guard did not anticipate a lawsuit, its declaratory judgment claim would lack the immediacy required for the controversy to be justiciable. *See Rowan Companies, Inc. v. Griffin,* 876 F.2d 26, 28 (5th Cir. 1989) ("A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop."). However, "[m]erely filing a declaratory judgment action in federal court with jurisdiction to hear it, in anticipation of . . . litigation, is not in itself improper anticipatory litigation . . . ." *Sherwin-Williams Co. v. Homes County*, 343 F.3d 383, 391 (5th Cir. 2003). *See also Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*, 2006 WL 1984627, *4 (S.D. Tex. July 14, 2006) (no improper anticipatory filing where parties could not agree over obligations, defendant claimed that it was owed three million dollars, defendant threatened to sue-and ultimately did sue-plaintiff for recovery of funds, and plaintiff reasonably feared litigation at the time it filed the declaratory judgment action). "In deciding whether a related declaratory judgment action in

another venue is an improper anticipatory suit for purposes of the 'first-to-file' rule, the court should consider, inter alia, whether 'a party engaged in bad faith conduct, by inducing an opposing party to delay filing of a lawsuit, so that he could file a preemptive lawsuit.'" *Doubletree Partners v. Land America Am. Title Co.*, 2008 WL 5119599, at *4 (N.D. Tex. Dec. 3, 2008) (quoting *Chapa v. Mitchell*, 2005 WL 2978396, at *2 (W.D. Tex. Nov. 4, 2005)).

Here, "there is no allegation, much less proof, of bad faith or improper motive on the part of [Gate Guard] in filing a declaratory judgment action . . . ." *Doubletree*, 2008 WL 5119599, at *4. At the time Gate Guard filed its Declaratory Judgment Action, it had no way of knowing whether it would take months or years for the DOL to decide to file an enforcement action, and, as the court in *National Automatic Laundry and Cleaning Council v. Shultz* recognized, "the reasons for requiring the employer to await an enforcement proceeding are weak, and are not as compelling as his need for declaratory relief." 443 F.2d at 702 (citing 3 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 21.08 at 189 (1958); *see also Barrick*, 215 F.3d at 49 (holding declaratory judgment action was ripe for judicial review where plaintiff's "only alternative to obtaining judicial review now is to violate EPA's directives . . . and then defend an enforcement proceeding on the grounds it raises here.").

### d. Did Gate Guard engage in forum shopping in bringing the suit?

One recognized exception to the "first-to-file" rule is when a party sues in one forum in anticipation of the opposing party bringing suit in another, less favorable forum. *Service Corp. Int'l v. Loewen Group Inc.*, 1996 WL 756808, *1—2 (S.D. Tex. Nov. 29, 1996). Here, there is no evidence that Gate Guard engaged in forum shopping by filing its Declaratory Judgment Action in this Court, especially given that that the same substantive law applies in

both the Victoria Division and the Corpus Christi Division. There are also significant contacts between the facts of this case and the Victoria Division, such that this division is a convenient forum for the Parties and witnesses. For example, Gate Guard has presented evidence that at least 85 of the gate attendants are located within the Victoria Division or are otherwise spread throughout jurisdictions outside the Southern District of Texas, while only three to four of the gate attendants are located within the Corpus Christi Division. (Steindorf Decl., Dkt. No. 9, Ex. A at 26—27.) The record also indicates that Rapstine works in the DOL's Victoria Field Office. (6:11-cv-14, Dkt. No. 41, Ex. B.)

### e.   Would any possible inequities exist in allowing Gate Guard to gain precedence in time or to change forums?

Given the Court's decision to consolidate the Declaratory Judgment Action and the FLSA Enforcement Action, neither side will gain precedence in time going forward if the Court retains this Declaratory Judgment Action. Moreover, the Court is unable to identify any inequities in adjudicating the FLSA Enforcement Action in the Victoria Division as opposed to the Corpus Christi Division, where it was originally filed.

### f.   Is the Victoria Division a convenient forum for the parties and witnesses?

In a footnote in its Motion to Dismiss, the DOL states that it filed its FLSA Enforcement Action in the Corpus Christi Division in part because "many of the affected employees who will be key witnesses reside in Corpus Christi, other key witnesses reside in Corpus Christi, the key payroll and other documents are located in Corpus Christi, and Corpus Christi is the most convenient forum for most of the employee [*sic*] who do not reside in Corpus Christi, in part because Corpus Christi has an airport." (Dkt. No. 21 at 4 n.1.) The

DOL has not identified who these "key witnesses" are, nor has the DOL otherwise offered any evidence in support of these claims.

As noted in Part II.B.2.d, *supra*, Gate Guard has offered evidence that at least 85 of the gate attendants work largely within the Victoria Division or are otherwise spread throughout jurisdictions outside the Southern District of Texas, and only three to four of the gate attendants are located in the geographical region encompassed by the Corpus Christi Division. Moreover, the key events giving rise to the Parties' dispute—*i.e.*, the work performed by the service technicians and gate attendants and the ensuing payments made to them—occurred outside of the Corpus Christi Division and in the Victoria Division. (Dkt. No. 9, Ex. A at 18.)

Thus, the Court finds that the Victoria Division is a convenient forum for the parties and witnesses.

### g.   Would retaining the Declaratory Judgment Action serve the purposes of judicial economy?

Gate Guard contends that the DOL's "stubborn[] insist[ence] on two lawsuits over the same exact facts and statute, or alternatively, to remove this action from Victoria where it was properly brought, is a waste of government resources . . . ." (Dkt. No. 22 at 10.) The Court agrees that retaining the Declaratory Judgment Action while the FLSA Enforcement Action is separately pending would be a huge waste of judicial resources. However, as explained fully in Part III, *infra*, the Court is consolidating the FLSA Enforcement Action into the first-filed Declaratory Judgment Action. Thus, retaining this lawsuit would not hinder the purposes of judicial economy.

For the foregoing reasons, the Court finds that this action is ripe and justiciable, and the factors set forth in *Jobs Training* and *Trejo* weigh in favor of exercising its discretion to decide the Declaratory Judgment Action.

### III.  Gate Guard's Motion to Consolidate

Gate Guard argues that, given the factual and legal overlap between the Declaratory Judgment Action and the FLSA Enforcement Action, the two cases should be consolidated in the interests of judicial economy and to avoid excessive costs and duplication of effort,

#### A. Legal Standard

Federal Rule of Civil Procedure 42 provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters at issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

FED. R. CIV. P. 42(a). The purpose of this rule "is to give the district court broad discretion to decide how cases on its docket are to be tried so that the business of the court may be dispatched with expedition and economy while providing justice to the parties." 9A WRIGHT & A. MILLER, FEDERAL PRAC. AND PROC. § 2381 (3d ed.) Even if there are some questions that are not common, this does not preclude consolidation. *Batazzi v. Petroleum Helicopters, Inc.*, 664 F.2d 49, 50 (5th Cir. 1981).

District courts routinely consolidate cases before them that substantially overlap. *See, e.g.*, *O'Hare v. Vulcan Capital, LLC*, 2007 WL 996437, at *3 (W.D. Tex. Feb. 20, 2007) (consolidating second-filed action with first-filed action after applying the first-to-file rule where "the core issues in the two cases . . . substantially overlap[ped] . . . [and] the two law suits ar[o]se out of the same subject matter, transactions, and issue"); *Mid-Continent Casualty*

*Co. v. Daviz-Ruiz Corp.*, 2006 WL 2583451, at *1 (S.D. Tex. Sept. 7, 2006) (*sua sponte* consolidating first-filed breach of contract action with second-filed action seeking declaratory judgment that insurer was not obligated to pay insured under terms of contract because the two actions involved "identical parties and common questions of law and fact"); *Lear Siegler Services v. Ensil Intern. Corp.*, 2005 WL 2645008, at *3 n.2 (W.D. Tex. Sept. 20, 2005) (applying the first-to-file rule and noting that "if the transfer is granted, this Court could . . . consolidate the actions").

### B. Analysis

As a preliminary matter, the Court finds that a substantial overlap exists between the Declaratory Judgment Action and the FLSA Enforcement Action. Both lawsuits arise out of the same transaction or occurrence, *i.e.*, the nature of the gate attendants' work and whether Gate Guard owes the gate attendants and service technicians back wages, including overtime pay. Both actions also involve the same factual and legal issues: (1) whether Gate Guard's classification of the gate attendants as independent contractors, rather than employees, is correct, and if not, the amount of back wages due pursuant to the FLSA; and (2) whether the overtime paid to the service technicians complies with or is in violation of the FLSA. As a result, discovery will entail the same issues, requests for documents, and deponents. The trial witnesses for both sides will be also the same in both actions, including owner Bert Steindorf, manager Sydney Smith, the DOL's investigators and decision makers, and Gate Guard's gate attendants and service technicians.

The DOL nonetheless maintains that consolidation in inappropriate for a number of reasons, none of which the Court finds persuasive.

First, the DOL argues that the FLSA Enforcement Action seeks relief that cannot be granted in the Declaratory Judgment Action, namely a monetary damage award of minimum wage and overtime backwages, as well as liquidated damages and injunctive relief. The DOL further claims that Sydney Smith is a required party to the FLSA Enforcement Action, yet he is not a plaintiff in the Declaratory Judgment Action. This does not preclude consolidation, as the claims asserted by the DOL in the FLSA Enforcement Action will be designated as counterclaims in the Declaratory Judgment Action, and Sydney Smith will be named as a defendant to those claims. *See Herman v. Excel Corp.*, 37 F. Supp. 2d at 1118 (holding that an employer may file an APA declaratory judgment counterclaim against the DOL in FLSA enforcement action).

The DOL next argues that consolidating the two actions will confuse the jury, and "[t]his dispute about which case is the 'lead action' will lead to more burdensome disputes in the future, including whether the Secretary is characterized as a Plaintiff or Defendant, who bears the burden of proof on the various issues, the order of the opening and closing arguments to the jury and the correct instructions to be submitted to the jury." (Dkt. No. 24 at 6.)[5] The Court has tried a number of cases in the past that involved counterclaims, cross-claims, third party defendants, interpleaders, etc., and does not find that the issue of which

---

5.   Because the Declaratory Judgment Action was filed before the FLSA Enforcement Action, the Local Rules suggest that the FLSA Enforcement Action be consolidated with and under the above numbered cause assigned to the first-filed Declaratory Judgment Action. S.D. Tex. L.R. 7.6 ("A motion to consolidate cases will . . . be heard by the judge to whom the oldest case is assigned. The term 'oldest case,' as used in this Rule, means the case filed first in any court, state or federal, including cases removed or transferred to this Court."); *see Mid-Continent Cas. Co.*, 2006 WL 2583451, at *1  (ordering related cases consolidated and designating the action in the "oldest case" as the "lead case" and the second-filed case a "member case (per Local Rule 7.6 which designates the 'oldest case' as the case filed first in any court, state or federal)").

case is the "lead action" or which party is characterized as the plaintiff or defendant will unnecessarily burden or confuse a jury in the event this action proceeds to trial.[6]

Finally, the DOL claims that consolidation "would accelerate the disputes between the parties, causing unnecessary cost and delay [and] burdening the Court . . . ." (Dkt. No. 24 at 6.)The DOL also complains that Gate Guard has filed identical motions in both cases using a consolidated caption,[7] and that "Gate Guard has served the Secretary with the same written discovery requests in this Amended DJ Action that they . . . also have served on the Secretary in the FLSA Enforcement Action, thereby burdening the Secretary with needless and burdensome duplicate discovery." (DOL M. to Stay Discovery, Dkt. No. 27 at 2.) With respect to the DOL's claim that consolidation would accelerate the disputes and/or cause unnecessary delay, the Court notes that both cases are proceeding under identical scheduling orders and have identical deadlines for filing expert reports, concluding discovery, and filing motions, and both cases are set for trial in April 2012. (6:10-cv-91, Dkt. No. 42; 6:11-cv-14, Dkt. No. 22.) Furthermore, the fact that Gate Guard has filed identical motions and served identical discovery requests in both actions only serves to support Gate Guard's position that the same factual and legal issues exist in both cases and consolidating the actions would be more efficient than litigating the two cases separately. This position is further supported by the fact that although Gate Guard has filed identical motions in both cases, the DOL has two sets of attorneys filing separate, albeit similar, responses for the Court to consider, which has only served to burden the Court with additional paperwork in an already-complicated matter.

---

6. Although the Court does not anticipate any confusion, the DOL is free to file a motion to realign the parties in the event that this case does proceed to trial.

7. *See, e.g.*, Gate Guard's Motion to Bifurcate Discovery (6:10-cv-91, Dkt. No. 23; 6:11-cv-14, Dkt No. 23); Gate Guard's Motion to Compel Answers to Deposition Questions, Imposition of Sanctions and Request for Guidelines on Deposition Conduct and for Magistrate Supervision of Depositions (6:10-cv-91, Dkt. No. 41; 6:11-cv-14, Dkt No. 55).

*Cf.* Secretary's Response Opposing Plaintiffs' Motion to Bifurcate and Stay Discovery and Re-Urging the Secretary's Motion to Dismiss the Amended Complaint, filed by the United States Attorney's Office (6:10-cv-91, Dkt. No. 26) and Secretary's Response Opposing Defendants' Motion to Bifurcate and Stay Discovery, filed by the Office of the Solicitor (6:11-cv-14. Dkt No. 28); Agreed Motion to Extend the Deadline to Respond to Motion to Compel Responses to Deposition Questions, filed by the United States Attorney (6:10-cv-91, Dkt. No. 43) and Agreed Motion to Extend the Deadline to Respond to Motion to Compel Discovery Responses and Motion to Compel Responses to Deposition Questions, filed by the Office of the Solicitor (6:11-cv-14, Dkt. No. 59).

The overall purpose of consolidation is to expedite trial and eliminate unnecessary repetition and confusion, *Miller v. U.S. Postal Service*, 729 F.2d 1033, 1036 (5th Cir. 1984), and the Court finds that purpose would especially be served here. As Judge Jack recognized in her Order transferring the FLSA Enforcement Action to this Court:

> "The Court finds that these actions 'involve such substantially similar issues that one court should decide the subject matter of both actions. . . . Both lawsuits involve the nature of certain contractors' and service technicians' work for [Gate Guard] and overtime wages allegedly owed to these individuals. Both lawsuits require deciding the same legal and factual issues; whether [Gate Guard]'s classifications of the contractors and service technicians is in violation of the FLSA, and the amount of overtime compensation, if any, [Gate Guard] owes to the contractors and service technicians. If these actions are not tried together, this would lead to judicial waste as well as piecemeal resolution of the FLSA issues, risking inconsistent judgments.

(2:11-cv-41, Dkt. No. 18 at 10 (internal citations omitted).)

Accordingly, the Court finds that given the substantial overlap between the Declaratory Judgment Action and the FLSA Enforcement Action, in the interests of judicial

economy and to avoid excessive costs and duplication of effort, the two cases should be consolidated.

**IV. Conclusion**

For the reasons set forth above, the Court hereby **ORDERS** as follows:

1. DOL's Motion to Dismiss Amended Declaratory Judgment Complaint (Dkt. No. 21) is **DENIED**.

2. Gate Guard's Motion to Consolidate (Dkt. No. 20) is **GRANTED**.

3. Civil Action No. 6:11-cv-14 shall be administratively **CLOSED,** and all pending motions in that action are **DENIED** as **MOOT**.

**SIGNED** this 12th day of July, 2011.

JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE