UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| GATE GUARD SERVICES, L.P. and BERT STEINDORF | : : : |
| Plaintiffs/Counter-Defendants | : : |
| v. | : : Civil Action No.   6:10-cv-00091 |
| HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR | : : : : |
| Defendant/Counter-Plaintiff | : : |

**SECRETARY'S MOTION FOR PARTIAL SUMMARY JUDGMENT** [1]

---

[1] This Motion is filed under seal as a preliminary matter pending the Court's ruling on Gate Guard Services L.P.'s Motion to Seal.  The Secretary opposes GGS's Motion to Seal for all of the reasons set forth in her Response to the Motion to Seal.

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES..........................................................................iii

I.      INTRODUCTION ................................................................................ 1

II.     STATEMENT OF THE CASE................................................................ 1

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ........................... 2

IV.     ARGUMENT AND AUTHORITY ......................................................... 14

   A.   GGS Is an "Enterprise" Within the Meaning of Sections 3(r) and 3(s)(1)(A) of the Act.......................................................................................................... 14

   B.   Bert Steindorf Is An Individual Employer Within the Meaning of the FLSA.............. 15

   C.   GGS's Gate Guards Are "Employees" Under the FLSA................................. 16

      1.   GGS's gate guards are "employees" within the meaning of section 3(e)(1) of the FLSA and are entitled to the FLSA's protections. ................................................ 16

      2.   Under the "economic realties" test, the gate guards are employees. ........................... 16

         a.   Control ............................................................................................ 18

         b.   Relative Capital Investment............................................................... 21

         c.   Profit and Loss .................................................................................. 23

         d.   Degree of Skill .................................................................................. 24

         e.   Permanency and Duration................................................................... 24

         f.   Integral Role...................................................................................... 26

         g.   Other Factors: Form Agreements......................................................... 27

      3.   *Talasek* is distinguishable on its facts regarding the factors of control, opportunity for profit and loss, and permanency of the relationship. ...................................... 30

      4.   The underlying purposes of the FLSA would be frustrated if GGS's gate guards were found to be independent contractors. ...................................................... 35

      5.   Other recent case law points to an employment relationship here.............................. 36

V.      CONCLUSION.................................................................................... 37

## TABLE OF AUTHORITIES

**CASES**

*Armour & Co. v. Wantock*, 323 U.S. 126 (1944), *reh'g denied*, 323 U.S. 126 (1945)................. 36

*Baker v. Barnard Constr. Co., Inc.*, 860 F. Supp. 766 (D.N.M. 1994).......................................... 21

*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436 (10th Cir. 1998) .......................................... 22

*Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042 (5th Cir. 1987), *cert. denied*, 484 U.S. 924 (1987) ................................................................................................. 17, 18, 19, 21, 23, 24, 26

*Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) ................................ 19, 24, 25, 26, 27

*Carrell v. Sunland Const., Inc.*, 998 F.2d 330 (5th Cir. 1993) .................................................. 30, 33

*Castillo v. Givens*, 704 F.2d 181 (5th Cir.), *cert. denied*, 464 U.S. 850 (1983) .................... 21, 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................... 2

*Cromwell v. Driftwood Elec. Contractors*, 2009 WL 3254467, 348 Fed.Appx 57 (5th Cir. 2009) ........................................................................................................................................ 30

*Dole v. Snell*, 875 F. 2d 802 (10th Cir. 1989) .............................................................................. 21

*Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985) ...................................... 20, 27

*Donovan v. Grim Hotel Co.*, 747 F.2d 966 (1984) ....................................................................... 16

*Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528 (5th Cir.1982) ............................................... 19

*Donovan v. Tehco, Inc.*, 642 F.2d 141 (5th Cir 1981) ............................................................. 16, 17

*Express Sixty-Minute Delivery Service, Inc.*, 161 F.3d 299 (5th Cir. 1998)............................ 22, 23

*Falk v. Brennan*, 414 U.S. 190 (1973) ......................................................................................... 16

*Hopkins v. Cornerstone Am.*, 545 F.3d 338 (5th Cir. 2008), *cert. denied* 129 S.Ct. 1635 (2009) ........................................................................................................16, 17, 18, 19, 21, 27

*Mack v. Talasek*, No. 6:09-cv-00053 (S.D. Tex., Victoria Div.), Dkt. No. 68 .........1, 30, 31, 32, 33, 34, 35

*McLaughlin v. Seafood, Inc.*, 861 F.2d 450 (5th Cir. 1988), on rehearing, 867 F.2d 875 (5th Cir. 1989) ................................................................................................................... 18, 26, 32

*Mednick v. Albert Enters., Inc.*, 508 F.2d 297 (5th Cir. 1975) ................................... 16, 17, 18, 27

*Mireles v. Frio Foods*, 899 F.2d 1407 (5th Cir. 1990) ................................................. 36

*Mitchell v. Strickland Transp. Co., Inc.*, 228 F.2d 124 (5th Cir. 1956) ........................... 17

*Molina v. South Florida Express Bankserv., Inc.*, 420 F.Supp.2d 1276 (M.D.Fla. 2006) ........... 20

*Real v. Driscoll Strawberry Assoc., Inc.*, 603 F.2d 748 (9th Cir. 1979) ........................... 27

*Reich v. Circle C Investments, Inc.*, 998 F.2d 324 (5th Cir. 1993) ........................... 17, 24

*Reich v. Priba Corp.*, 890 F.Supp 586 (N.D. Tex., Dallas Div., 1995) ................................. 19, 32

*Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662 (5th Cir. 1983) .......................... 19, 21, 27, 30

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947) ............................................... 16, 17, 26

*Shultz v. Hinojosa*, 432 F.2d 259 (5th Cir. 1970) ................................................. 17, 26

*Solis v. International Detective & Protective Service, Ltd.* ___ F.Supp. ___, No. 09C4998, 2011 WL 2038734 (N.D. Ill. 2011) ..................................................... 36, 37

*Solis v. Universal Project Management*, No. H-08-1517, 2009 WL 4043362 (S.D. Tex., Houston Div. Nov. 19, 2009) ................................................................... 16

*T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218 (Tex. 1992) ............................. 29

*Thibault v. Bell South Communications*, 612 F.3d 843 (5th Cir. 2010) ............... 17, 18, 27, 30, 33

*United States v. Rosenwasser*, 323 U.S. 360 (1945) ................................................. 16

*United States v. Silk*, 331 U.S. 704 (1947) ............................................................ 17, 25

*Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308 (5th Cir.), *cert. denied*, 429 U.S. 826 (1976) .................................................................... 16, 18, 21, 24, 27

*Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07-0069, 2008 WL 2944661 (M.D. Tenn. July 31, 2008) .................................................................... 25

*Zermeno v. Cantu, C.A.* No. H-11-10-1792, 2011 WL 2532904 (S.D. Tex. June 24, 2011) ....... 27

**STATUTES**

29 C.F.R. § 785.14 (2011) ................................................................... 36

29 U.S.C. § 201 ................................................................................ 1

29 U.S.C. § 203(d) ............................................................................ 15

29 U.S.C. § 203(e)(1) ......................................................................... 16

29 U.S.C. § 203(r)(1) ................................................................................................ 14

29 U.S.C. § 203(s)(1) ................................................................................................ 14

29 U.S.C. § 206(a) .................................................................................................... 14

29 U.S.C. § 207(a)(1) ............................................................................................... 14

Texas Private Security Act, Tex. Occ. Code Ann. § 1702 (Vernon) .................................. 7, 20, 22

## PUBLICATIONS

Social Security Administration Publication No. 05-10069 (January 2011) ................................. 12

## RULES

Fed. R. Civ. Proc. 56(c) ............................................................................................ 2

## I.   INTRODUCTION

Counter-Plaintiff/Defendant Hilda L. Solis, Secretary of Labor, U.S. Department of Labor (the "Secretary") respectfully files this Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56 against Plaintiff/Counter-Defendants Gate Guard Services, L.P. ("Gate Guard Services"), and Bert Steindorf ("Steindorf") (collectively, "GGS").  The Secretary requests the Court grant partial summary judgment in her favor that the affected GGS gate guards are employees and not independent contractors under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq*. ("FLSA" or the "Act"), leaving other issues including the amount of back wages due and owing from GGS to be proved at trial.

As discussed in more detail below, the facts of the employment relationship between GGS and its more than 380 gate guards differ significantly from those between another gate guarding company, Talasek, and its three gate guards on the factors of control, opportunity for profit and loss, and permanency of the relationship.  *See* Memorandum Opinion and Order issued on March 28, 2012 in *Mack v. Talasek*, No. 6:09-cv-00053 (S.D. Tex., Victoria Div.), Dkt. No. 68 ("*Talasek* Order").[2]  Most tellingly, and unlike Talasek, GGS exercised significant ***control*** over every aspect of its gate guards' work lives.  The undisputed facts and the applicable law in this *GGS* case demonstrate that the gate guards are employees under the FLSA and that the Secretary is entitled to summary judgment on the issue of liability.

## II.   STATEMENT OF THE CASE

On February 16, 2011, the Secretary of Labor initiated an action seeking to enjoin GGS from violating the FLSA's overtime, minimum wage, and recordkeeping provisions and to recover from GGS unpaid minimum wage and overtime compensation due under the Act and an

---

[2]   The Memorandum, Recommendation and Order issued on February 18, 2011, Dkt. No. 65 ("M&R") also describes facts in the *Talasek* case.

equal amount in liquidated damages. The Secretary's lawsuit seeks to recover unpaid minimum wages and overtime compensation and liquidated damages for 397 gate guard employees whom GGS has misclassified as independent contractors.[3]

Gate Guard Services had filed a prior complaint under the FLSA, asking, *inter alia*, that this Court declare that its gate guards are not employees but are independent contractors, and that they are not entitled to the FLSA's protections. Steindorf later joined Gate Guard Services as a plaintiff in that action for declaratory relief.

On July 12, 2011, the Court consolidated these two actions and designated the Secretary's Claims as Counter-Claims, the Secretary as Defendant/Counter-Plaintiff, and GGS as Plaintiffs/Counter-Defendants. July 12, 2011 Order, Dkt. No. 45.

The pleadings, depositions, answers to interrogatories, declarations, and counter-defendants' business records demonstrate that there is no genuine issue as to any material fact related to liability and that the Secretary is entitled to a partial judgment as a matter of law that the GGS gate guards are employees under the FLSA. *See* Fed. R. Civ. Proc. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. STATEMENT OF UNDISPUTED MATERIAL FACTS

Gate Guard Services advertises that it is in the business of providing "24 hour Oil Field Supervision."[4] It provides gate guards to monitor the entrance and exit gates at the wells of its

---

[3] The case has been narrowed to this issue because following the completion of discovery the parties jointly withdrew Sidney L. Smith as a counter-defendant as well as FLSA claims on behalf of 14 GGS service technician employees. Dkt. Nos. 99, 108 and 109.

[4] GGS's sign at one of its warehouse/maintenance yards advertises "Gate Guard Services, L.P. 24 Hr. Oil Field Supervision." *See* Ex. 37-A (Photograph of GGS's sign). As of April 17, 2012, GGS's website also advertised "Gate Guard Services, L.P., Providing 24 hour Gate Supervision Service." *See* April 17, 2012 printout of GGS's website, Ex. 37-B. Sometime during the week between April 17, 2012 and April 25, 2012, GGS changed its website. *See* Gate Guard Services website, available at http://gateguardservices.com (previously visited April 17, 2012, last visited

oil and gas field clients. Ex. 1 (Steindorf Deposition) at 17-18. Steindorf owns 99% of Gate Guard Services.[5] Ex. 1 at 87-88. He exercises the daily control and management of Gate Guard Services, including control over the employment and pay practices of its gate guards. Ex. 1 at 33, 120-21, 126 and 162. GGS provides no products or services other than gate guards to its oil and gas field clients. Ex. 1 at 17-18.

GGS requires that individuals desiring to become GGS gate guards complete a job application created by GGS. Ex. 1 at 157-58; Ex. 2 (Smith Deposition) at 70-71; and Ex. 3 (Declaration of Jose Coronel) at ¶ 2. At the time they complete their job application, they are also required to sign an agreement purportedly designating them as independent contractors.[6] GGS drafted this form agreement and the individuals desiring to become gate guards had no ability to negotiate the terms of this agreement. They signed the agreement only because they wanted the gate guard job. Once the gate guard applicants completed their job applications and signed the agreements that GGS presented to them, Sidney Smith, GGS's Qualified Manager, reviewed the job applications and signed agreements. Smith would then forward to Steindorf only those job applications and signed agreements of the individuals who Smith thought should be hired. Steindorf would then make the final decision as to who would be hired as a gate guard. GGS maintained files at its main office on all of the gate guards it hired.[7]

---

April 25, 2012). Photographs posted on its newly-revamped website continue to advertise the company as providing 24-hour oil field supervision. *See, e.g.,* Ex. 37-C (April 25, 2012 printout of photograph from GGS's new website).

[5] The other 1% is owned by Gate Guard Management, Inc., which is owned by Steindorf. Ex. 1 at 87-88 and 89-91.

[6] Multiple citations to the record supporting all of the facts discussed in each paragraph in the remainder of the Statement of Facts are found at the footnotes at the end of each such paragraph, to make this Motion more concise and easily readable.

[7] *See* Ex. 1 at 126-27; Ex. 2 at 62; 72 and 74; and 94-95; Ex. 3 at ¶3.

GGS used two different form agreements purportedly designating the gate guards as independent contractors.  Based on the dates on the forms, GGS used the first form agreement prior to or during the investigation conducted in this case by Department of Labor's Wage and Hour Division ("pre-investigation" form).  *See* Depo. Ex. 14 attached to Exs. 1 and 2.  GGS started to use a second form agreement at or after the conclusion of Wage and Hour's investigation ("post investigation form").  *See* Depo. Ex. 15 attached to Exs. 1 and 2.  It is believed that most, if not all, of the individuals listed on Exhibit A to the Secretary's Amended Complaint signed the pre-investigation form.

Although the form agreements purport to designate the gate guards as independent contractors, they contain terms that typically apply only to employment relationships.  Section 4 of the pre-investigation form provides that a gate guard cannot subcontract his assigned services unless he first "receives and/or provides to the Company written confirmation that the person is appropriately licensed to provide security services or properly registered with the company."  *See* Depo. Ex. 14 attached to Exs. 1 and 2.  Further, neither the pre-investigation nor the post investigation form contains a set date for the gate guards to complete their gate guarding services. *See* Depo. Exs. 14 and 15 attached to Exs. 1 and 2.  Nor does either form contain any suggestion that the gate guard is hired to perform a specific project.  *See id.*  Rather, both are for an indefinite term.  *See id.*  The pre-investigation form also lacks such material terms as the price and description of services to be rendered.  Although Section 1 of the form states the gate guard "shall provide professional guard duties," and "shall keep such logs and make such reports as may be required from time to time, and provide such other duties outlined in Exhibit A hereto" and Section 6 provides that the "sole benefit" to the gate guard is "the cash compensation described in Exhibit A of the Agreement," Exhibit A is missing from every pre-investigation

form contract, and GGS says that it cannot find it. *See* Depo. Ex. 14 attached to Exs. 1 and 2; Depo. Ex. 1 attached to Ex. 4 (Henderson Deposition). Steindorf remembers nothing about Exhibit A to the pre-investigation form. Ex. 1 at 327.

Once hired, GGS assigned the gate guards to the gates that they were to guard. The gate guards had no say as to which gates they would be assigned to guard. When GGS assigned a gate to a guard, the guard's only choice was to take or decline the assignment. If the guard declined the assignment, GGS would not likely hire him again.[8]

Similarly, GGS would set the daily rate of pay at which the gate guards would be paid for guarding a gate. Gate guards had no power to negotiate their daily rates of pay and had no say as to what that rate of pay would be.[9] Again, the gate guard's only choice was to accept the assignment at the daily rate of pay that GGS established or decline the assignment. If a gate guard declined the assignment, GGS would not likely hire him again.[10]

---

[8] *See* Ex. 3 at ¶6; Ex. 5 (Declaration of Mary Arp) at ¶6; Ex. 6 (Declaration of James T. Arp) at ¶6; Ex. 7 (Declaration of Marcy Clarida) at ¶2; Ex. 8 (Declaration of Tony Coronel) at ¶5; Ex. 9 (Declaration of John A. Helser) at ¶3; Ex. 10 (Declaration of Eddy Joe Hunt) at ¶2; Ex. 11 (Declaration of James R. Hunt) at ¶4; Ex. 12 (Declaration of Dwayne Kelley) at ¶2; Ex. 13 (Declaration of Richard Lane) at ¶2; Ex. 14 (Declaration of Nancy Ann McGinnis) at ¶2; Ex. 15 (Declaration of Marvin Sprouse, Jr.) at ¶2; Ex. 16 (Declaration of Leta Talley) at ¶2; Ex. 17 (Declaration of Roger W. Trooien) at ¶5; Ex. 18 (Declaration of Sonja Trooien) at ¶5; Ex. 25 (Declaration of Calvin Glen Pippen) at ¶8; Ex. 26 (Declaration of Donnice Bannister) at ¶2; Ex. 27 (Declaration of Fred W. Massingill) at ¶2; Ex. 28 (Declaration of Carla Scrogum) at ¶3; Ex. 29 (Declaration of Kevin D. Scrogum) at ¶3; Ex. 30 (Declaration of John Melvin Seller, Jr.) at ¶2; Ex. 31 (Declaration of Barbara Thames) at ¶3; Ex. 32 (Declaration of Jurell Thames) at ¶2; Ex. 33 (Declaration of Linda Walden) at ¶4; Ex. 34 (Declaration of Linda Lois Williams) at ¶2 : and Ex. 35 (Declaration of Tracy Sellers) at ¶5.

[9] At the conclusion of Wage and Hour's investigation, most gate guard were being paid only $125 per day. Ex. 1 at 151-52; Ex. 21 (Petty Deposition) at 100-01; Ex. 3 at ¶9; Ex. 17 at ¶7; and Ex. 18 at ¶7.

[10] *See* Ex. 3 at ¶9; Ex. 5 at ¶7; Ex. 6 at ¶7; Ex. 7 at ¶5; Ex. 8 at ¶8; Ex. 9 at ¶6; Ex. 10 at ¶5; Ex. 11 at ¶7; Ex. 12 at ¶3; Ex. 13 at ¶5; Ex. 14 at ¶5; Ex. 16 at ¶4; Ex. 17 at ¶7; Ex. 18 at ¶7; Ex. 19 (Declaration of Candy Shamley) at ¶3; Ex. 20 (Declaration of Lane Zlab) at ¶3; Ex. 21 at 35;

GGS required its gate guards to be working at their gates 24 hours a day, seven days a week. Someone had to be at the gate at all times. GGS even prohibited gate guards from leaving their gates when faced with tornado, flood and hurricane warnings. GGS told many gate guards that their job as a gate guard was a 24/7 job. Some gate guards received a written "reminder" from GGS that "this [their job] is always a 24/7 job!" *See* Depo. Ex. 7 attached to Ex. 1 and Depo. Ex. 2 attached to Ex. 21 (Petty Deposition). Many of the gate guards, with GGS's knowledge and permission, worked their assigned gates with their spouses. Even if both spouses worked at a gate, GGS would pay only one spouse.[11]

GGS's strict 24/7 job requirement[12] resulted in busy days *and* nights for many guards at their gates, as well as frequent interruptions in their sleep and meal times.[13] Some GGS gate guards slept in their clothes so that they could be readily available to answer the ringing bell

---

Ex. 25 at ¶11; Ex. 26 at ¶5; Ex. 27 at ¶5; Ex. 28 at ¶4; Ex. 29 at ¶6; Ex. 30 at ¶5; Ex. 31 at ¶5; Ex. 32 at ¶5; Ex. 33 at ¶5; Ex. 34 at ¶4; and Ex. 35 at ¶5.

[11] *See* Ex. 3 at ¶¶4 and 5; Ex. 5 at ¶¶30 and 31; Ex. 6 at ¶¶3, 30 and 31; Ex. 7 at ¶¶33 and 34; Ex. 8 at ¶¶3, 15, 30 and 31; Ex. 9 at ¶¶2, 29 and 30; Ex. 10 at ¶¶24-25; Ex. 11 at ¶¶2, 27 and 28; Ex. 12 at ¶¶21 and 22; Ex. 13 at ¶¶31 and 33; Ex. 14 at ¶¶31 and 32; Ex. 15 at ¶¶ 1 and 16; Ex. 16 at ¶20; Ex. 17 at ¶¶3, 28 and 29; Ex. 18 at ¶¶3, 28 and 29; Ex. 19 at ¶¶ 21 and 22; Ex. 20 at ¶¶20 and 22; Ex. 25 at ¶¶6, 7 and 38; Ex. 26 at ¶¶33 and 34; Ex. 27 at ¶¶32 and 33; Ex. 28 at ¶¶2, 25 and 26; Ex. 29 at ¶¶2, 29 and 30; Ex. 30 at ¶¶1, 17 and 28; Ex. 31 at ¶¶2, 23 and 24; Ex. 32 at ¶¶4, 23 and 24; Ex. 33 at ¶¶1, 23 and 24; and Ex. 33 at ¶¶24 and 25.

[12] The guards could not leave their gates even to get a bottle of milk. Ex. 27 ¶34.

[13] Ex. 3 at ¶¶29-33; Ex. 5 at ¶¶26-31; Ex. 6 at ¶¶26-31; Ex. 7 at ¶¶ 31-34; Ex. 8 at ¶¶26-31; Ex. 9 at ¶¶ 26-30; Ex. 10 at ¶¶ 21-25; Ex. 11 at ¶¶26-28; Ex. 12 at ¶¶20-23; Ex. 13 at ¶¶29- 33; Ex. 14 at ¶¶29- 32; Ex. 15 at ¶17; Ex. 16 at ¶ 21; Ex. 17 at ¶¶ 24-29; Ex. 18 at ¶¶ 24-29; Ex. 19 at ¶¶ 20-22; Ex. 20 at ¶¶19-22; Ex. 25 at ¶¶36-43; Ex. 26 at ¶¶ 30-34; Ex. 27 at ¶¶ 29-34; Ex. 28 at ¶¶ 29-34; Ex. 29 at ¶¶ 28-30; Ex. 30 at ¶¶ 24-28; Ex. 31 at ¶¶ 22-24; Ex. 32 at ¶¶ 22-24; Ex. 33 at ¶¶ 19-24; Ex. 34 at ¶¶ 24-25; Ex. 35 at ¶¶ 24-28.

through the night.[14]  And even if there were relatively quiet times, the guards never knew when

that would change since they had to be ready to answer the bell at all times.

       GGS required most of its gate guards to obtain licenses as Texas non-commissioned

security officers under GGS's name.[15]  To obtain these licenses, the gate guards had to complete

an application, provide their fingerprints, take a simple test, and pay a fee.  GGS paid for the cost

of the gate guards to get their finger prints taken and for the fee to get the license.[16]  GGS

performed the background checks and administered the tests required for the guards to get their

Texas security licenses, and if a gate guard could not get a license, he could not be hired by

GGS.[17]  The licenses expire after two years, and many of GGS's gate guards renewed their

licenses when they expired, still under GGS's name.[18]

---

[14] *See, e.g.* Ex.14 ¶32; Ex. 25 ¶43.

[15] A Texas non-commissioned security officer is a security officer who is not authorized to carry firearms.  The Texas Private Security Act, Chapter 1702 of the Texas Occupation Code, Tex. Occ. Code Ann. § 1702 (Vernon) (the "Texas "Private Security Act"), and the Act's administrative rules thereunder regulate such security guards.  A person seeking Texas registration to work as a non-commissioned security guard must apply under the name of a licensed security company such as GGS.  GGS's gate guards applied for their licenses under the aegis of GGS, with GGS's authorizing signature.  *See, e.g.,* Ex. 38 (certified copies of pertinent pages of a few of GGS gate guards' security guard applications in 2009, 2010 and 2011, with GGS's approving signature).  *See also* Ex. 39 (certified copies of GGS's security guard company licenses for 2010, 2011 and 2012; its application to be a licensed Texas security guard company; and it proofs of liability insurance).

[16] *See* Ex. 1 at 78 and 138; Ex. 2 at 44-45; Ex. 3 at ¶7; Ex. 5 at ¶4; Ex. 6 at ¶4; Ex. 7 at ¶3; Ex. 8 at ¶6; Ex. 9 at ¶4; Ex. 10 at ¶3; Ex. 11 at ¶5; Ex. 13 at ¶3; Ex. 14 at ¶3; Ex. 15 at ¶3; Ex. 16 at ¶3; Ex. 17 at ¶6; Ex. 18 at ¶6; Ex. 19 at ¶2; Ex. 20 at ¶2; Ex. 21 at 119, 125-26, 148, 150-51 and 157; Ex. 25 at ¶9; Ex. 26 at ¶3; Ex. 27 at ¶3; Ex. 29 at ¶4; Ex. 30 at ¶3; Ex. 31 at ¶4; Ex. 32 at ¶3; Ex. 33 at ¶2; Ex. 34 at ¶3; and Ex. 35 at ¶¶3-4.

[17] *See* Ex. 2 at pp.  72, 77-78.

[18] *See, e.g.,* Ex. 25 at ¶9.

Although GGS characterized the license as a "marketing ploy," GGS nonetheless required its guards to "have a printout or your Security License with you at all times." GGS sent a memo, under Bert Steindorf's signature[19] and on Gate Guard letterhead, titled "Gate Guard Duties and Requirements" requiring that "[a]ll Security personnel should be certified and have a card if asked for verification." Finally, GGS required its gate guards to display in the window of their trailers a sign identifying GGS as a Texas Department of Public Safety licensed provider of security services.[20]

GGS imposed upon its gate guards many additional rules and requirements. Gate guards were prohibited from having alcohol at their gate. GGS also prohibited its gate guards from having a firearm in their trailers. Gate guards were required to wear orange safety vests having the words "Gate Guard Services" printed on it. Some gate guards were required to wear shirts having the words "Gate Guard Services" printed on it. GGS provided the gate guards with these vests and shirts. Photographs of the Gate Guard uniform are provided at Exs. 37-D through 37-F. Gate guards were admonished in writing to wear their uniforms and that failure to do so could "lead to your termination by [GGS]."[21]

---

[19] During Steindorf's deposition, he claimed that someone used his signature stamp without his permission. Ex. 1 at 205-08 and 216. Sales Representative Jade Petty, however, testified that GGS headquarters sent her the memo and told her to distribute it to the guards in her area of responsibility. Ex. 21 at 180-81.

[20] *See* Ex. 1 at 173-79 and 204-06 and Depo. Exs. 7 and 9 attached thereto; Ex. 3 at ¶¶8 and 27; Ex. 5 at ¶¶5 and 25; Ex. 6 at ¶¶5 and 25; Ex. 7 at ¶¶4 and 26; Ex. 8 at ¶¶7 and 27; Ex. 9 at ¶¶5 and 23; Ex. 10 at ¶¶4 and 19; Ex. 11 at ¶¶6 and 24; Ex. 12 at ¶17; Ex. 13 at ¶¶3 and 25; Ex. 14 at ¶¶4 and 24; Ex. 16 at ¶17; Ex. 17 at ¶22; Ex. 18 at ¶22; Ex. 19 at ¶18; Ex. 20 at ¶17; Ex. 21 at 130-31 and 175-81 and Depo. Exs. 2 and 6 attached thereto; Ex. 25 at ¶¶10 and 31; Ex. 26 at ¶¶4 and 26; Ex. 27 at ¶¶4 and 24; Ex. 28 at ¶21; Ex. 29 at ¶¶4 and 25; Ex. 30 at ¶¶4 and 22; Ex. 33 at ¶3; Ex. 34 at ¶20; and Ex. 35 at ¶3.

[21] *See* Ex. 1 at 173-76, 204-06, 250-52 and 256-57 and Depo. Exs. 7-9, 12 and 13 attached thereto; Ex. 2 at 37-39 and 47-49 and Depo. Exs. 12 and 13 attached thereto; Ex. 3 at ¶¶18-20;

GGS instructed its gate guards not to throw cigarette butts around the trailer and the gate being guarded.  They were also told not to have trash around their camper and not to let trash "pile up on the trailer."  GGS's instructions were to "keep the area around your trailer clean and orderly."  GGS, not the guards, hauled the trash away from the gate guarding sites.[22]

GGS prohibited many of the gate guards from wearing shorts, flip flops or sandals at the gate.  GGS required many of the gate guards to wear hard hats, safety glasses, steel toed shoes, and fire retardant clothing at the gate.  GGS paid for the cost of the hard hats and safety glasses.[23]

GGS required its gate guards to record all vehicles entering and leaving a gate.  Gate guards were obligated to completely fill out the traffic logs that GGS provided to them.  GGS required its gate guards to report any vehicle not stopping at the gate or any other incident out of the ordinary.[24]

---

Ex. 5 at ¶¶14-18; Ex. 6 at ¶¶14-18; Ex. 7 at ¶¶13, 14, 16, 17 and 29; Ex. 8 at ¶¶18-20; Ex. 9 at ¶¶14-16 and 24; Ex. 10 at ¶12; Ex. 11 at ¶¶15-17; Ex. 12 at ¶¶9-10 and 18; Ex. 13 at ¶¶12-18; Ex. 14 at ¶¶11-17 and 26; Ex. 15 at ¶¶6-8; Ex. 16 at ¶¶5-11; Ex. 17 at ¶15; Ex. 18 at ¶15; Ex. 19 at ¶¶9-12 and 19; Ex. 20 at ¶¶8-11 and 18; Ex. 21 at 130-31, 166-68 and 175-81 and Depo. Exs. 2, 4 and 6 attached thereto; Ex. 25 at ¶20-22 and 33-34; Ex. 26 at ¶¶13-15; Ex. 27 at ¶¶12-13 and 27; Ex. 28 at ¶¶10-13 and 23; Ex. 29 at ¶¶14-17 and 27; Ex. 30 at ¶¶13-15; Ex. 31 at ¶¶12-13 and 20-21; Ex. 32 at ¶¶12-13 and 20-21; Ex. 33 at ¶¶12-13; Ex. 34 at ¶¶12-13 and 21-22 ; and Ex. 35 at ¶13-15.

[22] *See* Ex. 1 at 173-76 and Depo. Ex. 7 attached thereto; Ex. 7 at ¶¶27-28; Ex. 12 at ¶19; Ex. 13 at ¶26; Ex. 14 at ¶25; Ex. 15 at ¶14; Ex. 16 at ¶18; Ex. 21 at 130-31 and Depo. Ex. 2 attached thereto; Ex. 25 at ¶32; Ex. 26 at ¶¶27-28; Ex. 27 at ¶¶25-26; Ex. 28 at ¶22; and Ex. 29 at ¶26.

[23] *See* Ex. 1 at 173-78 and 190-92 and Depo. Exs. 7 and 8 attached thereto; Ex. 13 at ¶¶15-18; Ex. 14 at ¶¶14-17; Ex. 16 at ¶¶8-11; Ex. 19 at ¶12; Ex. 20 at ¶11; Ex. 21 at 130-31 and 166-68 and Depo. Exs. 2 and 4 attached thereto; Ex. 25 at ¶¶23-24; Ex. 26 at ¶19; Ex. 27 at ¶¶14-17; Ex. 28 at ¶14; and Ex. 29 at ¶18.

[24] For example, GGS gate guards reported an 8-foot alligator at one guard site, reported poachers on the oil field property and gave directions to a rescue squad to help a drilling crew member who was dying of a heart attack. *See* Ex. 25 at ¶¶ 34, 36.  *See also* Ex. 1 at 173-76, 204-06 and 232-37 and Depo. Exs. 7, 9 and 10 attached thereto; Ex. 3 at ¶29; Ex. 5 at ¶¶26, 28 and 29; Ex. 6

As mentioned earlier, the gate guards were obligated to guard their gates 24 hours a day, seven days a week. If a gate guard had to leave his gate, a "relief" guard had to be obtained to guard the gate. For some period of time, GGS would find a relief guard for some gate guards. Otherwise, finding a relief guard was the responsibility of the individual gate guard. Relief guards had to be licensed by the Texas Department of Public Safety and had to be approved by GGS. For some gate guards, if the relief guard relieved the gate guard for one day or more, GGS would pay the relief guard directly for those days and would not pay the gate guard for those days. In this situation, GGS would pay the relief guard the same daily rate that it would have paid to the gate guard. When this occurred, the gate guards were denied the ability to establish the rate of pay to be paid to their relief guards.[25]

GGS has a "payroll" policy for paying its gate guards. Payroll starts on Monday and runs through every other Sunday. Instead of being paid at the conclusion of a project, checks are mailed to gate guards every other week from Corpus Christi via United States mail. Thus, gate guards are being paid for their services while still completing a project for GGS. Ex. 22 (Pat Brown Deposition) at 131-32 and Depo. Ex. 8 attached thereto.

GGS required its gate guards to have a recreational vehicle or trailer at the gate to which they were assigned to guard. *See, e.g.,* photographs of GGS gate guard site, Exs. 37-G and 37-H.

---

at ¶¶26, 28 and 29; Ex. 7 at ¶¶31 and 32; Ex. 8 at ¶29; Ex. 9 at ¶¶26-28; Ex. 10 at ¶¶21-23; Ex. 11 at ¶26; Ex. 12 at ¶20; Ex. 13 at ¶¶29-30; Ex. 14 at ¶¶28-30; Ex. 17 at ¶27; Ex. 18 at ¶27; Ex. 19 at ¶20; Ex. 20 at ¶19; Ex. 21 at 130-31 and 175-81 and Depo. Exs. 2 and 6 attached thereto; Ex. 25 at ¶¶36 and 39-40; Ex. 26 at ¶¶30-32; Ex. 27 at ¶¶29-31; Ex. 28 at ¶24; Ex. 29 at ¶28; Ex. 30 at ¶¶24-26; Ex. 31 at ¶22; Ex. 32 at ¶22; Ex. 33 at ¶¶21-22; Ex. 34 at ¶23; and Ex. 35 at ¶24-26.

[25] *See* Ex. 1 at 242-45 and Depo. Ex. 11 attached thereto; Ex. 3 at ¶28; Ex. 7 at ¶30; Ex. 8 at ¶28; Ex. 9 at ¶25; Ex. 10 at ¶20; Ex. 11 at ¶25; Ex. 13 at ¶27; Ex. 15 at ¶15; Ex. 16 at ¶19; Ex. 21 at 154-56 and Depo. Ex. 3 attached thereto; Ex. 25 at ¶35; Ex. 27 at ¶28; and Ex. 35 at ¶23.

GGS provided some gate guards with their trailer. Ex.7 at ¶19. Most, however, had to supply their own trailer. Some gate guards already owned a trailer before they began to work for GGS. Some even lived in their trailers as their principle place of residence before they performed any work for GGS. Ex. 17 at ¶4; and Ex. 18 at ¶4.

GGS invested several thousands of dollars to supply equipment at each of the gates where its gate guards worked. At each gate, GGS provided and paid for a diesel generator to produce electricity for the gate guard's trailer. *See, e.g.*, photographs of diesel generator provided to GGS gate guards, Exs. 37-H, 37-I and 37-K. GGS supplied and paid for the diesel fuel for these generators. *See, e.g.,* Ex. 37-L. GGS also maintained the generators by paying for and changing their oil and filters. Similarly, GGS provided and paid for a water tank to provide the gate guards with water at their trailers. *See, e.g.*, photographs of water tank provided to GGS gate guards, 37-H and 37-I. GGS refilled, at its expense, these water tanks. GGS also provided a portable septic system for use at the gate guards' trailers. *See, e.g.,* Ex. 37-J. The diesel generator, water tank, and septic system that GGS provided all rested on one or more trailers that GGS provided and owned. GGS provided "air bells"[26] at each gate and halogen lights to light each gate. *See, e.g.*, Ex. 37-H. And, GGS provided the hauling trailers on which this equipment rested at each gate (GGS owns about 400 such trailers).[27] The cost of this equipment that GGS provided at each gate was estimated to be about $19,000 or $20,000, per gate.[28]

---

[26] The "air bells" were hoses that were laid on the ground at the gate site. When a vehicle would run over the hose, a bell would sound, alerting the gate guard that a vehicle was at the gate.

[27] Ex. 1 at 285; *see also* Exs. 37-I, 37-J, 37-K and 37-L (photographs of hauling trailers).

[28] *See* Ex. 1 at 299; Ex. 23 (Rapstine Deposition) at 272-76 and Depo. Ex. 10 (at 4) and Depo. Ex. 20 attached thereto; Ex. 3 at ¶¶21-26; Ex. 5 at ¶¶19-24; Ex. 6 at ¶¶19-24; Ex. 7 at ¶¶20-25; Ex. 8 at ¶¶21-26; Ex. 9 at ¶¶17-22; Ex. 10 at ¶¶13-18; Ex. 11 at ¶¶18-23; Ex. 12 at ¶¶11-16; Ex. 13 at ¶¶19-24; Ex. 14 at ¶¶18-23; Ex. 15 at ¶¶9-13; Ex. 16 at ¶¶12-16; Ex. 17 at ¶¶16-21; Ex. 18 at ¶¶16-21; Ex. 19 at ¶¶14-17; Ex. 20 at ¶¶13-16; Ex. 25 at ¶¶25-30; Ex. 26 at ¶¶20-25; Ex. 27 at

In addition, GGS owned thirteen late-model, three-quarter ton, long-wheelbase Chevrolet and Dodge pickup trucks, whose only function was to haul equipment to and for the gate guards' use at the gates. GGS owns two warehouses or operating yards and leases another two, where it stored and maintained the equipment that it provided to the gates guards at the gates. *See, e.g.,* photographs of GGS warehouse/operating yard, Exs. 37-M and 37-N. GGS also employed service technicians who serviced the gates by hauling, installing and maintaining GGS's gate guarding equipment to the gates, and resupplying the gate guards with diesel fuel and water every two weeks.[29]

None of the gate guards believed that they had an opportunity to make a profit while being a gate guard for GGS. Even GGS owner Steindorf admitted that the gate guards had no opportunity to make a profit while being a gate guard for GGS. *See* Ex. 1 at 309. Similarly, none of the gate guards believed that they could suffer a loss while being a gate guard for GGS. The gate guards were simply paid a daily rate for guarding a gate. None of the gate guards believed that they were in business for themselves. None of the gate guards advertised or held out their services as gate guards. None of the gate guards performed any kind of work for any other individual or entity while working as a gate guard for GGS. And, other than pension or social security income received by some guards,[30] none of the gate guards received any other

---

¶¶18-23; Ex. 28 at ¶¶15-20; Ex. 29 at ¶¶19-24; Ex. 30 at ¶¶16-21; Ex. 31 at ¶¶15-19; Ex. 32 at ¶¶15-19; Ex. 33 at ¶¶14-18; Ex. 34 at ¶¶14-19; and Ex. 35 at ¶ 16-21.

[29] *See* Ex. 1 at 305-308.

[30] Once an individual reaches the Social Security full retirement age, he is eligible to receive full Social Security benefits without any reduction for other earned income. *See* Social Security Administration Publication No. 05-10069 (January 2011).

kind of income while working as a gate guard for GGS. In fact, most gate guards felt economically dependent upon GGS.[31]

Steindorf admits that the gate guards that GGS hired did not require any specialized training to perform their job. The gate guards did not possess any special skills or experience and did not need any skills or experience to perform their gate guard jobs for GGS. Most gate guards never performed any kind of guarding work before beginning to work for GGS.[32]

The length of time that the gate guards worked for GGS varied greatly. While some worked for GGS for only short periods of time, many gate guards worked for GGS for periods in excess of one year, and several worked for GGS for many years with few if any "breaks" in employment. Regardless of how long they ultimately worked for GGS, the gate guards were not hired for a specific project or for a set term; instead, they were hired for an indefinite period of time.[33]

---

[31] Ex. 3 at ¶¶10-15; Ex. 5 at ¶¶8-12; Ex. 6 at ¶¶8-12; Ex. 7 at ¶¶6-11; Ex. 8 at ¶¶9-14; Ex. 9 at ¶¶7-12; Ex. 10 at ¶¶6-10; Ex. 11 at ¶¶8-13; Ex. 12 at ¶¶4-8; Ex. 13 at ¶¶6-10; Ex. 14 at ¶¶6-9; Ex. 17 at ¶¶8-13; Ex. 18 at ¶¶8-13; Ex. 19 at ¶¶4-7; Ex. 20 at ¶¶4-6; Ex. 25 at ¶¶4 and 12-18; Ex. 26 at ¶¶6-10; Ex. 27 at ¶¶6-10; Ex. 28 at ¶¶5-9; Ex. 29 at ¶¶9-12; Ex. 30 at ¶¶6-11; Ex. 31 at ¶¶6-10; Ex. 32 at ¶¶6-10; Ex. 33 at ¶¶6-9 and 11; Ex. 34 at ¶¶5-9; and Ex. 35 at ¶ 5-11.

[32] See Ex. 1 at 312; Ex. 3 at ¶16; Ex. 5 at ¶13; Ex. 6 at ¶13; Ex. 7 at ¶12; Ex. 8 at ¶17; Ex. 9 at ¶13; Ex. 10 at ¶11; Ex. 11 at ¶14; Ex. 12 at ¶8; Ex. 13 at ¶11; Ex. 14 at ¶10; Ex. 17 at ¶ 14; Ex. 18 at ¶14; Ex. 19 at ¶8; Ex. 20 at ¶7; Ex. 25 at ¶19; Ex. 26 at ¶11; Ex. 27 at ¶11; Ex. 28 at ¶9; Ex. 29 at ¶13; Ex. 30 at ¶12; Ex. 31 at ¶11; Ex. 32 at ¶11; Ex. 33 at ¶10; and Ex. 34 at ¶11.

[33] See Ex. 3 at ¶1; Ex. 5 at ¶1; Ex. 6 at ¶1; Ex. 7 at ¶1; Ex. 8 at ¶1; Ex. 9 at ¶1; Ex. 11 at ¶1; Ex. 13 at ¶1; Ex. 14 at ¶1; Ex. 15 at ¶1; Ex. 16 at ¶1; Ex. 17 at ¶1; Ex. 18 at ¶1; Ex. 19 at ¶1; Ex. 20 at ¶1; Ex. 25 at ¶¶1-3; Ex. 26 at ¶1; Ex. 27 at ¶1; Ex. 28 at ¶1; Ex. 29 at ¶1; Ex. 30 at ¶1; Ex. 31 at ¶1; Ex. 32 at ¶1; Ex. 34 at ¶1 and Ex. 35 at 1.

## IV.  ARGUMENT AND AUTHORITY

### A.   GGS Is an "Enterprise" Within the Meaning of Sections 3(r) and 3(s)(1)(A) of the Act.

The FLSA's minimum wage and overtime provisions apply to "enterprise[s] engaged in commerce or the production of goods for commerce." 29 U.S.C. §§ 206(a) and 207(a)(1). It is undisputed that GGS is an "enterprise" (as defined by sections 3(r) and 3(s)(1)(A) of the Act), because GGS has admitted as much in its  Declaratory Judgment Amended Complaint when it sought relief under the Act.  GGS's Amended Complaint, Dkt No. 14 at ¶¶4, 51, 59 and 68.  Further, GGS satisfies the Act's definitions.  GGS's operations are related activities performed for a common business purpose through unified operations, as well as the common control of individual defendant, Bert Steindorf, who owns and manages the company, thus satisfying the FLSA's definition of "enterprise." 29 U.S.C. § 203(r)(1) (defining "enterprise" as "related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or organizational units....") Section 3(s) of the Act states an "enterprise engaged in commerce" means "an enterprise that has employees engaged in commerce or ...that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and that has an annual gross volume of sales or business done of $500,000 or more.  29 U.S.C. § 203(s)(1).  Gate Guard Services is a Texas licensed private security contractor whose only business is to provide unarmed gate guards to its oil and gas field clients located throughout Texas and in Louisiana.  Gate Guard Services is a Texas limited partnership.  *See* Ex. 1 at 87-92 and Ex. 2 attached thereto at ¶1 and Ex. 3 attached thereto at Articles I and II.  GGS Management, Inc. is the General Partner of Gate Guard Services, L.P. and owns a 1% partnership interest in Gate Guard Services, L.P. Plaintiff/Counter-Defendant Steindorf is the

14

President of the General Partner GGS Management, Inc., is the sole limited partner of Gate Guard

Services, L.P. and owns a 99% partnership interest in Gate Guard Services, L.P. *Id.* Steindorf

manages the business operations and employment practices of this enterprise. *Id.*

In addition, it is undisputed that GGS is engaged in interstate commerce by providing its

guards to clients in Texas and Louisiana, Ex. 1 at 17 and 224, and by providing equipment including

diesel generators, diesel fuel, portable septic systems, water, alarm bells and cables and halogen

lights for its guards' use at GGS's clients' oil field gate guarding sites.  GGS's service technician

employees load that equipment on hauling trailers, attach the trailers to trucks, drive the trucks with

the loaded trailers to the oil field gate guarding sites, and then leave the loaded trailers for the gate

guards' use.  It is undisputed that some of that equipment was produced in interstate commerce,

including the generators, which are assembled in South Dakota and then sold to GGS. *Id.* at 283.

Thus, two or more employees handle goods or materials that have moved in interstate commerce. *Id.*

at 281-94. Lastly, it is undisputed that GGS, at all times relevant, had an annual dollar volume of

sales in excess of $500,000.  Ex. 24 (GGS's Amended and Supplemental Answers and Objections to

the Secretary's Interrogatories) at Interrogatory No. 17.  In sum, GGS is a covered "enterprise"

subject to the requirements of the FLSA.

**B.    Bert Steindorf Is An Individual Employer Within the Meaning of the FLSA.**

Bert Steindorf, owner of the corporate defendant, is an individual employer within the

meaning of section 3(d) of the Act.  The FLSA defines "employer" to "include any person acting

directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

Steindorf exercises day-to-day control and management of GGS, including the

employment and pay practices of GGS as to its guards. Ex. 1 at 31, 120-21, 126 and 162.

Steindorf's ownership interest, significant control of business operations, and decisions relating

to pay and signing paychecks establish him as an individual employer within the meaning of section 3(d). *See Falk v. Brennan*, 414 U.S. 190, 195 (1973); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (1984); *Solis v. Universal Project Management*, 2009 WL 4043362 at * 2 (S.D. Tex., Houston Div. Nov. 19, 2009), and cases cited therein ("The definition of 'employer' under the FLSA is expansive, extending to liability for persons with 'managerial responsibilities" and "substantial control of the terms and conditions of the [employee's] work")).

   C.   **GGS's Gate Guards Are "Employees" Under the FLSA.**

      1.   **GGS's gate guards are "employees" within the meaning of section 3(e)(1) of the FLSA and are entitled to the FLSA's protections.**

   The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The FLSA further states that "employ" "includes to suffer or permit to work." These definitions demonstrate the broad remedial nature of the Act. *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1311 (5th Cir.), *cert. denied*, 429 U.S. 826 (1976); *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 302-03 (5th Cir. 1975). Indeed, the U.S. Supreme Court has expressly observed that this definition is broad, *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947), and has described the Act's definition of employee as "the broadest definition that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363, n. 3 (1945); accord, *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008), *cert. denied* 129 S.Ct. 1635 (2009).

      2.   **Under the "economic realties" test, the gate guards are employees.**

   GGS denied its gate guard employees overtime compensation due under the FLSA by improperly treating these employees as "independent contractors." The label the parties put on the relationship, however, is not determinative, nor is it relevant whether the parties intended to create an employment relationship. *Rutherford Food*, 331 U.S. at 729; *Donovan v. Tehco, Inc.*, 642 F.2d

141, 143 (5th Cir 1981). Instead, in determining whether an employment relationship exists, courts examine the totality of the work circumstances to determine the "economic reality" of the relationship. *Rutherford Food*, 331 U.S. at 728. *See also Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 327 (5th Cir. 1993); *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1043 (5th Cir. 1987), *cert. denied*, 484 U.S. 924 (1987). The Fifth Circuit has explained that in making this determination, courts must focus on whether the alleged employee, as a matter of economic reality, is economically dependent on the alleged employer or instead is in business for himself. *Thibault v. Bell South Communications*, 612 F.3d 843, 845 (5th Cir. 2010); *Hopkins*, 545 F.3d at 343; *Circle C Investments*, 998 F.2d at 327.

To aid in the inquiry, the Fifth Circuit considers the following non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.* These are derived from *United States v. Silk*, 331 U.S. 704, 716 (1947), and are often called the "*Silk* Factors."

In addition to the five factors, *Silk* points to a sixth factor: the extent to which the services rendered by the worker are an integral part of the employer's business. *Silk*, 331 U.S. at 716. The Fifth Circuit's framework is adopted from *Silk*, and without denoting it as a separate factor, has considered the integral nature of the work at issue in determining the economic reality of an employment relationship. *See Mednick*, 508 F.2d at 300; *Shultz v. Hinojosa,* 432 F.2d 259, 265 (5th Cir. 1970); *Mitchell v. Strickland Transp. Co., Inc.*, 228 F.2d 124 (5th Cir. 1956).

None of the *Silk* factors is dispositive of the issue in and of itself. *Hopkins*, 545 F. 3d at 343 (5th Cir. 2008); *Circle C Investments,* 998 F.2d at 327; *Mednick,* 508 F.2d at 300 (5th Cir.

1975); *Pilgrim Equip.*, 527 F.2d at 311; *McLaughlin v. Seafood, Inc.*, 861 F.2d 450 (5th Cir. 1988), on rehearing, 867 F.2d 875 (5th Cir. 1989). Not only must each and every *Silk* factor be considered, but "[t]he determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented." *Thibault*, 612 F.3d at 848.

### a. Control

The first factor, the control over the gate guards exercised by GGS, weighs in favor of a conclusion that GGS's gate guards are employees. "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Hopkins*, 545 F.2d at 343, citing *Mr. W. Fireworks*, 814 F.2d at 1049.

As discussed above, GSS exercised control by setting the non-negotiable flat daily rates, refusing to negotiate raises, assigning the oil field sites, setting the usual 24/7 work schedule and requiring that the gates be staffed for the entire 24 hours a day during the entire work period. GGS also exercised control with its detailed work rules, requiring the guards to wear uniforms and certain safety gear and to affix GSS stickers or placards to their trailers, prohibiting them from wearing certain clothing, from drinking alcohol, from having a firearm in their trailers, and from leaving their assigned gate sites even in the face of tornado, flood and hurricane warnings. *See supra* pp. 2-13.

GGS further controlled the gate guards by prescribing how they performed their guard duties. For example, GGS determined whom the gates guards recorded as entering and leaving a gate and where and how they recorded that information, and GGS required its gate guards to report any vehicle not stopping at the gate or any other incident out of the ordinary. GGS's instructions went so far as to prohibit its gate guards from having cigarette butts around the gate

or trailer and from having trash around their own RVs, requiring them to keep the area clean. *Id.*

Additionally, an employer exercises control over its employees by telling them they "must sign an independent contractor agreement prepared by [the employer] without any input from the would-be independent contractor," and by "controlling all of the advertising," just as GGS did here.[34] *Reich v. Priba Corp.*, 890 F.Supp 586, 592 (N.D. Tex., Dallas Div., 1995).

Further, the guards performed such simple work that they did not require daily, hands-on supervision. "The lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Hopkins*, 545 F.2d at 343 (citing *Mr. W. Fireworks*, 814 F.2d at 1049). The "right to control" does not require continuous monitoring of employees. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988) ("An employer does not need to look over his workers' shoulders every day in order to exercise control."). Instead, control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control "[d]o not diminish the significance of its existence." *Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir.1982). And given that the gate guards worked remotely and disparately, continuous supervision was not

---

[34] *Id.* GGS provided the gate guards with 1099 tax forms that are used for independent contractors. To the extent that any guards deducted food, travel or other expenses from their GGS gate guarding income, they were merely following the tax laws for the independent contractor form agreements that GGS required that they sign and the 1099 forms that GGS prepared and provided to them at the end of each tax year. And in any event, the economic realities factors – and not what the parties believed or called themselves – are determinative. "Subjective beliefs cannot transmogrify objective economic realities. 'A person's subjective opinion that he is a businessman rather than an employee does not change his status.'" *Mr. W Fireworks,* 814 F.2d at 1049 (quoting *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 667 (5th Cir. 1983)). Moreover, "facile labels and subjective factors are only relevant to the extent that they mirror 'economic reality.'" *Id.* at 1044.

feasible,[35] which is why GGS controlled the gate guards by imposing on them specific and detailed instructions on how to perform their duties.  *See supra* pp. 2-13.

GGS also exercised control over the guards by asking them to obtain their certifications as Texas non-commissioned security officers under GGS's name. Although GGS characterized this practice as a "marketing ploy," it required many of its guards to "either have a printout or your Security License with you at all times." In addition, GGS sent a memo, under Steindorf's signature and on Gate Guard letterhead, titled "Gate Guard Duties and Requirements" requiring that all "Security personnel should be certified and have a card if asked for verification." *See supra* pp. 2-13.

GGS required the vast majority of its guards to be Texas registered, non-commissioned security guards who operated under its aegis.  The Texas Private Security Act prohibits registered security officers like the GGS guards from subcontracting their security work, contrary to GGS's contention that the GGS guards could hire relief guards to work directly for them.  In fact, in many instances, GGS paid substitute relief guards directly from its payroll, and that was its express "Relief Policy." *See supra* pp. 2-13.

GGS argues that it merely communicated the requirements of its customers to its gate guards, and therefore did not control its guards.  One court has rejected the same argument stating: "The Defendant's reasoning is circular.  Any employer's business is, in essence, directed by the needs of its customers." *Molina v. South Florida Express Bankserv., Inc.*, 420 F.Supp.2d 1276, 1284 n. 24 (M.D.Fla. 2006) (denying employer's motion for summary judgment).

---

[35] *See, e.g., Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1384 (3d Cir. 1985) (fact that workers were subject to little direct supervision was unsurprising and not significant given that such facts are typical of those who work at home).

Here, as in *Hopkins,* the evidence in the record establishes that GGS "controlled the 'meaningful' aspects of the business." 543 F.3d at 335. Here, as in *Hopkins*, the employer controlled the hiring, firing, and assignment of the subject employees. Here, as in *Hopkins*, the control factor shows that the GGS gate guards are employees of GGS.

### b. *Relative Capital Investment*

In weighing the relative investments of the alleged employees and employer, each gate guard's individual investment must be compared with GGS'Soverall investment in its business. *See Hopkins*, 545 F.3d at 344. Courts must consider "the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Dole v. Snell*, 875 F. 2d 802, 810 (10th Cir. 1989); *Mr. W. Fireworks*, 814 F.2d at 1052; *Castillo v. Givens*, 704 F.2d 181, 192 (5th Cir.), *cert. denied*, 464 U.S. 850 (1983); *Pilgrim Equip.*, 527 at 1313-14. Stated another way, courts look at whether the alleged employee's investment in the business significantly affects the amount of compensation he receives. *Baker v. Barnard Constr. Co., Inc.*, 860 F. Supp. 766, 774 (D.N.M. 1994), citing *Robicheaux,* 697 F.2d at 666. After all, GGS is an independent business, and if each gate guard is in business for himself too as a matter of economic reality, then each gate guard's investment should compare favorably with that of GGS. It does not.

GGS incurred large capital costs: GGS invested in its headquarters office space in Corpus Christi, job advertisements for gate guards, the trucks and flatbed trailers used to haul equipment to the guards, and its Texas service/maintenance yards. Ex. 1 at 46. GGS purchased and temporarily installed for the guards flatbed trailers carrying portable generators (including diesel fuel to run the generators), water tanks (including refills), and portable septic systems. GGS further paid for and provided lighting, air alarm bells and cords, safety equipment and clothes to

use as uniforms. The value of this equipment alone is at least $19,000 to $20,000 at each gate. *See* Ex. 1 at 299; Ex. 23 (Rapstine Deposition) at 272-76. GGS also paid some or all of the expenses for licensing the gate guards as Texas non-commissioned security officers and it invested in liability insurance for its gate guards, as required by the Texas Private Security Act. Ex. 22 at 45; *see supra* pp. 2-13.

On the other hand, the GGS gate guards made no such capital investments, no investments in GGS' business, and no investments in the gate guarding business generally. They simply paid the costs for their normal living expenses like any other employee: they paid for their own food, telephones, televisions, and the furniture, cookware, etc. in their recreational vehicles ("RV's"). At some sites, GGS required the gate guards to provide their own mobile living quarters, usually RV's, or it had a few RV's of its own that it offered to rent to the guards. Again, the guards' RV's were not investments in GGS. The RV's simply provided abodes for the guards and, unlike a courier driver's car, were not used to perform any of the services required of the guards: they were not used to complete traffic logs, observe and report incidents, or to stop some persons from entering the oil fields. The RV's do not indicate that the gate guards are independent contractors. *See Express Sixty-Minute Delivery Service, Inc.*, 161 F.3d 299, 304 (5th Cir. 1998); (courier driver's investment in car is diluted by fact that he uses it for personal purposes too, and driver's investment not significant when compared to employer's investment); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (rig welders' investments in equipped trucks costing between $35,000 and $40,000 did not indicate that they were independent contractors when compared to the employer's investment in its business).

Moreover, some guards already owned the mobile homes before they ever worked for GGS. *See, e.g., Mr. W. Fireworks, Inc.,* 814 F.2d at 2051 (holding that employee's home computer was not an investment in the company although it assisted him in his work, because he had originally purchased the computer for school work).  Others used their mobile homes for personal living quarters from time to time, whether working for GGS or not.[36]  The expenditures that the GGS gate guards made so that they could eat, sleep and live like any other person do not qualify as an "investments in GGS" or capital investments at all.  Comparing GGS's substantial capital investments in its business to the lack of investment by each individual gate guard shows that GGS and the gate guards are not on similar footings (they are not both in business for themselves) and that the gate guards are economically dependent on GGS.  This factor, like the other factors, weighs in favor of an employment relationship.

### c.  *Profit and Loss*

Steindorf, the owner and operator of GGS, admitted that the gate guards have no opportunity for profit or loss. Ex. 1 at 309.  GGS'Sgate guards have no opportunity for profit or loss because they are simply paid a fixed daily rate for the number of days worked.  They do not earn more for performing their jobs more efficiently or by exercising managerial skills, and they do not share in the company's overall profit or loss.[37]  And considering they made no investment in the business or tools or equipment necessary to perform the job, they did not take any risk that

---

[36] GGS provided at least one gate guard with a RV. Ex. 7 at ¶19.

[37] GGS's gate guards are distinguishable from the delivery workers in *Express Sixty-Minute Delivery Service,* 161 F.3d at 303.  In that case, the court found that the delivery workers could influence their opportunity for profit or loss because they could use their experience, skill, initiative, ability to cut costs, and understanding of the courier business to select schedules or routes that would optimize their incomes. *Id.* at 304.  In contrast, the guards' statements reveal that their daily pay rate was constant and they had no ability to change the rate by the assignments, over which they had no influence anyway.  As such, they are unlike the workers in *Express 60 Minutes Delivery Service.*

could possibly result in a loss. The GGS gate guards do not exercise entrepreneurial skills, could not do anything to affect their earnings other working additional days at the rate determined by GGS, and took no risks themselves – facts associated with individuals who are in business for themselves. *See supra* pp. 2-13.

### d.  *Degree of Skill*

Skills, even specialized skills, are not indicative of independent contractor status. *See Superior Care*, 840 F.2d at 1060. For a worker's skills to indicate independent contractor status, they should be used in some independent way, such as demonstrating business-like initiative. *See id.*; *see also Pilgrim Equip.*, 527 F.3d at 1314 ("routine work which requires industry and efficiency is not indicative of independence and nonemployee status"). The gate guards did not demonstrate any management, independent, or business-like initiative in performing their duties; indeed, it is undisputed that the gate guards' tasks require little skill at all. GGS provides a standard traffic log for the gate guards to complete on their job assignments. The gate guards' work includes recording the entry and exit of each vehicle to the oil field site and observing and immediately reporting any unauthorized incidents. Like the dancers in *Circle C Investments*, 998 F.2d at 328, and the fire stand operators in *Mr. W. Fireworks*, 814 F.2d at 1051, the guards "are more akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investment." They simply do not perform work requiring the organizational, management, and business skills of an independent contractor. *Mr. W. Fireworks*, 814 F.2d at 1053; *Pilgrim Equip.*, 527 F.2d at 1314; *see supra* pp. 2-13.

### e.  *Permanency and Duration*

GGS hires its gate guards for an indefinite period. The form agreements that GGS requires that its gate guards sign have neither termination dates, nor specific projects nor specific

gate assignments.  Instead, GGS hires its gate guards for indefinite periods of time, and the vast majority of the guards work at multiple gates.  This is consistent with GGS's practice of assisting guards to obtain their Texas security officer licenses under GGS's name, and providing license renewals under its name, so that the guards can quickly move from gate to gate as oil fields open and close. Given that the gate guards' relationships with GGS are indefinite and not for a fixed period or project, they are employees even if a few of the guards worked for GGS for relatively brief or intermittent periods. *See Silk*, 331 U.S. at 718 ("That the unloaders did not work regularly is not significant."); *Superior Care, Inc.* 840 F.2d at 1060-61(transient nurses found to be employees).  "Under the permanence prong, the duration of the working relationship is not as significant as the number of hours worked and the exclusivity of the working arrangement." *Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07-0069, 2008 WL 2944661 (M.D. Tenn. July 31, 2008) (citations omitted).  And, "[t]his is particularly true where the industry is such that work is partitioned among discrete projects," as is the case with the GGS guards. *Id.*

The gate guards work for GGS for varying duration.  Many of GGS's clients desire to have the same GGS guards work at all of their oil field sites, and those guards work for GGS continuously "following the oil rig."[38]   Such guards must be available to move to each new GGS-client site at short notice, and GGS instructs them to be ready to move immediately. Ex. 21 at 130 and 140-42 and Ex. 2 attached thereto.   All of these facts demonstrate that the guards are not hired for particular projects or for defined periods of time, and are thus economically dependent upon GGS. *See supra* pp. 2-13.

---

[38] For example, Tracy Sellers relates that GGS assigned her to guard the gate for Rig #38 from the time she began working for GGS as a gate guard in June 2010 to the present, and that she has never moved from this Rig #38 guarding assignment.  Rig #38 is stationed primarily in the Westoff, Texas and Yorktown, Texas areas, so that is where she has worked for the past two years as a GGS gate guard (Ex. 35 ¶1).

Further, workers have been deemed employees where their relative lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative. *Mr. W. Fireworks, Inc.*, 814 F.2d at 1053-54; *accord*, *Brock v. Superior Care*, 840 F.2d at 1060-61. Gate guarding assignments are intrinsically transient because a particular oil field needs a gate guard lasts only until the particular oil and gas task is concluded, but GGS'Sclients continue to need GGS's gate guards as other oil fields open and close, and as various tasks are completed at each oil field. In *McLaughlin*, the Fifth Circuit held that pieceworkers in a seafood processing plant were employees within the coverage of the FLSA even though they were transient workers who moved from job to job because their work was unskilled and they were economically dependent on their employer. *McLaughlin*, 861 F.2d at 452-53.

This factor, like the other *Silk* factors, points to a conclusion that the guards are employees.

### f. Integral Role

It is undisputed that providing gate guards to its clients is GGS's only business. The work performed by the guards is not only an integral and indispensable part of GGS's business, but is the very essence of GGS's business. Ex. 1 at 275. It is well-established that where workers play a crucial role in a company's operation, the workers are likely to be employees. *See Rutherford Food*, 331 U.S. at 725 & 729 (boners are employees because their work was "a part of the integrated unit of production" at the employer's factory; their activities were part of a series of interdependent steps, none of which was possible without the others); *Superior Care*, 840 F.2d at 1061 (nurses are employees because "[t]heir services are the most integral part of Superior Care's operation"); *Hinojosa*, 432 F.2d at 265 ("if a specific individual regularly

performs tasks essentially of a routine nature and that work is a phase of the normal operations of that particular business, the [FLSA] will ordinarily regard him as an employee"). As the Third Circuit stated in *Donovan v. DialAmerica Mktg.*, 757 F.2d at 1385 (3d Cir.), "regardless of the amount of work done, workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer." The work of GGS security guards is essential to the gate guarding business of GGS. That fact suggests that the gate guards are not in business for themselves; they are employees of GGS.

### g. *Other Factors: Form Agreements*

Consistent with the long-standing rule that all factors must be considered and none is dispositive, it is also a long-standing rule that the contractual designation of a worker as an independent contractor is not dispositive on employment status. *Thibault*, 612 F.3d at 845 (*citing Hopkins*, 545 F.3d at 346); *Castillo*, 704 F.2d at 188; *Robicheaux*, 697 F.2d at 667 (welders were found to be employees despite having signed an independent contractor agreement, explaining that "[a]n employee is not permitted to waive employee status"); *Pilgrim Equip.*, 527 F.2d at 1315; *Zermeno v. Cantu, C.A.* No. H-11-10-1792, 2011 WL 2532904 at * 2 (S.D. Tex. June 24, 2011). *See also, Superior Care, Inc.*, 840 F.2d at 1059 (2d Cir. 1988) ("[A]n employer's self-serving label of workers as independent contractors is not controlling ...."); *Real v. Driscoll Strawberry Assoc., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979) ("Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA"). In short, an employer "cannot saddle [a] worker with [a] status of independent contractor, thereby relieving itself of its duties under [the] Fair Labor Standards Act, by granting him some legal powers where economic reality is that worker is not and never has been independently in business which the employer would have him operate." *Mednick v. Albert Enters.*, 508 F.2d 297 (5th Cir. 1975).

GGS used two different independent contractor agreement forms:  one form prior to Wage and Hour's investigation ("pre-investigation form," *see* Ex. 14 to Ex. 1), and a second form at the conclusion of that investigation ("post-investigation form," *see* Ex. 15 to Ex. 1). Neither form reflects the true relationship between GGS and its gate guards.

GGS required gate guard applicants to sign one or the other of these "independent contractor agreements" as a pre-condition for even being considered for employment by GGS, which further shows GGS's control of the employment relationship.  GGS did not negotiate with its gate guards about these forms.   GGS Qualified Manager Sidney L. Smith had pre-written independent contractor forms that he handed to the guard applicants as part of their application packets, and he presented only the applications that he thought should be considered for hire to Steindorf, who made the ultimate hiring decisions. *See* Ex. 2 at pp. 70-74; 83.  Smith could not recall ever submitting any gate guard application to Steindorf *unless the guard applicant already had filled out the GGS-drafted independent contractor agreement*. *Id*. at pp. 86:12 – 87:4.  The guards, of course, were not represented by attorneys when they applied for employment with GGS.  *Id*. at pp. 83.   The guards signed the independent contractor paperwork only as part of GGS's required application process for becoming a GGS gate guard.

To the extent that the Court even considers the pre-investigation form, it is notable that it includes terms that typically would apply only to an employment relationship.  Section 4 provides that a gate guard cannot subcontract out his assigned services to be performed unless the gate guard first "receives and/or provides to the Company written confirmation that the person is appropriately licensed to provide security services or properly registered with the company."  This control is inconsistent with an independent contractor relationship.  Further, there is no completion date set forth in either form, which is consistent with at-will employment

rather than an independent contractor project such as putting up a fence or roof for a home owner, or office temping to substitute for an employee who is on vacation.

It is also notable that the pre-investigation form lacks the material terms of price and description of services to be rendered (although it purports to be a contract for the performance of those services) and as such would not be enforceable contract on its face. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218 (Tex. 1992).  That pre-investigation form lacks both the price and the complete description of services to be performed – the consideration for the agreement. Section 1 states the gate guard "shall provide professional guard duties," and "shall keep such logs and make such reports as may be required from time to time, and provide such other duties outlined in Exhibit A hereto."  Section 6 provides that the "sole benefit" to the gate guard is "the cash compensation described in Exhibit A of the Agreement. But Exhibit A is missing from every pre-investigation form, and GGS says that it cannot find one.

Finally the pre-investigation form also inaccurately states that the contractor guard is responsible for payment for all tools, fuel and materials necessary to perform the work.  As discussed above, it is undisputed that GGS provided the guards with diesel generators, diesel fuel and oil for the generators, waters tank filled with water, portable septic systems, hauling trailers to hold the generator, water tank and septic system, halogen lights and air bells and cables at GGS's expense.  In short, the pre-investigation independent contractor form is a mere fiction that GGS required its guards to sign as a condition of employment.

In late 2010, since or towards the end of WH's investigation, GGS drafted a new form and has required some but not all of its guards sign it.  GGS thereby attempted to cure the deficiencies in the pre-investigation form to buttress its argument that the guards are independent

contractors.  But the post-investigation form, too, fails to reflect the economic realties of this employment relationship.[39]

### 3. *Talasek* is distinguishable on its facts regarding the factors of control, opportunity for profit and loss, and permanency of the relationship.

The *Talasek* Order is not determinative in this case because *Talasek* is distinguishable on its facts regarding control, permanency of the relationship and opportunity for profit and loss. The Fifth Circuit recognizes that workers bearing the same title and performing many of the same duties may be employees in one case yet independent contractors in another, depending on the specific *Silk* factors in each case.  *Cf. Thibault*, 612 F.3d at 848 (finding splicers to be independent contractors) *with Cromwell v. Driftwood Elec. Contractors*, 2009 WL 3254467, 348 Fed.Appx 57, 61 (5th Cir. 2009) (unpublished) (vacating summary judgment for employer and finding splicers were employees); *cf. Robicheaux v. Radcliff Material*, 697 F.2d 662 (5th Cir. 1983) (finding welders were employees) *with Carrell v. Sunland Const., Inc.*, 998 F.2d 330 (5th Cir. 1993) (finding welders were independent contractors).

The employment relationship facts in *Talasek* are significantly different from those here concerning control, opportunity for profit and loss and permanency of the relationship.

First, GGS exercised far more pervasive ***control*** over its guards than did Talasek.   While the Court found that Talasek exercised little if any control over its gate guards (*Talasek* Order at 13), the undisputed evidence shows that GGS exercised extensive control over its gate guards. *See supra*, pp. 2-11; 18-21. For example, unlike the GGS guards, the Talasek guards "had some choice in the length of their shifts." *Talasek*  Order at 3.  In contrast, once a GGS guard accepted an assignment, GGS required that the guard stay and work that gate until the end of that gate

---

[39]  Steindorf admits that since this litigation commenced (GGS filed its action against the Secretary on November 20, 2010) until at least the date of Steindorf's deposition on October 20, 2011, GGS did not change its practices for its gate guards. *See* Ex. 1 at 356, ll. 11 to 14.

guarding assignment, which could last up to several months or even longer.  There was no such thing as a "GGS shift" for any GGS gate guard.  While working a gate, not matter for how long, if a GGS gate guard needed to take a break from the gate, then the guard had to wait until GGS supplied a temporary, GGS-licensed relief gate guard.  GGS eventually required its gate guards to provide their own relief guards before they could take a break, and those relief guards had to be GGS-licensed and approved by GGS, again showing GGS's control. *See supra* pp. 2-13.

As another example of the significant differences in control, Talasek, unlike GGS, placed no restrictions on its gate guards (*Talasek* Order at 3-4).  Talasek, unlike GGS, is not listed as a licensed security company with the Texas Security Bureau,  did not ask its guards to become Texas non-commissioned security officers operating under the company's name, did not assist its guards in obtaining those certifications, and did not require its guards to have their GGS certifications available at all times.  *See supra* pp. 2-13.

Another key difference in control is that one of Talasek's three guards began working for Talasek a week before she ever met the owner, and her only orders were to continue what she had been doing, *i.e.*, sign people in and out. *Talasek* Order at 4.  In contrast, GGS required its gate guards to complete pre-employment applications, conducted pre-employment interviews, and issued its gate guards detailed work rules many of which were in writing that regulated, among other things, footwear and clothing, worksite organization and trash disposal, and prohibited guards from having alcohol and firearms at the gates or from leaving a gate unattended for any reason.  *See supra* pp. 2-13.

Second, the facts differ markedly concerning the ***opportunity for profit and loss*** for Talasek's gate guards versus GGS's gate guards.  Here, Steindorf, the owner and person who ran GGS's business, *admitted* that the GGS gate guards had no opportunity for profit and loss.  And

as discussed above, the GGS guards had restrictions on other gate guarding employment that were not experienced by the Talasek guards, in that they had security guarding licenses that were *under GGS's name*. They suffered barriers to alternative guarding employment not experienced by the Talasek guards. As a practical matter, the GGS guards' unrelieved 24/7 schedule until the end of each guarding assignment, no matter how long, prevented them from holding down guarding jobs at other companies while they worked for GGS.[40]   Moreover, the GGS gate guards had no realistic opportunity to find other employment "between" GGS assignments, because even for those guards who had breaks between GGS assignments, the breaks were unpredictable and varied greatly, with many breaks lasting no more than a few days.[41]  *See supra* pp. 2-13.

The summary judgment record here also does not support a finding that the gate guards could have increased their profits by controlling costs that may have been reported as expenses on their income tax returns. *See Talasek* Order at 6.  To the extent that any GGS gate guards deducted food, gasoline or other expenses from their income tax returns, they were merely following the tax laws consistent with the independent contractor form agreements that GGS required that they sign and the 1099 forms that GGS prepared and provided to them at the end of each tax year.  Certainly, the  FLSA does not contemplate that an employer may misclassify his employees as independent contractors and thereby avoid paying them minimum wages and over time compensation required by the Act, then attempt to buttress that misclassification by providing the employees with independent contractor tax forms, and then further attempt to

---

[40] Further, even if the GGS guards had the ability to work at other establishments despite their 24/7 required work schedules, "an ability to work at other establishments is not dispositive of the issue." *Reich v. Priba Corp.*, 890 F.Supp 586, 592 (N.D. Tex., Dallas Div., 1995), *citing McLaughlin*, 861 F.2d at 452.

[41]   *See* fn. 24 and fns. 29-30, *supra.*

further buttress the misclassification by arguing that the employees took the deductions appropriate to the forms provided to them by their employer.  Moreover, costs incurred by the GGS guards were merely some of their living expenses such as food, telephone bills, gasoline and housing (RV) expenses, which were not gate guarding tools.  Unlike the welders in *Carrell*, 998 F.2d at 332, who incurred costs for welding tools, equipment and supplies, and the splicers in *Thibault v. Bellsouth Comm'ns, Inc.*, 612 F.3d 843,846 (5th Cir. 2010) who incurred costs such as the bucket trucks and splicing tools that were necessary work tools for performing the job, the GGS gate guards did not supply any of the equipment necessary for guarding the gates 24/7. *See Talasek* Order at 6.  Rather, GGS supplied and paid for the halogen lights that lit the gates through the night, the air alarms and cable, and all other gate guarding supplies. *See supra* pp. 2-13.  In summary, as Steindorf admitted, GGS's gate guards had no opportunity for profit and loss.

Third, regarding ***permanency and duration of employment***, the Talasek guards worked regular ten-to-fourteen day shifts, usually alternating with equal time off.  See *Talasek* Order  at 2; *Talasek* R&M at 2.  In contrast, GGS guards worked 24/7 until the completion of the oil field task which could last for many months, did not have or work "shifts," and never had time off during a gate assignment unless there was a GGS-approved relief guard available.  Moreover, unlike the three Plaintiff Talasek guards, many of GGS'Sgate guards worked for GGS several years even as many as six and one half years.[42]  Further unlike the three *Talasek* gate guards, many other GGS gate guards worked for many months without a break or with only a few breaks

---

[42]  *See* fn. 24 and fns. 29-30.

between assignments, and if breaks were taken they were unpredictable, irregular and of varying periods.[43]

Another critical difference relevant to permanency of employment and control is that while Talasek paid its guards at the end of every shift, (R&M at 12), GGS paid its guards every two weeks whether an assignment had concluded or not, which is consistent with an employment relationship. Ex. 22 at 131-32 and Ex. 8 attached thereto.

Additionally, unlike the Talasek gate guards, the GGS gate guards had security officer licenses under GGS's name that were active for two years, many of which were then renewed. This reflects the intent that the GGS guards were not working for a finite period or on a single gate assignment. In short, the facts concerning permanency and duration of employment point to an employment relationship in this case. *See supra* pp. 2-13.

The facts concerning relative capital investment and skill and initiative, on the other hand, are more similar to the facts in *Talasek,* which the court found pointed to an employment relationship. As to *relative capital investment*, GGS has an even larger capital investment than Talasek, because unlike Talasek, GGS is a large and growing business with an extensive infrastructure including its Corpus Christi headquarters, multiple warehouse service centers, and extensive (and expensive) equipment, and provides hundreds of gate guards throughout several states. Thus, the facts in this case provide even more support that the GGS's investments "substantially outweighed" those of the GGS gate guards, analogous to *Talasek*. *Talasek* Order at 5. Relative capital investment points here, as in *Talasek*, to an employment relationship. *See supra* pp. 2-13.

---

[43] *Id.*

The **skill and initiative** factor here, like the skill and initiative factor in *Talasek*, weighs in favor of finding the GGS gate guards were employees because the gate guarding job "required no special training or unique skill set." *Id.* at 8.

### 4. The underlying purposes of the FLSA would be frustrated if GGS's gate guards were found to be independent contractors.

The *Talasek* Order notes that the purposes of the FLSA would not be frustrated by finding that the gate guards were independent contractors of Talasek. *Talasek* Order at 14. Here, however, the FLSA's purpose *would* be frustrated if a company like GGS could continue to enjoy a financial windfall and competitive advantage from its lower labor costs from misclassifying its gate guards as independent contractors, when competing Texas companies within the same industry like C&K Rentals and TimeKeepers have complied with the FLSA and classify and pay their gate guards as employees. [44]

Equally, the FLSA's purpose is not served when an employer like GGS requires its gate guards to guard their gates 24 hours a day, every day; answer every alarm bell; physically open

---

[44]    *See* Ex. 36 ¶¶ 3-7; 8-13; 15 (Affidavit of Eden Ramirez) and Affidavit Exhibit 1 thereto. C & K Supply Inc. d/b/a C & K Rentals ("C & K") provides oil field gate guards to its oil and gas clients throughout Texas.  In June 2011, C & K agreed to pay backwages of $433,426 in minimum wage and overtime compensation to 124 former gate guards and oil equipment cleaners and committed to maintaining future compliance with the FLSA by properly classifying and compensating its employees for all hours of their work, after the U.S. Department of Labor investigated and found that the company had misclassified these employees as independent contractors.  TimeKeepers, Inc. ("TimeKeepers"),  provides licensed, non-commissioned security gate guards to its oil and gas clients located throughout Texas, just like GGS.  In 2011, WH's investigation of TimeKeepers found that the company properly classified 196 gate guards as employees, but failed to pay its gate guards for time and one-half for all hours worked in excess of 40 hours per week and instead paid them a straight daily rate in violation of the FLSA. In early 2012, TimeKeepers agreed to pay $143,516.73 in overtime backwages due to its 196 gate guard employees, and committed to maintaining future compliance with the FLSA. *Id.* Steindorf himself identifies TimeKeepers as one of GGS's competitors. Ex. 1 at 112.  Thus, hundreds of Texas gate guards were properly classified and paid under the FLSA as employees – but not GGS's gate guards.  Consequently, to the extent that the *Talasek* decision makes reference to industry practice as a possible factor, there is no clear practice.

and close the gates, record every vehicle entry and exit; report all unauthorized entrances; and report all unusual incidents at their gates[45], and then argue (and even convince some of the gate guards) that the gate guards only "work" when they put pencil to paper.  The nature of the job and its strict 24/7 schedule mean that many of the gate guards were constantly busy, and are frequently interrupted during their sleep and meal times.[46]  And although the compensable hours worked by the gate guards is not relevant unless and until they are first determined to be employees under the FLSA, it is still important to recognize at the outset that the FLSA encompasses as work the times that employees are "engaged to wait," as GGS's gate guards sometimes were here. *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944), *reh'g denied*, 323 U.S. 126 (1945); 29 C.F.R. § 785.14 (2011).  The Fifth Circuit has confirmed that time spent engaged to wait is compensable time if the facts indicate that employees' waiting time is predominantly for the benefit of the employer.  *Mireles v. Frio Foods*, 899 F.2d 1407 (5th Cir. 1990).

### 5.  Other recent case law points to an employment relationship here.

Every FLSA employment status case must be determined on its own facts, but a recently-decided case provides guidance here.  Last May, another federal district court granted summary judgment for the Secretary and found that security guards were employees under the FLSA. *Solis v. International Detective & Protective Service, Ltd.* ___ F.Supp. ___, No. 09C4998, 2011 WL 2038734 (N.D. Ill. 2011).  Like GGS, the employing company ("IDPS") required the guards to sign independent contractor agreements that contained few material terms and were at-will relationships.  2011 WL 2038734 at *10.  Like GGS, IDPS provided guidelines to the guards for performing their work, including telling them who to contact in an emergency and that they

---

[45] *See Supra* pp. 6-10.

[46] *Id.*

should complete incident reports, and instructing them not to personally investigate suspicious activity and to wear the proper uniform. *Id.* at * 3. Like GGS, IDPS provided equipment to the guards and provided liability insurance for the guards. The IDPS guards also provided some of their own work equipment. IDPS, like GGS, made sure the guards were licensed under the applicable state law. *Id.* at * 3. Like GGS, IDPS maintained files on all the guards. *See* Ex. 2 at 62 and 94-95. Like GGS, IDPS set the work schedules and made the assignments. *Id.* Like the GGS guards, the IDPS guards' skill and efficiency in completing the required duties was not linked to the amount they earned. 2011 WL 2038734 at * 10. IDPS guards, like the GGS guards, did not have a high degree of technical expertise or skill. *Id.* at * 10. The GGS guards, like the IDPS guards, were an integral part of the business. Id. at * 11. Here, as in IDPS, all of the *Silk* factors show that guards were "employees," not independent contractors.

## V. CONCLUSION

All of the *Silk* factors show that GGS and its gate guards had an employment relationship under the FLSA: GGS controlled its gate guards, the GGS gate guards had no opportunity for profit and loss, GGS's capital investment far outweighed that of its gate guards, the GGS gate guards lacked the skill and initiative necessary for independent contractors, GGS's gate guards were integral to its business, and finally, permanency and duration point to an employment relationship. Other factors and recent case law also show that GGS's gate guards were its employees, not independent contractors. For all of the foregoing reasons, the Secretary respectfully prays for summary judgment that GGS's gate guards are its employees and are not independent contractors under the FLSA.

Respectfully Submitted,

M. PATRICIA SMITH
Solicitor of Labor

JAMES E. CULP
Regional Solicitor

U. S. Department of Labor          MARGARET TERRY CRANFORD
Office of the Solicitor             Counsel for Wage and Hour
525 Griffin Street, Suite 501
Dallas, Texas 75202
Telephone:  972-850-3100
Facsimile:    972-850-3101

                                    /s/ Colleen B. Nabhan
                                    COLLEEN B. NABHAN
                                    Attorney-In-Charge
                                    Texas Bar No. 14769500
                                    RICHARD M. MOYED
                                    Texas Bar No. 14612550
                                    JENNIFER J. JOHNSON
                                    Texas Bar No. 24055743

                                    JOSE ANGEL MORENO
                                    United States Attorney

                                    JOHN A. SMITH III
                                    Assistant United States Attorney
                                    Southern District of Texas No. 8638
                                    Texas Bar No. 18627450
                                    800 North Shoreline, Suite 500
                                    Corpus Christi, Texas  78401
                                    Telephone:  (361) 888-3111
                                    Facsimile:  (361) 888-3200
                                    E-mail: john.a.smith@usdoj.gov

                                    Attorneys for Defendant/Counter-Plaintiff

## CERTIFICATE OF SERVICE

The foregoing document has been filed under seal pursuant to the agreement of the parties that documents containing information or documents that GGS claimed to be trade secrets in GGS's Amended Motion to Seal Deposition Transcripts and Motion for Protective Order would be filed under seal as a preliminary matter until the Court rules on that Motion. The undersigned certifies that on May 3, 2012, the foregoing document has been served via regular United States Mail on all counsel of record, in accordance with the Local Rules of the United States District Court for the Southern District of Texas regarding the service of pleadings filed under seal:

Annette A. Idalski
Kelly Campanella
Chamberlin, Hrdlicka, White, Williams & Martin
191 Peachtree Street, N.E., 34th Floor
Atlanta, GA 30303-1747

Daniel D. Pipitone
Chamberlain Hrdlicka White Williams & Martin
1200 Smith St. 14th Floor
Houston, TX 77002

And to AUSA John Smith, co-counsel to the undersigned.

By:    /s/Colleen B. Nabhan
COLLEEN B. NABHAN