UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| GATE GUARD SERVICES, L.P. | ) | |
| and BERT STEINDORF, | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | Civil Action File |
| | ) | No. 6:10-cv-91 |
| v. | ) | |
| | ) | JURY |
| HILDA L. SOLIS, SECRETARY OF LABOR, | ) | |
| UNITED STATES DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |
| | ) | |

**PLAINTIFF GATE GUARD SERVICES, L.P. AND BERT STEINDORF'S
CROSS MOTION FOR SUMMARY JUDGMENT**

**AND**

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

SUMMARY OF THE EVIDENCE ....................................................................... vii

I.      STATEMENT OF THE CASE................................................................... 1

II.     PROCEDURAL HISTORY AND BACKGROUND FACTS ........................... 3

        A.      THE WAGE AND HOUR INVESTIGATION ................................. 3

        B.      THE LITIGATION ....................................................................... 10

III.    GGS'S STATEMENT OF UNDISPUTED MATERIAL FACTS .................... 13

IV.     THE SECRETARY'S "STATEMENT OF UNDISPUTED MATERIAL FACTS"
        LACKS EVIDENTIARY SUPPORT ............................................................ 24

V.      ARGUMENT AND AUTHORITIES ............................................................ 32

        A.      GGS IS ENTITLED TO SUMMARY JUDGMENT ON THE
                MERITS IN BOTH ACTIONS .................................................... 32

                1.      Summary Judgment Standard ................................... 32

                2.      The Gate Attendants Are Not Subject To The FLSA
                        Because They Are Independent Contractors................ 33

                        a.      The Permanency of the Parties' Relationship ............. 34

                        b.      The Degree of Control Exercised Over the Worker .................. 40

                                i.      GGS Does Not Control the Details of the
                                        Work Performed by the Gate Attendants......................... 41

                                ii.     GGS Does Not Supervise the Gate
                                        Attendants ...................................................... 45

                        c.      The Skill and Initiative Required.................................... 52

                        d.      The Relative Investments of Each Party........................ 54

                        e.      The Worker's Opportunity for Profit and Loss............................ 58

                        f.      Written Independent Contractor Agreements ............................... 63

                3.      This Court And The Federal Government Consider Gate
                        Attendants To Be Independent Contractors............................. 66

a. *Mack v. Talasek* ............................................................... 66

b. The U.S. Army Corps of Engineers ................................................ 69

4. The Gate Attendants Independent Contractor Status Does Not Frustrate The Underlying Purpose Of The FLSA ............................ 72

B. GGS IS ENTITLED TO SUMMARY JUDGMENT IN BOTH ACTIONS BECAUSE THE SECRETARY IS IN DEFAULT ........................... 73

C. GGS IS ENTITLED TO JUDGMENT ON ALL CLAIMS IN THE SECRETARY'S COMPLAINT BASED ON THE DOCTRINE OF *RES JUDICATA* ............................................................... 76

VI. CONCLUSION & PRAYER ........................................................ 78

# TABLE OF AUTHORITIES

## Cases

*Alameda v. Sec'y of Health, Ed. and Welfare,*
    622 F.2d 1044 (1st Cir. 1980) .......................................................... 75

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505 (1986) .............................................. 32

*Beliz v. W.H. McLeod & Sons Packing Co.,*
    765 F.2d 1317 (5th Cir. 1985) .......................................................... 33

*Booth v. Quantum Chemical Corp.,*
    942 F. Supp. 580 (S.D. Ga. 1996) .................................................... 76

*Bostic v. Harris,*
    484 F. Supp. 686 (S.D. W.Va. 1979 ................................................ 75

*Boutin v. Exxon Mobil Corp.,*
    730 F. Supp. 2d 660 (S.D. Tex. 2010) .............................................. 51

*Brock v. Mr. W Fireworks, Inc.,*
    814 F.2d 1042, 1054 (5th Cir. 1987) ................................................ 40

*Brock v. Superior Care, Inc.,*
    840 F.2d 1054 (2d Cir. 1988) ........................................................... 46

*Carrell v. Sunland Constr., Inc.,*
    998 F.2d 330 (5th Cir. 1993) ............................... 33, 34, 37, 39, 40, 41,
    ............................................ 53, 54, 55, 56, 58, 60, 62, 63, 64, 65

*Chao v. Mid–Atl. Install. Servs.*, Inc.,
    16 Fed. App'x 104 (4th Cir. 2001) ................................................... 53

*Delphin v. Grayson County, Tex.,*
    No. 12–40102, 2012 WL 3205449 (5th Cir. Aug. 7, 2012) ................. 24

*Donovan v. DialAmerica Marketing, Inc.,*
    757 F.2d 1376 (3rd Cir. 1985) .......................................................... 52

*Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.,*
    553 F.3d 559 (7th Cir. 2009) .............................................. 41, 43, 46

*Forsyth v. Barr,*
    19 F.3d 1527 (5th Cir. 1994) ........................................................... 28

*Frederick v. Intercontinental Hotels Group Resources, Inc.*,
Civil Action No. 09–7497, 2011 WL 666843
(E.D. La. Feb. 14, 2011) ............................................................................ 24

*Gray v. Sage Telecom, Inc.*,
No. 3:05-cv-1677-G, 2006 WL 2820075
(N.D. Tex. Oct. 2, 2006) ....................................................................... 28, 59

*Halferty v. Pulse Drug Co., Inc.*,
821 F.2d 261 (5th Cir. 1987) ..................................................................... 33

*Haskins Trucking Inc. v. Goodyear Tire & Rubber Co.*,
Civil Action No. 07-0585, 2008 WL 1775272
(W.D. La. Apr. 17, 2008) ............................................................................ 24

*Henderson v. Hernandez*,
No. 5:05-CV-037-C, 2005 WL 473678
(N.D. Tex., March 1, 2005) ......................................................................... 34

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.*,
161 F.3d 299 (5th Cir. 1990) ................................................................. 27, 51

*Hickey v. Arkla Industries, Inc.*,
699 F.2d 748, 752 (5th Cir. 1983) .............................................................. 52

*Hopkins v. Cornerstone America*,
545 F.3d 338 (5th Cir. 2008) ......................................................... 39, 53, 62

*Hunter-Reed v. City of Houston*,
244 F. Supp. 2d 733, 746 (S.D. Tex. 2003) ............................................... 24

*Jacobson v. Comcast Corp.*,
740 F. Supp. 2d 683 (D. Md. 2010) ........................................................... 31

*Lindsley v. Bellsouth Telecommunications, Inc.*,
401 F. App'x 944 (5th Cir. 2010) ......................................................... 37, 64

*Lucas v. BMS Enters., Inc.*,
Civil Action No. 3:09–CV–2159–D, 2010 WL 2671305, at *3
(N.D. Tex. July 1, 2010) ............................................................................. 33

*Mack v. Talasek*,
No. V-09-53, 2012 WL 1067398, *4-6
(S.D. Tex. Mar. 28, 2012) ...................................... 27, 34, 35, 36, 37, 38, 42, 43,
.................................................................. 46, 47, 52, 59, 60, 62, 66, 67, 68, 69, 72

*Mersch v. City of Dallas*,
207 F.3d 732, 734–35 (5th Cir. 2000) ....................................................... 24

*Moreau v. Air France*,
    356 F.3d 942 (9th Cir. 2004) ........................................................ 48

*Patel v. Wargo*,
    803 F.2d 632 (11th Cir. 1986) ...................................................... 33

*Richardson v. Oldham*,
    811 F. Supp. 1186 (E.D. Tex. 1992) .............................................. 24

*Robicheaux v. Radcliff Material, Inc.*,
    697 F.2d 662 (5th Cir. 1983) ........................................................ 34

*Robinson v. Worthington*,
    544 F. Supp. 949 (N.D. Ala. 1982) ............................................... 76

*Santelices v. Cable Wiring*,
    147 F. Supp. 2d 1313, 1327-28 (S.D. Fla. 2001) .......................... 48

*Scott v. Harris*,
    550 U.S. 372, 127 S. Ct. 1769 (2007) .......................................... 32

*Solis v. International Detective & Protective Service, Ltd.*,
    819 F. Supp. 2d 740 (N.D. Ill. 2011) ...................................... 43, 72

*Stevenson v. Vinson*,
    Civil Action No. 9:09cv39, 2009 WL 5062068
    (E.D. Tex. Dec. 15, 2009) ............................................................ 32

*Stringer v. Heckler*,
    585 F. Supp. 709 (W.D. Ky. 1983) ............................................... 75

*Talbert v. American Risk Ins. Co.*,
    405 F. App'x 848 (5th Cir. 2010) ............................. 36, 37, 39, 45, 64

*Thibault v. Bellsouth Telecommunications, Inc.*,
    612 F.3d 843 (5th Cir. 2010) .................................. 34, 35, 38, 40, 41, 43,
    ............................................................ 46, 54, 55, 56, 59, 62, 63, 64

*Travland v. Ector County, Texas*,
    No. 93-8560, 39 F.3d 319, 1994 WL 612342
    (5th Cir. Oct. 20, 1994) ............................................................... 24

*United States v. Lawrence*,
    276 F.3d 193 (5th Cir. 2001) ........................................................ 32

*United States v. Shanbaum*,
    10 F.3d 305 (5th Cir. 1994) .......................................................... 76

*Weisel v. Singapore Joint Venture, Inc.,*
   602 F.2d 1185, 1188 (5th Cir. 1979) .................................................................................. 33

## **Statutes**

28 U.S.C. § 2412(d) ............................................................................................................ 78

## **Rules**

Fed. R. Civ. P. 12(a)(4) ...................................................................................................... 74

Fed. R. Civ. P. 55(d) ........................................................................................................... 74

Fed. R. Civ. P. 56 ................................................................................................................ 24

Fed. R. Civ. P. 56(c) ........................................................................................................... 32

## SUMMARY OF THE EVIDENCE

GGS and Mr. Steindorf rely upon the pleadings on file with the Court and incorporate by reference and rely upon the following summary judgment evidence attached hereto:

Tab A:      Declaration of Bert Steindorf, Jr. dated May 29, 2012 with the following exhibits:

| Ex. 1 | List of Independent Contractors |
|---|---|
| Exs. 2-458 | Independent Contractor Agreements |

Tab B:      Declaration of Rachel Jade Petty dated October 22, 2012 with the following exhibits:

| Ex. 1 | Emergency Contact Numbers |
|---|---|
| Ex. 2 | Just a Reminder |
| Ex. 3 | Relief Policy |
| Ex. 4 | Proper Attire for Each Situation |
| Ex. 5 | Employee Report of Accident, Injury, or Illness |
| Ex. 6 | Gate Guard Duties and Requirements |

Tab C:      Declaration of Pat Brown dated October 17, 2012 with the following exhibits:

| Ex. 1 | 1099 Detail Report for 2009 |
|---|---|
| Ex. 2 | 1099 Detail Report for 2010 |
| Ex. 3 | Transaction List by Vendor: January – March 2011 |
| Ex. 4 | Transaction List by Vendor:  April – May 25, 2011 |
| Ex. 5 | Transaction List by Vendor:  May 25, 2011 – August 10, 2011 |
| Ex. 6 | Transaction List by Vendor:  August 11, 2011 – November 29, 2011 |

Tab D:      Declarations of Gate Attendants:

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Declaration of Shirlene Abbie dated April 4, 2012 |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 2 | Declaration of James Arp dated February 14, 2011 |
| 3 | Declaration of Ricky Atteberry dated February 15, 2011 |
| 4 | Declaration of Gabrielle Badger dated February 12, 2011 |
| 5 | Declaration of Jim Bell dated January 22, 2011 |
| 6 | Declaration of Grant Bisel dated October 21, 2010 |
| 7 | Declaration of Kenneth Boren dated April 4, 2012 |
| 8 | Declaration of Jimmie Bowling dated January 2011 |
| 9 | Declaration of Marlin Braddock dated February 12, 2011 |
| 10 | Declaration of Robert Carter dated September 21, 2012 |
| 11 | Declaration of Maria Clark dated November 21, 2011 |
| 12 | Declaration of Thomas Clemens dated February 15, 2011 |
| 13 | Supplemental Declaration of Thomas Clemens dated November 19, 2011 |
| 14 | Second Supplemental Declaration of Thomas Clemens dated April 2, 2012 |
| 15 | Declaration of Betty Conrad dated February 15, 2011 |
| 16 | Declaration of Tony Coronel dated February 23, 2011 |
| 17 | Declaration of Benny Coulston dated February 16, 2011 |
| 18 | Supplemental Declaration of Benny Coulston dated April 4, 2012 |
| 19 | Declaration of James Dampier dated October 21, 2010 |
| 20 | Declaration of Robert Eldridge dated January 21, 2011 |
| 21 | Declaration of Cathy Evans dated February 14, 2011 |
| 22 | Declaration of Robert Ferrell dated March 11, 2011 |
| 23 | Declaration of Vincent Flickinger dated January 2011 |
| 24 | Declaration of Louis Fontenot dated February 12, 2011 |
| 25 | Declaration of Brenda Fuller dated January 2011 |
| 26 | Declaration of Chester Geering dated January 22, 2011 |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 27 | Declaration of Albert Giordano dated January 6, 2011 |
| 28 | Declaration of Richard Dale Guidry dated October 21, 2010 |
| 29 | Declaration of John Helser dated January 12, 2011 |
| 30 | Declaration of Adell Hembry dated January 6, 2011 |
| 31 | Declaration of Walter Hickey dated April 10, 2012 |
| 32 | Declaration of Grace Huitt dated January 2011 |
| 33 | Declaration of Janis Hunt dated October 21, 2010 |
| 34 | Declaration of James Hutto dated January 2011 |
| 35 | Declaration of Trena Jones dated January 7, 2011 |
| 36 | Declaration of Walter Jubeck dated January 21, 2011 |
| 37 | Declaration of Debbie Kershman dated January 7, 2011 |
| 38 | Declaration of Virginia Lee dated September 25, 2012 |
| 39 | Declaration of Elizabeth Lindsey dated January 21, 2011 |
| 40 | Declaration of Robert Lindsey dated January 21, 2011 |
| 41 | Declaration of Joye Lovett dated January 24, 2011 |
| 42 | Declaration of Karl Lovett dated January 22, 2011 |
| 43 | Declaration of John McAdoo dated January 7, 2011 |
| 44 | Supplemental Declaration of John McAdoo dated January 2012 |
| 45 | Declaration of Shirley McAdoo dated January 7, 2011 |
| 46 | Supplemental Declaration of Shirley McAdoo dated January 2012 |
| 47 | Declaration of Carroll McCaugherty dated February 15, 2011 |
| 48 | Declaration of John McClelland dated October 1, 2012 |
| 49 | Declaration of David McKinney dated January 2011 |
| 50 | Declaration of Pauline McKinney dated January 2011 |
| 51 | Declaration of Phylis Melton dated October 22, 2010 |
| 52 | Declaration of Sadie Milner dated February 16, 2011 |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 53 | Declaration of Willie Molina dated January 7, 2011 |
| 54 | Declaration of Judith Morris dated October 22, 2010 |
| 55 | Declaration of John Mostoller dated September 19, 2012 |
| 56 | Declaration of Anne Muraski dated February 16, 2011 |
| 57 | Declaration of Wayne Neff dated September 13, 2012 |
| 58 | Declaration of Raymond Olivarez dated September 23, 2012 |
| 59 | Declaration of James Padgett dated February 16, 2011 |
| 60 | Declaration of Jama Park dated November 9, 2011 |
| 61 | Declaration of Larry Phillip Payne dated October 21, 2010 |
| 62 | Declaration of Rachel Marie Payne dated October 21, 2010 |
| 63 | Declaration of Rolando Peña dated June 4, 2012 |
| 64 | Declaration of Harold Ronald Phelps dated October 21, 2010 |
| 65 | Supplemental Declaration of Harold Ronald Phelps dated April 4, 2012 |
| 66 | Declaration of Cindy Pritchett dated April 23, 2012 |
| 67 | Declaration of Debra Pruett dated January 31, 2011 |
| 68 | Declaration of Lawrence Quarles dated October 21, 2010 |
| 69 | Declaration of Billy Joe Reid dated February 14, 2011 |
| 70 | Supplemental Declaration of Billy Joe Reid dated September 28, 2011 |
| 71 | Declaration of Marjorie Reid dated February 14, 2011 |
| 72 | Declaration of Jan Renee dated January 21, 2011 |
| 73 | Declaration of Ken Roberts dated February 15, 2011 |
| 74 | Declaration of Gloria Rochester dated May 27, 2012 |
| 75 | Declaration of John Rogers dated September 22, 2012 |
| 76 | Declaration of Sheri Shows dated January 2011 |

| EXHIBIT | DESCRIPTION |
|---|---|
| 77 | Supplemental Declaration of Sheri Shows dated April 19, 2012 |
| 78 | Declaration of Carl Staley dated December 20, 2011 |
| 79 | Supplemental Declaration of Carl Staley dated January 6, 2012 |
| 80 | Declaration of Christine Stoltz dated September 13, 2012 |
| 81 | Declaration of John Stone dated January 1, 2012 |
| 82 | Declaration of Jerry Studlar dated November 16, 2011 |
| 83 | Declaration of Donna Suonvieri dated September 24, 2012 |
| 84 | Declaration of Roger Trooien dated February 15, 2011 |
| 85 | Declaration of Charles Wallace dated September 27, 2011 |
| 86 | Declaration of Eddie Ward dated May 14, 2012 |
| 87 | Declaration of Sandra Wells dated April 19, 2012 |
| 88 | Declaration of Milford Wheeler dated January 1, 2012 |
| 89 | Declaration of George White dated January 3, 2012 |
| 90 | Declaration of Joy White dated September 19, 2012 |
| 91 | Declaration of Lawrie Yaeger dated January 2011 |
| 92 | Declaration of Lawrie Yaeger dated January 4, 2012 |
| 93 | Supplemental Declaration of Lawrie Yaeger dated January 4, 2012 |
| 94 | Declaration of Roy Yoder dated March 10, 2011 |

Tab DD:     Declarations of Army Corps of Engineers Gate Attendants:

| Exhibit | DESCRIPTION |
|---|---|
| 1 | Supplemental Declaration of John McAdoo |
| 2 | Supplemental Declaration of Shirley McAdoo |
| 3 | Supplemental Declaration of Carl Staley |
| 4 | Declaration of John Stone |
| 5 | Declaration of Milford Wheeler |

Tab E:        Excerpts from the Deposition of Bert Steindorf, Jr. and the following exhibits thereto:

| Ex. 7 | Just a Reminder |
|-------|-----------------|
| Ex. 8 | Proper Attire for Each Situation |
| Ex. 9 | Gate Guard Duties and Requirements |
| Ex. 10 | Gate Guard Responsibilities |
| Ex. 11 | Jade Abbie Memo to Guards Regarding Relief |
| Ex. 12 | Gate Guard Services, L.P. Notice to Gate Guards Effective June 20, 2009 |
| Ex. 13 | Sid Smith Memo to Gate Guards Regarding Uniforms |

Tab F:        Excerpts from the Deposition of Sidney L. Smith

Tab G:        Excerpts from the Deposition of Pat Brown

Tab H:        Excerpts from the Deposition of Stacie Henderson

Tab I:         Excerpts from the Deposition of Jade Petty and the following exhibits thereto:

| Ex. 1 | Emergency Contact Numbers |
|-------|---------------------------|
| Ex. 2 | Just a Reminder |
| Ex. 3 | Relief Policy |
| Ex. 4 | Proper Attire for Each Situation |
| Ex. 5 | Employee Report of Accident, Injury, or Illness |
| Ex. 6 | Gate Guard Duties and Requirements |

Tab J         Excerpts from the Deposition of David Rapstine and the following exhibits thereto:

| Ex. 2 | Email from David Rapstine dated October 5, 2010 |
|-------|--------------------------------------------------|
| Ex. 5 | Letter from David Rapstine to GGS dated July 15, 2010 |
| Ex. 6 | Email from David Rapstine to Sabrina Loudin dated July 29, 2010 |
| Ex. 7 | David Rapstine's Training History |

| Ex. 10 | FLSA Narrative |
|--------|----------------|
| Ex. 19 | Gate Attendant List of Weeks Worked |
| Ex. 20 | Rapstine's Estimated Cost of Logistical Equipment |
| Ex. 22 | Rapstine's Initial Conference Notes |

Tab K:    Excerpts from the Deposition of Eden Ramirez and the following exhibits thereto:

| Ex. 19 | Gate Attendant List of Weeks Worked, From the Deposition of David Rapstine |
|--------|----------------|
| Ex. 30 | Training History |

Tab L:    Excerpts from the Deposition of Elsa J. Gonzalez:

Tab M:    Excerpts from the Deposition of Corando Carrizales

Tab N:    Excerpts from the Deposition of Hilda Waldine Mack

Tab O:    Gate Attendant Income Tax Returns

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | Shirlene Abbie Income Tax Return |
| 2 | Gabrielle M. Badger Income Tax Return |
| 3 | James J. Bell Income Tax Return |
| 4 | Kenneth D. Boren Income Tax Return |
| 5 | Thomas E. Clemens Income Tax Returns |
| 6 | Benny C. Coulston Income Tax Return |
| 7 | Bobby Dunseth Income Tax Return |
| 8 | Albert K. Giordano Income Tax Return |
| 9 | Walter J. Hickey Income Tax Return |
| 10 | Lena Miller Income Tax Return |
| 11 | Joe Oswalt Income Tax Return |
| 12 | Dalton L. Park Income Tax Return |
| 13 | Rolando R. Peña Income Tax Return |
| 14 | Harold R. Phelps Income Tax Return |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 15 | Cindy A. Pritchett Income Tax Return |
| 16 | Billy J. and Marjorie N. Reid Income Tax Returns |
| 17 | Roy Richter Income Tax Return |
| 18 | Sheri L. Shows Income Tax Return |
| 19 | Jonnie L. Tollett Income Tax Return |
| 20 | Eddie D. Ward Income Tax Return |
| 21 | Sandra J. Wells Income Tax Return |
| 22 | Janice A. Woodall Income Tax Return |
| 23 | Lawrie R. Yaeger Income Tax Return |

Tab P:      Criminal Records – Jerry Clayton Studlar

Tab Q:      Excerpts from the Deposition of Jimmy Lawrence

Tab R:      March 28, 2012 Memorandum and Opinion & Order, *Mack v. Talasek*, No. V-09-53, 2012 WL, 1067398 (S.D. Tex. Mar. 28, 2012) (J. Rainey).

Tab S:      Magistrate Judge Johnston's Memorandum, Recommendation, and Order, *Mack v. Talasek*, No. V-09-53, 2011 WL 7637222, (Feb. 18, 2011) (Mag. J. Johnston).

Tab T:      Certified Copy of U.S. Army Corps of Engineers Gate Attendant Bid Package

Tab U:      Declaration of Stacie Henderson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| GATE GUARD SERVICES, L.P. | ) | |
| and BERT STEINDORF, | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | Civil Action File |
| | ) | No. 6:10-cv-91 |
| v. | ) | |
| | ) | JURY |
| HILDA L. SOLIS, SECRETARY OF LABOR, | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| LABOR, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |

PLAINTIFF GATE GUARD SERVICES L.P. AND BERT STEINDORF'S
CROSS MOTION FOR SUMMARY JUDGMENT
AND
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Gate Guard Services, L.P. ("GGS") and Bert Steindorf ("Mr. Steindorf") file their Cross Motion For Summary Judgment and Opposition to Defendant's Motion For Partial Summary Judgment, showing the Court as follows:

## I.   STATEMENT OF THE CASE

The Secretary made a terrible mistake when she assessed a multi-million dollar fine, at the conclusion of her flawed investigation, against Mr. Steindorf, a sole proprietor, and his self-made company – Gate Guard Services, L.P. – for allegedly misclassifying gate attendants as contractors.   From the beginning, there was overwhelming evidence that the Gate Attendants were not subject to the Fair Labor Standards Act ("FLSA") because they are economically independent workers.   The error began with the Secretary's field investigation of GGS, which was conducted by Lead Wage and Hour Investigator, David Rapstine.   Unfortunately for GGS, Rapstine was not

a fair and neutral investigator.  Immediately after his very first meeting with GGS at the "opening conference," Rapstine made the following statement to a fellow wage and hour investigator: "You should have been there, this is a good example of a company digging their own grave."[1]  The very next day, without further investigation, Rapstine and another investigator began to calculate the Secretary's unsupported multi-million dollar back wage assessment.  (*Id.* at 178:25-180:3.)  Clearly, Rapstine rushed to judgment when he concluded GGS was in violation of the FLSA well before obtaining all the facts.  During their respective depositions, Rapstine apologized, and his supervisor, Eden Ramirez, conceded that Rapstine did not follow proper procedures when he presented GGS with the Summary of Wages amounting to over $6 million dollars.[2]

Having endured an unfair investigation, and facing a multi-million dollar fine, GGS successfully filed a declaratory judgment action seeking adjudication in this Court. Indeed, the hundreds of Gate Attendants currently at issue are, in every way, independent workers.  The Gate Attendants live in their own recreational vehicles, which they alone purchase, maintain, insure and transport from job to job.  They supply their own food, water, insurance, telephones, video cameras, remote controls, lights, and other items they need to perform their assignment.  They are free to leave the gate at any time and many do so.  They find and pay relief workers when they leave.  The Gate Attendants work on a project-to-project basis accepting or rejecting assignments for a variety of oil and gas companies at their own discretion.  They run their own businesses as reflected by their tax returns which evidence their business expenses, profits and losses.  Unlike employees, the Gate Attendants are not supervised by GGS, are not eligible for

---

[1] Tab J, Deposition of David Rapstine ["Rapstine Dep."] 105:25-108:14, 178:7-24; Ex. 6.)
[2] *Id.* 177:23-178:1; 335:13-23; Tab K, Deposition of Eden Ramirez ["Ramirez Dep."] 32:4-9.

promotions, do not receive training, and have no contact with GGS other than brief, sporadic encounters with a service technician who delivers fuel and water to the oil or gas company every couple of weeks.  When this case is properly viewed in its totality, there can be no other conclusion than that the Gate Attendants are independent contractors.

This case is a tragic waste of time and resources given that the government, via its Army Corps of Engineers, uses gate attendants in the exact same manner as GGS and classifies them as contractors – not employees.  Inexplicably, from the onset of the Wage and Hour investigation, and throughout this litigation, the Secretary has stubbornly refused to review the facts in their totality and instead relies upon labels and snippets of information taken out of context in order to make her case against GGS and Mr. Steindorf.  The Secretary's purported "Statement of Undisputed Material Facts" is a good example of this approach inasmuch as the vast majority of her "facts" <u>are not supported by the record</u>.  Each of these unsupported "facts" is highlighted for the Court.

For all of these reasons, GGS and Mr. Steindorf respectfully request that the Court grant their Motion For Summary Judgment and find in their favor on the sole remaining claim before the Court – e.g., that the Gate Attendants are properly classified as independent contractors and, are therefore, exempt from the FLSA.

## II.   <u>PROCEDURAL HISTORY AND BACKGROUND FACTS</u>

### A.   <u>THE WAGE AND HOUR INVESTIGATION</u>

Two former service technicians – Daniel McDaniel, whose chest bears a "KKK" tattoo, and Jerry Studlar, who was formerly convicted of indecency with a minor – filed complaints with the U.S. Department of Labor ("DOL") against GGS in or around

January 2010.[3]  In July 2010, Rapstine, then a nine year veteran, who had little training in contractor misclassification cases, began his investigation of GGS.  (Tab J, Rapstine Dep. 115:15-117:3; 169:18-20; 321:4-6.)   Of the approximately 300 to 400 investigations he has conducted, Rapstine estimated that only five involved contractor misclassification investigations.   (Id. 119:18-20; 173:12-14.)   Of the five, he could only recall two companies he investigated other than GGS – C&K and "a granite company"- and in both cases, he found misclassification violations.  (Id. 119:25-120:14, 122:8-123:12.)

Rapstine testified that he had been "briefed and provided instruction from our management and given, you know, training and literature that talks about [independent contractor analysis]."  (Id. 110:25-111:5.)  Yet, he could only recall a single one or two page memo which would evidence such "instruction," "training" and "literature" and admitted that even his "Training History Report" did not reflect training in independent contractor misclassification.  (Id. 115:15-119:6; 166:11-14; Ex. 7.)[4]  Despite the lack of training, Rapstine was assigned to investigate GGS.  His first contact with GGS was via a July 15, 2010 letter which advised that his "opening conference" would take place on July 29, 2010.  (Id. 67:1-18, Ex. 5.)[5]  Curiously, Rapstine did not wait for the initial conference and arrived unannounced at GGS's facility in Corpus Christi on July 19, 2010 and spoke to Sidney Smith, manager.  (Id. 74:10-17, 77:17-78:1; 174:7-10.)  Rapstine

---

[3] Tab J, Rapstine Dep. 168:4-169:20; Tab D, Ex. 82, Declaration of Jerry Studlar ["Studlar Dec."] ¶ 11; Tab B, Declaration of Rachel Jade Petty ["Petty Dec."] ¶ 12.   A certified copy of the records related to Studlar's indictment for failure to register as a sex offender for Indecency with a Child by Contact is attached hereto at Tab P.

[4] Rapstine thinks he may have been provided with a handout of a PowerPoint presentation and other memos, but did not recall any details regarding these items.  (Id.)

[5] Prior to this, he spent 15 minutes taking photographs of "equipment" at one of GGS's yards. (Tab J, Rapstine Dep. 170:11-171:25.)

conceded that he had never showed up unannounced prior to an initial conference in any of his investigations in his "almost ten years" with the DOL.  (*Id.* 79:8-23.)[6]

The initial conference proceeded at 9:00 a.m. on July 29, 2010.  (Tab J, Rapstine Dep. 176:8-11; Ex. 5.)  A couple of hours later, Rapstine sent an email to Sabrina Loudin, another investigator, stating in pertinent part:  "**Wish you could have been there, it was a good example of being quiet and letting them do all of the talking and consequently, digging their own grave.**"  (*Id.* 105:25-108:14,178:7-24; Ex. 6 (emphasis supplied).)  During his deposition, Rapstine apologized for making this comment and agreed that it was inappropriate and unprofessional.  (*Id.* 177:23-178:1, 335:13-23.)  Without further investigation or evidence beyond his initial conference with GGS other than interviewing the complainants, Rapstine began his very detailed back wages calculations.  (*Id.* 22:22-24:20.) He testified:

> Q.    All right. So then after you sent the e-mail to Ms. Loudin, you assigned Ms. Loudin to the case correct?
> A.    She was assigned to the case, that is correct.
> Q.    And you told her to immediately start entering data, correct?
> A.    Yes.
> Q.    And she got to work on it the very next day, on July 30th, 2010, correct?
> A.    That's correct.
> Q.    And, in fact, you got to work on it immediately on July 30th, 2010, correct?
> A.    Yes.
> Q.    And you worked very hard, almost every day after that, entering data for back wage computations; isn't that right?
> A.    I entered a lot of data, that's correct.
> Q.    For back wage computations, correct?
> A.    For potential back wage computations.
> …

---

[6] At the end of his deposition, Rapstine changed his testimony and stated that there were a few times when he appeared unannounced, or performed a "cold call," but he could not recall the names of the companies.  (Tab J, Rapstine Dep. 324:7-325:9.)

> Q.     All right.   And [Exhibit 4] doesn't say data entry for potential back wage computations, does it?
>
> A.     No.

(*Id.* 178:25-180:3.)  Over the course of that week, Loudin alone had spent 37.5 hours entering back wages information.  (*Id.* 189:25-190:3.)

Ramirez, Rapstine's supervisor, testified that before calculating back wages, it would be wise to first establish that the employer is covered under the FLSA so as not to waste time.  (Tab K, Ramirez Dep. 100:4-15.)  Rapstine did not do this.   (Tab J, Rapstine Dep. 178:25-180:3.)   It was only after calculating the amount of back wages which were allegedly due that Rapstine first began to interview gate attendants.  (*Id.* 189:19-190:6.) Rapstine interviewed 17 gate attendants/service technicians out of approximately 400 before he concluded his investigation and demanded that GGS pay over $6 million dollars to the government.  (*Id.* 206:15-18, Ex. 2.)  Rapstine could not recall whether he prepared a list of questions prior to the interview, but that it was not his normal practice. (*Id.* 236:13-19.)  **While he wrote down the answers to the questions he asked, he "destroyed" all of his notes taken between July and November 2010 by shredding them and putting them in a "burn barrel."**  (*Id.* 237:14-20; 243:4-244:5.)  Rapstine agreed that logic and common sense would dictate that a seasoned investigator would keep such notes, but he said that this was not his practice.  (*Id.* 328:5-329:25.)   His supervisor said that Rapstine should not have destroyed his notes.  (Tab K, Ramirez Dep. 139:19-23.)

In addition to destroying evidence, Rapstine did not ask questions critical to the determination of independent contractor status. For example, he did not ask gate attendants whether they declared themselves as independent contractors to the IRS (and

did not think it was important) (Tab J, Rapstine Dep. 131:11-22); he <u>did not know</u> if the gate attendants were guaranteed any work beyond the project assigned (*Id.* 137:2-12); he <u>did not ask</u> the gate attendants if they considered themselves to be independent contractors (*Id.* 138:19-22); he <u>did not ask</u> the gate attendants if they maintained and repaired their motor homes and fifth wheels (*Id.* 139:10-140:3); he <u>does not remember</u> asking whether the gate attendants "were switching back and forth from Gate Guard Services to another company" (*Id.* 141:2-10).  Moreover, Rapstine ignored evidence that weighed in favor of independent contractor status.  For example, Rapstine admitted that the gate attendants: did not have day-to-day supervision by GGS (*Id.* 137:13-17); provided their own food (*Id.* 140:4-7); found their own relief workers (*Id.* 140:8-15); were not restricted from working for other companies (*Id.* 140:16-21); were not provided with performance evaluations and were not disciplined. (*Id.* 210:19-211:1.)

Rapstine testified that the preparation of his "FLSA Narrative" began on July 28, 2010 and ended in October 2010 before he conducted his closing conference with GGS. (Tab J, Rapstine Dep. 294:10-17; Ex. 10.)  He used only the "initial conference worksheet and [his] recollection of the initial conference" to prepare the FLSA Narrative (*Id.* 291:4-292:21, Ex. 10.)  Rapstine testified that he may have used other notes, but he destroyed them.  (*Id.* 293:5-14.)  Not surprisingly given his approach, much of Rapstine's analysis set forth in the "FLSA Narrative" was factually incorrect and legally flawed.  For instance, Rapstine found that the "gate attendants were working under the supervision of the service technicians," yet found that the service technicians were nonexempt employees.  (*Id.* 259:15-20.)  When pressed, Rapstine admitted that while the service technicians may have contacted the Gate Attendants about new assignments,

which he deemed to be "instructions," the Gate Attendants had the right to reject those assignments.  (*Id.* 262:1-263:10.)  While Rapstine contends that a rejection could result in negative consequences to the Gate Attendant, he admitted that he did not know if the service technicians could terminate a contract with a Gate Attendant or what those negative consequences would be.  (*Id.* 264:16-22; 266:1-3.)[7]

Additionally, Rapstine incorrectly found that a <u>two month</u> assignment during the course of two years was "long term" and sufficient to prove "permanency of the relationship."  (*Id.* 272:8-13.)  When evaluating the investment of the Gate Attendants as compared to GGS, Rapstine admitted he only asked "about half" of the Gate Attendants he interviewed about the cost of their R.V./motor home and he did not obtain the model and make of these homes or attempt to price them himself.  (*Id.* 276:7-277:3.)   In contrast, he spent a significant amount of time doing internet research on the costs of the septic tank, water tank and fuel that was sometimes provided to, and purchased by, the oil companies from GGS for the Gate Attendants' use.  (*Id.* 273:18-275:22.)

Apparently based on the 17 interviews that he conducted, Rapstine determined that the Gate Attendants were employees because: (1) the majority wore an orange safety vest provided by GGS; and (2) he learned of a memorandum titled "Guard Duties and Responsibilities" that he obtained from an unidentified Gate Attendant, **although he admits that he does not know who drafted it, why it was drafted or the time period it was in effect (no one at GGS has ever seen this document)**.  (*Id.* 218:6-12; 219:4-223:9, Exs. 13-15; Tab E, Steindorf Dep. 232-237, Ex. 10.)   On October 4, 2010,

---

[7] GGS and Mr. Steindorf recently have learned that during an interview with one of GGS's service technicians, Rapstine revealed his bias against GGS by stating that "he wouldn't let his dog work" at GGS and called the service technician a "liar."  (Tab Q, Excerpts from the Deposition of J. Lawrence [Lawrence Dep.] 110-111, 118.)

Rapstine issued his findings to GGS claiming that GGS was in violation of the Fair Labor Standards Act ("FLSA") because the Gate Attendants were employees, instead of independent contractors. (*Id.* 251:15-252:18.) The Secretary mandated that GGS compensate the Gate Attendants at the federal minimum wage rate for 24 hours for each day they were assigned to an oil field gate. (*Id.*) The Secretary advised GGS to pay a whopping **$6,192,752** in back wages and unpaid overtime to the Gate Attendants and service technicians as set forth on its "Summary of Unpaid Wages." (*Id.* at Ex. 3; Am. Compl., Ex. A ¶¶ 7-8 thereto.)[8]

After Rapstine's closing conference on October 4, 2010 with GGS, Rapstine submitted his file to his supervisor, Ramirez. (Tab K, Ramirez Dep. 18:2-14.) Ramirez trusted Rapstine and relied upon Rapstine's investigation.[9] (*Id.* 75:20-76:21.) However, **Ramirez testified that Rapstine "did not follow the proper procedures" in presenting the multi-million dollar penalty to GGS**. (*Id.* 32:4-9.) Ramirez said the proper procedure is to "first address future compliance and then you proceed with presenting the findings, estimate of findings to the employer." (*Id.* 32:1-3.) Ramirez testified that "there's an expectation that [investigators] are familiar with the process and procedures to follow in the final conference" and that Rapstine was expected to comply with the DOL's Field Operations Handbook ("FOH"), but that he had deviated from the FOH without permission to do so. (*Id.* 37:19, 89:2-18.)

---

[8] When calculating the alleged back pay, Rapstine did not take into account that on some days Gate Attendants may not have logged in a single vehicle or very few vehicles during this 24-hour period. (Tab J, Rapstine Dep. 312:10-15.)
[9] Ramirez did not have any training courses in misclassification of employees as independent contractors and none were reflected on his Training Report. (Tab K, Ramirez Dep. 72-75; Ex. 30.) The only mention of misclassification of employees as independent contractors was at the annual meeting where the Solicitor's office would discuss some of their cases. (*Id.* 74-75.)

Ramirez forwarded the file to Randy O'Neal, Director of Enforcement in Dallas. (*Id.* 18:18-19:2.)  The file was then reviewed by Michael Speer, Target Enforcement Officer, who reports to O'Neal.  (*Id.* 19:3-4; 20:20-23.)  Speer directed Ramirez to have additional interviews conducted and to review the back wage computations.[10]  (*Id.* 21:2-22:18.)   According to Ramirez, "[a]fter we did follow-up interviews, conducted – reviewed the records, the computations were adjusted" . . . "the hours were adjusted.  We used 16 hours per day, which translate to five hours of sleep, three hours for meals."  (*Id.* 22:22-23:4-7.)  Therefore, the back wage calculations were reduced significantly from Rapstine's calculations which were based on 24 hours per day.  Ramirez prepared a new Summary of Wages.  (*Id.* 37:10-20).

On November 10, 2010, GGS's representative spoke to Ramirez who confirmed that litigation was imminent because GGS refused to come into compliance with the FLSA.  (Am. Compl. ¶ 37, Ex. A ¶ 4.)  On November 19, 2010, GGS's counsel met with Ramirez, Speer and Colleen Nabhan for a final conference.  (*Id.* ¶ 38-39, Ex. A ¶¶ 7-8.)  Ramirez and Speer stated that the DOL had "finished" its decision-making process and that an enforcement action against GGS by the DOL was forthcoming.  (*Id.*)

B.    **THE LITIGATION**

GGS filed this action seeking a declaratory judgment on November 19, 2010.[11]  GGS seeks declaratory relief arising from the Secretary's flawed classification of the Gate Attendants as employees, its improper calculation totaling over six million dollars in

---

[10] During the first week of November, Rapstine conducted an additional 10 or 12 interviews (Tab J, Rapstine Dep. 240:17-241:1); Carrizales conducted no more than five (Tab M, Deposition of Corando Carrizales ["Carrizales Dep."] 43:3-6; 55:4-11); and Gonzalez conducted five or ten (Tab L, Deposition of Elsa Gonzalez ["Gonzalez Dep."] 36:12-15).

[11] *See* Dkt. # 1; *see also* GGS Am. Compl. ¶¶ 38-39, Ex. A ¶¶ 7-8 thereto.

back wages, and its allegation that GGS has not complied with the recordkeeping requirements of the FLSA (hereinafter, "Declaratory Judgment Action").  (*Id.* ¶¶ 49-109.)

Almost three months after GGS filed its Declaratory Judgment Action, on February 16, 2011, the Secretary initiated nearly identical litigation against GGS, Mr. Steindorf, and Sidney L. Smith in the Corpus Christi Division of this District, Civil Action File No. 2:11-cv-00041 (hereinafter, "FLSA Enforcement Action").  (*See* Dkt. # 16-3.)  In that action, the Secretary alleged the exact same claims that are the basis of GGS's Declaratory Judgment Action, including that GGS, Mr. Steindorf and Mr. Smith owe back wages, including unpaid overtime, and have violated the recordkeeping requirements of the FLSA with respect to the gate attendants and service technicians. (*See id.*)  GGS, Mr. Steindorf and Mr. Smith sought dismissal and/or transfer of the FLSA Enforcement Action based on the first-to-file rule, and, on March 22, 2011, the Honorable Janis Graham Jack granted their motion and transferred the FLSA Enforcement Action to the Victoria Division, Civil Action No. 6:11-cv-00014. (FLSA Enforcement Action, Dkt. # 18.)  After the transfer on April 22, 2011, GGS and Mr. Steindorf filed their Answer and Mr. Smith filed his Motion to Dismiss the FLSA Enforcement Action because he is not individually liable under the FLSA and was never a proper defendant.  (FLSA Enforcement Action, Dkt. ## 24-25.)

In the meantime, on March 10, 2011, the Secretary filed a Motion to Dismiss GGS's Complaint in the Declaratory Judgment Action, which was rendered moot upon the filing of GGS and Mr. Steindorf's Amended Complaint on March 11, 2011.[12]  (Dkt. # 13, 14, 18.)  On March 31, 2011, the Secretary filed a Motion to Dismiss GGS and Mr.

---

[12] Among other amendments, the Amended Complaint added Mr. Steindorf as a party plaintiff in the Declaratory Judgment Action.  (*See* Dkt. # 14.)

Steindorf's Amended Complaint, which was fully briefed by the parties on June 9, 2011. (Dkt. # 21, 22, 37.) GGS and Mr. Steindorf also filed a Motion to Consolidate the Declaratory Judgment Action and the FLSA Enforcement Action, which was fully briefed on April 20, 2011. (Dkt. # 20, 24.) On July 12, 2011, this Court denied the Secretary's Motion to Dismiss GGS's Amended Complaint in the Declaratory Judgment Action, and also granted the Motion to Consolidate. (Dkt. # 45.) Although her Motion to Dismiss was denied, **the Secretary has never filed an Answer to GGS's Amended Complaint. Thus, the Secretary is in default and dismissal is warranted as set forth in Section V(B),** *infra*.

With respect to discovery, this Court partially granted GGS's Motion to Bifurcate Discovery on October 13, 2011 and, therefore, discovery has been limited to the issue of liability.[13] (Dkt. # 74.) While GGS's Motion to Compel was pending, the Secretary filed her Motion For Partial Summary Judgment on May 3, 2012.[14] On September 27, 2012, GGS withdrew the Motion to Compel without prejudice so that summary disposition could proceed. (Dkt. # 119.) GGS and Mr. Steindorf's Cross Motion for Summary Judgment is now ripe for adjudication.

To date, the Secretary has abandoned two key claims.[15] On November 28, 2011, the Secretary voluntarily dismissed all of the FLSA claims related to GGS's service

---

[13] During the discovery period, which ended December 30, 2011, the parties deposed twelve (12) witnesses, and exchanged multiple sets of written discovery and document productions. (*See* Dkt. # 105.) On September 9, 2011, GGS filed a Motion to Compel seeking the production of questionnaires, witness statements, investigation notes, and representations contained in the Secretary's own FLSA Narrative, which were improperly withheld by the Secretary under the guise of the "government informant's privilege." (Dkt. # 58.)

[14] GGS and the Secretary agreed that a response to the Secretary's Motion For Partial Summary Judgment would be due only after the Court ruled on the Motion to Compel. (Dkt. # 115.)

[15] The Secretary also significantly reduced her calculation of alleged "unpaid wages." After litigation commenced, the DOL's back wages calculations – amounting to **$6,192,752** – were reduced to two million dollars. The difference in the calculations was nearly four million dollars. (Tab K, Ramirez

technicians.[16]  (Dkt. # 99.)  On January 19, 2012, the Secretary voluntarily dismissed Mr. Smith as a counter-defendant.  (*See* Dkt. # 109.)  The only issue remaining for this Court is whether the Gate Attendants are independent contractors, and, thus, exempt from the FLSA.  The undisputed facts overwhelmingly warrant judgment in favor of GGS and Mr. Steindorf.

### III.   GGS'S STATEMENT OF UNDISPUTED MATERIAL FACTS

GGS, founded in 2003, is a Texas limited partnership which locates gate attendants for oil field operators.  (Tab A, Declaration of Bert Steindorf ["Steindorf Dec."], ¶ 2.)[17]  Mr. Steindorf is the founder and sole limited partner of GGS.  (*Id.*)  GGS markets the business through its sales associates and secures contracts with various oil companies. (Tab E, Deposition of Bert Steindorf ["Steindorf Dep."] 63:23-25; 65:10-15; 68:18-69:11.)[18]

GGS contracts with Gate Attendants who perform the sole duty of logging in and out vehicles at oil field operation sites.  (Tab E, Steindorf Dep. 111:14-20.)  GGS enters into written "Independent Contractor Agreements" with the Gate Attendants.  (Tab A, Steindorf Dec. ¶ 4 and Exs. 2-458.) The Gate Attendants are paid varying daily rates of $100, $125, $175 or more.  (Tab E, Steindorf Dep. 151:18-152:4; Dkt. # 111, Ex. 29; Brown Dep. 55:12-14; Tab N, Mack Dep. 54.)   Some Gate Attendants negotiate their daily rate, and some do not.  (Tab E, Steindorf Dep. 122:10-12; Tab D, Ex. 70, Reid Supp. Dec., Ex. A, p. 3; Tab A, Steindorf Dec. ¶ 5, Exs. 2-458; Dkt. # 111, Ex. 29.)

---

Dep. 261:3-13.)  Notwithstanding this, Rapstine testified that if Mr. Steindorf had written a check for **$6,192,752** on October 4, 2010 when the Secretary's findings were presented to him, he would have taken the check.  (Tab J, Rapstine Dep. 62:6-16.)

[16]  Likewise, GGS dismissed the claims in its Declaratory Judgment Action related to the Service Technicians, given the Secretary's agreement to abandon her attempts to recover back wages on behalf of the Service Technicians.  (*See* Dkt. # 99.)

[17]  A true and correct copy of the Declaration of Bert Steindorf is attached hereto at Tab A.

[18]  Excerpts from the Deposition of Bert Steindorf which are cited herein are attached at Tab E.

The Gate Attendants understand that they are paid to log vehicles entering and exiting the gate.[19]   The Gate Attendants are responsible for recording the name of the driver, company, license tag number, and date and time that each vehicle enters or departs the oil field (the "gate attendant services").   (Tab A, Steindorf Dec. ¶ 6.)   This information is recorded onto a document called a "Traffic Log," which can then be used to identify persons present at an oil field in the event of an emergency.   (*Id.*)[20]   When the bell rings, Gate Attendants do their log-in work and then return to their personal pursuits.[21]   It takes approximately 30 seconds to five minutes to open the gate and log-in the occupants and vehicle.[22]   On a slow or average day, zero to 75 vehicles enter and exit

---

[19] *See* Tab D which includes the following Declarations:   Ex. 1, Abbie Dec. ¶ 20; Ex. 2, Arp Dec. ¶ 13; Ex. 3, Atteberry Dec. ¶ 14; Ex. 4, Badger Dec. ¶ 10; Ex. 5, Bell Dec. ¶ 15; Ex. 6, Bisel Dec. ¶¶ 3,10, 12 ; Ex. 8, Bowling Dec. ¶ 15; Ex. 9, Braddock Dec. ¶ 16; Ex. 10, Carter Dec. ¶ 20; Ex. 11, Clark Dec. ¶ 4; Ex. 12, Clemens Dec. ¶ 15; Ex. 13, Clemens Supp. Dec. ¶ 14 ; Ex. 15, Conrad Dec. ¶ 15; Ex. 16, Coronel Dec. ¶ 15; Ex. 17, Coulston Dec. ¶ 16; Ex. 19, Dampier Dec. ¶¶ 4, 6; Ex. 20, Eldridge Dec. ¶ 13; Ex. 21, Evans Dec. ¶ 15; Ex. 22, Ferrell Dec. ¶ 15; Ex. 23, Flickinger Dec. ¶ 14; Ex. 24, Fontenot Dec. ¶ 16; Ex. 25, Fuller Dec. ¶ 14; Ex. 26, Geering Dec. ¶ 13; Ex. 27, Giordano Dec. ¶ 15; Ex. 28, Guidry Dec. ¶ 9; Ex. 29, Helser Dec. ¶ 12; Ex. 30, Hembry Dec. ¶ 15; Ex. 31, Hickey Dec. ¶ 18; Ex. 32, Huitt Dec. ¶ 14; Ex. 33, Hunt Dec. ¶ 3; Ex. 34, Hutto Dec ¶ 14; Ex. 35, Jones Dec. ¶ 15; Ex. 36, Jubeck Dec. ¶ 14; Ex. 37, Kershman Dec. ¶ 14; Ex. 38, Lee Dec. ¶ 20; Ex. 39, E. Lindsey Dec. ¶ 15; Ex. 40, R. Lindsey Dec. ¶ 15; Ex. 41, J. Lovett Dec. ¶ 14; Ex. 42, K. Lovett Dec. ¶ 14; Ex. 43, J. McAdoo Dec. ¶ 14; Ex. 45, S. McAdoo Dec. ¶ 14; Ex. 47, McCaugherty Dec. ¶ 14; Ex. 48, McClelland Dec. ¶ 21; Ex. 49, D. McKinney Dec. ¶ 14; Ex. 50, P. McKinney Dec. ¶ 14; Ex. 51, Melton Dec. ¶ 4; Ex. 52, Milner Dec. ¶ 16; Ex. 53, Molina Dec. ¶ 14; Ex. 54, Morris Dec. ¶¶ 4, 7; Ex. 55, Mostoller Dec. ¶ 20; Ex. 56, Muraski Dec. ¶ 14; Ex. 57, Neff Dec. ¶ 22; Ex. 58, Olivarez Dec. ¶ 20; Ex. 59, Padgett Dec. ¶ 15; Ex. 60, Park ¶¶ 3, 13; Ex. 61, L. Payne ¶¶ 4, 8; Ex. 62, R. Payne ¶¶ 4, 8; Ex. 63, Pena Dec. ¶ 16; Ex. 64, Phelps ¶¶ 3, 11; Ex. 65, Phelps Supp. Dec. ¶ 3; Ex. 66, Pritchett Dec. ¶ 17; Ex. 67, Pruett Dec. ¶ 15; Ex. 68, Quarles Dec. ¶ 3; Ex. 69, B. Reid Dec. ¶ 15;Ex. 71, M. Reid Dec. ¶ 15; Ex. 73, Roberts Dec. ¶ 14; Ex. 74, Rochester Dec. ¶ 19; Ex. 75, Rogers Dec. ¶ 21; Ex. 76, Shows Dec. ¶ 10; Ex. 78, Staley Dec. ¶ 16; Ex. 80, Stoltz Dec. ¶ 21; Ex. 81, Stone Dec. ¶ 16; Ex. 82, Studlar Dec. ¶ 5; Ex. 83, Suonvieri Dec. ¶ 20; Ex. 84, Trooien Dec. ¶ 14; Ex. 86, Ward Dec. ¶ 16; Ex. 87, Wells Dec. ¶ 16; Ex. 88, Wheeler Dec. ¶ 15; Ex. 89, G. White Dec. ¶ 4; Ex. 90, J. White Dec. ¶ 19; Ex. 91, Yaeger Dec. ¶ 14; Ex. 94, Yoder Dec. ¶ 14.

[20] GGS's service technicians visit the Gate Attendants on assignment approximately every week or every other week to service the septic tanks and/or provide fuel for the generators.   (*Id.* ¶ 9.)

[21] *See* fn. 19.

[22] *See* Tab D which includes the following Declarations:   Ex. 1, Abbie Dec. ¶ 15; Ex. 2, Arp Dec. ¶ 9; Ex. 3, Atteberry Dec. ¶ 10; Ex. 5, Bell Dec. ¶ 9; Ex. 8, Bowling Dec. ¶ 9; Ex. 9, Braddock Dec. ¶ 9; Ex. 10, Carter Dec. ¶ 13; Ex. 12, Clemens Dec. ¶ 10; Ex. 13, Clemens Supp. Dec. ¶ 10; Ex. 16, Coronel Dec. ¶ 10; Ex. 17, Coulston Dec. ¶ 9; Ex. 20, Eldridge Dec. ¶ 7; Ex. 21, Evans Dec. ¶ 9; Ex. 22, Ferrell Dec. ¶ 10; Ex. 23, Flickinger Dec. ¶ 8; Ex. 24, Fontenot Dec. ¶ 11; Ex. 25, Fuller Dec. ¶ 8; Ex. 26, Geering Dec. ¶ 7; Ex. 27, Giordano Dec. ¶ 10; Ex. 28, Guidry Dec. ¶¶ 7–8; Ex. 29, Helser Dec. ¶ 7; Ex. 30, Hembry Dec. ¶ 10; Ex. 31, Hickey Dec. ¶ 12; Ex. 32, Huitt Dec. ¶ 9; Ex. 34, Hutto Dec ¶ 9; Ex. 35, Jones Dec. ¶ 10; Ex. 36, Jubeck Dec. ¶ 9; Ex. 37, Kershman Dec. ¶ 9; Ex. 38, Lee Dec. ¶ 12; Ex. 39, E. Lindsey Dec. ¶ 10;

14

during a 24 hour period.[23]   During fracking or when it is busy, approximately 75 to 200 vehicles enter and exit the gate during a 24 hour period.[24]

The Gate Attendants have no duties related to security.  (Tab A, Steindorf Dec. ¶ 7.)  They do not carry weapons and they are not authorized to use force against any individual.  (Tab J, Rapstine Dep. 287:20-288:5.)  Some of the Gate Attendants choose to maintain licenses through the Texas Department of Public Safety.  (Tab E, Steindorf Dep. 163:22-164:3.)   These licenses are not required for the actual work that the Gate Attendants perform – *e.g.*, logging vehicles in and out.  (Tab A, Steindorf Dec. ¶ 7.)

---

Ex. 40, R. Lindsey Dec. ¶ 10; Ex. 41, J. Lovett Dec. ¶ 9; Ex. 42, K. Lovett Dec. ¶ 9; Ex. 43, J. McAdoo Dec. ¶ 9; Ex. 45, S. McAdoo Dec. ¶ 9; Ex. 47, McCaugherty Dec. ¶ 9; Ex. 48, McClelland Dec. ¶ 13; Ex. 49, D. McKinney Dec. ¶ 9; Ex. 50, P. McKinney Dec. ¶ 9; Ex. 51, Melton Dec. ¶ 12; Ex. 52, Milner Dec. ¶ 10; Ex. 53, Molina Dec. ¶ 9; Ex. 54, Morris Dec. ¶ 8; Ex. 55, Mostoller Dec. ¶ 13; Ex. 56, Muraski Dec. ¶ 9; Ex. 57, Neff Dec. ¶ 13; Ex. 58, Olivarez Dec. ¶ 13; Ex. 59, Padgett Dec. ¶ 9; Ex. 63, Pena Dec. ¶ 11; Ex. 66, Pritchett Dec. ¶ 12; Ex. 67, Pruett Dec. ¶ 9; Ex. 69, B. Reid Dec. ¶ 10; Ex. 71, M. Reid Dec. ¶ 10; Ex. 72, Renee Dec. ¶ 9; Ex. 73, Roberts Dec. ¶ 11; Ex. 74, Rochester Dec. ¶ 12; Ex. 75, Rogers Dec. ¶ 13; Ex. 77, Shows Supp. Dec. ¶ 7; Ex. 78, Staley Dec. ¶ 10; Ex. 80, Stoltz Dec. ¶ 13; Ex. 81, Stone Dec. ¶ 8; Ex. 83, Suonveiri Dec. ¶ 13; Ex. 84, Trooien Dec. ¶ 9; Ex. 86, Ward Dec. ¶ 11; Ex. 87, Wells Dec. ¶ 13; Ex. 88, Wheeler Dec. ¶ 9; Ex. 90, J. White Dec. ¶ 13; Ex. 91, Yaeger Dec. ¶ 9; Ex. 93, Yaeger Supp. Dec. ¶ 11; Ex. 94, Yoder Dec. ¶ 8.

[23] *See* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶¶ 13–14; Ex. 2, Arp Dec. ¶ 8; Ex. 3, Atteberry Dec. ¶ 9; Ex. 5, Bell Dec. ¶¶ 7–8; Ex. 8, Bowling Dec. ¶¶ 7–8; Ex. 9, Braddock Dec. ¶ 7, Ex. 10, Carter Dec. ¶ 14; Ex. 12, Clemens Dec. ¶ 9; Ex. 13, Clemens Supp. Dec. ¶ 9; Ex. 15, Conrad Dec. ¶¶8-9; Ex. 16, Coronel Dec. ¶ 8; Ex. 17, Coulston Dec. ¶ 8; Ex. 19, Dampier Dec. ¶ 8; Ex. 21, Evans Dec. ¶ 7; Ex. 22, Ferrell Dec. ¶¶ 7–8; Ex. 23, Flickinger Dec. ¶ 7; Ex. 24, Fontenot Dec. ¶ 8; Ex. 25, Fuller Dec. ¶ 7; Ex. 27, Giordano Dec. ¶ 8–9; Ex. 28, Guidry Dec. ¶ 7; Ex. 30, Hembry Dec. ¶¶ 8–9; Ex. 32, Huitt Dec. ¶ 8; Ex. 34, Hutto Dec ¶¶ 7–8; Ex. 35, Jones Dec. ¶¶ 8–9; Ex. 37, Kershman Dec. ¶ 8; Ex. 38, Lee Dec. ¶ 13; Ex. 39, E. Lindsey Dec. ¶ 8; Ex. 40, R. Lindsey Dec. ¶ 8; Ex. 41, J. Lovett Dec. ¶ 8; Ex. 42, K. Lovett Dec. ¶ 8; Ex. 43, J. McAdoo Dec. ¶ 8; Ex. 45, S. McAdoo Dec. ¶ 8; Ex. 47, McCaugherty Dec. ¶¶ 7–8 ; Ex. 48, McClelland Dec. ¶ 14; Ex. 49, D. McKinney Dec. ¶ 8; Ex. 50, P. McKinney Dec. ¶ 8; Ex. 51, Melton Dec. ¶¶ 9–11; Ex. 52, Milner Dec. ¶ 8; Ex. 53, Molina Dec. ¶ 8; Ex. 54, Morris Dec. ¶ 13; Ex. 56, Muraski Dec. ¶ 7–8; Ex. 57, Neff Dec. ¶¶ 14, 15; Ex. 66, Pritchett Dec. ¶ 11; Ex. 67, Pruett Dec. ¶ 8; Ex. 69, B. Reid Dec. ¶ 8; Ex. 71, M. Reid Dec. ¶ 8; Ex. 73, Roberts Dec. ¶¶ 9, 10; Ex. 74, Rochester Dec. ¶ 13; Ex. 78, Staley Dec. ¶ 10; Ex. 80, Stoltz Dec. ¶ 14; Ex. 81, Stone Dec. ¶ 7; Ex. 83, Suonvieri Dec. ¶ 14; Ex. 84, Trooien Dec. ¶ 8; Ex. 88, Wheeler Dec. ¶ 8.

[24] *See* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 13; Ex. 2, Arp Dec. ¶ 8; Ex. 3, Atteberry Dec. ¶ 8; Ex. 8, Bowling Dec. ¶ 7; Ex. 9, Braddock Dec. ¶ 7; Ex. 12, Clemens Dec. ¶¶ 8-9; Ex. 13, Clemens Supp. Dec. ¶ 9; Ex. 15, Conrad Dec. ¶ 9; Ex. 16, Coronel Dec. ¶ 9; Ex. 19, Dampier Dec. ¶ 8; Ex. 21, Evans Dec. ¶ 8; Ex. 22, Ferrell Dec. ¶¶ 7-9; Ex. 24, Fontenot Dec. ¶ 9; Ex. 27, Giordano Dec. ¶ 9; Ex. 28, Guidry Dec. ¶ 8; Ex. 30, Hembry Dec. ¶ 9; Ex. 38, Lee Dec. ¶ 14; Ex. 39, E. Lindsey Dec. ¶ 9; Ex. 40, R. Lindsey Dec. ¶ 9; Ex. 48, McClelland Dec. ¶ 15; Ex. 51, Melton Dec. ¶ 10; Ex. 52, Milner Dec. ¶ 7; Ex. 53, Molina Dec. ¶ 8; Ex. 55, Mostoller Dec. ¶ 15; Ex. 57, Neff Dec. ¶ 16; Ex. 58, Olivarez Dec. ¶15; Ex. 69, B. Reid Dec. ¶ 9; Ex. 71, M. Reid Dec. ¶ 9; Ex. 74, Rochester Dec. ¶ 14; Ex. 80, Stoltz Dec. ¶ 15; Ex. 88, Wheeler Dec. ¶ 9.

However, GGS uses the licenses as a marketing tool because the maintenance of a license establishes that the Gate Attendants have had a criminal background check and have passed a basic competency test.   (Tab E, Steindorf Dep. 163:22-164:3;  165:16-20; 185:18-186:6; 202:18-20.)

Depending upon the assignment, the Gate Attendants are required to ensure onsite coverage either 12 hours or 24 hours per day depending upon the oil company's hours. (Tab A, Steindorf Dec. ¶ 8.)  The Gate Attendants have authority to hire or assign relief workers to cover the gate. (*Id.*)[25]  Some of the Gate Attendants hire such relief workers.[26] Other Gate Attendants use family members such as their spouse, adult children or other

---

[25] *See* Tab A, Steindorf Dec. ¶ 8.  *See also* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 9; Ex. 2, Arp Dec. ¶ 7; Ex. 3, Atteberry Dec. ¶ 7; Ex. 4, Badger Dec. ¶ 6; Ex. 5, Bell Dec. ¶ 6; Ex. 6, Bisel Dec. ¶ 7; Ex. 8, Bowling Dec. ¶ 6; Ex. 9, Braddock Dec. ¶ 6; Ex. 10, Carter Dec. ¶ 6; Ex. 11, Clark Dec. ¶ 5; Ex. 12, Clemens Dec. ¶ 7; Ex. 13, Clemens Supp. Dec. ¶ 7; Ex. 14, Clemens Sec. Supp. Dec. ¶ 5; Ex. 15, Conrad Dec. ¶ 7; Ex. 16, Coronel Dec. ¶ 7; Ex. 17, Coulston Dec. ¶ 7; Ex. 18, Coulston Supp. Dec. ¶ 7; Ex. 19, Dampier Dec. ¶ 6; Ex. 20, Eldridge Dec. ¶ 6; Ex. 21, Evans Dec. ¶ 6; Ex. 22, Ferrell Dec. ¶ 6; Ex. 23, Flickinger Dec. ¶ 6; Ex. 24, Fontenot Dec. ¶ 6; Ex. 25, Fuller Dec. ¶ 6; Ex. 27, Giordano Dec. ¶ 7; Ex. 28, Guidry Dec. ¶ 6; Ex. 29, Helser Dec. ¶ 6; Ex. 30, Hembry Dec. ¶ 7; Ex. 31, Hickey Dec. ¶ 10; Ex. 32, Huitt Dec. ¶ 7; Ex. 33, Hunt Dec. ¶ 7; Ex. 34, Hutto Dec ¶ 6; Ex. 35, Jones Dec. ¶ 7; Ex. 36, Jubeck Dec. ¶ 7; Ex. 37, Kershman Dec. ¶ 7; Ex. 38, Lee Dec. ¶ 10; Ex. 39, E. Lindsey Dec. ¶ 7; Ex. 40, R. Lindsey Dec. ¶ 7; Ex. 41, J. Lovett Dec. ¶ 7; Ex. 42, K. Lovett Dec. ¶ 7; Ex. 43, J. McAdoo Dec. ¶ 7; Ex. 45, S. McAdoo Dec. ¶ 7; Ex. 47, McCaugherty Dec. ¶ 6; Ex. 48, McClelland Dec. ¶ 11; Ex. 49, D. McKinney Dec. ¶ 7; Ex. 50, P. McKinney Dec. ¶ 7; Ex. 51, Melton Dec. ¶ 8; Ex. 52, Milner Dec. ¶ 6; Ex. 53, Molina Dec. ¶ 7; Ex. 54, Morris Dec. ¶ 7; Ex. 55, Mostoller Dec. ¶ 10; Ex. 56, Muraski Dec. ¶ 6; Ex. 57, Neff Dec. ¶ 10; Ex. 58, Olivarez Dec. ¶ 10; Ex. 59, Padgett Dec. ¶ 7; Ex. 60, Park ¶ 9; Ex. 61, L. Payne ¶ 8; Ex. 62, R. Payne ¶ 8; Ex. 63, Pena Dec. ¶ 9; Ex. 64, Phelps ¶ 14; Ex. 65, Phelps Supp. Dec. ¶ 6; Ex. 66, Pritchett Dec. ¶ 9; Ex. 67, Pruett Dec. ¶ 7; Ex. 68, Quarles Dec. ¶ 7; Ex. 69, B. Reid Dec. ¶ 7; Ex. 71, M. Reid Dec. ¶ 7; Ex. 72, Renee Dec. ¶ 7; Ex. 73, Roberts Dec. ¶ 7; Ex. 74, Rochester Dec. ¶ 10; Ex. 75, Rogers Dec. ¶ 10; Ex. 76, Shows Dec. ¶ 6; Ex. 77, Shows Supp. Dec. ¶ 6; Ex. 78, Staley Dec. ¶ 8; Ex. 80, Stoltz Dec. ¶ 10; Ex. 81, Stone Dec. ¶ 6; Ex. 82, Studlar Dec. ¶ 6; Ex. 83, Suonvieri Dec. ¶ 10; Ex. 84, Trooien Dec. ¶ 7; Ex. 86, Ward Dec. ¶ 9; Ex. 87, Wells Dec. ¶ 9; Ex. 88, Wheeler Dec. ¶ 6; Ex. 90, J. White Dec. ¶ 10; Ex. 91, Yaeger Dec. ¶ 7; Ex. 93, Yaeger Supp. Dec. ¶ 8; Ex. 94, Yoder Dec. ¶ 6.

[26] *See* Tab A, Steindorf Dec. ¶ 8.  *See also* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 9; Ex. 3, Atteberry Dec. ¶ 7; Ex. 4, Badger Dec. ¶ 6; Ex. 10, Carter Dec. ¶ 10; Ex. 11, Clark Dec. ¶ 5; Ex. 13, Supp. Clemens Dec. ¶ 7; Ex. 15, Conrad Dec. ¶ 7; Ex. 19, Dampier Dec. ¶ 6; Ex. 24, Fontenot Dec. ¶ 6; Ex. 25, Fuller Dec. ¶ 6; Ex. 28, Guidry Dec. ¶ 6; Ex. 31, Hickey Dec. ¶ 10; Ex. 32, Huitt Dec. ¶ 7; Ex. 34, Hutto Dec. ¶ 6; Ex. 36, Jubeck Dec. ¶ 7; Ex. 38, Lee Dec. ¶ 10; Ex. 47, McCaugherty Dec. ¶ 6; Ex. 49,  D. McKinney Dec. ¶ 7; Ex. 50, P. McKinney Dec. ¶ 7; Ex. 51, Melton Dec. ¶ 8; Ex. 52, Milner Dec. ¶ 6; Ex. 55, Mostoller Dec. ¶ 10; Ex. 57, Neff Dec. ¶ 10; Ex. 58, Olivarez Dec. ¶ 10; Ex. 59, Padgett Dec. ¶ 7; Ex. 67, Pruett Dec. ¶ 7; Ex. 68, Quarles Dec. ¶ 7; Ex. 73, Roberts Dec. ¶ 7; Ex. 74, Rochester Dec. ¶ 10; Ex. 75, Rogers Dec. ¶ 10; Ex. 78, Staley Dec. ¶ 8; Ex. 80, Stoltz Dec. ¶ 10; Ex. 81, Stone Dec. ¶ 6; Ex. 90, Yaeger Dec. ¶ 10; Ex. 93, Supp. Yaeger Dec. ¶ 8.

relatives to cover the gate.[27]   The Gate Attendants can leave the oil field site at their discretion as long as they secure coverage for the gate.  (Tab A, Steindorf Dec. ¶ 8.)  The Gate Attendants pay their relief workers directly.[28]   Gate Attendants are not required to obtain approval from GGS for their relief workers.  (Tab A, Steindorf Dec. ¶ 8.)  Some Gate Attendants advise GGS of the name of the relief worker and some do not.  (*Id.*)  Although it is well known that GGS prefers relief workers to be licensed, this is not a requirement and some Gate Attendants do not even know if their relief workers are licensed.  (*Id.*; Tab D, Ex. 1, Abbie Dec. ¶ 9.)

The Gate Attendants understand and agree that they are independent contractors.[29]

---

[27] *See* Tab A, Steindorf Dec. ¶ 8.  *See also* Tab D which includes the following Declarations:  Ex. 2, Arp Dec. ¶ 7; Ex. 3, Atteberry Dec. ¶ 7; Ex. 5, Bell Dec. ¶ 6; Ex. 6, Bisel Dec. ¶ 7; Ex. 10, Carter Dec. ¶ 10; Ex. 15, Conrad Dec. ¶ 7; Ex. 21, Evans Dec. ¶ 6; Ex. 27, Giordano Dec. ¶ 7; Ex. 29, Helser Dec. ¶ 6; Ex. 30, Hembry Dec. ¶ 7; Ex. 33, Hunt Dec. ¶ 7; Ex. 34, Hutto Dec ¶ 6; Ex. 38, Lee Dec. ¶ 10; Ex. 39, E. Lindsey Dec. ¶ 7; Ex. 40, R. Lindsey Dec. ¶ 7; Ex. 41, J. Lovett Dec. ¶ 7; Ex. 42, K. Lovett Dec. ¶ 7; Ex. 43, J. McAdoo Dec. ¶ 7; Ex. 45, S. McAdoo Dec. ¶ 7; Ex. 48, McClelland Dec. ¶ 11; Ex. 50, P. McKinney Dec. ¶ 7; Ex. 51, Melton Dec. ¶ 8; Ex. 52, Milner Dec. ¶ 6; Ex. 55, Mostoller Dec. ¶ 10; Ex. 56, Muraski Dec. ¶ 6; Ex. 57, Neff Dec. ¶10; Ex. 58, Olivarez Dec. ¶ 10; Ex. 59, Padgett Dec. ¶ 7; Ex. 60, Park ¶ 9; Ex. 61, L. Payne ¶ 8; Ex. 62, R. Payne ¶ 8; Ex. 67, Pruett Dec. ¶ 7; Ex. 68, Quarles Dec. ¶ 7; Ex. 69, B. Reid Dec. ¶ 7; Ex. 71, M. Reid Dec. ¶ 7; Ex. 72, Renee Dec. ¶ 7; Ex. 74, Rochester Dec. ¶ 10; Ex. 75, Rogers Dec. ¶ 10; Ex. 80, Stoltz Dec. ¶ 10; Ex. 83, Suonvieri Dec. ¶ 10; Ex. 86, Ward Dec. ¶ 9; Ex. 90, J. White Dec. ¶ 10; Ex. 91, Yaeger Dec. ¶ 7; Ex. 93, Yaeger Supp. Dec. ¶ 8.

[28] *See* Tab A, Steindorf Dec. ¶ 8.  *See also* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 9; Ex. 3, Atteberry Dec. ¶ 7; Ex. 4, Badger Dec. ¶ 6; Ex. 10, Carter Dec ¶ 10; Ex. 11, Clark Dec. ¶ 5; Ex. 12, Clemens Dec. ¶ 7; Ex. 13, Clemens Supp. Dec. ¶ 7; Ex. 14, Clemens Sec. Supp. Dec. ¶ 5; Ex. 15, Conrad Dec. ¶ 7; Ex. 17, Coulston Dec. ¶ 7; Ex. 18, Coulston Supp. Dec. ¶ 8; Ex. 19, Dampier Dec. ¶ 6; Ex. 24, Fontenot Dec. ¶ 6; Ex. 25, Fuller Dec. ¶ 6; Ex. 27, Giordano Dec. ¶ 7; Ex. 28, Guidry Dec. ¶ 6; Ex. 31, Hickey Dec. ¶ 10; Ex. 32, Huitt Dec. ¶ 7; Ex. 34, Hutto Dec ¶ 6; Ex. 36, Jubeck Dec. ¶ 7; Ex. 38, Lee Dec. ¶ 10; Ex. 47, McCaugherty Dec. ¶ 6; Ex. 49, D. McKinney Dec. ¶ 7; Ex. 50, P. McKinney Dec. ¶ 7; Ex. 51, Melton Dec. ¶ 8; Ex. 52, Milner Dec. ¶ 6; Ex. 55, Mostoller Dec. ¶ 10; Ex. 57, Neff Dec. ¶ 10; Ex. 59, Padgett Dec. ¶ 7; Ex. 66, Pritchett Dec. ¶ 9; Ex. 67, Pruett Dec. ¶ 7; Ex. 68, Quarles Dec. ¶ 7; Ex. 73, Roberts Dec. ¶ 7; Ex. 74, Rochester Dec. ¶ 10; Ex. 75, Rogers Dec. ¶ 10; Ex. 76, Shows Dec. ¶ 6; Ex. 78, Staley Dec. ¶ 8; Ex. 80, Stoltz Dec. ¶ 10; Ex. 81, Stone Dec. ¶ 6; Ex. 87, Wells Dec. ¶ 9; Ex. 91, Yaeger Dec. ¶ 7; Ex. 93, Yaeger Supp. Dec. ¶ 8.

[29] *See* Tab A, Steindorf Dec. Exs. 2-458; *See* Tab D which includes the following Declarations: Ex. 1, Abbie Dec. ¶ 2; Ex. 2, Arp Dec. ¶ 2; Ex. 3, Atteberry Dec. ¶ 2; Ex. 4, Badger Dec. ¶ 2; Ex. 5, Bell Dec. ¶ 2; Ex. 6, Bisel Dec. ¶ 2; Ex. 7, Boren Declaration, ¶ 2; Ex. 8, Bowling Dec. ¶ 2; Ex. 9, Braddock Dec. ¶ 2; Ex. 10, Carter Dec. ¶ 2; Ex. 11, Clark Dec. ¶ 2; Ex. 12, Clemens Dec. ¶ 2; Ex. 15, Conrad Dec. ¶ 2; Ex. 16, Coronel Dec. ¶ 2; Ex. 17, Coulston Dec. ¶ 2; Ex. 19, Dampier Dec. ¶ 2; Ex. 20, Eldridge Dec. ¶ 2; Ex. 21, Evans Dec. ¶ 2; Ex. 22, Ferrell Dec. ¶ 2; Ex. 23, Flickinger Dec. ¶ 2; Ex. 24, Fontenot Dec. ¶ 2; Ex. 25, Fuller Dec. ¶ 2; Ex. 26, Geering Dec. ¶ 2; Ex. 27, Giordano Dec. ¶ 2; Ex. 28, Guidry Dec. ¶ 2; Ex. 29, Helser Dec. ¶ 2; Ex. 31, Hickey Dec. ¶ 2; Ex. 32, Huitt Dec. ¶ 2; Ex. 33, Hunt Dec. ¶ 2; Ex. 34, Hutto Dec ¶ 2; Ex. 35, Jones Dec. ¶ 2; Ex. 36, Jubeck Dec. ¶ 2; Ex. 37, Kershman Dec. ¶ 2; Ex. 38, Lee Dec. ¶ 2;

They declare to the IRS that they are self-employed.[30]  Having declared themselves self-employed to the IRS, the Gate Attendants deduct expenses related to their work as gate attendants, including, for example, car and truck expenses, depreciation, repairs and maintenance, supplies, meals and expenses, modem fees, utilities, propane, telephone expenses, safety equipment expenses, certification and registration fees, contract labor, and legal and professional services.[31]  They also record their business profits and losses on their tax returns.[32]  Many of the Gate Attendants supplement their income with

---

[30] Ex. 39, E. Lindsey Dec. ¶ 2; Ex. 40, R. Lindsey Dec. ¶ 2; Ex. 41, J. Lovett Dec. ¶ 2; Ex. 42, K. Lovett Dec. ¶ 2; Ex. 43, J. McAdoo Dec. ¶ 2; Ex. 45, S. McAdoo Dec. ¶ 2; Ex. 47, McCaugherty Dec. ¶ 2; Ex. 48, McClelland Dec. ¶ 2; Ex. 49, D. McKinney Dec. ¶ 2; Ex. 50, P. McKinney Dec. ¶ 2; Ex. 51, Melton Dec. ¶ 2; Ex. 52, Milner Dec. ¶ 2; Ex. 53, Molina Dec. ¶ 2; Ex. 54, Morris Dec. ¶ 2; Ex. 55, Mostoller Dec. ¶ 2; Ex. 56, Muraski Dec. ¶ 2; Ex. 57, Neff Dec. ¶ 2; Ex. 58, Olivarez Dec. ¶ 2; Ex. 59, Padgett Dec. ¶ 2; Ex. 60, Park ¶ 2; Ex. 61, L. Payne ¶ 2; Ex. 62, R. Payne ¶ 2; Ex. 63, Pena Dec. ¶ 2; Ex. 64, Phelps ¶ 2; Ex. 66, Pritchett Dec. ¶ 2; Ex. 67, Pruett Dec. ¶ 2; Ex. 68, Quarles Dec. ¶ 2; Ex. 69, B. Reid Dec. ¶ 2; Ex. 71, M. Reid Dec. ¶ 2; Ex. 72, Renee Dec. ¶ 2; Ex. 73, Roberts Dec. ¶ 2; Ex. 74, Rochester Dec. ¶ 2; Ex. 75, Rogers Dec. ¶ 2; Ex. 76, Shows Dec. ¶ 2; Ex. 78, Staley Dec. ¶ 2; Ex. 80, Stoltz Dec. ¶ 2; Ex. 81, Stone Dec. ¶ 2; Ex. 82, Studlar Dec. ¶ 2; Ex. 83, Suonvieri Dec. ¶ 2; Ex. 84, Trooien Dec. ¶ 2; Ex. 85, Wallace Dec. ¶ 3; Ex. 86, Ward Dec. ¶ 2; Ex. 87, Wells Dec. ¶ 2; Ex. 88, Wheeler Dec. ¶ 2; Ex. 89, G. White ¶ 2; Ex. 90, J. White Dec. ¶ 2; Ex. 91, Yaeger Dec. ¶ 2; Ex. 94, Yoder Dec. ¶ 2.

[30] See Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶¶ 24-25; Ex. 7, Boren Dec. ¶¶ 2-3;; Ex. 10, Carter Dec. ¶ 24; Ex. 11; Clark Dec. ¶ 9; Ex. 13, Supp. Clemens Dec. ¶ 8; Ex. 18, Supp. Coulston Dec. ¶¶ 10-11; Ex. 31, Hickey Dec. ¶ 22; Ex. 38, Lee Dec. ¶ 25; Ex. 44; J. McAdoo Supp. Dec. ¶ 10; Ex. 46, S. McAdoo Supp. Dec. ¶ 10; Ex. 48, McClelland Dec. ¶ 26; Ex. 55, Mostoller Dec. ¶ 25; Ex. 57, Neff Dec. ¶ 27; Ex. 58, Oliverez Dec. ¶ 25; Ex. 60, Park Dec. ¶ 8; Ex. 63, Pena Dec. ¶ 20; Ex. 65, Phelps Supp. Dec. ¶¶ 8, 9; Ex. 66, Pritchett Dec. ¶¶ 21-22; Ex. 74, Rochester Dec. ¶ 23; Ex. 75, Rogers Dec. ¶ 26; Ex. 77, Shows Supp. Dec. ¶¶ 9-10; Ex. 80, Stoltz Dec. ¶ 25;Ex. 78, Staley Dec. ¶ 9; Ex. 79, Staley Supp. Dec. ¶ 10; Ex. 81, Stone Dec. ¶ 25; Ex. 83, Suonvieri Dec. ¶ 25; Ex. 86, Ward Dec. ¶¶ 20-22; Ex. 87, Wells Dec. ¶¶ 20-21; Ex. 88, Wheeler Dec. ¶ 25; Ex. 89, G. White Dec. ¶ 10; Ex. 90, J. White Dec. ¶ 23; Ex. 93, Yaeger Supp. Dec ¶10.  See also Tab O which includes the following Income Tax Returns: Ex. 1, Shirlene Abbie Income Tax Return; Ex. 2, Gabrielle Badger Income Tax Return; Ex. 3, James Bell Income Tax Return; Ex. 4, Kenneth Boren Income Tax Return; Ex. 5, Thomas Clemens Income Tax Return, Ex. 6, Benny Coulston Income Tax Return; Ex. 7, Robert Dunseth Income Tax Return; Ex. 8, Albert Giordano Income Tax Return; Ex. 9, Walter Hickey Income Tax Return; Ex. 10, Lena Miller Income Tax Return; Ex. 11, Joe Oswalt Income Tax Return; Ex. 12, Dalton Park Income Tax Return; Ex. 13, Rolando Pena Income Tax Return; Ex. 14, Harold Ronald Phelps Income Tax Return; Ex. 15, Cindy Pritchett Income Tax Return; Ex. 16, Billy J. and Marjorie Reid Income Tax Return; Ex. 17, Roy Richter Income Tax Return; Ex. 18, Sheri Shows Income Tax Return; Ex. 19, Jonnie Tollett Income Tax Return; Ex. 20, Eddie Ward Income Tax Return; Ex. 21, Sandra Wells Income Tax Return; Ex. 22, Janice Woodall Income Tax Return; Ex. 23, Lawrie Yaeger Income Tax Return.

[31] See id.

[32] Id.

18

revenues earned from their gate attendant businesses.[33]

When the Gate Attendants report to the oil field site to begin their assignment, they receive no training or instruction on how to do their work.[34] The Gate Attendants are expected to, and do, work without day-to-day supervision.[35] GGS has no control over how they perform their jobs; GGS is <u>not</u> onsite.[36] In fact, the only contact a Gate Attendant has with GGS is when a GGS service technician brings water and fuel approximately every other week.[37] The oil company or landowner, not GGS, sometimes

---

[33] *See* Tab D which includes the following Declarations:  Ex. 6, Bisel Dec. ¶ 13; Ex. 33, Hunt Dec. ¶ 15; Ex. 48, McClelland Dec. ¶ 27; Ex. 57, Neff Dec. ¶ 28; Ex. 64, Phelps Dec. ¶ 15; Ex. 68, Quarles Dec. ¶ 14; Ex. 80, Stoltz Dec. ¶ 27; Ex. 86, Ward Dec. ¶23.

[34] *See* Tab A, Steindorf Dec. ¶ 9; *see also* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 4; Ex. 10, Carter Dec. ¶ 4; Ex. 11, Clark Dec. ¶ 10; Ex. 13, Clemens Supp. Dec. ¶ 4; Ex. 18, Coulston Supp. Dec. ¶¶ 2, 4; Ex. 31, Hickey Dec. ¶ 5; Ex. 38, Lee Dec. ¶ 4; Ex. 44, J. McAdoo Supp. Dec. ¶ 6; Ex. 46, S. McAdoo Supp. Dec. ¶ 6; Ex. 48, McClelland Dec. ¶ 4; Ex. 55, Mostoller Dec. ¶ 4; Ex. 57, Neff Dec. ¶ 4; Ex. 58, Olivarez Dec. ¶ 4; Ex. 60, Park Dec. ¶ 11; Ex. 63, Pena Dec. ¶ 4; Ex. 65, Phelps Supp. Dec. ¶ 3; Ex. 66, Pritchett Dec. ¶ 4; Ex. 74, Rochester Dec. ¶ 5; Ex. 75, Rogers Dec. ¶ 4; Ex. 77, Shows Supp. Dec. ¶ 2; Ex. 79, Staley Supp. Dec. ¶ 6; Ex. 80, Stoltz Dec. ¶ 4; Ex. 81, Stone Dec. ¶ 21; Ex. 86, Ward Dec. ¶ 4; Ex. 87, Wells Dec. ¶ 4; Ex. 88, Wheeler Dec. ¶ 21; Ex. 89, G. White Dec. ¶ 6; Ex. 90, J. White Dec. ¶ 4.

[35] *See* Tab J, Rapstine Dep. 137:13-17; *see also* Tab D which includes the following Declarations: Ex. 1, Abbie Dec. ¶ 7; Ex. 2, Arp Dec. ¶ 5; Ex. 3, Atteberry Dec. ¶ 5; Ex. 4, Badger Dec. ¶ 5, Ex. 5, Bell Dec. ¶ 4; Ex. 6, Bisel Dec. ¶ 4; Ex. 8, Bowling Dec. ¶ 4; Ex. 9, Braddock Dec. ¶ 4; Ex. 10, Carter Dec. ¶ 8; Ex. 14, Clemens Sec. Supp. Dec. ¶ 4; Ex. 15, Conrad Dec. ¶ 5; Ex. 16, Coronel Dec. ¶ 5; Ex. 17, Coulston Dec. ¶ 5; Ex. 20, Eldridge Dec. ¶ 4; Ex. 21, Evans Dec. ¶ 4; Ex. 22, Ferrell Dec. ¶ 4; Ex. 23, Flickinger Dec. ¶ 4; Ex. 24, Fontenot Dec. ¶ 4; Ex. 26, Geering Dec. ¶ 4; Ex. 27, Giordano Dec. ¶ 5; Ex. 28, Guirdy Dec. ¶ 4; Ex. 29, Helser Dec. ¶ 4; Ex. 30, Hembry Dec. ¶ 5; Ex. 31, Hickey Dec. ¶ 8; Ex. 32, Huitt Dec. ¶ 5; Ex. 33, Hunt Dec. ¶ 4; Ex. 34, Hutto Dec. ¶ 4; Ex. 35, Jones Dec. ¶ 5; Ex. 36, Jubeck Dec. ¶ 5; Ex. 37, Kershman Dec. ¶ 5; Ex. 38, Lee Dec. ¶ 8; Ex. 41, J. Lovett Dec. ¶ 5; Ex. 42, K. Lovett Dec. ¶ 5; Ex. 43, J. McAdoo Dec. ¶ 5; Ex. 44, J. McAdoo Supp. Dec. ¶ 7; Ex. 45, S. McAdoo Dec. ¶ 5; Ex. 46, S. McAdoo Supp. Dec. ¶ 7; Ex. 47, McCaugherty Dec. ¶ 4; Ex. 48, McClelland Dec. ¶ 9; Ex. 49, D. McKinney Dec. ¶ 5; Ex. 50, P. McKinney Dec. ¶ 5; Ex. 51, Melton Dec. ¶ 16; Ex. 52, Milner Dec. ¶ 4; Ex. 53, Molina Dec. ¶ 5; Ex. 54, Morris Dec. ¶ 12; Ex. 55, Mostoller Dec. ¶ 8; Ex. 56, Muraski Dec. ¶ 4; Ex. 57, Neff Dec. ¶ 8; Ex. 58, Olivarez Dec. ¶8; Ex. 59, Padgett Dec. ¶ 5; Ex. 63, Pena Dec. ¶ 7; Ex. 64, Phelps Dec. ¶ 4; Ex. 66, Pritchett Dec. ¶ 7; Ex. 67, Pruett Dec. ¶ 5; Ex. 68, Quarles Dec. ¶ 4; Ex. 69, B. Reid Dec. ¶ 5; Ex. 71, M. Reid Dec. ¶ 5; Ex. 72, Renee Dec. ¶ 5; Ex. 74, Rochester Dec. ¶ 8; Ex. 75, Rogers Dec. ¶ 8; Ex. 76, Shows Dec. ¶ 4; Ex. 77, Shows Supp. Dec. ¶ 4; Ex. 78, Staley Dec. ¶ 5; Ex. 79, Staley Supp. Dec. ¶ 7; Ex. 80, Stoltz Dec. ¶ 8; Ex. 81, Stone Dec. ¶¶ 4, 22; Ex. 83, Suonvieri Dec. ¶ 8; Ex. 84, Trooien Dec. ¶ 5; Ex. 86, Ward Dec. ¶ 7; Ex. 87, Wells Dec. ¶ 7; Ex. 88, Wheeler Dec. ¶¶ 4, 22; Ex. 90, J. White Dec. ¶ 8; Ex. 91, Yaeger Dec. ¶ 5; Ex. 93, Yaeger Supp. Dec. ¶ 6; Ex. 94, Yoder Dec. ¶ 4.

[36] Tab A, Steindorf Dec. ¶ 9.

[37] *See* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 21; Ex. 2, Arp Dec. ¶ 14; Ex. 3, Atteberry Dec. ¶ 15; Ex. 4, Badger Dec. ¶ 11; Ex. 5, Bell Dec. ¶ 16; Ex. 8, Bowling Dec. ¶ 16; Ex. 9, Braddock Dec. ¶ 17; Ex. 10, Carter Dec. ¶ 21; Ex. 11, Clark Dec. ¶ 10; Ex. 13, Clemens Supp. Dec. ¶ 15; Ex. 15, Conrad Dec. ¶ 16; Ex. 16, Coronel Dec. ¶ 16; Ex. 17, Coulston Dec. ¶ 17; Ex. 20, Eldridge Dec. ¶ 14; Ex. 21, Evans Dec. ¶ 16; Ex. 22, Ferrell Dec. ¶ 16; Ex. 23, Flickinger Dec. ¶ 15; Ex. 24, Fontenot

19

makes requests of the gate attendant either orally or in writing, and may have rules governing anyone who enters the property.[38]  These communications, made by the oil and gas companies, involve safety and quality control issues.  (Tab A, Steindorf Dec. ¶10.)

In order to contract with GGS, the Gate Attendants are required to own an R.V., fifth wheel or trailer for use at the oil field site.  (Tab A, Steindorf Dec. ¶ 11; Tab K, Ramirez Dep. 243:9-12.)  With <u>one</u> exception out of the hundreds of Gate Attendants currently at issue, all Gate Attendants have their own motor home or R.V. onsite at the oilfield.  (Tab A, Steindorf Dec. ¶ 11.)  They often live with their families onsite and some have pets.[39]  When not logging vehicles in and out during an assignment, the Gate Attendants engage in personal activities such as reading, using the Internet, talking on the

---

Dec. ¶ 17; Ex. 27, Giordano Dec. ¶ 16; Ex. 29, Helser Dec. ¶ 13; Ex. 30, Hembry Dec. ¶ 16; Ex. 31, Hickey Dec. ¶ 19; Ex. 32, Huitt Dec. ¶ 15; Ex. 34, Hutto Dec ¶ 15; Ex. 35, Jones Dec. ¶ 16; Ex. 36, Jubeck Dec. ¶ 15; Ex. 37, Kershman Dec. ¶ 15; Ex. 38, Lee Dec. ¶ 21; Ex. 41, J. Lovett Dec. ¶ 15; Ex. 42, K. Lovett Dec. ¶ 15; Ex. 43, J. McAdoo Dec. ¶ 15; Ex. 45, S. McAdoo Dec. ¶ 15; Ex. 47, McCaugherty Dec. ¶ 15; Ex. 48, McClelland Dec. ¶ 22; Ex. 49, D. McKinney Dec. ¶ 15; Ex. 50, P. McKinney Dec. ¶ 15; Ex. 52, Milner Dec. ¶ 17; Ex. 53, Molina Dec. ¶ 15; Ex. 55, Mostoller Dec. ¶ 21; Ex. 56, Muraski Dec. ¶ 15; Ex. 57, Neff Dec. ¶ 23; Ex. 58, Olivarez Dec. ¶ 21; Ex. 59, Padgett Dec. ¶ 16; Ex. 63, Pena Dec. ¶17; Ex. 66, Pritchett Dec. ¶ 18; Ex. 67, Pruett Dec. ¶ 16; Ex. 69, B. Reid Dec. ¶ 16; Ex. 71, M. Reid Dec. ¶ 16; Ex. 72, Renee Dec. ¶ 14; Ex. 74, Rochester Dec. ¶ 20; Ex. 75, Rogers Dec. ¶ 22; Ex. 76, Shows Dec. ¶ 11; Ex. 78, Staley Dec. ¶ 17; Ex. 80, Stoltz Dec. ¶ 22; Ex. 81, Stone Dec. ¶ 16; Ex. 83, Suonvieri Dec. ¶ 21; Ex. 84, Trooien Dec. ¶ 15; Ex. 86, Ward Dec. ¶ 17; Ex. 87, Wells Dec. ¶ 17; Ex. 90, J. White Dec. ¶ 20; Ex. 91, Yaeger Dec. ¶ 15; Ex. 93, Yaeger Supp. Dec. ¶ 15; Ex. 94, Yoder Dec. ¶ 15.

[38] *See* Tab A, Steindorf Dec. ¶ 10.  *See also* Tab D which includes the following Declarations: Ex. 11, Clark Dec. ¶ 6; Ex. 38, Lee Dec. ¶ 22; Ex. 44, J. McAdoo Supp. Dec. ¶ 8; Ex. 46, S. McAdoo Supp. Dec. ¶ 8; Ex. 48, McClelland Dec. ¶ 23; Ex. 55, Mostoller Dec. ¶ 22; Ex. 57, Neff Dec. ¶ 24; Ex. 58, Olivarez Dec. ¶ 22; Ex. 75, Rogers Dec. ¶ 23; Ex. 80, Stoltz Dec. ¶ 23; Ex. 83, Suonvieri Dec. ¶ 22.  *See* Tab I, Petty Dec. ¶ 4-10.).

[39] *See* Tab A, Steindorf Dec. ¶ 11.  *See also* Tab D which includes the following Declarations:  Ex. 2, Arp Dec. ¶ 6; Ex. 3, Atteberry Dec. ¶ 6; Ex. 4, Badger Dec. ¶ 5; Ex. 5, Bell Dec. ¶ 5; Ex. 6, Bisel Dec. ¶ 6; Ex. 8, Bowling Dec. ¶ 5; Ex. 9, Braddock Dec. ¶ 5; Ex. 12, Clemens Dec. ¶ 6; Ex. 15, Conrad Dec. ¶ 6; Ex. 16, Coronel Dec. ¶ 6; Ex. 17, Coulston Dec. ¶ 6; Ex. 20, Eldridge Dec. ¶ 5; Ex. 21, Evans Dec. ¶ 5; Ex. 22, Ferrell Dec. ¶ 5; Ex. 23, Flickinger Dec. 5; Ex. 25, Fuller Dec. ¶ 5; Ex. 26, Geering Dec. ¶ 5; Ex. 27, Giordano Dec. ¶ 6; Ex. 29, Helser Dec. ¶ 5; Ex. 30, Hembry Dec. ¶ 6; Ex. 32, Huitt Dec. ¶ 6; Ex. 33, Hunt Dec. ¶ 6; Ex. 34, Hutto Dec. ¶ 5; Ex. 38, Lee Dec. ¶ 5; Ex. 39, E. Lindsay Dec. ¶ 6; Ex. 40, R. Lindsay Dec. ¶ 6; Ex. 41, J. Lovett Dec. ¶ 6; Ex. 42, K. Lovett Dec. ¶ 6; Ex. 43, J. McAdoo Dec. ¶ 6; Ex. 45, S. McAdoo Dec. ¶ 6; Ex. 48, McClelland Dec. ¶ 5; Ex. 49, D. McKinney Dec. ¶ 6; Ex. 50, P. McKinney Dec. ¶ 6; Ex. 52, Milner Dec. ¶ 5; Ex. 55, Mostoller Dec. ¶ 5; Ex. 56, Muraski Dec. ¶ 5; Ex. 57, Neff Dec. ¶ 5; Ex. 58, Olivarez Dec. ¶5; Ex. 59, Padgett Dec. ¶ 5; Ex. 61, L. Payne Dec. ¶ 5; Ex. 62, R. Payne Dec. ¶ 5; Ex. 64, Phelps Dec. ¶ 6; Ex. 67, Pruett Dec. ¶ 6; Ex. 69, B. Reid Dec. ¶ 6; Ex. 71, M. Reid Dec. ¶ 6; Ex. 72, Renee Dec. ¶ 6; Ex. 75, Rogers Dec. ¶ 5; Ex. 80, Stoltz Dec. ¶ 5; Ex. 81, Stone Dec. ¶ 5; Ex. 83, Suonvieri Dec. ¶ 5; Ex. 84, Trooien Dec. ¶ 6; Ex. 88, Wheeler Dec. ¶ 5; Ex. 90, J. White Dec. ¶ 5; Ex. 91, Yaeger Dec. ¶ 6; Ex. 94, Yoder Dec. ¶ 5.

telephone, watching television, completing household chores, talking with friends who stop by to visit, or other pursuits or hobbies.[40] The Gate Attendants are free to do as they please in their R.V.s, which are their homes. (*Id.*) Some of the Gate Attendants sell food onsite, perform retail sales, and provide services such as massage therapy.[41] However, they are expected to abide by the oil company and landowner's safety and quality control requests. (Tab A, Steindorf Dec. ¶ 10.) Safety measures include, but are not limited to, a prohibition of alcohol and cigarette butts outside of their respective motor homes and a requirement that the Gate Attendant use a hard hat, safety boots, and safety glasses as determined by the oil company or landowner. (*Id.*)

Each of the Gate Attendants works on projects which range from one week to several weeks; over half of the Gate Attendants worked an average of 16 weeks. (Tab A, Steindorf Dec. ¶ 14; Tab C, Brown Dec. Exs. 1-6; Tab K, Ramirez Dep. Ex. 19.) The Gate Attendants are authorized to work for GGS's competitors, or to perform other

---

[40] *See* Tab K, Ramirez Dep. 150:4-9. *See also* Tab D which includes the following Declarations: Ex. 1, Abbie Dec. ¶ 18; Ex. 2, Arp Dec. ¶ 12; Ex. 3, Atteberry Dec. ¶ 13; Ex. 4, Badger Dec. ¶ 9; Ex. 5, Bell Dec. ¶ 13; Ex. 6, Bisel Dec. ¶ 8; Ex. 8, Bowling Dec. ¶¶ 13-14; Ex. 9, Braddock Dec. ¶¶ 14-14; Ex. 10, Carter Dec. ¶ 18; Ex. 12, Clemens Dec. ¶ 13; Ex. 15, Conrad Dec. ¶ 13; Ex. 16, Coronel Dec. ¶ 13; Ex. 17, Coulston Dec. ¶ 14; Ex. 19, Dampier Dec. ¶ 7; Ex. 20, Eldridge Dec. ¶ 11; Ex. 21, Evans Dec. ¶ 13; Ex. 22, Ferrell Dec. ¶ 13; Ex. 23, Flickinger Dec. ¶ 12; Ex. 24, Fontenot Dec. ¶ 14; Ex. 25, Fuller Dec. ¶ 12; Ex. 26, Geering Dec. ¶ 11; Ex. 27, Giordano Dec. ¶ 13; Ex. 28, Guidry Dec. ¶ 8; Ex. 29, Helser Dec. ¶ 10; Ex. 30, Hembry Dec. ¶ 13; Ex. 31, Hickey Dec. ¶ 16; Ex. 32, Huitt Dec. ¶ 12; Ex. 33, Hunt Dec. ¶ 8; Ex. 34, Hutto Dec ¶ 12; Ex. 35, Jones Dec. ¶ 13; Ex. 36, Jubeck Dec. ¶ 12; Ex. 37, Kershman Dec. ¶ 12; Ex. 38, Lee Dec. ¶ 18; Ex. 39, E. Lindsey Dec. ¶ 13; Ex. 40, R. Lindsey Dec. ¶ 13; Ex. 41, J. Lovett Dec. ¶ 12; Ex. 42, K. Lovett Dec. ¶ 12; Ex. 43, J. McAdoo Dec. ¶ 12; Ex. 45, S. McAdoo Dec. ¶ 12; Ex. 47, McCaugherty Dec. ¶ 12; Ex. 48, McClelland Dec. ¶ 19; Ex. 49, D. McKinney Dec. ¶ 12; Ex. 50, P. McKinney Dec. ¶ 12; Ex. 51, Melton Dec. ¶ 13; Ex. 52, Milner Dec. ¶ 14; Ex. 53, Molina Dec. ¶ 12; Ex. 54, Morris Dec. ¶ 9; Ex. 55, Mostoller Dec. ¶ 18; Ex. 56, Muraski Dec. ¶ 12; Ex. 57, Neff Dec. ¶ 20; Ex. 58, Olivarez Dec. ¶ 18; Ex. 59, Padgett Dec. ¶ 13; Ex. 61, L. Payne ¶ 7; Ex. 62, R. Payne ¶ 7; Ex. 63, Pena Dec. ¶ 14; Ex. 64, Phelps ¶ 12; Ex. 66, Pritchett Dec. ¶ 15; Ex. 67, Pruett Dec. ¶ 13; Ex. 68, Quarles Dec. ¶ 12; Ex. 69, B. Reid Dec. ¶ 13; Ex. 71, M. Reid Dec. ¶ 13; Ex. 72, Renee Dec. ¶ 12; Ex. 73, Roberts Dec. ¶ 12; Ex. 74, Rochester Dec. ¶ 17; Ex. 75, Rogers Dec. ¶ 19; Ex. 76, Shows Dec. ¶ 9; Ex. 78, Staley Dec. ¶ 14; Ex. 80, Stoltz Dec. ¶ 19; Ex. 81, Stone Dec. ¶ 13; Ex. 83, Suonvieri Dec. ¶ 18; Ex. 84, Trooien Dec. ¶ 12; Ex. 86, Ward Dec. ¶ 14; Ex. 87, Wells Dec. ¶ 14; Ex. 88, Wheeler Dec. ¶ 13; Ex. 90, J. White Dec. ¶ 17; Ex. 91, Yaeger Dec. ¶ 12; Ex. 93, Yaeger Supp. Dec. ¶ 14; Ex. 94, Yoder Dec. ¶ 12.

[41] *See* Tab I, Petty Dep. 110:6-17. *See* Tab D which includes the following Declarations: Ex. 18, Coulston Supp. Dec. ¶ 21 and Ex. A thereto; Ex. 87, Wells Dec. ¶ 22. *See also* Tab O, Ex. 5, Clemens Tax Return.

unrelated work.[42]   Sandra Wells has a separate business through which she provides massage therapy services.  (Tab D, Ex. 87, Wells Dec. ¶ 22.)  Similarly, at the same time that he provided gate attendant services for GGS, Benny Coulston was in the business of selling cosmetic teeth whitening.  (Tab D, Ex. 18, ¶ 21, Ex. A.)  The Gate Attendants also could increase their profits by accepting additional assignments from GGS or working for other companies.[43]  Some Gate Attendants also perform gate attendant work for the Army Corps of Engineers as independent contractors.[44]  In fact, the government's gate attendant program is almost identical to that of GGS.  *See* Section V(A)(3)(b), *infra*.

Gate Attendants are hired on a project-by-project basis.[45]  They are not guaranteed continued work beyond each project; rather, from the beginning of their relationships with GGS, the Gate Attendants know that their positions are temporary.[46]

---

[42] *See* Tab J, Rapstine Dep. 140:16-21; Tab A, Steindorf Dec. ¶14; *See also*, Tab D which includes the following Declarations: Ex. 10, Carter Dec. ¶ 23; Ex. 18, Coulston Supp. Dec. ¶ 9 and Ex. A thereto; Ex. 38, Lee Dec. ¶ 24; Ex. 44, J. McAdoo Supp. Dec. ¶ 3; Ex. 45, S. McAdoo Supp. Dec. ¶ 3; Ex. 55, Mostoller Dec. ¶24; Ex. 56, Muraski Dec. ¶ 2; Ex. 57, Neff Dec. ¶ 26; Ex. 58, Olivarez Dec. ¶ 24; Ex. 61, L. Payne Dec. ¶ 3; Ex. 62, S. Payne Dec. ¶ 3; Ex. 63, Pena Dec. ¶ 19; Ex. 73, Roberts Dec. ¶ 4; Ex. 74, Rochester Dec. ¶ 22; Ex. 75, Rogers Dec. ¶ 25; Ex. 77, Shows Supp. Dec. ¶ 8; Ex. 79, Staley Supp Dec. ¶ 3; Ex. 80, Stoltz Dec. ¶ 25; Ex. 81, Stone Dec. ¶ 18; Ex. 83, Suonvieri Dec. ¶ 19; Ex. 87, Wells Dec. ¶ 19; Ex. 88, Wheeler Dec. ¶ 24; Ex. 89, G. White Dec. ¶ 3; Ex. 90, J. White Dec. ¶ 22.

[43] *See* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶¶ 6, 23; Ex. 10, Carter Dec. ¶ 11; Ex. 18, Coulston Supp. Dec. ¶¶ 3, 9; Ex. 31, Hickey Dec. ¶¶ 7, 21; Ex. 55, Mostoller Dec. ¶11; Ex. 57, Neff Dec. ¶ 11; Ex. 58, Olivarez Dec. ¶ 11; Ex. 66, Pritchett Dec. ¶ 20; Ex. 75, Rogers Dec. ¶ 11; Ex. 80, Stoltz Dec. ¶ 11; Ex. 87, Wells Dec. ¶ 19; Ex. 90, J. White Dec. ¶ 11.

[44] *See* Tab A, Steindorf Dec. 14; *See* Tab DD which includes the following Declarations:  Ex. 44, J. McAdoo Supp. Dec. ¶¶3-11; Ex. 46, S. McAdoo Supp. Dec. ¶¶ 3-11; Ex. 79, Staley Supp. Dec. ¶¶ 3-11; Ex. 81, Stone Dec. ¶¶ 18-26; Ex. 88, Wheeler Dec. ¶¶ 18-25; Ex. 89, G. White Dec. ¶¶ 3-9.

[45] Tab A, Steindorf Dec. ¶ 15. *See also* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 6; Ex. 10, Carter Dec. ¶ 6; Ex. 11, Clark Dec. ¶ 3; Ex. 14, Clemens Sec. Supp. Dec. ¶ 3; Ex. 18, Coulston Supp. Dec. ¶ 3; Ex. 31, Hickey Dec. ¶ 7; Ex. 38, Lee Dec. ¶ 6; Ex. 55, Mostoller Dec. ¶ 6; Ex. 57, Neff Dec. ¶ 6; Ex. 58, Olivarez Dec. ¶ 6; Ex. 63, Pena Dec. ¶ 6; Ex. 65, Phelps Supp. Dec. ¶ 2; Ex. 66, Pritchett Dec. ¶ 6; Ex. 70, B. Reid. Supp. Dec. ¶ 3; Ex. 74, Rochester Dec. ¶ 7; Ex. 75, Rogers Dec. ¶ 6; Ex. 77, Shows Supp. Dec. ¶ 3; Ex. 78, Staley Dec. ¶ 6; Ex. 80, Stoltz Dec. ¶ 6; Ex. 83, Suonveiri Dec. ¶ 6; Ex. 86, Ward Dec. ¶ 6; Ex. 87, Wells Dec. ¶ 6; Ex. 90, J. White Dec. ¶6; Ex. 93, Yaeger Supp. Dec. ¶ 4.

[46] Tab A, Steindorf Dec. ¶ 15; *See* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 6; Ex. 10, Carter Dec. ¶ 6; Ex. 11, Clark Dec. ¶ 3; Ex. 14, Clemens Sec. Supp. Dec. ¶ 3; Ex. 18, Coulston Supp. Dec. ¶ 3; Ex. 31, Hickey Dec. ¶ 7; Ex. 38, Lee Dec. ¶ 7; Ex. 48, McClelland Dec. ¶ 8; Ex. 55, Mostoller Dec. ¶ 7; Ex. 57, Neff Dec. ¶ 7; Ex. 58, Olivarez Dec. ¶ 7; Ex. 63, Pena Dec. ¶ 6; Ex. 65, Phelps Supp. Dec. ¶ 2; Ex. 66, Pritchett Dec. ¶ 6; Ex. 70, B. Reid. Supp. Dec. ¶ 4; Ex. 74, Rochester Dec. ¶ 7; Ex. 75, Rogers Dec. ¶ 7; Ex. 77, Shows Supp. Dec. ¶ 3; Ex. 78, Staley Dec. ¶ 6; Ex. 80, Stoltz Dec. ¶ 7;

Upon completion of a project, the Gate Attendants are under no obligation to accept another project, and, in fact, do reject projects.[47]   Some Gate Attendants are "snow birds" who travel to Texas for short periods of time and then return to their homes in the Northern United States.  (*See, e.g.,* Tab D, Ex. 31, Hickey Dec. ¶7.)  There is no retribution for rejecting a project, and Gate Attendants are again called upon.[48]

The Gate Attendants use many of their own tools, equipment and supplies when performing gate attendant services. (Tab D, Exs. 1-94.) For example, the Gate Attendants are required to supply the on-site trailers or R.V.s used by them to sleep, eat, and otherwise live during the project.  (Tab A, Steindorf Dec. ¶ 11; Tab D, Exs. 1-94.)  They are also required to supply and purchase their own insurance, food, water, and maintenance for their trailers.[49]  Some provide their own shirts, motion sensors, cameras, bells and lights for the gate where vehicles enter and depart.[50]  GGS provides an orange vest and asks the Gate Attendants to wear it for safety reasons; but GGS has not penalized anyone for not wearing the vest.  (Tab A, Steindorf Dec. ¶ 13.)  Like the Army

---

Ex. 83, Suonvieri Dec. ¶ 7; Ex. 86, Ward Dec. ¶ 6; Ex. 87, Wells Dec. ¶ 6; Ex. 90, J. White Dec. ¶ 7; Ex. 93, Yaeger Supp. Dec. ¶ 4.

[47] Tab A, Steindorf Dec. ¶ 15; *See* Tab D which includes the following Declarations: Ex. 1, Abbie Dec. ¶ 6; Ex. 10, Carter Dec. ¶ 6; Ex. 11, Clark ¶ 7; Ex. 18, Coulston Supp. Dec. ¶ 3; Ex. 31, Hickey Dec. ¶ 7; Ex. 48, McClelland Dec. ¶¶ 6, 7; Ex. 55, Mostoller Dec. ¶ 6; Ex. 57, Neff Dec. ¶ 6; Ex. 60, Park Dec. ¶ 4; Ex. 65, Phelps Supp. Dec. ¶ 2; Ex. 66, Pritchett Dec. ¶ 6; Ex. 74, Rochester Dec. ¶ 7; Ex. 75, Rogers Dec. ¶ 6; Ex. 77, Shows Supp. Dec. ¶ 3; Ex. 78, Staley Dec. ¶ 6; Ex. 80, Stoltz Dec. ¶ 6; Ex. 83, Suonvieri Dec. ¶ 6; Ex. 86, Ward Dec. ¶ 6; Ex. 87, Wells Dec. ¶ 6; Ex. 90, J. White Dec. ¶ 6.

[48] *See* Steindorf  Dec. ¶ 15; *See* Tab D which includes the following Declarations: Ex. 1, Abbie Dec. ¶ 6; Ex. 10, Carter Dec. ¶ 6; Ex. 18, Coulston Supp. Dec. ¶ 3; Ex. 31, Hickey Dec. ¶ 7; Ex. 48, McClelland Dec. ¶¶6, 7; Ex. 60, Park Dec. ¶ 4; Ex. 65, Phelps Supp. Dec. ¶ 2; Ex. 66, Pritchett Dec. ¶ 6; Ex. 77, Shows Supp. Dec. ¶ 3; Ex. 78, Staley Dec. ¶ 6; Ex. 80, Stoltz Dec. ¶6; Ex. 83, Suonvieri Dec. ¶6; Ex. 86, Ward Dec. ¶ 6; Ex. 87, Wells Dec. ¶ 6.

[49] *See* Tab D which includes the following Declarations:  Ex. 10, Carter Dec. ¶ 9; Ex. 38, Lee Dec. ¶ 9; Ex. 48, McClelland Dec. ¶ 10; Ex. 55, Mostoller Dec. ¶ 9; Ex. 57, Neff Dec. ¶ 9; Ex. 58, Olivarez Dec. ¶ 9; Ex. 63, Pena Dec. ¶ 8; Ex. 74, Rochester Dec. ¶ 9; Ex. 75, Rogers Dec. ¶ 9; Ex. 80, Stoltz Dec. ¶ 9; Ex. 83, Suonvieri Dec. ¶ 9; Ex. 90, J. White Dec. ¶ 9.

[50] *See* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶¶24-25 and Ex. A; Ex. 7,Boren Dec. ¶¶ 2-3 and Ex. A thereto; Ex. 13, Clemens Supp. Dec. ¶ 6; Ex. 18, Coulston Supp. Dec. ¶¶6, 11 and Ex. A thereto; Ex. 65, Phelps Supp. Dec. ¶ 9 and Ex. A thereto; Ex. 66, Pritchett Dec. ¶¶ 5, 21-22 and Ex. A thereto; Ex. 74, Rochester Dec. ¶ 6; Ex. 78, Staley Dec. ¶ 7; Ex. 80, Stoltz Dec. ¶ 5; Ex. 87, Wells Dec. ¶ 21 and Ex. A thereto.

Corp of Engineers' (the "ACE") independent contractor gate attendant program, GGS sometimes supplies a septic tank and water.[51]   The oil companies either provide or purchase fuel and a generator from GGS during the assignment, which is used by the Gate Attendants.[52]

GGS provides the Gate Attendants with 1099 forms for the Internal Revenue Service ("IRS").  (Tab A, Steindorf Dec. ¶ 16.)

## IV.   THE SECRETARY'S "STATEMENT OF UNDISPUTED MATERIAL FACTS" LACKS EVIDENTIARY SUPPORT[53]

The material facts in this case, set forth *supra*, are not in dispute based on the overwhelming record evidence and, therefore, GGS and Mr. Steindorf are entitled to summary judgment.  In contrast to the undisputed material facts presented by GGS and Mr. Steindorf, the majority, if not the entirety, of the Secretary's alleged "material facts" are either not supported by the record, are not material, or consist of conclusory statements which should be disregarded by the Court.  For the most part, the Secretary's

---

[51] *See* Tab D which includes the following Declarations:  Ex. 44, J. McAdoo Supp. Dec. ¶ 5; Ex. 46, S. McAdoo Supp. Dec. ¶ 5; Ex. 79, Staley Supp. Dec. ¶ 5; Ex. 81, Stone Dec. ¶ 20; Ex. 88, Wheeler Dec. ¶ 20; Ex. 89, G. White Dec. ¶5.

[52] *See* Tab E, Steindorf Dep. 279:24-281:5; 282:1-4; 285:4-10; Tab H, Deposition of Stacie Henderson ["Henderson Dep."] 45:9-18.

[53] Also, Exhibits 37A-N, a series of nineteen photographs and two purported printouts from an internet site (Dkt. #111, Exs. 37–A–37-N), have not been authenticated and are, therefore, inadmissible evidence. A court may only consider admissible evidence in ruling on a motion for summary judgment. Fed. R. Civ. P. 56; *Mersch v. City of Dallas*, 207 F.3d 732, 734–35 (5th Cir. 2000); *Delphin v. Grayson County, Tex.*, No. 12–40102, 2012 WL 3205449, at *3 (5th Cir. Aug. 7, 2012).  *Richardson v. Oldham*, 811 F. Supp. 1186, 1198 (E.D. Tex. 1992) (striking unauthenticated police records and photographs from consideration at summary judgment stage); *Haskins Trucking Inc. v. Goodyear Tire & Rubber Co.*, Civil Action No. 07-0585, 2008 WL 1775272, at *2 (W.D. La. Apr. 17, 2008) ("Goodyear's Motion to Strike the black and white faxed copies and the color prints of the photographs submitted by Haskins Trucking is granted."); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 746 (S.D. Tex. 2003) (holding that unsworn and unauthenticated internet documents were not competent summary judgment evidence); *Frederick v. Intercontinental Hotels Group Resources, Inc.*, Civil Action No. 09–7497, 2011 WL 666843, at *8 (E.D. La. Feb. 14, 2011) (holding that materials printed from internet sources were inadmissible because they were not authenticated); *see also Travland v. Ector County, Texas*, No. 93-8560, 39 F.3d 319, 1994 WL 612342 at * 4–5 (5th Cir. Oct. 20, 1994) (holding that the district court abused its discretion when it considered unauthenticated, inadmissible memorandum as summary judgment evidence because custodian or other qualified witness did not verify its reliability as required by Fed. R. Evid. 803(6)).

purported facts hinge on the testimony contained in a handful of declarations executed by current or former gate attendants which are intentionally vague or outright misleading. (*See generally* Dkt. # 111, p. 5, fns. 8, 10.)[54]   Oftentimes, the Secretary relies upon only one declaration to support a "fact" and then attributes it to all of gate attendants at issue. In many instances, the declarations simply do not say what the Secretary claims they say. The following examples illustrate this point, each of which is more fully addressed in the argument section.

<u>Rejecting Assignments</u>.   GGS does not dispute the Secretary's assertion that a Gate Attendant is offered a gate assignment on a take-it or leave-it basis without options for other gates, but the Secretary's statement in this regard lacks an understanding of the business.   For example, when an oil company calls GGS to request a Gate Attendant, GGS calls the Gate Attendant and offers that particular gate because it is the only one available and the need is imminent.   (Steindorf Dec. ¶ 15.)   GGS's business is not such that it has multiple gates for the Gate Attendant to choose from.   (*Id.*) Second, the Secretary's assertion that "[i]f the guard declined the assignment, GGS would not likely hire him again" is an unsupported, conclusory, speculative allegation and should be stricken from each of the declarations cited by the Secretary.   (Dkt. # 111, p. 5, n.8.)   <u>Not a single Gate Attendant testified that GGS actually ceased contracting with the Gate Attendant after he rejected an assignment.</u>   To the contrary, 20 Gate Attendants testified that they declined projects <u>and subsequently did contract work for GGS</u>.[55]

---

[54] Of the 28 declarations submitted by the Secretary, however, only 25 of the declarants were ever paid as Gate Attendants. (Tab C, Declaration of P. Brown, Exs. 1-6)  The remaining three declarants were spouses of gate attendants who lived with the Gate Attendants at the choice of the Gate Attendants. (Dkt. #111, Ex. 5, Ex. 18, Ex. 31; Tab D, Ex. 2, Arp. Dec. ¶ 6; Tab D, Ex. 84, Trooien Dec. ¶ 6).  As such, these three declarations should be disregarded in their entirety.

[55] *See* fn. 49.

Working "24/7".  The Secretary erroneously asserts with no record support that "GGS required its gate guards to be working at their gates 24 hours a day, seven days a week" and that "[s]omeone had to be at the gate at all times".  (Dkt. # 111, p. 7.)  There is no evidence in the record that a Gate Attendant was required to stand at the gate 24 hours a day, 7 days a week.  Even the mere three declarations that the Secretary relies upon does not support this false assertion given their testimony that they "slept" at night.  (*Id.* at Exs. 14, ¶ 32; 25, ¶34; 26, ¶18.)  Over 80 Gate Attendants testified that they were only required to man the gate when a vehicle drove through and were otherwise free to engage in personal pursuits.[56]  Based on the number of vehicles logged in per day during the busiest times at the rate of two to five minutes per vehicle, the Gate Attendants spent at most 2-3 hours a day at the gate.  (*See* fns. 22-24 *supra*.)  Moreover, the record shows that the Gate Attendants could and did hire relief workers, and were free to leave the oil field as long as they obtained a relief worker.[57]  The significant amount of "free" time the Gate Attendants enjoyed is highly indicative of independent contractor status which the Secretary tries to mask, albeit unsuccessfully.

Ability to Work Other Jobs.  The Secretary incorrectly argues that "[n]one of the gate guards performed any work for any other individual or entity while working as a gate guard for GGS."  (Dkt. # 111, p. 12.)  The Secretary not only fails to cite record support for this allegation, but fails to understand that it is not material.  The record shows that the Gate Attendants could perform other work pursuant to their contract, and that many of them did so.  (*See* fn. 42-43 and Section V(A)(2)(e), *infra.*)  Even Rapstine admitted that GGS did not restrict the Gate Attendants from working for other

---

[56] *See* fn. 19, 40.
[57] *See* fns. 25-28.

companies.  (Tab J, Rapstine Dep. 140:16-21.)  This key point, which the Secretary misses, is that the Gate Attendants "could" perform other work, not that they chose not to perform other work.  This Court made this same point in *Mack* stating that "[t]he Fifth Circuit has instead relied on what restrictions the purported employer placed on workers, instead of what the workers chose to do, in concluding that workers were independent contractors and not employees."  *Mack v. Talasek*, Civil Action No.V-09-53, 2012 WL 1067398, at *2 (S.D. Tex.  March 28, 2012) (J. Rainey) (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1990)) (Tab R).

    <u>Investment by Gate Attendants</u>.  Disregarding the weight of the evidence, the Secretary contends that the Gate Attendants invested nothing into their business.  (Dkt. #111, p. 22.)  However, it is undisputed that Gate Attendants could only contract with GGS if they owned their own R.V. or trailer.[58]  (Tab K, Ramirez Dep. 243:9-12.)  It is undisputed that this was at times up to a $70,000 investment by the Gate Attendant. (Rapstine Dep. 276:7-20.) Mr. Rapstine ignored this cost during his flawed investigation and none of the declarations submitted by the Secretary mention the cost of purchasing the R.V. or trailer, the cost of maintaining the R.V. or trailer, the cost of transporting the R.V. or trailer to the various gate locations across Texas, or the cost of insuring the R.V. or trailer, all of which are expenses borne by the Gate Attendant that are necessary to their performance of their obligations under the terms of the independent contractor agreement. (*See generally* Dkt. #111, p. 5, fn. 8).  Over 30 Gate Attendants testified that they personally bore these costs. (*See* fn. 30-31, *supra*.)  The Secretary's assertions that "some guards already owned a trailer before they began to work for GGS" and that

---

[58] Of the hundreds of Gate Attendants, the Secretary cites to only <u>one</u> Gate Attendant that did not own his own R.V./trailer.  (Dkt. #111, fn. 36.)

"some even lived in their trailers as their principle place or residence before they performed any work for GGS" is immaterial and irrelevant. (Dkt. # 111, p. 10-11.) The Secretary also grossly misrepresents GGS's alleged "investment" which is addressed in Section V(A)(2)(d), *infra*.

Profit and Loss.   The Secretary's assertion that "[n]one of the gate guards believed that they had an opportunity to make a profit" and "none believed that they could suffer a loss" is pure speculation and simply not true. (Dkt. # 111, p. 12.) The Secretary's only support for this statement are declarations containing the declarant's mistaken "belief" as to their ability to earn a profit or loss. (*Id.* at Exs. 3, 5-20, 25-35.) These portions of the declarations should be disregarded because they are based upon speculation and conclusions of law. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence"); *Gray v. Sage Telecom, Inc.*, No. 3:05-cv-1677-G, 2006 WL 2820075 at *5 (N.D. Tex. Oct. 2, 2006). The Secretary's own evidence contradicts this "belief"; for example, Kevin Scrogum testified that he could earn more money based on the number of rigs at the gate, and earned an additional $100 per day for escorting duties. (Dkt. # 111, Ex. 29, ¶¶ 7-9.) Significantly, at least 23 of the Gate Attendants' tax returns and declarations show that they did earn profits and suffer losses. (Tab O, Ex. 1-23.) It is also undisputed that the Gate Attendants can, and do, hire relief workers at a lower rate of pay than their daily rate from GGS, and can earn a profit (or conversely, suffer a loss) based upon their use of relief workers. (*See* Section V(A)(2)(e) *infra*, fns. 25-28 *supra*.)[59]

---

[59] The Secretary also cites to an excerpt of Mr. Steindorf's deposition wherein Mr. Steinforf stated that the Gate Attendants could not earn a profit. (Dkt. # 111, p. 12.) Relying exclusively on this "gotcha" moment and the other conclusory and speculative testimony cited above, the Secretary ignores the objective

<u>Length of Assignments</u>.   The Secretary falsely states: "many gate guards worked for GGS for periods in excess of one year, and several worked for GGS for many years with few if any 'breaks' in employment. …the gate guards were not hired for a specific project or for a set term; instead they were hired for an indefinite period of time."  (Dkt. 111, p. 13.)  The Secretary's own evidence contradicts these misrepresentations inasmuch as at least 15 of the declarations submitted by the Secretary alone show that there were significant breaks between assignments ranging from one to nine months.[60]  The pay list attached to Bookkeeper Pat Brown's declaration reveals significant breaks in service for the majority of the Gate Attendants.  (Tab C, P. Brown Dec. Exs. 1-6.)

<u>Negotiating Pay/Terms</u>.  The Secretary contends that "gate guards had no power to negotiate their daily rates of pay and had no say as to what that rate of pay would be." (Dkt. # 11, p 5.)  Yet, this exact question was posed by the Secretary on her Form WH-31 Interview Statement that she refused to produce to GGS in this litigation.  (Tab D, Ex. 70, Ex. A.)  On Gate Attendant Billy Reid's WH-31 form, which he voluntarily produced to GGS, **he responded "yes" in response to the question, "were you able to negotiate**

---

and indisputable evidence that the Gate attendants could and did earn profits or suffer losses arising from their work for GGS.  (*See* Section V(A)(2)(e) *infra*.)

[60] The declarations relied upon by the Secretary in her Motion reveal that the Gate Attendants took assignments on a job-by-job basis with plenty of breaks in service.  Jose Coronel had an approximately three (3) month break in service (Ex. 3, J. Coronel Dec. ¶ 1); Mary Arp had a three (3) month break, a seven (7) month break, and then a one (1) month break in service (Ex. 5, M. Arp Dec. ¶ 1); James Arp had two separate breaks in service of approximately three (3) months each, then an additional one (1) month break (Ex. 6, J. Arp Dec. ¶ 1); Marcy Clarida had two (2) breaks in service, each lasting approximately one (1) month (Ex. 7, Clarida Dec. ¶ 1); John Helser had a break in service lasting about one and one-half (1 ½) months, a two (2) month break, an approximately five (5) month break, and then a one (1) month break in service (Ex. 9, Helser Dec. ¶ 1); James Hunt had a two (2) month break in service, a three (3) month break, and a seven and one-half (7 ½) month break in service (Ex. 11, Hunt Dec. ¶ 1); Nancy Ann McGinnis had two (2) breaks in service of approximately one (1) month each, and then a three (3) month break in service (Ex. 14, McGinnis Dec. ¶ 1); Candy Shamley had a nine (9) month break in service and a two (2) month break in service (Ex. 19, Shamley Dec. ¶ 1); Lane Zlab had a nine (9) month break in service and a two (2) month break in service (Ex. 20, Zlab Dec. ¶ 1); Fred Massingill had a two (2) month break in service, then a three (3) month break in service (Ex. 27, Massingill Dec. ¶ 1); Barbara Thames had a seven (7) month break and then a two (2) month break in service (Ex. 31, B. Thames Dec. ¶ 1);  and Jurell Thames also had a seven (7) month break and then a two (2) month break in service (Ex. 32, J. Thames Dec. ¶ 1).

**your pay with GGS**?" (*Id.*)  The Secretary chose to disregard this answer and likely hundreds of others, but there is no way of knowing as she has not produced any of these WH-31 forms with her Motion and refuses to produce them to GGS based on the government informant privilege.  Moreover, her Motion is devoid of any competent evidence regarding the actual "ability" or "power" of the Gate Attendants to negotiate rates of pay.  The three declarants that she relies upon merely said "GGS did not negotiate with me" (Dkt. #111, Ex. 3, ¶ 3); or that they were "unsuccessful" in their attempts to negotiate a higher rate of pay (Dkt. # 111, Ex. 11, ¶ 7; Dkt. # 111, Ex. 16, ¶ 4.) But, this does not prove that the rate of pay was non-negotiable – just that these declarants either did not try to negotiate or were unsuccessful in their attempts to bargain for more money.  Mr. Steindorf's testimony establishes that GGS *does* negotiate the daily rate with Gate Attendants.  (Tab E, Steindorf Dep. 150:7-18.)  Some, but not all, of the Gate Attendants did negotiate their rates which ranged from $100, $125, $175 or more. (Tab E, Steindorf Dep. 151:18-152:4; Dkt. # 111, Ex. 29; Brown Dep. 55:12-14; Tab D., Ex. 70, Ex. A; Dkt. # 111, Ex. 29, ¶¶ 7, 8.)   Some Gate Attendants wrote on their contracts the words: "negotiable" (Tab A at Ex. 81) or "$125 for one rig" (Tab A at Ex. 31) or "depends on gate" (Tab A at Ex. 48). And they certainly could negotiate any rate with their relief workers.  (*See* fns. 25-28.) The evidence shows that other terms were negotiated as well inasmuch as some Gate Attendants refused to sign the Independent Contractor Agreement altogether or crossed out provisions with which they disagreed. (Dkt. #111, Ex. 3 Coronel Dec. ¶ 3; Steindorf Dec., Tab A, Exs. 31, 36, 48.)

       <u>Safety Rules</u>. The Secretary contends that GGS "imposed upon its gate guards many additional rules and requirements."  (Dkt. #111, p. 8.)  The Secretary references the

following "rules" all of which are safety-related – prohibition against: throwing cigarette butts and trash around the trailer and gate; using alcohol; wearing unsafe clothing such as flip flops, shorts, and sandals; keeping firearms at the gate; and requiring safety gear such as orange vests, safety glasses and steel toed boots.  (*Id.* pp. 8-9.)  These "rules and requirements", however, had nothing to do with how the job was performed and, are, thus, not at all material to the independent contractor analysis.  (*See* Section V(A)(2)(b)(ii) *infra*.)  They are merely safety provisions which are required by law, including OSHA, and mandated by the oil and gas company and the landowner. Companies frequently place quality-control and safety restrictions on subcontracting, and this does not convert an independent contractor relationship into an employment relationship.  *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 691-92 (D. Md. 2010) (holding that Comcast's quality control and safety measures over its subcontractors did not establish an employment relationship.)  While some of the declarations relied upon by the Secretary speculate that "GGS could fire me if I did not wear the uniform" (Dkt. # 111, Ex. 29, ¶ 17), there is no evidence that any Gate Attendant was ever "fired" for this reason.  In fact, some of the Gate Attendants chose not to wear the orange vests.  Gate Attendant Maria Clark said that she and her staff do not wear the orange vests and although GGS requested her to do so, she believes it is her decision to wear it or not. (Tab D, Ex. 11, Clark Dec. ¶ 11.) [61]

---

[61] Another misrepresentation is the Secretary's assertion that "GGS requires that individuals desiring to become GGS gate guards complete a job application created by GGS." (Dkt. # 111, p. 3.)  This contention is patently false and a misrepresentation of the evidence.  The only "application" completed by the Gate Attendants is the Texas Department of Public Safety ("DPS") application used to obtain a license. (Tab F, Deposition of Sidney Smith ["Smith Dep."] 45:9-11; 70:7-11.)  Although the Secretary relies upon Mr. Steindorf's testimony to support her contention, Mr. Steindorf repeatedly testified that the Gate Attendants do not complete an "application" for GGS, but they do usually complete an application to receive a license through the Texas DPS.  (Tab E, Steindorf Dep. 157:5-11; 164:6-24.)  Similarly, the Secretary cites to the single declaration of Jose Coronel as "evidence" that gate attendants were required to

These are just some examples of the Secretary's misrepresentation of the evidence. The Secretary's lack of record support and broad brushed conclusory statements are more fully addressed in the argument section *infra*.

## V.   ARGUMENT AND AUTHORITIES

### A.   GGS IS ENTITLED TO SUMMARY JUDGMENT ON THE MERITS IN BOTH ACTIONS

#### 1.   Summary Judgment Standard

Summary judgment is proper if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). The non-movant must present more than a mere scintilla of evidence to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505 (1986). "When opposing parties tell two difference stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007) (where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial). To carry this burden at summary judgment, the nonmovant must present evidence sufficient to support a resolution of the factual issues in his favor." *Stevenson v. Vinson*, Civil Action No. 9:09cv39, 2009 WL 5062068, at *3 (E.D. Tex. Dec. 15, 2009); *see also United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). Self-serving allegations

---

complete a "job application." (Dkt. # 111, p. 3 (citing to Ex. 3 Decl. of Jose Coronel ¶ 2). But the declaration only vaguely states that he "filled out **_an application_** and other paperwork." *Id.* (emphasis supplied). While it is unclear as to what the declarant is referring because of the lack of factual detail, it is most likely the DPS application. (Dkt. # 111, p. 7, fn 16.) The Secretary is well aware that there is no "[job] application created by GGS" and she has not produced one. Similarly, the Secretary contends that GGS keeps a "file" on each Gate Attendant, but cites only to Sidney Smith's deposition where he testifies that he kept a list of the gate attendants. (Dkt. 111 at 3, fn. 7.) There is no evidence that any such file was kept containing documents evidencing an employee relationship. This is another misrepresentation.

are not the type of "significant probative evidence" required to defeat summary judgment. *See*   This is exactly what the Secretary has done in this case – her Motion is riddled with misrepresentations, speculation not supported by the record, and "facts" which are not material to the independent contractor analysis.  GGS and Mr. Steindorf, on the other hand, have set forth undisputed material facts by over 90 Gate Attendants which overwhelmingly support independent contractor status.

### 2.   The Gate Attendants Are Not Subject To The FLSA Because They Are Independent Contractors

FLSA liability must be predicated on the existence of an employer-employee relationship. *See Lucas v. BMS Enters., Inc.,* Civil Action No. 3:09–CV–2159–D, 2010 WL 2671305, at *3 (N.D. Tex. July 1, 2010) (citing *Patel v. Wargo*, 803 F.2d 632, 637 (11th Cir. 1986)).  The FLSA does not apply where, as here, an independent contractor relationship has been formed.  *See Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 264 (5th Cir. 1987) ("The proper categorization is important because the protection of the FLSA extends only to employees, and thus an employer can avoid the minimum wage and overtime requirements of the FLSA by establishing that a particular person is an independent contractor and not an employee."); *Weisel v. Singapore Joint Venture, Inc.,* 602 F.2d 1185, 1188 (5th Cir. 1979).

The Fifth Circuit utilizes a five factor test to determine whether an individual is an employee or an independent contractor.  *See Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332 (5th Cir. 1993).[62]   The factors considered by the Fifth Circuit in this analysis are: (1) the permanency of the relationship between the worker and the alleged employer; (2) the degree of control exercised over the worker by the alleged employer; (3) the skill

---

[62] The employee versus independent contractor determination is a question of law.  *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327, & n.24 (5th Cir. 1985).

and initiative required to perform the job at issue; (4) the extent of the relative investments of the worker and the alleged employer; and (5) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer.[63] *See id.* at 332-33.  In many cases there are factors pointing in both directions, so the Court must weigh all of the facts before it and, using these five factors as a guide, <u>as well as others</u>, make the appropriate determination regarding a worker's status.  *See id.* 334 (emphasis added).  These factors are merely aids to analysis and no single factor is determinative. *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 846 (5th Cir. 2010).  "The determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented."  *Id.* at 843.

### a.      The Permanency of the Parties' Relationship

Where, as here, a relationship can be characterized as temporary, project-by-project or on-again-off-again it will weigh in favor of an independent contractor determination.  *See Thibault*, 612 F.3d at 846; *see also Carrell*, 998 F.2d at 332; *Mack v. Talasek*, No. V-09-53, 2012 WL 1067398, at *4-6 (S.D. Tex. Mar. 28, 2012) (J. Rainey) (Tab R).  In each of these cases, the individuals at issue were found to be independent contractors because they worked on a project-by-project basis for a few weeks or months and were not prohibited from performing work for other companies. *Id.*

In *Carrell*, for example, the Fifth Circuit, in determining whether welders who worked on a project-by-project basis were independent contractors, reviewed the length of time the worker performed services for Sunland and whether the worker provided

---

[63] Although not a separate factor in this analysis, the classification of workers as independent contractors by an employer pursuant to a written agreement or otherwise, along with the workers' classification of themselves as "self-employed" or independent contractors, are both relevant factors to consider in evaluating whether a worker is an independent contractor or an employee.  *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983); *Henderson v. Hernandez*, No. 5:05-CV-037-C, 2005 WL 473678, at *1 (N.D. Tex. March 1, 2005).

services for other companies between jobs for Sunland.  *Id.* at 334.  Holding that the welders were independent contractors and not employees under the FLSA, the court stated that "[t]he Welders' relationship with Sunland was on a project-by-project basis, the Welders worked from job to job and from company to company; many of the Welders spent little time working for Sunland . . ."  *Id.*  In this regard, the Court noted that the welders "worked at various times from 1987 to 1990," and that "[t]he average number of weeks that each Welder worked per year for Sunland varied from approximately 3 weeks to 16 weeks."  *Id.* at 332.

Similarly, in *Thibault v. Bellsouth*, the Fifth Circuit, in analyzing the permanency of the relationship between a cable splicer and a telecommunications company, said:

> . . . Thibault <u>did not work exclusively</u> for the defendants.  <u>He had his own business</u> selling picnic tables, storage buildings, and customized golf carts, in his home state of Delaware.  The nature of splicer work requires travel to different parts of the nation where the jobs are.  <u>Splicers travel from job-to-job and from state-to-state looking for work</u>.  Thibault and Peek traveled from Delaware to work in the aftermath of Hurricane Katrina.  The project lasted only until the re-wiring project after Katrina finished.  **Thibault intended to return to Delaware after <u>seven or eight months</u>**.

612 F.3d 843, 846 (5th Cir. 2010) (emphasis added).

This Court recently analyzed the permanency of the relationship factor in connection with gate attendants working for Talasek, a GGS competitor.  *See Mack*, 2012 WL 1067398, *4-6.  These gate attendants worked "off and on"  between nine months and twenty months.  *Id.* at *5.  The gate attendants "were hired on a job-by-job basis and were fully aware that their positions were temporary."  *Id.*  They also were free to accept other jobs when they were not working for Talasek.  *Id.* Significantly, this Court found that "the permanency factor does not tip in favor of finding that Plaintiffs were

employees merely because Talasek would offer Plaintiffs work at another job site at the completion of each shift." *Id.* at *6. These same facts are present in this case.

Here, the undisputed evidence reveals that <u>the Gate Attendants do not have a permanent relationship with GGS</u>. Instead, just like the plaintiffs in *Carrell*, *Mack*, and *Thibault*: (1) the Gate Attendants work on a project-by-project or job-by-job basis[64] with each job ranging from one week to several weeks (Tab A, Steindorf Dec. ¶ 14; Tab C, Brown Dec. Exs. 1-6; Ramirez Dep. 226:3-15, Ex. 19); (2) GGS does not guarantee any work beyond each project, the Gate Attendants know that their work is temporary[65] (Ramirez Dep. 239:7-15) and as acknowledged by the Secretary, once a project is completed, the Gate Attendants are free to reject projects (Tab K, Ramirez Dep. 238:24-239:3; Tab J, Rapstine Dep. 262:1-3);[66] and (3) the Gate Attendants are authorized to do other work. Thus, there is no dispute that <u>the Gate Attendants controlled the length of time during which they provided services to GGS</u>. This is strong evidence of an independent contractor relationship. *See Mack*, 2012 WL 1067398 at *4-6 (that gate attendants were hired on a job-by-job basis weighed in favor of finding independent contractor relationship existed). *See also Talbert v. American Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (independent contractor relationship existed where the worker did not dispute that she, and not the defendant, "ultimately controlled the number of hours she worked".)

First, like the plaintiffs in *Carrell* and *Thibault*, the majority of the Gate Attendants worked for a relatively short period of time for GGS. Indeed, <u>the Secretary's own calculations</u> reflect that over half of the Gate Attendants work 15 weeks or less.

---

[64] *See* fn. 45.
[65] *See* fn. 46.
[66] *See* fns. 47-48.

36

(Tab J, Rapstine Dep., Ex. 19.)  Even taking into account an additional year and a half of pay records (since the time Ramirez calculated the weeks worked in Exhibit 19 during the Wage and Hour investigation), over half of the Gate Attendants worked 16 weeks or less. (*See* Tab C, Brown Dec. Exs. 1-6; Rapstine Dep. Ex. 19; Ramirez Dep. p. 226, Ex. 19.) As acknowledged by the Secretary, the Gate Attendants "work for GGS for varying duration," and "a few of the guards worked for GGS for relatively brief or intermittent periods."  (Dkt. # 111, p. 25.)[67]  This type of temporary relationship strongly weighs in favor of an independent contractor relationship.  *See Mack,* 2012 WL 1067398 at *5* (gate attendants performed services for the defendant for approximately nine to twenty months and did not have a permanent relationship); *Carrell*, 998 F.2d at 332 (projects lasting an average of three weeks to sixteen weeks weighed in favor of independent contractor relationship); *Talbert*, 405 F. App'x at 856 (worker who performed services for the defendant for twelve weeks was an independent contractor); *Lindsley v. Bellsouth Telecomms., Inc.*, 401 F. App'x 944, 945 (5th Cir. 2010) (worker who performed cable splicing services for three months was an independent contractor).

Second, the Gate Attendants' job is not permanent because they are not obligated to accept any assignment from GGS and many do, in fact, reject assignments.[68]  In holding that the gate attendants were independent contractors, this Court, in the *Mack* case, found that the gate attendants used by Talasek "were under no obligation to return to work for another shift or to accept any request by Talasek that they work at another location."  *See Mack*, 2012 WL 1067398 at *2.  The undisputed evidence reveals that

---

[67] The Secretary conveniently fails to quantify what she means by "a few" and, as set forth above, over one half of all of the Gate Attendants work sixteen weeks or less – much less than the 9 to 20 month durations at issue in *Mack*.  *See Mack,* 2012 WL 1067398 at * 5.

[68] *See* fns. 47, 48.

Gate Attendants can and do reject assignments for various reasons including:  returning home for the summer (*see*, *e.g.*, Tab D, Ex. 31, Hickey Dec. ¶ 7; Ex. 48, McClelland Dec. ¶ 6; Ex. 86, Ward Dec. ¶ 6); travel or vacation (*see*, *e.g.*, Tab D, Ex. 79, Staley Dec. ¶6); or because they prefer to work with certain oil companies (*see, e.g.*, Tab D, Ex 1, Abbie Dec. ¶6; Ex. 18, Coulston Supp. Dec. ¶ 3.)  The Secretary's witness, Jose Coronel, best described the Gate Attendants unilateral <u>freedom to control their schedules</u>: "After working alone for many months at gate locations without any break until each assignment ended, I would then take a break to get out in the world where I could talk to people and engage in normal life again, before starting another assignment."  (Dkt. #111, Ex. 3, ¶ 34.)  Notwithstanding their rejection of assignments, GGS continues to offer assignments to the Gate Attendants.[69]  With her MSJ, the Secretary attached declarations from a small number of Gate Attendants who <u>speculate</u> that if they declined an assignment "GGS would not likely hire [them] again."  (*See*, *e.g.*, Dkt. # 111, Ex. 10 at ¶ 2.)  Of course, none of these Gate Attendants testified that they actually declined an assignment and, if so, whether they received additional assignments from GGS.  (*Id.*)  For this reason, their testimony should be disregarded.

Third, just like the gate attendants in *Mack* and the splicer in *Thibault*, the Gate Attendants could and did perform other jobs in between their assignments for GGS (Steindorf Dec. ¶ 14.)[70]  *See Mack*, 2012 WL 1067398 at *5; *Thibault*, 612 F.3d at 846. Some of the Gate Attendants perform gate attendant work for the federal government's Army Corps of Engineers.[71]  Certain Gate Attendants operate other unrelated businesses

---

[69] See fns. 47, 48.
[70] *See* fns. 42-44.
[71] *See* fn. 44.

in between their assignment for GGS.[72]   To the extent some of the Gate Attendant testimony submitted by the Secretary states that they did not perform other work - it is irrelevant.  This Court found in *Mack* that if they <u>could have</u> performed other work due to the temporary and sporadic nature of their assignments resulting in breaks in service, then this evidence weighs in favor of independent contractor status.  *Mack*, 2012 WL 1067398 at *4.

Indeed, despite the Secretary's false assertion that their contracts were "indefinite" with "few, if any, breaks in service," the declarations submitted by the Secretary reflect that the Gate Attendants **had breaks in their assignments ranging from one to nine months** and could have easily taken on other jobs.  (*See*, fn. 60.)  The Secretary's flimsy argument that the Gate Attendants could not do other work because they had to "follow the rig" and "move quickly" is not supported by the weight of the evidence which shows significant breaks between assignments and overwhelming testimony (including by Rapstine and Ramirez) that the Gate Attendants were allowed to reject assignments at their discretion.  (*Id.*; Dkt. #111, Exs. 3, 5-9, 11, 14, 19, 20, 27, 31, 32.)  As set forth in the Independent Contractor Agreements, GGS <u>did not prohibit</u> the Gate Attendants from working for other companies. (Tab A, Steindorf Dec.14, Ex. 2-458.)  *See Talbert*, 2010 WL 5186768, at *7 (finding that the plaintiff was an independent contractor when she was not precluded from doing the same type of work for other companies while she worked for her alleged employer); *Harrison*, 331 U.S. at 707 (plaintiffs were independent contractors when they could perform the same type of work for other companies); *c.f. Hopkins*, 545 F.3d at 346 (plaintiffs were employees when they were not allowed to work for other companies or themselves); *Carrell*, 998 F.2d at 332

---

[72] *See* fns. 42-43.

(plaintiffs were employees where "the Welders moved from job to job, company to company, and state to state").

Turning a blind eye to this overwhelming record evidence and instead relying on the testimony of <u>a single</u> Gate Attendant (Tracy Sellers) who says she "followed the rig," apparently at her choosing, and the omission of a completion date in the Independent Contractor Agreements, and other speculative testimony, the Secretary carelessly concludes that "GGS hires its gate guards for an indefinite period of time." (Dkt. # 111, p. 25.) This flawed reasoning based on snippets of information, much like that relied upon by Rapstine, is easily dismissed when the record is reviewed as a whole.[73] The Gate Attendants did not have permanent relationships based on: (1) sporadic assignments lasting an average of 16 weeks, (2) their ability to reject assignments, and (3) their ability to work for other companies. Thus, they are independent contractors.

### b.      The Degree of Control Exercised Over the Worker

The next factor, the degree of control exercised over the worker, also weighs in favor of a finding that an independent contractor relationship exists between GGS and the Gate Attendants. As an initial matter, the parties' intent and understanding of the nature of their relationship is relevant to determining whether the worker is an independent contractor. *See Carrell*, 998 F.3d at 334; *Thibault*, 612 F.3d at 846 ("Here, the defendants considered the splicers independent contractors. Many of the splicers considered themselves to be self-employed.") As reflected in the hundreds of

---

[73] The Secretary's reliance on *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1054 (5th Cir. 1987) and related cases concerning seasonal workers completely misses the mark. The Secretary cites these cases for the proposition that the transient nature of gate attending prevents short assignments from weighing in favor of independent contractor status. She misrepresents these holdings. The oil drilling business is not seasonal. Thus, Brock is inapposite. *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1054 (5th Cir.1987) ("[W]hen an industry is **seasonal**, the proper test for determining permanency of the relationship is not whether the alleged employees returned from season to season, but *whether the alleged employees worked for the entire operative period of a particular season.*"). This is not applicable here.

Independent Contractor Agreements and the 94 declarations attached to this Motion, GGS and the Gate Attendants understand and believe that they have an independent contractor relationship.  (*See* Tab A, Steindorf Dec. ¶¶ 3-4 Exs. 2 - 458 thereto.)[74]  This understanding permeated the relationship inasmuch as GGS did not control the details of the work <u>and</u> GGS did not supervise or train the Gate Attendants.

      i.     <u>GGS Does Not Control the Details of the Work Performed by the Gate Attendants</u>

In analyzing the "control" factor, Courts focus on whether the alleged employer controlled <u>the details of the work</u> performed by the worker.  *See Thibault*, 612 F.3d at 846-47.  An employer's failure to control how the work is performed is indicative of independent contractor status.  *Id.* (cable splicer was an independent contractor where he decided how to perform his work and alleged employer never specified how to do the splicing); *Carrell*, 998 F.2d at 334 (welder was an independent contractor where he controlled the manner and details of work); *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 566 (7th Cir. 2009) (finding that the worker was an independent contractor where he controlled the details of his work).  In *Mack*, this Court analyzed whether Talasek exercised control over its gate attendants.  This Court said:

> Finally and most importantly, the Court agrees with the M&R's finding that Plaintiffs worked with no day-to-day supervision, as Plaintiffs' own testimony shows that Talasek exerted no control over how they performed their jobs. Boutin admitted that Talasek had no control over what Plaintiffs did on a daily basis "outside of requiring [them] to be at the shift site." Mack testified that she did not even meet Talasek until after she had been on a job site for about a week, and because she had worked as a gate guard before, her only "orders" were to "continue what [she had] been doing," that is, to sign people in and out.

---

[74] *See* fns. 29, 46.

*Mack,* 2012 WL 1067398 at *2 (alterations in original) (internal citations omitted).  The

facts in *Mack* are strikingly similar to the facts here.  The undisputed evidence shows that

**GGS does not** have control over the details of the work performed by the Gate

Attendants.  For example, the Gate Attendants testified that GGS does not train or

instruct them on how to complete their duties[75] - none testified that they were trained on

the job.  One Gate Attendant said: "nobody tells us how to do our work."  (Tab D, Ex. 11,

Clark Dec. ¶ 10.)  Gate Attendant Waldine Mack testified that no one had to tell her what

her duties were when she worked for GGS.  (Tab N., Excerpts of the Deposition of

Waldine Mack [Mack Dep.] 58.)  Rather, the Gate Attendants simply spoke to other gate

attendants to understand what was required during an assignment or they knew from prior

gate attendant jobs. (*Id.*; *See* Tab D, Ex. 1, Abbie Dec. ¶ 4; Ex. 11, Clark Dec. ¶ 10; Ex.

18, Coulston Supp. Dec. ¶ 4.)  They each determined how to do the work - one Gate

Attendant stated that he uses his iPhone to dictate the vehicle information, and later goes

back to the Traffic Log to complete the entries.  (Tab D, Ex. 57, Neff Dec. ¶ 13.)  **GGS**

**merely communicated the location of the gate, the start date, and the outcome to be**

**achieved (signing vehicles in and out using a Traffic Log).**[76]  The communication of

---

[75] *See* fn. 34.

[76] *See* Tab A, Steindorf Dec. ¶ 9.  See also Tab D which includes the following Declarations: Ex.
1, Abbie Dec. ¶ 3; Ex. 2, Arp Dec. ¶ 4; Ex. 3, Atteberry Dec. ¶ 4; Ex. 4, Badger Dec. ¶ 3; Ex. 5, Bell Dec. ¶
3; Ex. 6, Bisel Dec. ¶ 3; Ex. 8, Bowling Dec. ¶ 3; Ex. 9, Braddock ¶ 3; Ex. 10, Carter Dec. ¶ 3; Ex. 11,
Clark Dec. ¶ 10; Ex. 12, Clemens Dec. ¶ 4; Ex. 15, Conrad Dec. ¶ 3; Ex. 16, Coronel Dec. ¶ 3; Ex. 17,
Coulston Dec. ¶ 4; Ex. 19, Dampier Dec. ¶ 4; Ex. 20, Eldridge Dec. ¶ 3; Ex. 21, Evans Dec. ¶ 3; Ex. 22,
Ferrell Dec. ¶ 3; Ex. 23, Flickinger Dec. ¶ 3; Ex. 24, Fontenot Dec. ¶ 3; Ex. 26, Geering Dec. ¶ 3; Ex. 27,
Giordano Dec. ¶ 4; Ex. 28, Guirdy Dec. ¶ 3; Ex. 29, Helser Dec. ¶ 3; Ex. 31, Hickey Dec. ¶ 3; Ex. 32, Huitt
Dec. ¶ 4; Ex. 33, Hunt Dec. ¶ 3; Ex. 34, Hutto Dec. ¶ 3; Ex. 35, Jones Dec. ¶ 4; Ex. 36, Jubeck Dec. ¶ 4;
Ex. 37, Lee Dec. ¶ 3; Ex. 41, J. Lovett Dec. ¶ 4; Ex. 42, K. Lovett Dec. ¶ 4; Ex. 43, J. McAdoo Dec. ¶ 4;
Ex. 44, J. McAdoo Supp. Dec. ¶ 4; Ex. 45, S. McAdoo Dec. ¶ 4; Ex. 46, S. McAdoo Supp. Dec. ¶ 4; Ex.
47, McCaugherty Dec. ¶ 3; Ex. 48, McClelland Dec. ¶ 3; Ex. 49, D. McKinney Dec. ¶ 4; Ex. 50, P.
McKinney Dec. ¶ 4; Ex. 51, Melton Dec . ¶ 4; Ex. 52, Milner Dec. ¶ 3; Ex. 53, Molina Dec. ¶ 4; Ex. 54,
Morris Dec. ¶ 4; Ex. 55, Mostoller Dec. ¶ 3; Ex. 56, Muraski Dec. ¶ 3; Ex. 57, Neff Dec. ¶ 3; Ex. 58,
Olivarez Dec. ¶ 3; Ex. 59, Padgett Dec. ¶ 4; Ex. 60, Park Dec. ¶ 3; Ex. 61, L. Payne Dec. ¶ 4; Ex. 62, R.
Payne Dec. ¶ 4; Ex. 64, Phelps Dec. ¶ 3; Ex. 66, Pritchett Dec. ¶ 3; Ex. 67, Pruett Dec. ¶ 4; Ex. 68, Quarles

this basic information to the Gate Attendants is not evidence of control by GGS. *See Mack,* 2012 WL 1067398 at *2. *See also Thibault,* 612 F.3d at 846-47 (noting that the splicers were required to work at specific times and "[t]he defendants assigned the splicers to specific splicing work," and told the splicers "what needed to be fixed or spliced," yet finding that the splicers decided how to do the work); *Estate of Suskovich,* 553 F.3d at 566 (assigning work to an independent contractor is not evidence of control and stating "[m]erely setting a work schedule is not sufficient to support a finding that a given person is an employee rather than an independent contractor. Nor is the fact that a person is required to be at a given place at a given time or assigned project work sufficient to support an employer-employee relationship.") (internal citations omitted).

Contrary to this authority, the Secretary contends that because GGS informed the Gate Attendants of the location and length of the assignment and that people were to be logged in and logged out, GGS exercised the type of control that is relevant to the Court's analysis. (*See* Dkt. # 111, pp. 18, 20.) Not only is this argument legally flawed as established by the authority cited herein, but it also is illogical. Using the Secretary's reasoning, a company could never contract for services because it could not tell the contractors what services are needed or where to perform them.

Moreover, the case law cited by the Secretary does not support her contention that GGS exercises control over the Gate Attendants. For example, the Secretary heavily relies upon *Solis v. International Detective & Protective Service, Ltd.,* a case with drastically distinguishable facts to those here. *See* 819 F. Supp. 2d 740, 750-51 (N.D. Ill.

Dec. ¶ 3; Ex. 69, B. Reid Dec. ¶ 4; Ex. 71, M. Reid Dec. ¶ 4; Ex. 72, Renee Dec. ¶ 4; Ex. 76, Shows Dec. ¶ 3; Ex. 78, Staley Dec. ¶ 3; Ex. 79, Staley Supp. Dec. ¶ 4; Ex. 80, Stoltz Dec. ¶ 3; Ex. 81, Stone Dec. ¶ 3; Ex. 83, Suonvieri Dec.  3; Ex. 84, Trooien Dec. ¶ 4; Ex. 86, Ward Dec. ¶ 3; Ex. 87, Wells Dec. ¶ 3; Ex. 88, Wheeler Dec. ¶¶ 3, 19; Ex. 89, G. White Dec. ¶ 4; Ex. 90, J. White Dec. ¶ 3; Ex. 91, Yaeger Dec. ¶ 4; Ex. 93, Yaeger Supp. Dec. ¶ 5; Ex. 94, Yoder Dec. ¶ 3.

2011).  In *International Detective Service*, the defendant:  provided specific guidelines regarding how to do the work; "regularly visited the worksites to verify that the Guards were complying with [the defendant's] rules;" "held meetings with the Guards to review its procedures;" "offered title and distinctions to Guards to create incentives for them to remain with the company for the long-term;" disciplined workers by reducing their pay when, for example, they were in an accident while driving a company vehicle; and prohibited the workers from soliciting "outside workers to carry out their security assignments." *Id.* at *8.  <u>None of these facts are present in the instant case</u>.

As set forth above, the Gate Attendants did not have titles and distinctions; GGS did not discipline the Gate Attendants (let alone for accidents) and did not hold meetings with them. (Steindorf Dec. ¶ 9.)  Significantly, unlike the workers in *Int'l Detective Service*, not only can the Gate Attendants decide for themselves how to complete the gate attendant duties, but <u>they also are free to assign their duties to other individuals</u>.[77]  Many Gate Attendants do, in fact, hire relief workers.[78]  The hiring of relief workers is done oftentimes without GGS's knowledge and approval, and according to Mr. Steindorf, is not required.  (Tab A, Steindorf Dec. ¶ 8.)  Although GGS prefers relief workers to be licensed for marketing purposes, this is not a requirement and some relief workers, in fact, are not licensed.  (Tab A, Steindorf Dec. ¶ 8.)  Indeed, GGS does not even have control over <u>who</u> performs the gate attendant duties.  (*Id.*)

Although the Secretary makes the conclusory, unsupported assertion that "[f]or some period of time, GGS would find a relief guard for some gate guards," none of the Secretary's 28 declarations support this allegation, nor do the more than 400 contracts

---

[77] *See* fn. 25.
[78] *See* fns. 25-28.

and 90 declarations attached to this Motion. (Dkt. #111, p. 10.)   Indeed, GGS has consistently testified that it was not the company's policy to find and pay relief guards. (Tab E, Steindorf Dep. 245; Tab A, Steindorf Dec. ¶ 8; Tab B, P. Brown Dep. 7-11). Additionally, GGS has provided 34 declarations from Gate Attendants stating that the Gate Attendants, not GGS, hired relief workers, and that the Gate Attendants, not GSS, paid[79] the relief works directly. (*See*, fns. 26 and 28).   The Secretary eventually seems to concede this point when she concludes, "otherwise, finding a relief guard was the responsibility of the individual gate guard."   (Dkt. #111, p. 10.)   Even assuming for the sake of argument that GGS did find and/or pay relief workers, this does not advance the Secretary's "control" argument.   Indeed, it shows that the Gate Attendants had the freedom to leave the gate at their choosing leaving GGS to have to find a replacement. There is no evidence that any Gate Attendant was reprimanded for leaving the gate.

> ii.   GGS Does Not Supervise the Gate Attendants

The lack of day-to-day supervision by the alleged employer is strong evidence of an independent contractor relationship.   *See Talbert v. Am. Risk Ins. Co.*, 405 F. App'x. 848, 856 (5th Cir. 2010) (insurance adjuster classified as independent contractor where employer provided little to no daily supervision of the adjuster).   In *Thibault*, the alleged supervisor "would only come by occasionally and never specified how [the worker]

---

[79] Similarly, the Secretary erroneously concludes as if it were fact that "for some gate guards, if the relief guard relieved the gate guard for one day or more, GGS would pay the relief guard directly for those days and would not pay the gate guard for those days." *Id*.   The five declarations relied upon by the Secretary to support the assertion that GGS paid relief workers do not state whether these "relief workers" were actual contractors of GGS who were "filling in" and do not identify the relief workers.   Sales representative Jade Petty, who worked in North Texas, testified that she sometimes tried to help the gate attendants find relief and then stopped doing so because she was too busy.   [Petty Dec. ¶ 5.]   If Ms. Petty found relief workers who were already GGS's contractors, then this might explain why GGS may have paid the relief workers directly – because they were contractually obligated to do so.   Given the vagueness of the Secretary's evidence it is uncertain.   Regardless, this was not the policy or practice of GGS given Mr. Steindorf's and Ms. Brown's testimony and the overwhelming testimony of 34 other Gate Attendants who testified that they, not GGS, found and  paid their relief workers.   (*See*, fns. 25 and 28).

should do the splicing." *Thibault*, 612 F.3d at 847.  Instead, the worker was simply told what needed to be fixed "and then it was up to [the worker] to go out and fix the problem."  *Id.  See also Mack*, 2012 WL 1067398 at *2 (noting the importance of the fact that the gate attendants "worked with no day-to-day supervision").

Like the defendants in *Mack*, *Thibault* and *Talbert*, it is undisputed that GGS does not supervise the Gate Attendants.[80]  Even the Secretary admits that the Gate Attendants "did not require daily, hands-on supervision."[81]  (Dkt. # 111, p. 19.)  It also is undisputed that GGS does not evaluate the performance of the Gate Attendants.[82]  They do not receive performance evaluations and they are not demoted or promoted based on their performance.  (*Id.*)  Instead, they are responsible only for the results of their work, which is completing the Traffic Logs.[83]  *See Estate of Suskovich*, 553 F.3d at 566 (noting that the alleged employers did not have the means to adequately supervise the worker and that the worker "was accountable to [the alleged employers] only for the results of his work.").  Given the isolated location of the gates, it would be nearly impossible to supervise the day-to-day activities of the Gate Attendants.  (Tab A, Steindorf Dec. ¶ 9.)[84] Unlike an employment relationship, the Gate Attendants have infrequent and sporadic contact with GGS.  As 63 of the Gate Attendants testified in their declarations, they only

---

[80] *See* fn. 35.

[81] As a result, the case law cited by Secretary is without merit.  For example, in *Brock v. Superior Care, Inc.*, "Superior Care unequivocally expressed the right to supervise the nurses' work, and the nurses were well aware that they were subject to such checks as well as to regular review of their nursing notes." 840 F.2d 1054, 1060 (2d Cir. 1988).  There was no such supervision here.

[82] *See* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶¶ 4, 7; Ex. 10, Carter Dec. ¶¶ 4, 8; Ex. 18, Coulston Supp. Dec. ¶¶ 2, 4; Ex. 31, Hickey Dec. ¶¶ 5, 8; Ex. 38, Lee Dec. ¶¶4, 8; Ex. 48, McClelland Dec. ¶¶ 4, 9; Ex. 55, Mostoller Dec. ¶¶4, 8; Ex. 57, Neff Dec. ¶¶ 4, 8; Ex. 58, Olivarez Dec. ¶¶ 4, 8; Ex. 63, Pena Dec. ¶¶ 4, 8; Ex. 65, Phelps Supp. Dec. ¶¶ 3, 4; Ex. 66, Pritchett Dec. ¶¶ 4, 7; Ex. 74, Rochester Dec. ¶¶ 5, 8; Ex. 75, Rogers Dec. ¶¶ 4, 8; Ex. 77, Shows Supp. Dec. ¶ 4; Ex. 80, Stoltz Dec. ¶¶4, 8; Ex. 83, Suonvieri Dec. ¶ Ex. 86, Ward Dec. ¶¶ 4, 7; Ex. 87, Wells Dec. ¶¶ 4, 7; Ex. 90, J. White Dec. ¶¶ 4, 8.

[83] *Id.*

[84] The Secretary also admits that is would not be "feasible" for "continuous supervision" of the Gate Attendants because they work remotely and disparately.  (Dkt. # 111, pp. 19-20.)

see someone from GGS approximately every other week when the generator and septic systems is serviced.[85]   Like the attendants in *Mack*, the Gate Attendants are free to do their work as they see fit, and when they are not logging a vehicle, they have complete freedom to do as they please, including watching TV, reading, sleeping, eating, talking on the telephone, surfing the Internet, or any other personal activity.[86]   *Mack*, 2012 WL 1067398 at *8. During their available free time while on assignment for GGS, as stated *supra*, some of the Gate Attendants perform other work:

> … [T]hey do multiple things on location. … They have multiple businesses.  Some run a concession stand, like cokes and nachos and chips.  And some of them have eBay stores and some of them have Etsy stores online.  Some of them are insurance adjusters.  Some of them are land men.  Some of them are attorneys.

(Tab I, Petty Dep. 110:6-17.)  Some of the Gate Attendants testified that they are in the business of massage therapy, retail, and teeth whitening product sales.[87]   For example, Sandra Wells has a separate business through which she provides massage therapy services.  (*See* Tab D, Ex. 87, Wells Dec. ¶ 22.)  At the same time he provided services to GGS, Benny Coulston also was in the business of cosmetic teeth whitening.  (*See* Tab D, Ex. 18, Coulston Supp. Dec. ¶ 21 and Ex. A.)  Thomas Clemens and his wife, Marion, operated a retail store.  (Tab O, Ex. 5, Clemens Tax Return.)

Grasping at straws, the Secretary argues that GGS supervised the Gate Attendants because they relayed messages concerning safety attire, safety practices, and quality control as required by the oil companies or landowner for all persons at the oil field.[88]

---

[85] *See* fn. 37.
[86] *See* fns. 39-41.
[87] *See* Tab D, Ex. Ex. 18, Coulston Supp. Dec. ¶ 21 and Ex. A thereto; Ex. 87, Wells Dec. ¶ 22; Tab O, Ex. 5. Clemens Tax Return.
[88] Although the Secretary does not appear to reference it in her Motion, she attaches Exhibit 10 called "Gate Guard Responsibilities" to Mr. Steindorf's deposition which is a document that Rapstine obtained during his investigation – it was not obtained from GGS.  The Secretary has no evidence as to

(*See* Dkt. # 111, pp. 18-19.)  The Secretary's argument is devoid of legal support.  Courts have long held that **the implementation of safety measures does not evidence the type of control found in employer-employee relationships**.  *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004) (stating that control exercised to "ensur[e] compliance with safety and security regulations" is "qualitatively different" than the type of control that evidences an employment relationship.)

GGS does not dispute that it asks the Gate Attendants to wear an orange safety vest while logging vehicles at the gate.  (Tab A, Steindorf Dec. ¶ 13.)[89]  This safety measure is not always followed by the Gate Attendants and no remedial action has ever been taken by GGS as a result of their failure to wear the safety vest[90] (see Tab D, Ex. 11, Clark Dec. ¶ 11.)  *See also Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1327-28 (S.D. Fla. 2001) (court found cable company who had contracted with a cable installation company was not an employer where cable installers were required to wear ID badges and to have vehicle signs identifying themselves as contractors of the cable company.)

In addition, to evidence control, the Secretary points to four memorandums prepared and issued by a sales representative, Jade Petty, to Gate Attendants working

---

who prepared it or what date it was prepared.  No one at GGS, including Mr. Steindorf, has ever seen this document before.  (Tab E, Steindorf Dep. 232-37, Ex. 10; Rapstine Dep. 218:6-12; 219:4-223:9, Ex. 13.)

[89] As reflected in the 28 declarations attached to the Secretary's MSJ, the declarants provided inconsistent and contradictory testimony regarding the clothing they allegedly were required to wear during an assignment.  (*See* Dkt. # 111, Exs. 3, 5-20, 25-35.)  To the extent the Secretary is arguing that GGS required more than an orange safety vest, her own evidence establishes that simply is not true.  (*See also* Tab A, Steindorf Dec. ¶ 13; Tab D, Ex. 11, Clark Dec. ¶ 11; Ex. 60, Park Dec. ¶ 12.)  Moreover, it is undisputed that GGS stopped using the polo shirts in 2008, a time period not relevant to this lawsuit.  (Ex. E, Steindorf Dep. 110:1-13.)  Regardless, this does not evidence employee status.  *See also Santelices v. Cable Wiring*, 147 F. Supp. 2d at 1313, 1327-28.

[90] In 2008, prior to the relevant time period in this lawsuit, Sid Smith, manager, sent out a memorandum advising that if DPS fined a Gate Attendant for not wearing an orange safety vest, then the Gate Attendant's contract may be terminated by GGS.  (Tab F, Smith Dep., 37-38, Ex. 13.)  However, no such remedial action was taken against any gate attendant.  (Tab A, Steindorf Dec. ¶13.)  Likewise, Exhibit 12 to Mr. Steindorf's deposition, a letter dated June 20, 2009 was sent to <u>one</u> gate attendant at the request of a particular client regarding safety vests and coverage.  (Tab E, Steindorf Dep. 250:18-252:25.)

solely in her small territory in North Texas.  (*See* Dkt. # 111, 18-19.)  As an initial matter, these four memorandums were not approved by Mr. Steindorf (with one exception) and were not authorized for dissemination to any Gate Attendant.[91]  None of the Gate Attendants testified that they ever saw or received these memorandums, likely because they were given to only a handful of gate attendants, according to Ms. Petty. Nonetheless, the Secretary misrepresents the record to the extent she contends they applied to Gate Attendants company-wide.  Even assuming they had been authorized, however, they do not evidence control as they address only safety concerns by the oil companies/landowners and do not address how the work should be performed.  (Tab E, Steindorf Dep. 175:20-176:12, 196:15-22, 203:15-204:1, 217:3-218:1; Exs. 7-9; Tab B, Petty Dec. 4-10, Exs. 1-2, 4, 6.)[92]

For example, Ms. Petty once distributed, to gate attendants in her territory, a document containing emergency telephone numbers of five gas company clients as requested by the clients.  (Petty Dec. ¶ 4, Ex. 1.)  At the request of the gas company clients, she also prepared and distributed to 10-15 gate attendants, a document reminding them that alcohol is not allowed; that proper safety attire is required which excludes shorts, flip flops and open toed shoes; that trash must be picked up; and that gate attendants should record incoming vehicles during the night for safety purposes.  (*Id.* at ¶ 6, Ex. 3.)  EOG also gave her a document called "Proper Attire For Each Situation"

---

[91] Dkt. # 111, p. 18-19; Tab E, Steindorf Dep. 173:23-233:25, Exs. 7-9, 11; Tab A, Steindorf Dec. ¶10; Tab B, Petty Dec. 4-10, Exs. 1-2, 4, 6, Tab I, Petty Dep. 93:18-22; 94:2-7; 131:11-25; 141:16-25; 143:3-8; 171:16-172:9.)

[92] Petty, a sales representative, also was reprimanded for sending a memorandum regarding relief workers, which was not authorized or condoned by GGS and which GGS immediately revoked upon learning of the memorandum.  (Tab I, Petty Dep. 160:2-22; Tab E, Steindorf Dep. 242:12-244:4.)  It has never been the responsibility of GGS to locate relief workers for the Gate Attendants and it is against GGS's policy to pay relief workers directly.  (Tab E, Steindorf Dep. 245:7-9; 247:2-24, Ex. 11; Petty Dep. 163:22-164:5.) Ms. Petty testified: "I was being nice and I was finding relief for them and it is not my job; it is not my duty so this went out to let them know what."  (Petty Dep. 14, Ex. 2.)

pertaining to safety clothes and shoes that she distributed to a couple of gate attendants working for EOG in North Texas.  (*Id.* at ¶7, Ex. 4.)  Finally, after meeting with XXXXX, a client, and receiving a list of safety and quality control requirements from that company, Ms. Petty distributed the list only to a "handful" of gate attendants working for that client in her territory.  (*Id.* at 9, Ex. 6.)  This time, she did receive approval from Mr. Steindorf.[93]  The client document specifically requires that the gate attendant report to the "Company Man or Tool Pusher" and not GGS and addresses safety, trash, safety attire, and other quality issues such as being on-time and accuracy when completing logs.  (*Id.*)  This does not evidence control according to the court in Comcast who rejected the Secretary's same argument in that case:

> ... The Secretary's arguments imputing employer liability to Comcast are devoid of merit. She argues that because Comcast set technical specifications which had to be met, insisted that Installers be fit to enter customers' homes, and mandated that that the Installers show up within a four-hour window, Comcast "controlled" the Installers. The Court notes that taking this argument to its logical conclusion, a case could be made that the *customer* is an employer of the Installers. After all, the customer also expects the Installer to show up within the four hour window, to be fit to enter the house, and to install the cable service in a quality manner.

*Id.* at 677 (emphasis in original).  Courts across the country have held that requirements concerning safety and quality control do not evidence an employer-employee relationship.  *Jacobson*, 2010 WL 3769120, at *6 (no employer liability where Comcast exercised only quality control for safety and to ensure quality service); *See Moreau*, 356 F.3d at 950-951 (no joint employer liability where Air France did not directly control the workers, "but would instead communicate any complaints to ensure passenger safety and therefore qualitatively different from the control exercised by an employer); *Boutin v.*

---

[93] Tab E, Steindorf Dep. 214:18-25, Ex. 9; Tab A, Steindorf Dec. ¶10.

*Exxon Mobil Corp.*, 730 F. Supp. 2d 660, 680 (S.D. Tex. 2010) (holding that Exxon was not a joint-employer under Title VII because to the extent it supervised the plaintiff, it was only to ensure the contract was performed as required).

Finally, the Secretary contends that simply because GGS has a security license and preferred its Gate Attendants to be licensed by DPS, this somehow amounted to control. (Dkt. # 111, p. 20.) But, the Secretary fails to cite to any authority to support this conclusion. It is true that for marketing purposes (e.g., to distinguish itself from the competition) and because licenses show that the Gate Attendants have had criminal background checks, GGS requests that the Gate Attendants obtain a non-commissioned security officer license from the Texas Department of Public Safety. (Tab E, Steindorf Dep. 165:16-20; 185:18-186:6; 202:18-20.) However, a license is not required. (Tab A, Steindorf Dec. ¶ 8; First Supp. Steindorf Declaration, ¶¶ 11-12, filed as a sealed event on 12/30/2011.) If a Gate Attendant obtains a license, it can be transferred to any company the Gate Attendants contract with; some Gate Attendants already have a license when they start their contract work with GGS. (*Id.* at ¶ 7.) The licenses do not evidence control because they have nothing to do with how the work is performed. *Herman v. Mid-Atlantic Install. Servs.*, 164 F. Supp. 2d 667, 673 (D. Md. 2000) ("MAT's drug test and background-check policy [mandated by its contract with Comcast] is neutral. It denotes neither an employee/employer nor a contractor/client relationship.")

Accordingly, because it is undisputed that GGS does not control the details of the work and does not supervise the Gate Attendants, this factor weighs strongly in favor of an independent contractor finding.

c.     **The Skill and Initiative Required**

This Court has recently held that gate attendants, like the Gate Attendants here, do not require skill and initiative in order to complete their assignments of logging vehicles at a gate site.  *Mack*, 2012 WL 1067398 at *4.  While the task of logging vehicles in and out may not require skill and initiative, the Gate Attendants in this case, unlike *Mack*, are actually running their own businesses, which does require skill and initiative.  *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (a contractor's maintaining or retaining control of the components of running a business which are open to initiative weighs in favor of independent contractor status); *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1387 (3rd Cir. 1985) ("The distributors needed to possess some degree of managerial skill to ensure that their revenues exceeded expenses. Moreover, it was necessary for the distributors to be able to keep records regarding the number of cards delivered to, and completed by, each distributee so that proper payment could be made. Some distributors benefitted from their skill in persuading others to become distributees, and they certainly exercised business-like initiative in this regard.").

For example, as set forth in Gate Attendant Maria Clark's declaration, her company, "RV Transports MA Clark," contracted with GGS to perform gate attendant services.  (Tab D, Ex. 11, Clark Dec. ¶ 2.)  RV Transports MA Clark, not GGS, hires and pays the gate attendants it sends to GGS, which "results in that sometimes my company has profits and sometimes it has losses."  (*Id.* ¶ 5.)  Similarly, when Lawrie Yaeger accepts an assignment from GGS, he hires other individuals to man the gate on a rotating basis.  (Tab D, Ex. 91, Yaeger Dec. ¶ 7.)  Mr. Yaeger pays these individuals directly, and he deducts a fee for the individuals' use of his camper during their shift at the gate.  (*Id.*)  Also, Gate Attendant Shirlene Abbie hires relief works every other week and makes a

substantial profit (over $18,000) by the use of relief workers and controlling expenses. (Tab D, Ex. 1, Abbie Dec. ¶¶ 9, 24-25, Ex. A.) Benny Coulston also makes a profit from the relief worker he uses for GGS assignments.  (*See* Tab D, Ex. 18, Coulston Supp. Dec. ¶ 12 and Exs. B and C.)   The Gate Attendants, not GGS, pay their relief workers directly and also decide the amount to pay them, oftentimes resulting in a profit.[94] (*See also*, fn. 101.) These are a few examples of the skill and initiative of the Gate Attendants.  While the Secretary cites to the declarations of other gate attendants who claim that they did not run a business, this is not determinative inasmuch as they had the opportunity to do so. *See, generally, Chao v. Mid–Atl. Install. Servs.*, Inc., 16 Fed. App'x 104, 107 (4th Cir. 2001) (affirming a finding of the district court as to independent contractor status based partly on the fact that "[a]n Installer's net profit or loss depends … on the business acumen with which the Installer makes his required capital investments in tools, equipment, and a truck; and on the Installer's decision whether to hire his own employees or to work alone.").

However, should the Court conclude, that this single factor is not met in this case, it is not determinative of the outcome. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) ("No single factor is determinative"). There often are factors pointing in both directions and the Court must make a determination based on the weight of the evidence.  *See Carrell v. Sunland Constr., Inc.*, 998 F.2d at 332.  The scale here is tipped overwhelmingly in GGS's favor as the other four factors strongly support a finding that an independent contractor relationship exists between GGS and the Gate Attendants.

---

[94] *See* fn. 25, 31; Tab O.

### d.      The Relative Investments of Each Party

An analysis of the next factor, the relative investments of the worker and the alleged employer, provides further evidence of the economic independence of the Gate Attendants.  *See Carrell*, 998 F.2d at 333.  Courts focus, not on the alleged employer's "overall investment" in the business, but rather the comparative investment of the worker and the alleged employer regarding the specific job at issue.  *See Thibault*, 612 F.3d at 847 (stating that "[t]he court in *Carrell* 'recognized' the overall investment by the alleged employer, but it did not focus on it….")  Taking into account the substantial investments borne by the Gate Attendants for each assignment they accept from GGS, this factor weighs in favor of finding an independent contractor relationship.

First, the Gate Attendants incur the most significant investment necessary for performing the gate attendant services – purchasing their living quarters during the assignment (*i.e.*, R.V.)  In fact, every Gate Attendant, with a mere one exception, purchased their own living quarters, which is reflected in the hundreds of Independent Contractor Agreements and over 90 declarations attached to this Motion.[95]  As acknowledged by Rapstine, this investment can total over $70,000.  (Tab J, Rapstine Dep. 276:4:19.)  In addition, the Gate Attendants purchase their own insurance and are responsible for the costs related to the maintenance of their R.V.[96]  Thus, like the worker in *Thibault* who "had his own motor home, which he brought to Louisiana to live in," and the workers in *Carrell*, who purchased and maintained their own trucks, tools and machines amounting to an average investment of $15,000, the Gate Attendants heavily

---

[95] Tab A, Steindorf  Dec. Exs. 2-452; Tab D, Exs 1-94.  The fact that the Gate Attendants purchase their own living quarters (*i.e.*, the R.V.) also is undisputed by the Secretary.  (Tab K, Ramirez Dep. 243:9-12.).

[96] *See* fn.49; Tab J, Rapstine Dep. 139:17-22.

invest in the equipment used to perform gate attendant services.  *Carrell*, 998 F.2d at 333; *Thibault*, 612 F.3d at 848.   Moreover, like the worker in *Thibault* who traveled to Louisiana looking for work in the aftermath of Hurricane Katrina, the Gate Attendants also are responsible for their own travel to the Texas oil field.  *Thibault*, 612 F.3d at 846. Specifically, Gate Attendants are responsible for the fuel expenses incurred in transporting their R.V. or trailer to the remote oil field locations for each assignment which can be significant if the Gate Attendants are traveling from other states. (Tab A, Steindorf Dec. ¶12.)   The Gate Attendants are also responsible for their own living expenses such as: meals, household cleaning supplies, small tools, and laundry.[97]  They also purchase items to do the work such as: Internet, mobile phone service, uniforms, postage, safety equipment, paper, bells, video cameras, cables, and remote gate openers.[98]

The Gate Attendants are also responsible for finding and paying their own relief workers during an assignment as set forth in their Independent Contractor Agreements. (See, fn. 25-28; Tab A, Steindorf Dec. ¶ 8, Exs. 2-458.)  Indeed, all of the 94 declarations from Gate Attendants attached to this Motion attest to the fact that they, not GGS, are responsible for finding relief workers during an assignment.   (*See generally* Tab D hereto; *see also* Tab D, Ex. 1, Abbie Dec., Ex. A; Ex. 18, Coulston Supp. Dec. Exs. A, B; Tab O, Ex. 12, Park Tax Return, Sch. C (all showing deductions for "contract labor".)) The Gate Attendants claim these expenses on Schedule "C" of their federal income tax returns.[99]

---

[97] S*ee* fn. 31, 49; Tab J, Rapstine Dep. 140:4-7; Tab K, Ramirez Dep. 243:13-15; Tab E, Steindorf Dep. 285:22-25.
[98] *See* fn. 49, 50.
[99] *See* fn. 30-32.

Inexplicably, the Secretary chose to overlook this evidence.  When evaluating the investment of the Gate Attendants as compared to GGS, Rapstine admittedly only asked "about half" of the Gate Attendants he interviewed ("[a]bout ten") the cost of their R.V. and he did not obtain the model and make of these homes or attempt to price them himself.  (Tab J, Rapstine Dep. 276:7-12; 276:24-277:3.)  Rapstine <u>did not ask</u> the Gate Attendants if they maintained and repaired their R.V.s (or about their fuel costs) (*id.* at 139-140).  Although Rapstine elected to ignore much of this critical evidence during his investigation, the Fifth Circuit strongly considers all of these expenses when analyzing the relative investment of the parties.  (Tab J, Rapstine Dep. 139-140).  *See Carrell*, 998 F.2d at 333 (considering the average cost of the workers' investment, which totaled $15,000, including repair and maintenance of equipment, and lodging and meals); *Thibault*, 612 F.3d at 847-48 (considering the worker's investment of tools, equipment, bucket truck, and the motor home in which he lived during an assignment).  As these cases establish, Rapstine and the Secretary are wrong to disregard the significant investments made by the Gate Attendants which weigh in favor of finding an independent contractor relationship.

The Court also must consider GGS's investment.  *See Carrell*, 998 F.2d at 333.  Sometimes, GGS supplies the septic tank and water which the Gate Attendants use during an assignment.  (Tab A, Steindorf Dec. 13; Tab E, Steindorf Dep. 280:2-6.)  The Army Corps of Engineers also supplies its contractor gate attendants with a septic tank.  (*See* fn. 122 *infra*.) On occasion, however, the oil company may provide water service to the Gate Attendants or their R.V. may be equipped with its own septic system.  (Tab D, Ex. 15, Conrad Dec. ¶ 16; Ex. 18, Coulston Supp. Dec. ¶ 6.)  Sometimes, the Gate Attendants'

R.V.s are equipped with a generator. (Tab E, Steindorf Dep. 279:24-280:6; Tab D, Ex. 18, Coulston Supp. Dec. ¶ 6.) If the Gate Attendant's R.V. is not equipped with a generator, the landowner or oil field operator may have a power pole on site that the Gate Attendants use during an assignment, or they can connect to the drilling rig for electricity. (Tab E, Steindorf Dep. 285:4-10; Tab D, Ex. 15, Conrad Dec. ¶ 16.) If there is no power pole on site and the Contractor Gate Attendant's R.V. is not equipped with a generator or cannot connect to the rig, GGS will provide a generator at a cost to the oil company. (Tab E, Steindorf Dep. 279:24-281:5.) Approximately forty percent (40%) of the time, the oil company operator and/or the landowner – not GGS – provides the diesel needed to run the generators. (Tab E, Steindorf Dep. 282:1-4.) Importantly, if GGS provides the diesel, <u>GGS recoups this cost from the oil field operator</u>. (Tab H, Henderson Dep. 45:9-18.) Moreover, while GGS does sometimes provide lights, stop signs and bells, some of the Gate Attendants provide their own lights (Tab E, Steindorf Dep. 289:7-10), stop signs (*id.* 293:4-7), and bells (*id.* 290:9-13).[100]

Rapstine took great pains to determine GGS's purported costs by doing Internet research on the costs of a septic tank, water tank and diesel provided to the oil companies and which the Gate Attendants used, and, not surprisingly, the Secretary now heavily relies upon this "internet investigation" for the value of the "capital investment" at each gate. (Tab J, Rapstine Dep. 273-275, Ex. 20; Dkt. #111, p. 22.) According to Rapstine's calculations, GGS invested approximately $19,950 in total for each assignment, <u>but this is incorrect</u>. (Tab J, Rapstine Dep. Ex. 20.) Not surprisingly, Rapstine did not take into account the costs recouped by GGS from the oil field operators, nor did he account for

---

[100] *See* fn. 50; *See also* Tab D, Ex. 13, Clemens Supp. Dec. ¶ 6; Ex. 17, Coulston Dec. ¶ 6; Ex. 69, B. Reid Dec. ¶ 6; Ex. 78, Staley Dec. ¶ 7; Ex. 81, Stone Dec. ¶ 5.

the Gate Attendants who supply their own generators, lights, bells, and stop signs.  (*See* Tab J, Rapstine Dep. Ex. 20.)  **Perhaps the biggest misstep is that Rapstine did not take into account that GGS reuses the equipment at issue over and over at various gate locations staffed by different Gate Attendants over multiple years throughout the life of the equipment. (Tab A, Steindorf Dec. ¶13)**.  <u>**GGS did not invest $19,950 per assignment or gate**</u>.  As such, Rapstine incorrectly weighted the value of the capital investment in the equipment with respect to the operation of a gate in relation to the investment of the independent contractor Gate Attendants. (*See id.*)  In any event, the amount invested by the Gate Attendants, as set forth above, often dwarfs $19,950.  *See Carrell*, 998 F.2d at 333 (welder classified as independent contractor even where alleged employer provided some equipment and tools to the workers and also provided "helpers" to the workers, in light of contractor's investment in supplying his own truck, welding machine and maintenance, lodging,  meals, and assistants).

Considering <u>all</u> of the evidence related to the investment of the parties, this factor supports GGS's classification of the Gate Attendants as independent contractors.

### e.   <u>The Worker's Opportunity for Profit and Loss</u>

The final factor in the Fifth Circuit's analysis examines the extent to which the employer controls the amount of profit the worker is able to earn.  *See Carrell*, 998 F.2d at 333-34.  The alleged employer's control over the method and amount of payment (*i.e.*, hourly rate of pay, daily rate of pay, etc.) is not solely determinative.  *Id*.  Instead, courts take into consideration the ability of the worker to control his or her costs, earn additional income, and deduct business expenses, as reported by the workers on their tax returns.  For example, in *Carrell*, the employer, Sunland, set the plaintiffs' hourly rate of pay and controlled the number of hours worked.  998 F.2d at 333.  The Court, however, focused

on the tax returns filed by the plaintiff-welder, which revealed that he reported net taxable profits each year he worked for Sunland (*Id.* at 333-34) and considered that "many of the other Welders classified themselves as self-employed on their income tax returns." *Id.* at 334.  The Court held:

> Sunland exerted some control over the Welders' opportunity for profits by fixing the hourly rate and the hours of work.  Yet, the tax returns of Carrell indicate that the Welders' profits <u>also depended on their ability to control their own costs</u>.  Moreover, the Welders worked for numerous companies in each of the years relevant to this dispute.

*Id.* (emphasis added).  *See also Thibault*, 612 F.3d at 848 (worker who was paid an hourly rate and a per diem stipend was able to control his costs and expenses and thereby maximize his profits by providing his own lodging, food, tools, among other costs.)  Similarly, this Court in its recent decision in *Mack* found that gate attendants working for Talasek were able to control their opportunity to earn a profit.  *Mack,* 2012 WL 1067398 at *3-4.  Among the facts this Court found persuasive was the gate attendants' ability to take on other work during the time they were not working for Talasek (before, after and in between assignments).  *Id.* at *4.  ("Plaintiffs did not work a required schedule that precluded extra work.")  Moreover, like the plaintiffs in *Carrell* and *Thibault*, the gate attendants deducted their business expenses, could suffer losses, and could increase their profits by controlling their costs.  *Id.* at *3.

In its argument totaling only <u>four sentences</u> on this factor, the Secretary unconvincingly argues that because Mr. Steindorf and some of the gate attendants testified that they could not make a profit or suffer a loss, that this is dispositive.  (Dkt. # 111, pp. 23-24.)  **However, the Secretary's attempt to seek a legal conclusion from a lay witness does not advance her case**.  *Gray v. Sage Telecom, Inc.*, No. 3:05-cv-1677-

G, 2007 WL 2820075, at *5 (N.D. Tex. Oct. 2, 2006).  There is considerable evidence in the record based on the tax returns of the Gate Attendants which shows they made a profit and suffered a loss; unfortunately, the Secretary continues to disregard these exceedingly compelling facts.

The record overwhelmingly shows that the gate attendants had the opportunity to and did, in fact, make a profit and, at times, suffered a loss.  For example, like the gate attendants in *Mack* and the welders in *Carrell*, the Gate Attendants here reported net taxable profits or losses during the time they performed services for GGS.[101]  As reflected on these tax returns, the Gate Attendants' opportunity for profit or loss depends upon their ability to control their costs, just like the gate attendants in *Mack*.  *See Mack*, 2012 WL1067398 at *3 (noting that the gate attendants could suffer losses as reflected on their tax returns).  The Gate Attendants also classify themselves as self-employed and deduct their business expenses on their tax returns.[102]  *See Carrell*, 998 F.2d at 334 (noting that the welders classified themselves as self-employed).  The Gate Attendants deduct expenses such as:  car and truck expenses, depreciation, repairs and maintenance, supplies, meals and expenses, modem fees, utilities, propane, telephone expenses, safety

---

[101] *See* Tab O, Ex. 1, Abbie Income Tax Return ($18,531 net profit); Ex. 2, Badger Income Tax Return ($14,658 net profit); Ex. 3, Bell Income Tax Return ($454 net profit); Ex. 4, Boren Income Tax Return ($11,059 net profit); Ex. 5, Clemens Income Tax Return ($1,854 net loss – 2009; $4,730 net loss – 2010); Ex. 6, Coulston Income Tax Return ($5,815 net loss); Ex. 7, Dunseth Income Tax Return ($12,164 net profit); Ex. 8, Giordano Income Tax Return ($3,193); Ex. 9, Hickey Income Tax Return ($414.00); Ex. 10, Miller Income Tax Return ($29,607); Ex. 11, Oswalt Income Tax Return ($27,800); Ex. 12, Park Income Tax Return ($17,869); Ex. 13, Pena Income Tax Return ($12,000 net profit); Ex. 14, Phelps Income Tax Return ($5,619 net profit); Ex. 15, Pritchett Income Tax Return ($16,412 net profit); Ex. 16, Reid Income Tax Return ($10,570 net profit – 2009; $9,164 net profit – 2010); Ex. 17, Richter Income Tax Return ($4,715 net profit); Ex. 18, Shows Income Tax Return ($3,019 net profit); Ex. 19, Tollett Income Tax Return ($6,768 net profit); Ex. 20, Ward Income Tax Return ($3,345 net profit – 2009; $11,503 net profit – 2010; Ex. 21, Wells Income Tax Return ($3,743 net profit); Ex. 22, Woodall Income Tax Return ($16,544 net profit); Ex. 23, Yaeger Income Tax Return ($5,915 net profit); fns. 31-32.

[102] *See* fn. 31-32.

equipment expenses, certification and registration fees, contract labor, and legal and professional services.[103]

In addition to controlling their costs and deducting their business expenses, the Gate Attendants also testified that they can maximize their profits by hiring relief guards at a lower rate of pay than they receive from GGS.[104]  Furthermore, the Gate Attendants, not GGS, pay their relief workers directly and also decide the amount to pay their relief workers.[105]  As set forth in Maria Clark's declaration, her company, "RV Transports MA Clark", contracted with GGS to perform gate attendant services.  (Tab D, Ex. 11, Clark Dec. ¶ 2.)  RV Transports MA Clark, not GGS, hires and pays the gate attendants it sends to an assignment for GGS, which "results in that sometimes my company has profits and sometimes it has losses."  (*Id.* ¶ 5.)  Similarly, when Lawrie Yaeger accepts an assignment from GGS, he hires other individuals to man the gate on a rotating basis. (Tab D, Ex. 91, Yaeger Dec. ¶ 7.)  Mr. Yaeger pays these individuals directly, and **he deducts a fee for the individuals' use of his camper during their shift at the gate**. (*Id.*)  Moreover, Shirlene Abbie hires and pays her own relief workers every other week and realizes a profit.  (Tab D, Ex. 1, Abbie Dec. ¶ 9.)  Benny Coulston issues a Form 1099 to a relief worker he uses and earns a profit.  (*See* Tab D, Ex. 18, Coulston Supp. Dec. ¶ 12 and Exs. B and C.)

Finally, like the welders in *Carrell* and *Thibault*, the Gate Attendants could increase their profits by performing work for other companies or for their own

---

[103] *See* fn. 31; Tab O.
[104] *See* fn. 43.
[105] *See* fn. 28. GGS's bookkeeper testified that she "was not aware of ever paying for a relief guard." (Tab G, Brown Dep. 64:7-11.)

businesses.[106]  *See Carrell*, 998 F.2d at 334; *Thibault*, 612 F.3d at 848.  For example,

Sandra Wells has a separate business through which she provides massage therapy

services.  (*See* Tab D, Ex. 87, Wells Dec. ¶ 22.)  Similarly, at the same time he provided

gate attendant services for GGS, Benny Coulston was in the business of cosmetic teeth

whitening.  (*See* Tab D, Ex. 18, Coulston Supp. Dec. ¶ 21 and Ex. A.)  Like the gate

attendants in *Mack*, the Gate Attendants also could increase their profits by accepting

additional assignments from GGS or working for others companies.[107]  *See Mack*, 2012

WL 1067398 at *4.  Thus, the opportunity to increase their profits depended, in large

part, on the ability and willingness of the Gate Attendants to accept and/or find additional

work.  *See Thibault*, 612 F.3d at 848.

As previously explained *supra* in Section IV, the Secretary's allegation that GGS

set "non-negotiable flat daily rates" and "refus[ed] to negotiate raises" is not true and

even her own evidence belies this allegation.  (*See* Dkt. # 111, p. 18 and Ex. 29, K.

Scrogum Dec.)  Again, Billy Reid submitted Form WH-31 to the Secretary plainly stating

that he negotiated his daily rate with GGS, but she chose to disregard it.  (Tab D, Ex. 70,

Ex. A.)  In a declaration submitted by the Secretary, Mr. Scrogum states that he was paid

an <u>additional</u> amount for working at gates with more than one rig and received an

<u>additional</u> $100 per day for performing "escorting duties."  (*Id.*, Ex. 29, ¶¶ 7-8.)  This is

entirely consistent with Mr. Steindorf's testimony that GGS negotiates the daily rate,

---

[106] See fns. 42-43.

[107] Fn. 45.  The case law cited by the Secretary is not applicable to the facts here.  In *Hopkins v. Cornerstone America*, the control factor weighed in favor of an employment relationship because the defendant had almost complete control over the plaintiffs' ability to increase their income which was determined "from overwrite commissions on their subordinates' sales."  545 F.3d 338, 342-43 (5th Cir. 2008) (the plaintiffs' income derived "from overwrite commission on their subordinates' sales," but the personnel decisions and territories covered by their subordinates were controlled by the defendant).  Here, the Gate Attendants have the ability to increase their earnings by accepting additional assignments, accepting assignments at gates with more than one rig, picking up additional duties at assignments, or hiring relief workers at a lower rate of pay. *See* Dkt. # 111, Ex. 29, ¶¶ 7-8; fns. 42-43, *supra*.

which varies because "[s]ometimes there are several rigs in the location, and we will pay the gate attendants compensation for that extra work."  (Tab E, Steindorf Dep. 150:7-18. *See also* Tab I, Petty Dep. 97:2-8.)  The Independent Contractor Agreements reveal that some Gate Attendants wrote the following regarding their daily rate:  "negotiable" (Tab A, Steindorf Dec. Ex. 81), "$125 for one rig" (*id.* at Ex. 31) or "depends on gate" (*id.* at Ex. 48).   Notwithstanding all of this evidence, the *Carroll* court held that the alleged employer's control over the method and amount of payment (*i.e.*, hourly rate of pay, daily rate of pay, etc.) is not solely determinative - courts take into consideration the ability of the worker to control his or her costs, earn additional income, and deduct business expenses, as reported by the workers on their tax returns.  *See Carrell*, 998 F.2d at 333-34. Because the Gate Attendants are able to control their opportunity for profit or loss, this factor <u>very strongly</u> weighs in favor of finding an independent contractor relationship.

### f.    <u>Written Independent Contractor Agreements</u>

The 457 written Independent Contractor Agreements ("ICA") between the Gate Attendants and GGS attached to this Motion identify the Gate Attendants as "independent contractors."  (Tab A, Steindorf Dec. ¶ 4 and Exs. 2 - 458.)  In the ICAs executed prior to 2011, Paragraph 1 states in pertinent part: "In the performance of the services, Contractor shall operate as an independent contractor" <u>and</u> in the ICAs executed during and after 2011, Paragraph 1(b) states in pertinent: "Contractor shall operate as an independent contractor."  (*Id.*)  Paragraph 7 in both ICAs is captioned "Independent Contractor" and states that "[t]his agreement shall not render the Contractor an employee. . . ."  (*Id.*)

Courts have long held that a written contract between the parties expressly confirming independent contractor status is relevant to the determination. *See Thibault*,

612 F.3d at 845-46 (noting that the contractual designation of a worker as an independent contractor is not controlling, but it is relevant.)  In the same vein, the Fifth Circuit has held that an individual's awareness that the alleged employer classified him or her as an independent contractor weighs in favor of independent contractor status.  *See Carrell*, 998 F.2d at 334 (finding that plaintiffs were independent contractors when they were aware that their alleged employer classified them as independent contractors).  Not only were the Gate Attendants aware that GGS classified them as independent contractors based on their ICAs, but they were also aware of this fact based on the 1099 forms they received for 2009, 2010, 2011 and 2012.  (Tab A, Steindorf Dec. ¶ 16.)

Similarly, the Gate Attendants held themselves out to be independent contractors by signing the ICAs and declaring to the IRS that they were self-employed both while working for GGS and while working for similar companies both before and after working for GGS. (*See* fns. 31-32.)  Indeed, all 94 declarations attached to this Motion state that the Gate Attendants believed they were independent contractors.  The Fifth Circuit and Texas courts have found that such declarations of independent contractor status are evidence that these individuals are indeed independent contractors.  *See Talbert*, 2010 WL 5186768, at *7 (finding that the plaintiff was an independent contractor when her resume reflected that she had held herself out to be an independent contractor, having worked for multiple companies prior to working for her alleged employer for a period of twelve weeks); *Lindsley*, 2010 WL 4609109, at *2 (finding that the plaintiff was an independent contractor when he considered himself self-employed); *Thibault*, 612 F.3d at 846 (finding that the plaintiffs were independent contractors when they considered

themselves self-employed); *Carrell,* 998 at 334 (finding that plaintiffs were independent contractors when several of them classified themselves as self-employed.)

Finally, although the Secretary complains that there is no set term or price in the ICA for the work or negotiation of the terms, she is incorrect.  Paragraph 2 of the ICAs state that the Gate Attendants are paid "per day" "for each day Contractor performs Contractor Services which consist of opening and closing the gate and for logging vehicles entering and departing the gate."  (Tab A, Steindorf Dec. ¶ 4 and Exs. 2 - 458.) While not all of the ICAs include the specific daily rate (particularly those prior to 2011), some do include the daily rate ( *e.g*., *id.* at Exs. 298, 299, 308, 312, 323, 331, 332, 334, 337, 346, 350) or denote, in place of the rate, terms such as: "negotiable" (*id*. at Ex. 81), "$125 for one rig" (*id.* at Ex. 31), or "depends on gate" (*id*. at Ex. 48).  Moreover, the ICAs show that Gate Attendants did not accept a "form" agreement and crossed out certain terms.  (*E.g., see* Tab A. Steindorf Dec., Exs. 44 and 253.)

Indeed, the 457 ICAs confirm that the Gate Attendants were independent contractors in practice – *e.g.*, Self-Employment Taxes: the Gate Attendants hold themselves out as independent contractors via their tax returns (paragraphs 5, 8; fn. 29-32); Tools, Equipment: they are responsible at their expense for "vehicles, tools, facilities, lodging, office equipment, fuel and phone service" (paragraphs 2, 5; fn. 31,49-50); Services: they kept "logs" and  complied with safety/quality restrictions - "services shall be in a manner consistent with appropriate safety, health, and environmental considerations, including but not limited to any restrictions imposed by the operator, lease holder or landowner as may apply" (paragraph 1, fn. 19); Employment of Others: they hired and paid relief workers - "Contractor may employ others to assist Contractor in

carrying out the services required herein provided . . . Contractor shall be solely responsible for any person hired by Contractor, including but not limited to payment of wages" (paragraphs 4,6; fn. 25-28.) (Tab A, Steindorf Dec. ¶4, Exs. 2-457.)  Overall, the ICAs are consistent with the testimony of the 100 plus Gate Attendant witnesses in this case.

> ### 3.  This Court And The Federal Government Consider Gate Attendants To Be Independent Contractors.

#### a.  *Mack v. Talasek*

This Court has the unique advantage of having recently decided the exact issue presented in this case – whether gate attendants who log vehicles entering and exiting an oil field are independent contractors under the FLSA.  The Court's rulings on the *Mack* plaintiffs' objections to Magistrate Judge Johnston's Memorandum, Recommendation, and Order ("M&R")[108] concerning the elements of the independent contractor test can be easily applied to the facts present here.  **In many ways, the facts of the instant case weigh more strongly in favor of independent contractor status**.

With respect to the degree of control exercised by Talasek, the Court overruled the plaintiffs' objections to the M&R and found that "the control factor weighs in favor of finding that Plaintiffs were independent contractors."  *Mack*, 2012 WL 1067398 at *2. Like the Gate Attendants here, who are free to accept or reject the assignments offered by GGS, the gate attendants in *Mack* "were under no obligation to return to work for another shift or to accept any request by Talasek that they work at another location."  *Id.* at *2.[109] The Gate Attendants, like the gate attendants in *Mack*, were not "under any restrictions

---

[108] A true and correct copy of Magistrate Judge Johnston's Memorandum, Recommendation, and Order is attached hereto as Exhibit W.

[109] *See* fn. 46-47.

on working for other gate guard companies during the extended periods of time between jobs they performed for" GGS.  *Id.*[110]  "Finally, and most importantly," the Gate Attendants "worked with no day-to-day supervision" and GGS "had no control over what [the Gate Attendants] did on a daily basis outside of requiring them to be at the shift site." *Id.* (internal quotations omitted).[111]

The Court also overruled the *Mack* plaintiffs' objections regarding their opportunity for profit or loss.  *Mack*, 2012 WL 1067398 at *3-4.  Just like the Secretary contends in her Motion, the *Mack* plaintiffs argued that "they could not increase their income during any fixed period, regardless of how much initiative and skill they applied, nor did they face any risk of loss."  *Id.* at *3; *see also* Dkt. # 111, pp. 23-24.  Rejecting this argument, the Court found that the tax returns of the *Mack* gate attendants, just like the tax returns of the Gate Attendants here, revealed that they "did face risk of loss and, like the plaintiffs in *Thibault* and *Carrell*, Plaintiffs could have increased their profits by controlling their costs."  *Mack* Order, p. 6.[112]  The plaintiffs in *Mack*, like the Gate Attendants, "did not work a required schedule that precluded extra work," and "could have increased their overall profits by working more, either by taking more jobs with Talasek or by taking jobs with the other general contractors, landowners, or oil companies during the extended periods of time they had off between jobs they worked for Talasek."  *Mack*, 2012 WL 1067398 at *4.[113]

Also like the gate attendants in *Mack*, the Gate Attendants do not have a permanent relationship with GGS.  Instead, they work "on a job-by-job basis and [are]

---

[110] *See* fns. 42, 45, 47.
[111] *See* fn. 35.
[112] *See* fns. 26-28, 31.  This Court also overruled the *Mack* plaintiffs' objection to Magistrate Judge Johnston's reliance on their tax returns.  *Mack* Order, p. 12.
[113] *See* fns. 42, 43.

fully aware that their positions [are] temporary." *Mack*, 2012 WL 1067398 at *5.[114]   The Gate Attendants can accept other jobs during the periods of time they are working an assignment for GGS.  *Id.*[115]   This Court also rejected the Secretary's argument that she meets the permanency factor because "the guards work at multiple gates" or sometimes accept assignments at gates for the same oil company.  (Dkt. # 111, p. 25.)  Talasek, like GGS, offered multiple assignments to the gate attendants, and the Court stated "that the permanency factor does not tip in favor of finding that Plaintiffs were employees merely because Talasek would offer Plaintiffs work at another job site at the completion of each shift." *Mack*, 2012 WL 1067398 at *6.

The distinctions between the facts in *Mack* and the facts here also are important.  The largest investment borne by the Gate Attendants – their R.V. – was not an investment made by the gate attendants in *Mack*.[116]   Instead, Talasek "supplied the on-site trailers that Plaintiffs used as living quarters while on shift." *Mack*, 2012 WL 1067398 at *3.  Thus, the Gate Attendants here incur significantly greater investment costs than did the gate attendants in *Mack* due to state-to-state and city-to-city travel as well as maintenance and insurance.  Thus, the relative investment of the parties also favors a finding of an independent contractor relationship here.

Finally, the other evidence relied upon by this Court in *Mack* is nearly identical to the evidence here.  The Gate Attendants have written contracts with GGS to work as independent contractors; in *Mack*, the gate attendants had oral contracts with Talasek.  (*Mack,* 2012 WL 1067398 at *7; Tab A, Steindorf Dec. ¶ 4 and Exs. 2-458.)  This "designation is relevant when it mirrors economic reality." *Mack,* 2012 WL 1067398 at

---

[114] *See* fns. 40-41.
[115] *See* fn. 42.
[116] *See* Tab A, Steindorf Dec. ¶11.

*7.   The Gate Attendants "work as self-employed gate attendants for other companies under the nearly identical circumstances."  *Id.*  Indeed, Hilda Mack, the plaintiff in *Mack*, also contracted with GGS to perform gate attendant services.  (*Mack*, 2012 WL 1067398 at *7; Tab A, Steindorf Dec. ¶ 4 and Ex. 228.)  Making allowances for the operational characteristics unique to the gate guarding business, this Court found that "the fact that it is industry custom in this region for oil field gate attendants to be treated as independent contractors and paid a per diem rate to live and work at well locations on a temporary, job-by-job basis is [] relevant and supports a finding the Plaintiffs were independent contractors."  *Mack*, 2012 WL 1067398 at *8.  Naturally, the same is true here.

As in *Mack*, the Gate Attendants' actual work duties only took a few hours a day.  *Mack*, 2012 WL 1067398 at *8.[117]  During the remainder of the day, the Gate Attendants are free to eat, sleep, watch TV, or engage in other personal pursuits.  *Id.*  Thus, "the underlying purpose of the FLSA would not be frustrated by a finding that [the Gate Attendants] are not employees entitled to the protections of the FLSA."  *Mack*, 2012 WL 1067398 at *8.  Given the similarities between *Mack* and this case, the Gate Attendants are clearly independent contractors under the FLSA.

### b.        The U.S. Army Corps of Engineers

The federal government's enforcement action against GGS is the **height of hypocrisy** given its own classification of gate attendants as independent contractors.  Like GGS and other companies, the federal government's Army Corps of Engineers ("ACE") uses the services of gate attendants at federal parks and it <u>classifies its gate</u>

---

[117] *See* fns. 23-24.

69

attendants as independent contractors.[118]  As shown below, the relationship between GGS and the Gate Attendants is much more indicative of an independent contractor relationship than the relationship between the ACE and its gate attendants.  For this reason, the federal government's contradictory positions should be repudiated.

The services performed by the Gate Attendants for GGS and the ACE's gate attendants are almost identical.  For example, just as the Gate Attendants log vehicles entering and exiting an oil field operation during an assignment for GGS, the ACE's gate attendants "log the Park Rangers and any contractors that came in to do work when they initially came to the park" during ACE assignments.[119]  The ACE, however, also requires its gate attendants to provide maps and information to park guests upon request, collect money from park guests, and patrol the park and notify a Park Ranger or law enforcement in the event of unusual behavior.[120]

The ACE, like GGS, requires gate attendants to provide their own R.V. in which they live during an assignment.[121]  The ACE provides water, sewer, and electrical hookups for the R.V.s.[122]  The ACE has provided its gate attendants with golf carts to "make rounds of the park" and provides and maintains the "gate house" from which the gate attendants work.  (Tab D, Ex. 89, G. White Dec. ¶ 7.)  As noted above, GGS provides a septic system and sometimes provides a generator to the Gate Attendants

---

[118] *See* fn. 44; *See also* Tab T, Certified copy of the U.S. Army Corp of Engineers Gate Attendant Bid Package. *See also* Tab DD.

[119] *See* Tab D which includes the following Declarations:  Ex. 44,  J. McAdoo Supp. Dec. ¶ 4; Ex. 46, S. McAdoo Supp. Dec. ¶ 4; Ex. 79, Staley Supp. Dec. ¶ 4; Ex. 81, Stone Dec. ¶ 19; Ex. 88, Wheeler Dec. ¶19; Ex. 89, G. White Dec. ¶ 4.

[120] *See* Tab D which includes the following Declarations:  Ex. 44, J. McAdoo Supp. Dec. ¶ 4; Ex. 46, S. McAdoo Supp. Dec. ¶ 4; Ex. 79, Staley Supp. Dec. ¶ 4; Ex. 81, Stone Dec. ¶ 19; Ex. 88, Wheeler Dec. ¶ 19; Ex. 89, G. White Dec. ¶ 4.

[121] *See* Tab D which includes the following Declarations:  Ex. 44, J. McAdoo Supp. Dec. ¶ 5; Ex. 46, S. McAdoo Supp. Dec. ¶ 5; Ex. 79, Staley Supp. Dec. ¶ 5; Ex. 81, Stone Dec. ¶ 20; Ex. 88, Wheeler Dec. ¶ 20; Ex. 89, G. White Dec. ¶ 5.

[122] *Id.*

70

during an assignment, but recoups these costs from the oil companies.  (*See* Section (B)(2)(d), *supra*.)

The ACE provides its gate attendants with a uniform and requires the gate attendants to wear the uniform at all times, and sometimes provided magnetic signs that state "Gate Attendant" which is to be placed on the attendant's vehicle when patrolling the park.[123]  GGS does not require that the Gate Attendants wear a uniform, but does request that they wear an orange safety vest.[124]

Unlike GGS, the ACE provides training to the gate attendants regarding the rules and regulations of the park.[125]  The ACE also provides computer training to its gate attendants.  (Tab D, Ex. 79, Staley Supp. Dec. ¶ 6; Ex. 81, Stone Dec. ¶ 21; Ex. 88, Wheeler Dec. ¶ 21.)  They are required to attend a "pre-work conference" to discuss the scope of work.  (Tab D, Ex. 89, G. White Dec. ¶ 11 and Ex. A thereto.)  ACE instructs the gate attendants to be well-groomed and wear proper attire at all times (such as not wearing flip flops), and instructs the gate attendants to keep the area around their R.V. free from clutter.[126]  Significantly, the ACE gate attendants are given specific instructions regarding the collection of fees from park guests, and are required to use government-issued forms to record the fees collected.[127]  The ACE's gate attendants are "supervised

---

[123] *See* Tab D which includes the following Declarations:  Ex. 44, J. McAdoo Supp. Dec. ¶ 8; Ex. 46, S. McAdoo Supp. Dec. ¶ 8; Ex. 79, Staley Supp. Dec. ¶ 8; Ex. 81, Stone Dec. ¶ 23; Ex. 88, Wheeler Dec. ¶ 23; Ex. 89, G. White Dec. ¶ 7.

[124] *See* Tab A, Steindorf Dec. ¶ 13.

[125] *See* Tab D which includes the following Declarations:  Ex. 44, J. McAdoo Supp. Dec. ¶ 6; Ex. 46, S. McAdoo Supp. Dec. ¶ 6; Ex. 79, Staley Supp. Dec. ¶ 6; Ex. 81, Stone Dec. ¶ 21; Ex. 88, Wheeler Dec. ¶ 21; Ex. 89, G. White Dec. ¶ 6.

[126] *See* Tab D which includes the following Declarations:  Ex. 44, J. McAdoo Supp. Dec. ¶ 8; Ex. 46, S. McAdoo Supp. Dec. ¶ 8; Ex. 79, Staley Supp. Dec. ¶ 8; Ex. 81, Stone Dec. ¶ 23; Ex. 88, Wheeler Dec. ¶ 23; Ex. 89, G. White Dec. ¶¶ 8, 11 and Ex. A thereto.

[127] *See* Tab D, Ex. 79, Staley Supp. Dec. ¶ 6; Ex. 81, Stone Dec. ¶ 21; Ex. 89, G. White Dec. ¶¶ 6, 11 and Ex. A thereto.

by a Park ranger who checks on [the] logs as well as the money [the attendant] collected."[128]

As the comparison above amply demonstrates, GGS is well-justified in classifying the Gate Attendants as independent contractors.  Unlike the ACE, GGS does not supervise the Gate Attendants;[129] GGS does not provide training to the Gate Attendants; GGS does not provide instructions to the Gate Attendants.[130]  Given the evidence, there simply is no reason for the DOL to take aim at GGS.  Accordingly, GGS's Motion should be granted.

4.     **The Gate Attendants Independent Contractor Status Does Not Frustrate The Underlying Purpose Of The FLSA[131]**

As this Court has acknowledged in the *Talasek* case, this is not a situation where the conditions are detrimental to the health and well-being of the workers or where there is a need to eliminate low wages and long hours.  *See Mack*, 2012 WL 1067398 at *8. The Court pointed out that while some of the gate attendants may be required to stay on location 24 hours per day, their actual work duties of signing vehicles in and out only took 2 to 4 hours per day leaving them free to engage in personal pursuits during the remaining 20-22 hours.  *Id.*  The facts are exactly the same here.  Contrary to the Secretary's supposition, the Gate Attendants were engaged in personal pursuits in their own homes the majority of the time and actually only manned the gate for a couple of

---

[128] *See* Tab D & Declarations:  Ex. 44, J. McAdoo Supp. Dec. ¶ 7; Ex. 46, S.. McAdoo Supp. Dec. ¶ 7; Ex. 79, Staley Supp. Dec. ¶ 7; Ex. 81, Stone Dec. ¶ 22; Ex. 88, Wheeler Dec. ¶22.
[129] *See* fns. 34-36.
[130] *See* fns. 34-36.
[131] The Secretary unconvincingly relies upon her decision in *Solis v. International Detective & Protective Service, Ltd.* 819 F. Supp. 2d 740 N.D. Ill. 2011).  That case, however, is entirely inapposite to the facts of this case because it involved real security guards who carried weapons, were charged with securing sites, had job titles, received promotions and evaluations and were supervised on a daily basis. Unlike the instant case, they did not live in their own trailers with their families in remote locations and log in vehicles with no supervision.

hours per day.[132]   The Gate Attendants were free to leave at any time as long as they hired a relief worker to fill in.  (Tab A, Steindorf Dec. ¶ 8.)  Moreover, many of the gates closed in the evening and/or traffic decreased at night.[133]  The record evidence shows that numerous Gate Attendants assigned family members to assist or hired others, some of whom were licensed by the Texas Department of Public Safety and some whom were not.[134]   A finding of independent contractor status certainly would not frustrate the purposes of the FLSA; it would support it.

Finally, the Secretary's assertion that this Court should find in her favor because she classified the gate attendants at TimeKeepers and C&K Rentals as employees is highly concerning.  If Rapstine conducted the investigation of these companies in the same manner as his investigation of GGS, it is highly likely that the Secretary's findings regarding those companies were, like this case, factually and legally flawed.  Perhaps, these small business could not afford to take on the government and were forced to settle.  Under the circumstances, the Secretary's argument is unavailing.

## B.  GGS IS ENTITLED TO SUMMARY JUDGMENT IN BOTH ACTIONS BECAUSE THE SECRETARY IS IN DEFAULT

The Secretary is in default, and judgment in GGS's favor is warranted.  GGS filed its initial Complaint on November 19, 2010, seeking a declaration that the Gate Attendants are independent contractors and that GGS is not subject to the provisions of

---

[132] *See* fn. 40.

[133] *See* Tab D which includes the following Declarations:  Ex. 1, Abbie Dec. ¶ 12; Ex. 5, Bell Dec. ¶ 10; Ex. 8, Bowling Dec. ¶ 10; Ex. 9, Braddock Dec. ¶ 6; Ex. 10, Carter Dec. ¶ 15; Ex. 11, Clark Dec. ¶ 6; Ex. 17, Coulston Dec. ¶ 10; Ex. 24, Fontenot Dec. ¶ 7; Ex. 38, Lee Dec. ¶ 15; Ex. 48, McClelland Dec. ¶ 16; Ex. 57, Neff Dec. ¶ 17; Ex. 60, Park ¶ 10; Ex. 75, Rogers Dec. ¶ 16; Ex. 80, Stoltz Dec. ¶ 16; Ex. 81, Stone Dec. ¶ 10; Ex. 88, Wheeler Dec. ¶ 11; Ex. 94, Yoder Dec. ¶ 9.

[134] *See* fns. 25-28.

the FLSA.  (Case No. 6:10-cv-91, Dkt. #1.)[135]  On March 10, 2011, the Secretary filed a

Motion to Dismiss GGS's Complaint based upon lack of subject matter jurisdiction.  (*Id.*

at Dkt. #13.)  On March 11, 2011, GGS filed its Amended Complaint.  (*Id.* at Dkt. #14.)

On March 31, 2011, the Secretary filed a Motion to Dismiss GGS's Amended Complaint.

(*Id.* at Dkt. #21.)[136]   On July 12, 2011, the Court entered an Order denying the

Secretary's Motion to Dismiss GGS's Amended Complaint.  (*Id.* at Dkt. #45.)  However,

the Secretary never filed an answer to the Amended Complaint, despite the requirement

set forth in Fed. R. Civ. P. 12(a)(4), which provides:

> Unless the court sets a different time, serving a motion under this rule
> alters these periods as follows: (A) if the court denies the motion or
> postpones its disposition until trial, the responsive pleading must be served
> within 14 days after notice of the court's action; or (B) if the court grants a
> motion for a more definite statement, the responsive pleading must be
> served within 14 days after the more definite statement is served.

Pursuant to Fed. R. Civ. P. 12(a)(4), the Secretary's answer to GGS's Amended

Complaint should have been filed within 14 days of the Order denying the Secretary's

Motion to Dismiss, or on or before July 26, 2011.  To date, the Secretary has not filed an

answer and is in default.

Fed. R. Civ. P. 55(d) provides that a default judgment may be entered against the

United States, its officers, or its agencies "if the claimant establishes a claim or right to

relief by evidence that satisfies the court."  The fact that this evidentiary standard must be

satisfied prior to obtaining a default judgment against the government does not in any

way prohibit an entry of default against the government and does not relieve the

---

[135] As stated *supra*, the Secretary filed her own Complaint against GGS in a separate action on
February 16, 2011, seeking certain amounts owed in connection with GGS's alleged violations of the
FLSA. (Secretary's Complaint, Dkt. #1, Case No. 6:11-cv-14).  The cases have now been consolidated for
the convenience of the parties.
[136] In light of the filing of the Amended Complaint, the Court denied the Secretary's original
Motion to Dismiss as moot.  (Dkt. #18, Case No. 6:10-cv-91).

government from its duty to defend cases or obey court orders and rules. *See Alameda v. Sec'y of Health, Ed. and Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980).

For example, in *Bostic v. Harris*, the District Court entered a default judgment against the Secretary of Health, Education and Welfare after the Secretary failed to file a timely answer to the plaintiff's complaint for black lung benefits under the Federal Coal Mine Health and Safety Act. *See* 484 F. Supp. 686, 692-93 (S.D. W.Va. 1979) The Secretary filed a motion for leave to file the answer out of time, arguing that a default should not be entered because "the delay was slight, the [Secretary] acted with reasonable promptness to cure the default, and that a meritorious defense exists." *See id*. at 688. The District Court disagreed and denied the Secretary's motion based upon the Secretary's negligence in failing to file an answer. *See id*. at 689. The District Court then entered detailed findings of fact in support of the plaintiff's claim and held that, based upon the Secretary's failure to file an answer and the fact that the "great weight of the evidence supports the plaintiff's claim for black lung benefits," the plaintiff was entitled to a default judgment against the Secretary and the requested benefits. *See id*. at 690-693. *See also Stringer v. Heckler*, 585 F. Supp. 709, 711-12 (W.D. Ky. 1983) (holding that entry of default judgment and/or summary judgment appropriate where Secretary failed to comply with court's order to show plaintiff in disability benefits case was capable of performing substantial gainful activity).

Like the plaintiffs in the *Bostic* and *Stringer* cases, GGS has submitted substantial evidence in connection with this Motion demonstrating that it should prevail on the merits of its claims against the Secretary. GGS has, therefore, met the burden set forth in Fed. R. Civ. P. 55(d). Moreover, like the government entities at issue in the *Bostic* and

*Stringer* cases, the Secretary has failed to comply with the rules of this Court and has failed to file an answer to GGS's Amended Complaint.  Accordingly, GGS submits that entry of a default judgment against the Secretary is appropriate in this case as to the claims set forth in GGS's Amended Complaint.

## C. GGS IS ENTITLED TO JUDGMENT ON ALL CLAIMS IN THE SECRETARY'S COMPLAINT BASED ON THE DOCTRINE OF *RES JUDICATA*

Assuming that a default judgment is entered, the Secretary's claims would be barred by the doctrine of *res judicata*. Generally, *res judicata* is appropriate if: (1) the parties to both actions are identical (or in privity); (2) the judgment in the first action is rendered by a court of competent jurisdiction; (3) the first action concluded with a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits.[137]  *See United States v. Shanbaum*, 10 F.3d 305, 310 (5th Cir. 1994).  Several courts have specifically addressed the application of *res judicata* principles in the context of consolidated cases such as this one and have held that, in such circumstances, *res judicata* is appropriate if the above criteria are satisfied.  *See*, *e.g.*, *Booth v. Quantum Chemical Corp.*, 942 F. Supp. 580, 587 n. 6 (S.D. Ga. 1996); *Robinson v. Worthington*, 544 F. Supp. 949, 952 (N.D. Ala. 1982).

The *Booth* case is factually similar to the instant case and is on point.  In the *Booth* case, an employee filed a state court wrongful termination suit against her employer.  *See* 942 F. Supp. at 582.  Several months later, the employee filed another claim against her employer in superior court, alleging a violation of Title VII of the Civil

---

[137]  In this case, there is no question that the parties are identical (element 1); that the default judgment (if entered) will be entered by this Court, a court of competent jurisdiction (element 2); and that the default judgment will constitute a final judgment on the merits as to GGS's claims against the Secretary set forth in the Amended Complaint (element 3).

76

Rights Act of 1964. *See id.* at 583. This case was then removed to federal court. *See id.* Meanwhile, the employer obtained summary judgment in the state court wrongful termination case. *See id.* However, before the court entered the final order in the wrongful termination case, the employee moved to consolidate the cases, the motion was granted, and the consolidated cases were assigned to the District Court. *See id.* The employer then moved for summary judgment in the District Court on the basis of *res judicata*, arguing that the summary judgment award in its favor in the state court wrongful termination case barred the employee's Title VII claims in the District Court action under the theory that, if the employee's termination was proper, there could be no Title VII claim. *See id.* at 585. The District Court granted the employer's summary judgment motion and found that the employee's Title VII claims were barred by the *res judicata* doctrine, specifically recognizing that, "When a court enters a judgment for a defendant, the 'effect of [the] judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial.'" *See* 942 F. Supp. at 584 (citation omitted.) The preclusive effect "extends not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same 'operative nucleus of fact.'" *See id.* (citation omitted).

In this consolidated action, the Secretary's claims against GGS unquestionably arise out of the same "operative nucleus of fact" as GGS's claims against the Secretary. Both parties' claims center around the issue of whether the Gate Attendants are independent contractors and, whether GGS has complied with the FLSA. More specifically, GGS, in the first-filed action, seeks a declaration that the Gate Attendants are independent contractors and that GGS is, therefore, not subject to the FLSA. The

Secretary, in the second-filed action, seeks back wages due to GGS's alleged violation of the FLSA.  A default judgment in GGS's favor on the claims in its Amended Complaint therefore equates to a determination that the Gate Attendants are contractors.  Such a result moots the Secretary's claims in the second-filed action based on *res judicata*.

## VI.   CONCLUSION & PRAYER

It is a shame that GGS has had to go to such trouble and expense to prove that its Gate Attendants are independent contractors.  Despite the mountain of evidence, the Secretary unnecessarily and unfairly forced GGS and Mr. Steindorf, a small business owner, to expend significant time and resources to set the record straight.  The Secretary's actions were not substantially justified, particularly given the government's own classification of its ACE gate attendants as contractors.  GGS and Mr. Steindorf will most certainly seek their costs and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) at the appropriate time.

Respectfully submitted this 29th day of October, 2012.

**CHAMBERLAIN HRDLICKA**
**WHITE WILLIAMS & AUGHTRY**

By:  */s/ Annette A. Idalski*_____
        Annette A. Idalski
        Texas Bar No. 00793235
        Federal I.D. No. 1130754
        191 Peachtree Street, 34th Floor
        Atlanta, GA  30303-1747
        Telephone:  (404) 588-3570

        Daniel D. Pipitone
        Texas Bar No. 16024600
        Federal I.D. 0294
        1200 Smith Street, 14th Floor
        Houston, TX 77002-4310
        Telephone: (713) 654-9670
        *Counsel for Plaintiffs/Counter-*
        *Defendants*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| GATE GUARD SERVICES, L.P. | ) | |
| and BERT STEINDORF, | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | Civil Action File |
| | ) | No. 6:10-cv-91 |
| v. | ) | |
| | ) | JURY |
| HILDA L. SOLIS, SECRETARY OF LABOR, | ) | |
| UNITED STATES DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

This is to certify that on this date I have electronically filed the foregoing PLAINTIFF GATE GUARD SERVICES, L.P AND BERT STEINDORF'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT with the Clerk of Court via the CM/ECF system which will automatically send a copy of the same to:

UNITED STATES DEPARTMENT OF LABOR
Colleen B. Nabhan
Office of the Solicitor
525 Griffin Street, Suite 501
Dallas, Texas 75202
nabhan.colleen@dol.gov

OFFICE OF UNITED STATES ATTORNEY
John A. Smith
800 N Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
john.smith@usdoj.gov

This 29th day of October, 2012.

**CHAMBERLAIN HRDLICKA
WHITE WILLIAMS & AUGHTRY**

By:___*/s/ Annette A. Idalski*_____
         Annette A. Idalski
         Texas Bar No. 00793235