# TAB A

# DECLARATION OF BERT STEINDORF, JR.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| GATE GUARD SERVICES, L.P. and BERT STEINDORF, | ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | Civil Action File No. 6:10-cv-91 |
| v. | ) ) | JURY |
| HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | ) ) ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

## DECLARATION OF BERT STEINDORF, JR.

1. My name is Bert Steindorf. I am personally familiar with matters set forth herein and if called to testify, I could and would do so competently.

2. I am the founder and sole limited partner of Gate Guard Services, L.P. ("GGS"), a Texas limited partnership. GGS was founded in 2003. The sole general partner is an entity called GGS Management, Inc., of which I am the sole shareholder. There are no other partners in the company.

3. GGS is involved in the business of locating and contracting with independent gate attendants ("Contractors") to perform the service of logging vehicles for oil and gas operators in Texas. GGS markets the business through its sales force and secures contracts for the gate attendant services with the oil companies.

4. I enter into Independent Contractor Agreements on behalf of GGS with the Contractors. Attached hereto as Exhibit 1 is a list of individuals with whom I enter into Independent Contractor Agreements. Attached hereto, as Exhibits 2 through 458, are true and correct copies of the confidential Independent Contractor Agreements that I approved and signed with the individuals identified in Exhibit 1.

5. The Contractors are paid different daily rates ranging from $125, $175, or more. I sometimes negotiate the daily rate to be paid during an assignment when requested by the Contractor. Some assignments are more difficult than others given the location and drilling activities, and as such, the rates paid to the Contractors vary.

6. I contract with the Contractors to record the name of the driver, company, license tag number, and the date and time that each vehicle enters or departs the oil field. This information is recorded on a Traffic Log, which is sometimes provided by GGS and sometimes provided by the oil company. The Traffic Log can then be used to identify persons present at an oil field in the event of an emergency.

7. The Contractors have no duties related to security. Some of the Contractors maintain licenses through the Texas Department of Public Safety. While the license is not required for the actual work performed by the Contractors, I use the licenses as a marketing tool because it shows our customers that the Contractors have passed a criminal background check and a basic competency test. The Contractors can and often do use the licenses to obtain other contracting work for GGS's competitors. The license is portable and travels with Contractor. GGS does not pay for the license. Some Contractors obtained their licenses before they ever worked with GGS.

8. The Contractors have the authority to assign other individuals to attend the gate during an assignment, and they are not required to obtain approval from me or anyone at GGS for their relief workers. I prefer licensed workers because this is what my customers prefer but it is not a requirement and some relief workers, who are family members, are not licensed. Depending upon the assignment, the Contractors are required to make sure that either they or their relief workers are onsite either 24 hours per day or 12 hours per day. As long as the Contractor secures coverage for the gate, they can leave the oil field site during an assignment at

their discretion. The Contractors are required to find and pay their relief workers and the Contractors decide the amount to pay their relief workers. If there were instances where GGS was paying relief workers, I am not aware of it and I did not approve it. Some Gate Attendants advise GGS of the name of the relief worker and some do not.

9. GGS does not train or instruct the Contractors on how to do the work. The Contractors are simply told the location and estimated length of the assignment and that vehicles are to be logged in and out on a Traffic Log. They are expected to, and do, work with no day-to-day supervision. GGS has no interest in supervising the Contractors because the Contractors are responsible only for the results of their work, which is completing Traffic Logs. In any event, given the isolated location of the gates, it would be nearly impossible to supervise the day-to-day activities of the Contractors. No one from GGS is onsite during an assignment, and GGS service technicians only visit the site every other week to service the septic tank and generator that GGS provides to the oil companies. The Gate Attendants do not have titles and distinctions; GGS does not discipline the Gate Attendants and does not hold meetings with them.

10. GGS's customers (the oil company or landowner) sometimes request that the Contractors abide by certain rules that apply to everyone onsite. Sometimes the oil company or landowner communicates these rules verbally and sometimes they communicate the rules in writing. Depending upon the assignment, the oil company or landowner may have safety or quality control requirements, such as prohibiting alcohol and firearms onsite, prohibiting cigarette butts and trash from being thrown around the trailer, and requiring that flip flops, sandals and shorts not be worn and that a hard hat, safety boots and/or safety glasses should be worn for safety reasons or logs must be complete. These rules and requests come from the oil company or landowner – not from GGS. I am aware that Jade Petty passed along some of these safety and quality control rules at the request of our clients. With one exception, I did not

3

approve these communications in advance and Ms. Petty was reprimanded. GGS does not issue these types of communications on its own. With regard to the exception, I am referring to page 2 of Exhibit 9 to my deposition. It is my recollection that the client, XXXX, sent page 1 of Exhibit 9 to Jade Petty, who sent it to me, and then it was placed on GGS letterhead and signed by me (which is page 2 of Exhibit 9) and passed along, at XXXX's request, to the Gate Attendants <u>only</u> in North Texas (Jade's territory) who work for XXXX.

11. Contractors are required to own an R.V., fifth wheel, trailer, or other similar equipment which they use during an assignment. With very few exceptions, the Contractors live onsite during an assignment, oftentimes with their families and pets. When they are not logging vehicles, the Contractors are free to engage in personal activities or do as they please.

12. In addition to the R.V., fifth wheel, trailer or other similar equipment required to be supplied by the Contractors, the Contractors also are responsible for their own food, water, Internet, telephone, and other living expenses; insurance for themselves and for the R.V., Fifth Wheel, trailer or similar equipment, travel expenses, maintenance and repairs of their trailers or R.V.s; and tools. The travel expenses incurred by the Contractors include the significant gasoline usage required to transport the R.V., fifth wheel, trailer or other similar equipment to and from the remote gate locations at the beginning or end of each assignment. Some contractors travel from other states. Some Contractors provide cameras, cables, motion sensors, remote gate openers, shirts, bells and lights used at the gate.

13. GGS asks the Contractors to wear an orange vest for safety reasons. We have not actually penalized any Gate Attendant for failing to wear a vest. It has come to my attention during this lawsuit that Sidney Smith sent out a communication (attached as Exhibit 13 to my deposition transcript) to the Gate Attendants in 2008 advising the Gate Attendants that if DPS were to fine them for not wearing an orange vest, then GGS may terminate their contract. We

have not terminated any contracts for this reason. GGS also supplies a septic tank for some of the assignments, and the oil companies either provide or purchase fuel and lease a generator from GGS during an assignment, which the Contractor then uses free of charge. GGS reuses the equipment that it provides at the gate location assignments at multiple gate locations over multiple years so that the cost of such equipment is not related solely to the operation of one gate assignment. The value of this equipment naturally depreciates.

14. The Contractors work on assignments that range from one week (or less) to several weeks. Over half of the Contractors on our pay list during the time period relevant to this lawsuit worked on average 16 weeks. GGS does not prohibit the Contractors from working for other companies, including, gate guard companies during or in between assignments.

15. The Contractors are hired on a job-by-job or project-by-project basis; the assignments are temporary. Many of the Contractors accept assignments from GGS on a sporadic basis. They are not guaranteed any work beyond each assignment or job. After the Contractors complete an assignment, they are under no obligation to accept another assignment from GGS. Many Contractors reject assignments from GGS, and GGS continues to offer these Contractors assignments. I am not aware of any instance where GGS did not contract with an individual because they rejected an assignment. A Gate Attendant is offered a gate assignment on a take-it or leave-it basis without options for other gates. The reason for this is that when an oil company calls GGS to request a Gate Attendant, GGS calls the Gate Attendant and offers that particular gate because it is the only one available at that time and the need is usually imminent. GGS's business is not such that it has multiple gates for the Gate Attendant to choose from.

16. GGS issues a 1099 form to the Contractors.

I declare under the penalty of perjury that the foregoing is true and correct.

5

Executed this 29th day of May, 2012.

_____
Bert Steindorf