UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| GATE GUARD SERVICES L.P. *et al.*, | § | |
| | § | |
| **Plaintiff/Counter–Defendants,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V–10–91 |
| | § | |
| HILDA L. SOLIS, Secretary of Labor, | § | |
| United States Dept. of Labor, | § | |
| | § | |
| **Defendant/Counter–Plaintiff.** | § | |

MEMORANDUM OPINION & ORDER

Pending before the Court is a Motion for Partial Summary Judgment filed by Defendant/Counter–Plaintiff Hilda L. Solis, Secretary of Labor, United States Department of Labor (hereinafter "the DOL") (Dkt. No. 123). Also pending before the Court is Plaintiffs/Counter–Defendants Gate Guard Services, L.P. and owner Bert Steindorf's (collectively "GGS") Cross Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment (Dkt. No. 126), to which the DOL has responded (Dkt. No. 131) and GGS has replied (Dkt. No. 134).

**I. Factual and Procedural Background**

GGS is a Texas limited partnership that locates gate attendants for oilfield operators. GGS contracts with approximately 400 gate attendants that perform the job of logging in vehicles entering and departing oilfield operation sites. Gate attendants must ensure that their assigned gates are manned either 12 hours or 24 hours per day, and therefore most gate attendants live at the gate site during an assignment. GGS classifies the gate attendants as independent contractors and pays them between $100 and $175 per day.

1

In September 2010, DOL Wage and Hour Investigator David Rapstine ("Rapstine") began an investigation into the independent contractor classification of GGS's gate attendants and its service technicians' wages. In October 2010, Rapstine informed GGS that it was in violation of the Fair Labor Standards Act (FLSA) because the gate attendants were employees, not independent contractors. The DOL also mandated that GGS compensate the gate attendants at the federal minimum wage rate for 24 hours for each day they are assigned to an oilfield operation.

During a November 2010 meeting, the DOL insisted that GGS immediately come into compliance with the FLSA by re-classifying the gate attendants as employees and paying over $6 million in back wages to the gate attendants and service technicians. GGS then filed the above-captioned declaratory judgment action seeking a determination of whether it is in compliance with the FLSA ("Declaratory Judgment Action"). Specifically, GGS seeks declaratory relief arising from the DOL's allegedly flawed classification of the gate attendants as employees instead of independent contractors, its calculation totaling over $6 million in back wages, and its allegation that GGS has not complied with recordkeeping requirements.

On February 16, 2011—before GGS served the DOL with its complaint in the Declaratory Judgment Action—the DOL filed an enforcement action under the FLSA in the Southern District of Texas, Corpus Christi Division, which was assigned to Senior U.S. District Judge Janis Graham Jack ("FLSA Enforcement Action"). *Hilda L. Solis, Secretary of Labor, United States Department of Labor v. GGS Services, LP DBA GGS Services, Bert Steindorf and Sidney L. Smith*, Civil Action No. 2:11-41 (S.D. Tex. 2011). The FLSA Action named as co-defendants GGS, Steindorf, and manager Sidney Smith, citing them for alleged minimum wage, overtime, and record-keeping violations pertaining to at least 345 gate attendants, as well as for overtime and record-keeping violations regarding the service technicians. The FLSA

Enforcement Action seeks back wages, liquidated damages, and injunctive relief against all three defendants.

On March 22, 2011, Judge Jack granted GGS's Motion to Transfer based on the first-to-file rule and transferred the FLSA Enforcement Action to the Victoria Division. On March 31, 2011, the DOL moved to dismiss the Declaratory Judgment Action. Meanwhile, GGS filed a Motion to Consolidate the Declaratory Judgment Action and the FLSA Enforcement Action. On July 12, 2011, the Court issued a Memorandum Opinion & Order denying the DOL's Motion to Dismiss, granting GGS's Motion to Consolidate, and recharacterizing the DOL's claims as counterclaims against GGS. The DOL has since voluntarily dismissed all of the FLSA claims related to GGS's service technicians and all claims against Smith.

The DOL now moves for partial summary judgment, asking the Court to rule that the affected gate attendants are employees and not independent contractors under the FLSA, leaving the amount of back wages GGS owes the gate attendants, if any, to be proved at trial. GGS moves for summary judgment on its claim that the gate attendants are independent contractors and it is exempt from the requirements of the FLSA.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non–movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non–movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477

U.S. 317, 323–25 (1986). To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non–movant. *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995). "The court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations" or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Freeman v. U.S.*, 2005 WL 3132185, *2 (S.D. Tex. Nov. 22, 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## III. Evidentiary Objections

Before considering the substantive merits of the Parties' cross motions for summary judgment, the Court first notes that GGS has objected to portions of the DOL's summary

judgment evidence.[1] The Court has considered both the evidence proffered and GGS's objections, and to the extent the Court has regarded portions of the evidence as relevant, admissible, and necessary to the resolution of particular summary judgment issues, it hereby overrules the evidentiary objections. To the extent the Court has not relied on other evidence about which GGS complains, the remaining objections are denied as moot.

## IV. Analysis

The FLSA requires covered employers to pay non-exempt employees for hours worked in excess of defined maximum hours. 29 U.S.C. § 207(a)(1) (requiring that covered employers pay employees at least one-and-a-half times the regular rate for hours worked in excess of forty hours per week). The FLSA authorizes the DOL to bring an enforcement action against an employer for violation of its hour and wage provisions. *See Id.* § 216.

The single issue the Court must decide with respect to both Parties' motions for summary judgment is whether the gate attendants are employees of GGS within the meaning of the FLSA or independent contractors and thus not subject to the FLSA's compensation requirements.

The determination of whether the gate attendants are employees under the FLSA is a legal, not a factual, finding. *See Lindsley v. BellSouth Telecomms. Inc.*, 2010 WL 4609109, at *1 (5th Cir. Nov. 15, 2010) (citing *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1045 (5th Cir. 1987)). The Court determines whether a worker qualifies as an employee under the FLSA by focusing on "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). "The determination of whether an individual is an employee

---

1. Specifically, GGS complains that three of the DOL's twenty-eight declarants are not gate attendants, but are merely spouses of gate attendants who lived at the oilfield site at the choice of the gate attendants; as such, these three declarations (Dkt. No. 123, Exs. 5, 18, 31) should be disregarded in their entirety. GGS further argues that DOL Exhibits 37A–N, a series of 19 photographs and 2 purported printouts from an internet site, have not been authenticated and are therefore inadmissible.

or independent contractor is highly dependent on the particular situation presented." *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 848 (5th Cir. 2010). No single factor will be determinative of the Court's inquiry. *Hopkins*, 545 F.3d at 343.

The five non-exhaustive factors most often considered by the courts are: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." *Hopkins*, 545 F.3d at 343.

The Court will consider each factor below.

**A. Degree of Control**

In analyzing the "control" factor, courts focus on whether the alleged employer controlled the details of the job, including, for example, the worker's schedule, timing of breaks, training, compensation, supervision, and manner and method of the work performed. *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 332, 334 (5th Cir. 1993).

GGS requires that most of the gate attendants with which it contracts become licensed as Texas non-commissioned security officers. (*See* Dkt. No. 123, Ex. 38.) To obtain a license, a gate attendant must undergo a background check, take a simple test, and pay a fee. (Smith Dep., Dkt. No. 123, Ex. 2 at 44:17–45:19.) GGS pays for the gate attendants to get their fingerprints taken and to get the license. (*See* Decls. cited at Dkt. No. 123, p.7 n.16.) GGS instructs the gate attendants to keep a printout of their license with them at all times and to display a sign in the windows of their trailer identifying GGS as a Texas DPS licensed provider of security services. (Dkt. No. 126, Tab E, Exs. 7 & 9; Decls. cited at Dkt. No. 123, pg. 8, n.20.)  GGS explains that it uses the licenses as a marketing tool to attract new clients because the maintenance of a license

establishes that the gate attendants have had a criminal background check and have passed a basic competency test. (Steindorf Dep. at 163:22–164: 3; 165:16–20; 185:18–186:6; 202:18–20.)

When an oil company calls GGS to request a gate attendant, GGS calls a gate attendant and offers that particular gate on a take-it or leave-it basis, without the option for another gate, because that gate is the only one available at that time. (Steindorf Decl. ¶ 15.) Gate attendants are free to reject assignments without penalty, and they do so for various reasons, including returning to their out-of-state homes for the summer, travel or vacation, a preference to work with certain oil companies, or simply a desire to "talk to people and engage in normal life" for a while. (Dkt. No. 126, Tab D, Exs. 1, 16, 17, 31, 48, 78, 86; Dkt. No. 123, Ex. 3 at ¶ 34.)[2] *See Harrison v. Greyvan Lines, Inc.*, 331 U.S. 704, 707 (1947) (finding that the plaintiffs were independent contractors when they could refuse to take certain job assignments without penalty); *Talbert v. American Risk Ins. Co., Inc.*, 405 Fed. App'x 848, 856 (5th Cir. 2010) (finding that the plaintiff was an independent contractor when she controlled how much she worked for the alleged employer); *Mack v. Talasek*, 2012 WL 1067398, *2 (S.D. Tex. Mar. 28, 2012) (finding that control factor weighed in favor of independent contractor status where gate attendants "were under no obligation to return to work for another shift or to accept any request by [alleged employer] that they work at another location").

When a gate attendant reports to the oilfield site to begin an assignment, they receive no training or instruction on how to do their work. (Steindorf Decl. ¶ 9; Decls. at Dkt. No. 126, Tab D (hereinafter "Tab D Decls.").) *See U.S. v. Silk*, 331 U.S. 704, 707 (1947) (superseded by

---

2. The DOL offered the declarations of a number of gate attendants who claim that that if they decline an assignment, GGS would "not likely" hire them again or would "likely" ignore their requests for future work, and therefore it was "their understanding" that they should not decline assignments. (*See* Dkt. No. 123 at 5 n.8.) These individuals offer no basis for their speculation, and not one of them testified that they had ever declined an assignment or that they had personal knowledge of any other gate attendant with whom GGS had ceased contracting after the attendant declined an assignment. However, a dozen gate attendants testified that they had declined assignments and still received subsequent assignments from GGS. (Tab D. Decls. 1, 10, 18, 31, 48, 55, 65, 78, 80, 83, 86, 87.)

statute on other grounds) (finding that plaintiff coal transporters were independent contractors when they were not instructed how to do their jobs); *Thibault*, 612 F.3d at 847 (finding that plaintiff cable splicers were independent contractors when the alleged employer did not train them to do their jobs and they simply learned by "on the job" training); *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 Fed. App'x 57, 61 (5th Cir. 2009) (fact that plaintiff cable splicers controlled the details of how they performed their work weighed in favor of independent-contractor status).

The gate attendants are expected to, and do, work with no day-to-day supervision. (Tab D Decls.) They are not provided with performance evaluations and are not disciplined. (Rapstine Dep., Dkt. No. 126, Tab J, at 210:19–211:1.) The only contact a gate attendant has with GGS is when a service technician brings water and fuel approximately every other week. (*Id.* at 137:13–17; Steindorf Decl. ¶ 9; Tab D Decls.) *See Thibault*, 612 F.3d at 847 (finding that plaintiffs were independent contractors when their supervisors only came by occasionally and never specified how they should do their jobs); *Talbert*, 405 Fed. App'x at 856 (finding that plaintiff was an independent contractor when she was expected to handle the files assigned to her with little or no day-to-day supervision); *Cromwell*, 348 Fed. App'x at 61 (fact that plaintiffs were not closely supervised weighed in favor of independent-contractor status).

Each gate attendant must ensure that their assigned gate is covered either 12 hours or 24 hours per day, depending upon the oil company's hours. (Steindorf Decl. ¶ 8.) Although the gate attendants are generally onsite 24 hours a day, their actual work duties of signing people in and out only take a few hours per day.[3] (Decls. cited at Dkt. No. 126, pp.14–15, n.22–24.) During the remainder of the day, the gate attendants are free to engage in personal activities such as reading,

---

3.  It takes approximately 30 seconds to 5 minutes to open the gate and log in the occupants and vehicle. On a slow or average day, 0 to 75 vehicles enter and exit during a 24-hour period, and on a busy day, approximately 75 to 200 vehicles enter and exit the gate.

using the Internet, talking on the telephone, watching television, knitting, playing dominoes or computer games, completing household chores, riding a bike, shopping, running a second business, or other hobbies. (Ramirez Dep., Dkt. No. 126, Tab K, at 150:4–9; s*ee also* Decls. cited at Dkt. No. 126, p.14, n.19.) A large number of gate attendants choose to have their spouses live with them at the oilfield sites. (Tab D Decls.) Some gate attendants also have pets living with them (*Id.*, Exs. 21, 38, 55, 57), and others have family and friends visit during an assignment (*Id.*, Exs. 10, 28, 38, 48, 75, 80).

Gate attendants are authorized to hire relief workers to cover the gate, and they can leave the oilfield site at their discretion as long as they secure coverage for the gate. (*See* Part IV.C, *infra*.) Some gate attendants hire relief workers, while others use family members such as their spouse, adult children, or other relatives to cover the gate. (*Id.*) *See Ruiz v. Affinity Logistics Corp.*, 2012 WL 3672561, *5 (S.D. Cal. Aug. 27, 2012) (finding "that the Plaintiffs' ability to hire others to operate the trucks and perform the services they contracted with Affinity to perform[ ] is highly indicative of an independent contractor relationship. An employee is not able to hire a substitute to do their work . . . ."); *Taylor v. Waddell & Reed, Inc.*, 2012 WL 3584942, *5 n.9 (S.D. Cal. Aug. 20, 2012) ("ability to hire assistants . . . points toward independent contractor status").

The Parties have presented conflicting evidence regarding whether GGS requires that gate attendants obtain GGS's approval for their relief workers and whether relief workers must be licensed by DPS. (*C.f.* Steindorf Decl. ¶ 8; Petty Memorandum to Gate Attendants, Dkt. No. 123, Ex. 11 to Steindorf Dep.;[4] Decls. cited at Dkt. No. 123, p.10, n.25.) Regardless, the record shows that dozens of gate attendants admit that they do not inform GGS of the identities of their

_____

4. Sales representative Jade Petty, who worked in North Texas, was reprimanded for sending a memorandum regarding relief workers that was not authorized or condoned by GGS and that GGS immediately revoked upon learning of its existence. (Petty Dep., Dkt. No. 126, Tab I at 160:2-22; Steindorf Dep. at 242:12-244:4.)

9

relief workers (Tab D Decls. 1, 10, 11, 12, 13, 17, 24, 31, 32, 34, 36, 38, 47, 52, 57, 59, 60, 67, 73, 74, 78, 80, 87, 93), and some gate attendants do not ask if their relief workers are licensed (*Id.*, Decls. 1, 74).

The DOL argues that GGS substantially controls the gate attendants because GGS; (1) prohibits throwing cigarette butts and trash around the trailer and gate, keeping firearms and using alcohol at the gate, and wearing clothing such as flip flops, shorts, and sandals; (2) requires safety gear such as orange vests, safety glasses, and steel toed boots; and (3) in the past, required some gate attendants to wear a uniform. (*See* Decls. cited at Dkt. No. 123, p.9, nn.22–23.) GGS explains that these requirements are not meant to control the gate attendants, but are either required by the Occupational Safety & Health Administration or Texas Private Security Bureau rules and regulations, or are quality control and/or safety provisions that are mandated by the oil and gas companies or landowner—not GGS. (Steindorf Dep. Ex 12; Tab D Decls. 11, 38, 48, 55, 57, 58, 60, 75, 78, 80, 82, 83.) *See Carrell*, 998 F.2d at 332 (control factor weighed in favor of independent contractor status where customers, not purported employer, dictated how welders did their jobs); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 691–92 (D. Md. 2010) (holding that contractor's quality control and safety measures over its subcontractors did not establish an employment relationship); *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 501 (D.C. Cir. 2009) (recognizing that "a uniform requirement often at least in part is intended to ensure customer security rather than control the driver"); *Ruiz*, 2012 WL 3672561 at *5 (purported employer did not exercise control over delivery drivers where requirements were mandated by the customer and federal regulations); *Taylor*, 2012 WL 3584942 at *5 n.9 ("[C]ompliance with legal requirements is not indicative of control for purposes of establishing an employer-employee relationship.")

The DOL further urges the Court to follow a recent decision by the Northern District of Illinois granting summary judgment for the DOL and concluding that the armed security guards in question were employees under the FLSA. *See Solis v. Intern. Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740 (N.D. Ill. 2011). However, the *IDPS* court's determination of employee status was based on several significant facts related to control that are absent from this case. Specifically, the defendant employer in *IDPS*: provided specific guidelines regarding how to do the work; "regularly visited the worksites to verify that the Guards were complying with [the employer's] rules;" "held meetings with the Guards to review its procedures;" "offered title and distinctions to Guards to create incentives for them to remain with the company for the long-term;" disciplined workers by reducing their pay; and prohibited the workers from soliciting "outside workers to carry out their security assignments." *Id.* at 744–46. None of these facts are present here.

The Court finds that the control factor weighs in favor of finding that the gate attendants are independent contractors.

### B. Relative Investments

The next factor compares the investments of the worker to the alleged employer.

In order to contract with GGS, gate attendants are required to own an R.V., fifth wheel, or trailer for use at the oilfield site. (Steindorf Decl. ¶ 11; Ramirez Dep. at 243:9–12.) With one exception out of roughly 400 individuals, all gate attendants have their own motor home or R.V. onsite (Steindorf Decl. ¶ 11), which amounts to an investment of anywhere between $800 and $72,000 by an individual gate attendant (Rapstine Dep. at 276:7–20).[5] Gate attendants are

---

5. The DOL argues that the RVs are not investments by the gate attendants because "some guards already owned the mobile homes before they ever worked for GGS," and "others used their mobile homes for personal living quarters from time to time, whether working for GGS or not." (Dkt. No. 123 at 23.) The record shows that, out of 28 declarations offered by the DOL and more than 90 declarations offered by GGS, one gate attendant stated that he and his wife already owned an RV that they used for other things before working for GGS (Hunt Aff ¶ 3),

required to supply and purchase their own insurance, food, water, and maintenance for their trailers. (Decls. cited at Dkt. No. 126, p. 23, n.49.) Some gate attendants also provide their own uniforms, motion sensors, cameras, bells, and lights for the gate. (*Id.* n.50.) Income tax returns for 23 gate attendants show that, in addition to the items listed above, gate attendants deducted business–related expenses for cell phone service, transportation, car and truck expenses, depreciation, repairs and maintenance, supplies, modem fees, utilities, propane, telephone expenses, safety equipment expenses, certification and registration fees, contract labor, and legal and professional services. (Dkt. No. 126, Tab O.)

GGS generally supplies air bells, a water tank, portable septic system, hard hats, and halogen lights at each gate, although some gate attendants provide their own. (*See* Decls. cited at Dkt. No. 123, pp.11–12, n.28.) The oil companies that contract with GGS either provide or purchase from GGS a diesel generator and fuel, which the gate attendants use during the assignment. (Steindorf Dep. at 279:24–281:5; 282:1–4; 285:4–10; Henderson Dep., Dkt. No. 126, Tab H, at 45:9–18.) Based on Rapstine's internet investigation and interviews with a handful of service technicians, the DOL estimates that the cost of this equipment is between $19,000 and $20,000 per gate. (Rapstine Dep. at 273:12–275:25, Ex. 20.) GGS also invests in service technicians to run the operation, 13 pickup trucks used to haul equipment to the gates, and two truck maintenance facilities. (Steindorf Dep. at 306:18–309:6.)

GGS disputes the DOL's $20,000 figure for equipment per gate, based on the facts that Rapstine did not take into account the costs recouped by GGS from the oilfield operators, that some gate attendants supply their own generators, and that GGS reuses the equipment at issue at

---

one stated that he and his wife had lived in their RV for years before contracting with GGS (Trooien Aff. ¶ 4), and one gate attendant stated that he and his wife already owned an RV before working for GGS, but he does not indicate whether it was for personal or work purposes (Thams Aff. ¶ 14). The testimony of three individuals cannot be imputed to GGS's roughly 400 remaining gate attendants, especially given that the DOL's own evidence shows that one gate attendant bought a used RV after GGS told him that it was required (Coronell Aff. ¶ 5) and another gate attendant stated that he initially borrowed a camper from relatives (Pippen Aff. ¶ 7).

various oilfield sites staffed by different gate attendants over multiple years. (Steindorf Decl. ¶13.) Moreover, as the Fifth Circuit recognized in *Thibult*, the Court should not focus on the "overall investment" by GGS, but should instead "compare[] the amount the alleged employer and employee each contribute to the specific job the employee undertakes." *Thibault*, 612 F.3d at 847 (citing *Carrell*, 998 F.2d at 333).

Having compared the investments made by the gate attendants and GGS with respect to a given gate assignment, the Court finds that the relative investments factor is neutral.

### C. Opportunity for Profit or Loss

The next factor considers the degree to which the worker's opportunity for profit or loss is determined by the alleged employer.

Gate attendants are paid varying daily rates of $100, $125, $175 or more. (Steindorf Dep. at 151:18–152:4; Brown Dep., Dkt. No. 123, Ex. 29 at 55:12–14.) Some gate attendants negotiate their daily rate, and some do not. (*C.f.* Steindorf Dep. 122:10–12; Tab D Decl. 70, Ex. A at 3; Steindorf Decl. ¶ 5, Exs. 2–458; Dkt. No. 123, Ex. 29.) Some attempt to negotiate their daily rate but are unsuccessful. (Dkt. No. 123, Exs. 3, 17.)

As recognized in Part IV.A, *supra*, the gate attendants' actual work duties of signing people in and out only takes a few hours per day. Some gate attendants take advantage of this free time and increase their overall profits by performing other jobs while at the well site, such as running a concession stand onsite, performing retail sales online through eBay and Etsy, and providing services such as massage therapy and cosmetic teeth whitening. (Petty Dep., Dkt. No. 126, Tab I, at 110:6–17; Tab D. Decls. 18 & Ex. A thereto, 87 ¶ 22; Dkt. No. 126, Tab O, Ex. 5.)

Gate attendants may also increase their overall profits by taking jobs with other general contractors, landowners, or oil companies during the extended periods of time they have off between jobs they work for GGS. The declarations offered by the DOL show that gate attendants

took assignments on a job-by-job basis with plenty of breaks in service, ranging from one to nine months. (Dkt. No. 123, Exs. 5–20, 25–35.) Here, like the gate attendants in *Mack* and unlike the plaintiffs in *Cromwell*, the gate attendants do not work a required schedule that precludes extra work. *See Cromwell*, 348 Fed. App'x at 61 (factor related to opportunity for profit or loss weighed in favor of employment status where employees' required schedule of 13 consecutive 12–hour days with one day off "had the effect of severely limiting any opportunity for profit or loss" by "preclud[ing] significant extra work."); *Mack*, 2012 WL 1067398 at *4 (gate attendants' work schedule did not preclude extra work where they averaged between 10 and 14 days between jobs, and one attendant went nearly two months between jobs).

Gate attendants can also increase their profits—or potentially suffer a loss—based upon their use of relief workers. Gate attendants generally pay their relief workers directly and also decide the amount to pay them. (Steindorf Decl. ¶ 8; Decls. cited at Dkt. No. 126, p.17, n.28.) For example, RV Transports MA Clark hires and pays the gate attendants it sends to GGS, which "results in that sometimes [the] company has profits and sometimes it has losses." (Tab D Decl. 11.) Gate attendant Lawrie Yaeger hires relief workers to cover the gate on a rotating basis and deducts a fee for their use of his camper during their shift. (*Id.*, Decl. 91.)  Gate attendant Shirlene Abbie increases her profits by hiring relief workers every other week. (*Id.* Decl. 1 & Ex. A thereto.) (*See also Id.*, Decl. 18 & Exs. B and C thereto.)

As stated in Part IV.B *supra*, the gate attendants' tax returns show that they deducted business-related expenses for insurance, food, water, cell phone service, transportation, car and truck expenses, depreciation, repairs and maintenance, supplies, modem fees, utilities, propane, telephone expenses, safety equipment expenses, certification and registration fees, contract labor, and legal and professional services. (Dkt. No. 126, Tab O.)  Twenty-three of the gate attendants' tax returns show that they did earn profits and suffer losses. (*Id.*) Thus, like the plaintiffs in

*Thibault*, *Carrell*, and *Mack*, the gate attendants may also increase their profits by controlling their costs. *See Thibault*, 612 F.3d at 846 (finding plaintiff cable splicers were independent contractors and noting that plaintiffs "increased profits by controlling costs (repairs, supply costs, food, water, housing, etc.)"); *Carrell*, 998 F.2d at 332 (welders were independent contractors where, although company "exerted some control over the Welders' opportunity for profits by fixing the hourly rate and the hours of work . . . , the tax returns of [one welder] indicate[d] that the Welders' profits also depend[ed] on their ability to control their own costs."); *Mack*, 2012 WL 1067398 at *3 (finding that plaintiff gate attendants could increase profits by controlling costs related to office expenses, food, transportation, cell phone service, supplies, taxes, licenses, entertainment, advertising, contract labor, and insurance).

The DOL argues that "*none* of the gate attendants believed that they had an opportunity to make a profit" and "*none* believed that they could suffer a loss." (Dkt. No. 123 at 12 (emphasis added).) The DOL supports this allegation based on the declarations of 23 gate attendants who stated that this was their belief. (Decls. cited at Dkt. No. 123, p.13, n.31.) The DOL also cites the deposition testimony of Bert Steindorf, who testified that the gate attendants could not make a profit by performing their job more efficiently or exercising managerial skill. (Steindorf Dep. at 309:15–25.) The Court agrees with GGS that these statements are speculative, conclusory, and/or directly contradicted by the evidence cited above, as well as by the statements of 13 gate attendants who stated that they could make a profit or suffer a loss. (Tab D Decls. 1, 10, 11, 18, 55, 57, 58, 66, 75, 80, 83, 87, 90.)

The Court finds that "opportunity for profit or loss" factor weighs in favor of finding that the gate attendants are independent contractors.

### D. Skill and Initiative

Both Parties agree that the gate attendants' job duties of writing down the license plate numbers of vehicles that come in and out of oilfield gates require no special training or unique skill set.

The Court finds that the skill and initiative factor weighs in favor of finding that the gate attendants are employees.

### E. Permanency of the Relationship

Where a relationship can be characterized as temporary, project-by-project, or on-again, off-again, it will weigh in favor of an independent contractor determination.

Here, GGS hires gate attendants on a project-by-project basis, with each project ranging from one week to several weeks. (Steindorf Decl. ¶¶ 14–15; Tab D Decls.; Ramirez Dep. at 226:3–15, Ex. 19.) Each gate attendant stays at their assigned gate until the drilling job is finished and the project ends. (*E.g.*, Park Decl., Dkt. No. 126, Ex. 60.) *See Thibault*, 612 F.3d at 846 (plaintiff cable splicers were independent contractors where their work lasted only until their particular project was finished); *Carrell*, 998 F.2d at 334 (plaintiff welders were independent contractors where their relationships with their alleged employer was on a project-by-project and job-by-job basis).

The DOL acknowledges that the gate attendants "work for GGS for varying duration," and "a few of the guards worked for GGS for relatively brief or intermittent periods." (Dkt. No. 123 at 25.) Over half of the gate attendants worked for GGS for 4 months or less. (*See* Dkt. No. 126, Tab C, Brown Decl. Exs. 1–6; Rapstine Dep. Ex. 19; Ramirez Dep. at 226:8–25 & Ex. 19 thereto.) *See Carrell*, 998 F.2d at 332 (projects lasting an average of three to sixteen weeks weighed in favor of independent contractor relationship); *Talbert*, 405 F. App'x at 856 (worker who performed services for the defendant for twelve weeks was an independent contractor);

16

*Mack*, 2012 WL 1067398 at *5 (relationship was not permanent where gate attendants performed services for the defendant for approximately nine to twenty months).

The DOL's evidence also shows that the gate attendants took significant breaks between projects, ranging from one to nine months. (Dkt. No. 123, Exs. 3–20, 25–35.) *See Mack*, 2012 W L 1067398 at *7 (relationship was not permanent where gate attendants had extended periods of time off between jobs); *see also Lindsley*, 401 Fed. App'x at 945–46 (fact that plaintiff worked 12- to 13-hour days for 13 consecutive days before receiving the fourteenth day off "pushed against," but did not preclude, a finding that plaintiff was an independent contractor); *Cromwell*, 348 Fed. App'x at 61 (permanency factor weighed in favor of employment status where splicers worked a schedule of 13 consecutive 12-hour days with 1 day off for approximately eleven months, and "did not have [a] temporary, project-by-project, on-again-off-again relationship with their purported employers").

The DOL appears to argue that the gate attendants' security licenses somehow limit them to working only for GGS because they are issued under GGS' name; however, more than one gate attendant testified that their security license allows them to contract with any company they choose. (Tab D. Decls. 19, 62.) As set forth in the Independent Contractor Agreements and attested to by a number of gate attendants, GGS does not prohibit the gate attendants from working for other companies. (Steindorf Decl.¶ 14 & Ex. 2–458 thereto; Tab D Decls. 1, 10, 14, 18, 31, 38, 48, 58, 75, 86, 87, 90.) Moreover, one gate attendant testified that he is currently a contractor for both GGS and another gate attendant company, and provides the same services for both companies. (Roberts Decl., *Id.*, Ex. 73 ¶ 4.) *See Silk*, 331 U.S. at 707 (plaintiffs were independent contractors when they could perform the same type of work for other companies); *Carrell*, 998 F.2d at 332 (plaintiffs were independent contractors where "the Welders moved from job to job, company to company, and state to state"); *Talbert*, 405 Fed. App'x at 856–57

(finding that the plaintiff was an independent contractor when she was not precluded from doing the same type of work for other companies while she worked for her alleged employer); *c.f. Hopkins*, 545 F.3d at 346 (plaintiffs were employees when they were not allowed to work for other companies or themselves).

The gate attendants are not guaranteed continued work beyond each project; rather, from the beginning of their relationships with GGS, the gate attendants know that their positions are temporary. (Steindorf Decl. ¶ 15; Decls. Tab D Decls. cited at Dkt. No. 126, p. 22, n.46.) *See Talbert*, 405 Fed. App'x at 856 (plaintiff insurance claims adjuster was independent contractor in part because "it [was] undisputed that, from the beginning of her relationship with [her purported employer], [plaintiff] was aware that her position was expressly temporary"). Upon completion of an assignment, a gate attendant is free to accept or reject other assignments without retribution. (Ramirez Dep. at 238:24–239:3; Tab J, Rapstine Dep. 262:1–3.) *See Thibault*, 612 F.3d at 847 (plaintiff cable splicers were independent contractors where they would finish a particular job and report back to their alleged employer for other possible job assignments). Finally, the Court notes that the permanency factor does not tip in favor of finding that the gate attendants were employees merely because GGS would offer them work at another oilfield site at the completion of each shift. *See Carrell*, 998 F.2d at 332 (permanency factor weighed in favor of independent contractor status where company hired welders on a project-by-project basis, despite fact that company made an effort to move welders to subsequent projects).

The Court finds that the permanency factor weighs in favor of finding that the gate attendants are independent contractors.

### G. Other Factors

#### 1. Independent Contractor Agreements

GGS enters into written Independent Contractor Agreements ("Agreements") with the gate attendants. (Steindorf Decl. ¶ 4 & Exs. 2–458 thereto.)  The Agreements executed before 2011 state that "[i]n the performance of the services, Contractor shall operate as an independent contractor" (¶ 1), and the Agreements executed during and after 2011 state that "Contractor shall operate as an independent contractor" (¶ 1(b)). (Exs. 2–458 to Steindorf Decl.) Both Agreements also contain a section captioned "Independent Contractor" and provide that "[t]his agreement shall not render the Contractor an employee. . . ." (*Id.* ¶ 7.)

The contractual designation of [a] worker as an independent contractor is not *necessarily* controlling." *Thibault*, 612 F.3d at 846 (emphasis added). However, such a designation is relevant where it mirrors economic reality. *Hopkins*, 545 F.3d at 346. Because the gate attendants' independent contractor status has been proven by other evidence (see Parts IV.A, IV.C, IV.E, *supra*), their contractual designation as independent contractors is relevant, and the Court may properly consider this evidence.

#### 2. Industry Custom

It has been the practice of a number of gate attendants to work for other companies as self-employed gate attendants under nearly identical circumstances. For example, Hilda Mack, the plaintiff in *Mack*, also contracted with GGS to perform gate attendant services. (*Mack*, 2012 W L 1067398 at *7; Steindorf Decl. ¶ 4 & Ex. 228 thereto.) A number of gate attendants have also worked as self-employed gate attendants for the Army Corps of Engineers. *See* Part IV.G.3, *infra*.

This Court recognized in *Mack* that case law is somewhat sparse and inconsistent with respect to whether industry custom or standard may be considered in determining whether

individuals are independent contractors or employees under the FLSA. *Mack*, 2012 WL 1067398 at *8 (citing *Mid-Continent Cas. Co. v. Davis*, 2011 WL 13727, *4 (N.D. Tex. Jan. 3, 2011) (recognizing that industry standard was to treat members of framing crew as independent contractors, and "[p]ursuant to the industry standard . . . [alleged employer did] not have control over whether the crew members work[ed] for other framing crews or even r[a]n their own framing business."); *Tr. of Mich. Reg. Council of Carpenters Emp. Benefits Fund v. Fox Bros. Co.*, 2005 WL 3579173, *6 (E.D. Mich. Decl. 27, 2005) (fact that method of payment was according to industry standard supported a finding that plaintiffs were independent contractors); *but see Caballero v. Archer*, 2007 WL 628755, *4 (W.D. Tex. Feb 1, 2007) (expert's interpretation of industry standards was "not relevant to the legal standards for determining an employer/employee relationship")). However, the Fifth Circuit has stated that "courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ." *Mr. W Fireworks*, 814 F.2d at 1054 (referring to seasonal nature of firework stands). Although not dispositive, the Court finds the fact that it is industry custom in this region for oilfield gate attendants to be treated as independent contractors and paid a per diem to live and work at well locations on a temporary, job-by-job basis is nonetheless relevant and supports a finding the gate attendants are independent contractors.

### 3. Army Corps of Engineers

Like GGS and other companies who use gate attendants in the oilfield, the Army Corps of Engineers (ACE) uses the services of gate attendants at federal parks and classifies these gate attendants as independent contractors.

Like GGS gate attendants, ACE gate attendants log the park rangers and any contractors coming into the park. (ACE Bid Package, Dkt. No. 126, Tab T; Decls. at Dkt. No. 126, Tab DD.)

ACE gate attendants also provide maps and information to park guests upon request, collect money from park guests, patrol the park, and notify a park ranger or law enforcement in the event of unusual behavior. (*Id.*) Like GGS gate attendants, ACE gate attendants must provide their own RV in which they live during an assignment and are instructed by the ACE to keep the area around their RV free from clutter. (*Id.*) Like GGS, ACE provides gate attendants with water, sewer, and electrical hookups for their RVs. (*Id.*) ACE also provides golf carts to make rounds of the park, and a gate house from which the gate attendants work. (*Id.*)

Like GGS gate attendants, ACE gate attendants are instructed to be well groomed and wear proper attire at all times. (*Id.*) ACE gate attendants are also required to wear a uniform at all times, are provided training on computers and the rules and regulations of the park, and are required to attend a "pre-work conference" to discuss the scope of work. (*Id.*) Unlike GGS gate attendants, ACE gate attendants are given specific instructions regarding the collection of fees from park guests and are required to use government-issued forms to record the fees collected. (*Id.*) Finally, ACE gate attendants are supervised by park rangers, who monitors the logs and money collected. (*Id.*)

The DOL argues that comparing GGS gate attendants with ACE park attendants "is like comparing apples with horses" because ACE park attendants must bid for the work awarded under contract and cannot terminate their contract with ACE without being subject to a "re-procurement cost." (Dkt. No. 131 at 10 (citing Bid Package at 10, 22).) While these differences may exist, the Court finds that the similarities between GGS and ACE gate attendants with respect to the control, relative investments, skill and initiative, and permanency factors that the Court must consider under *Hopkins* and *Silk* far outweigh these contractual differences.

### 4. Underlying Purpose of the FLSA

Finally, this Court has previously found that the underlying purpose of the FLSA would not be frustrated by a finding that gate attendants working under nearly identical circumstances are not employees entitled to the protections of the FLSA. *Mack*, 2012 WL 1067398 at *8. As the Fifth Circuit recognized in *Usery v. Pilgrim Equipment Co., Inc.*, the purpose of the FLSA "is to 'eliminate low wages and long hours' and 'free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers.'" 527 F.2d 1308, 1311 (5th Cir. 1976) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947)). As set forth in Part IV.A, *supra*, although gate attendants are required to stay on location 12–24 hours a day, their actual work duties take only a few hours per day. During the remainder of the day, the gate attendants are free to do as they please, and some have family, friends, and pets visit and/or live with them during an assignment. These are hardly the type of "detrimental" work conditions contemplated by the FLSA.

## V. Conclusion

The Court's determination of employee status is very fact dependant, and here, "as with most employee-status cases, there are facts pointing in both directions." *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 305 5th Cir. 1998) (acknowledging that "with most employee-status cases, there are facts pointing in both directions" and affirming district court's finding that workers were independent contractors where the degree of control, opportunity for profit or loss, and permanency factors favored such a finding, while the relevant investment and skill/initiative factors favored finding that the workers were employees).

For the reasons set forth above, the Court hereby **DECLARES** that the gate attendants are independent contractors, not employees; as such, GGS is exempt from the requirements of the FLSA.

The Court further **ORDERS** as follows:

1. Gate Guard Services, L.P. and Bert Steindorf's Cross Motion for Summary Judgment (Dkt. No. 126) is **GRANTED**;

2. The Department of Labor's Motion for Partial Summary Judgment (Dkt. No.123) is **DENIED**; and

3. The Department of Labor's counter–claims against GGS are **DISMISSED**.

Because the Court has determined that GGS is entitled to summary judgment on the merits, it need not consider GGS's argument that the DOL is in default.

It is so **ORDERED**.

**SIGNED** this 13th day of February, 2012.


_____

JOHN D. RAINEY

SENIOR U.S. DISTRICT JUDGE