**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| GATE GUARD SERVICES, L.P. | ) | |
| and BERT STEINDORF, | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | Civil Action File |
| | ) | No. 6:10-cv-91 |
| v. | ) | |
| | ) | |
| HILDA L. SOLIS, SECRETARY OF LABOR, | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| LABOR, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**GATE GUARD SERVICES, L.P. AND BERT STEINDORF'S MOTION TO
RECOVER ATTORNEYS' FEES AGAINST HILDA L. SOLIS, SECRETARY OF
LABOR, UNITED STATES DEPARTMENT OF LABOR**

I.    **INTRODUCTION**

Plaintiffs Gate Guard Services, L.P. ("GGS") and Bert Steindorf (collectively "Plaintiffs") seek to recover their attorneys' fees which they were forced to incur in the prosecution of their declaratory judgment action and in the defense of the counter-claims filed by the Secretary of Labor, United States Department of Labor ("the Secretary"). As the prevailing parties, Plaintiffs are entitled to attorneys' fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(b), because the Secretary acted in bad faith both during its administrative investigation and in the course of litigation for this matter. This Motion pertains to Plaintiffs' entitlement to its non-taxable attorneys' fees and costs.[1]

---

[1] Plaintiffs will file their Bill of Costs related to their taxable expenses in accordance with the Federal Rules of Civil Procedure and Local Rules of this Court.

## II.   STATEMENT OF MATERIAL FACTS

The Secretary's pursuit of Plaintiffs began two and a half years ago in July 2010. (Ex. A, Rapstine Dep. 67:1-18, Ex. 5.)[2]  Since then, Plaintiffs have unnecessarily incurred significant attorneys' fees in order to preserve their legal right to classify the gate attendants as independent contractors and to escape a multi-million dollar penalty that was unlawfully assessed against them by the Secretary. (Ex. B, Declaration of Annette Idalski ["Idalski Dec."] ¶ 17.)[3]

The Secretary's investigation was initiated as a result of complaints filed by two former service technicians – Danny McDaniel, whose chest bears a "KKK" tattoo as a "joke," and Jerry Studlar, who was formerly convicted of indecency with a four-year old.[4]  In July 2010, Lead Wage and Hour Investigator, David Rapstine, then a nine-year veteran, who admits he had little training in contractor misclassification cases, began his investigation of GGS. (Ex. A, Rapstine Dep. 115:15-117:3; 169:18-20; 321:4-6.).[5]  The complainants, Studlar and McDaniel, were "friends" of Rapstine whom they knew "[f]rom the bars and stuff like that."[6]

---

[2] The relevant portions of the transcript of the deposition of David Rapstine are attached hereto as Exhibit A.

[3] The Declaration of Annette A. Idalski is attached hereto as Exhibit B.

[4] Former GGS service technician Jerry Studlar, who pled guilty to molesting a four-year-old child, testified in another matter that he initiated this lawsuit by contacting a "friend of [his]" who he identified as David Rapstine.  *Lawrence, et al. v. Gate Guard Services, L.P., et al.,* Case No. 2:12-cv-00188, United States District Court for the Southern District of Texas, Honorable Nelva Gonzalez Ramos presiding, see pages 30-32, 78-79 and 81 of the Transcript of the Deposition of Jerry Studlar, taken on December 21, 2012, attached hereto as Exhibit C.  In the same case, former GGS service technician Danny McDaniel provided sworn testimony regarding his KKK tattoo.  (*Lawrence, et al. v. Gate Guard Services, L.P., et al.,* Case No. 2:12-cv-00188, United States District Court for the Southern District of Texas, Honorable Nelva Gonzalez Ramos presiding at pages 44-47 and 95 of the Transcript of the Deposition of Danny McDaniel, taken on December 21, 2012, attached hereto as Exhibit D.)

[5] Of the approximately 300 to 400 investigations he had conducted, Rapstine estimated that a mere <u>five</u> involved contractor misclassification investigations. (*Id.* 119:18-20; 173:12-14.)

[6] *See* fn. 4, *supra.*  Another former service technician, Marvin Simmons, confirmed that he was aware that Studlar and Rapstine were "good friends" and when asked in his deposition if he knew David

Rapstine's first contact with GGS came via a July 15, 2010 letter which advised GGS that the "opening conference" would take place on July 29, 2010. (Ex. A., Rapstine Dep. 67:1-18, Ex. 5.)  But, Rapstine did not wait for the initial conference and arrived unannounced at GGS's office in Corpus Christi on July 19, 2010 and spoke to Sidney Smith, manager. (*Id.* 74:10-17, 77:17-78:1; 174:7-10.)  Rapstine did not provide any explanation for his early arrival and surprise appearance, but testified that he had never appeared unannounced prior to an initial conference in any of his investigations in his "almost ten years" with the DOL.[7] (*Id.* 79:8-23.)

Rapstine's initial conference began at 9:00 a.m. on July 29, 2010. (*Id.* 176:8-11; Ex. 5.) Within a couple of hours of beginning the initial conference, Rapstine sent an email to Sabrina Loudin, another Wage and Hour investigator, stating in pertinent part: "**Wish you could have been there, it was a good example of being quiet and letting them do all of the talking and consequently, digging their own grave.**" (*Id.* 105:25-108:14,178:7-24, Ex. 6 (emphasis supplied).  During his deposition, Rapstine apologized for making this comment and agreed that it was inappropriate and unprofessional. (*Id.* 177:23-178:1, 335:13-23.) Without further investigation or evidence beyond his initial conference with GGS (other than interviewing McDaniel and Studlar), Rapstine began his very detailed and massive back wages calculations. (*Id.* 22:22-24:20.)

It was only **after** calculating the substantial amount of back wages which were allegedly due that Rapstine first began to actually interview Gate Attendants. (*Id.* 189:19-

Rapstine, he responded, "Yes.  From the bars and stuff like that."  *See* pages 61-63 of the Transcript of the Deposition of Marvin Simmons, taken on January 3, 2013, in the case styled *Lawrence, et al. v. Gate Guard Services, L.P., et al.,* Case No. 2:12-cv-00188, United States District Court for the Southern District of Texas, Honorable Nelva Gonzalez Ramos presiding, attached hereto as Exhibit E.

[7] At the end of his deposition, Rapstine changed his testimony and stated that there were a few times when he appeared unannounced, or performed a "cold call," but he could not recall the names of the companies where this occurred.  (Ex. A, Rapstine Dep. 324:7-325:9.)

190:6.)  He interviewed only 17 gate attendants/service technicians out of approximately 400 before concluding his investigation and demanding that GGS pay over $6,000,000 to the government. (*Id.* 206:15-18, Ex. 2.)   With regard to the steps that he took in supporting his $6,000,000 calculation, Rapstine could not recall whether he prepared a list of questions prior to the interviews of the 17 individuals, but said that it was not his normal practice to do so. (*Id.* 236:13-19.)   While he claims that he wrote down the answers to the questions he asked during the interviews that formed the basis of his conclusion, he "destroyed" all of these notes which were taken between July and November 2010 by shredding them and/or putting them in a "burn barrel." (*Id.* 237:14-20; 243:4-244:5.)   Rapstine agreed that logic and common sense would dictate that a seasoned investigator would keep such notes of a contested and potentially adversarial investigation, but he said that this was not his practice either. (*Id.* 328:5-329:25.)   **His supervisor testified that Rapstine should not have destroyed his notes of his interviews**. (Ex. F, Ramirez Dep. 139:19-23.)[8]

On October 4, 2010, Rapstine issued his findings to GGS claiming that GGS was in violation of the Fair Labor Standards Act ("FLSA") because the Gate Attendants were employees, instead of independent contractors. (Ex. A, Rapstine Dep. 251:15-252:18.) The Secretary mandated that GGS compensate the Gate Attendants at the federal minimum wage rate for 24 hours for each day they were assigned to an oil field gate. (*Id.*) The Secretary advised GGS to pay **$6,192,752** in back wages and unpaid overtime to the Gate Attendants and service technicians as set forth on its "Summary of Unpaid Wages."

---

[8] The relevant portions of the transcript of the deposition of Eden Ramirez are attached hereto as Exhibit F.

(*Id.* at Ex. 3; Am. Compl., Ex. A ¶¶ 7-8 thereto.)   This outrageous demand would later prove to be incorrect by the Secretary's own admissions.

After Rapstine's closing conference with GGS on October 4, 2010, he submitted his file to his supervisor, Ramirez. (Ex. F, Ramirez Dep. 18:2-14.) **Ramirez testified that Rapstine "did not follow the proper procedures" in presenting the multi-million dollar penalty to GGS**. (*Id.* 32:4-9.)   Ramirez said the proper procedure is to "first address future compliance and then you proceed with presenting the findings, estimate of findings to the employer." (*Id.* 32:1-3.)   Ramirez testified that "there's an expectation that [investigators] are familiar with the process and procedures to follow in the final conference" and that Rapstine was expected to comply with the DOL's Field Operations Handbook ("FOH"), but that he had deviated from the FOH without permission to do so. (*Id.* 37:19, 89:2-18.)   Nevertheless, Ramirez rubber-stamped Rapstine's findings.

Plaintiffs attempted to discuss with the Secretary the flawed results and the reasons the findings were terribly wrong, but the Secretary ignored Plaintiffs' overtures and insisted it would litigate if Plaintiffs did not reclassify their workers and remit the $6 million to the government immediately.   (Dkt. #22, Ex. B, Correspondence to DOL.) Specifically, emails from GGS's counsel dated December 20, 2010 and February 14, 2011 went unanswered by the Secretary. (*Id.*)   **Faced with this unwarranted $6 million demand, GGS had absolutely no choice but to file a lawsuit seeking declaratory relief** in this Court arising from the Secretary's flawed classification of the Gate Attendants as employees, her improper calculation of backwages, and allegation that GGS has not complied with the recordkeeping requirements of the FLSA.

Before the Secretary was served with GGS's lawsuit, the Secretary initiated nearly identical litigation before the Honorable Janis Jack in the United States District Court, Southern District of Texas, Corpus Christi Division, alleging that GGS, Mr. Steindorf, and manager Sidney Smith owed back wages and unpaid overtime to the Gate Attendants and service technicians.  (*See Solis v. Gate Guard Services, L.P. et al.*, 2:11-cv-00041, U.S. District Court for the Southern District of Texas, Corpus Christi Division.) The Secretary was then served with Plaintiffs' declaratory judgment Complaint.  (Dkt. #6; Dkt. #45, p. 3.)  Even though the Secretary is well aware of the "first to file" rule, she refused to dismiss her action in Corpus Christi and refused to consolidate the matters.  (Dkt. #24.)  **This forced GGS to prepare and file motions to consolidate both lawsuits and to transfer the Corpus Christi action to Victoria causing considerable and unwarranted expense.** (Dkt. #20, 22, 37.)  Then, once the matter was transferred by Judge Jack to this Court, the Secretary did not cease her expansion of the proceedings.  She sought to dismiss the declaratory judgment action forcing Plaintiffs to prepare further briefing, causing additional expense.  (Dkt. #21.) Until these motions were ruled upon, GGS was forced to duplicate efforts and incur and fund legal fees for two separate lawsuits.

When these procedural matters were resolved four months later in Plaintiffs' favor and the parties finally began discovery, the Secretary continued to make the litigation difficult for Plaintiffs.  She stonewalled Plaintiffs at the very first deposition – which was of David Rapstine – by objecting to nearly every question asked.  (Dkt. #41). Plaintiffs were forced to end the deposition and seek the Court's assistance in setting

parameters for the Secretary's conduct.  (*Id.*)[9]  The cancellation of Rapstine's deposition caused Plaintiffs to have to reschedule the deposition which resulted in a duplication of travel costs and deposition preparation.  (Idalski Dec. ¶ 11.)

Unbelievably, when responding to written discovery, **the Secretary reduced its $6 million demand to $2 million, essentially admitting that it erred by excluding sleep and meal time from its initial $6 million demand.**  (Ex. F, Ramirez Dep. 22:22-23:4-7.)  **Worse, Rapstine testified that he was unaware of the error, did not know the demand was reduced and would have accepted the $6 million dollars had GGS paid it at the conclusion of his investigation.** (Ex. A, Rapstine Dep. 60-62.)

During the litigation, the Secretary repeatedly withheld evidence from Plaintiffs and the Court relying each time on the government informant privilege unnecessarily requiring GGS to prepare letters pursuant to Rule 37 and to file motions to compel.  (Dkt. #41, 58.)  An egregious example of this is the following: Rather than depose any of the 400 Gate Attendants, the Secretary mailed questionnaires, referred to as "WH-31 Interview Statement[s]", to the Contractor Gate Attendants.  (*See* Dkt. #58.)  But, the Secretary refused to produce any of the questionnaires obtained during the course of the litigation or Rapstine's investigation claiming the government informant privilege.  (*Id.*)  On September 9, 2011, GGS was forced to file a Motion to Compel seeking the production of questionnaires, witness statements, and investigation notes supporting the representations contained in the Secretary's own FLSA Narrative.  (*Id.*)  This resulted in yet additional briefing and considerable expense to GGS.

Later, Plaintiffs withdrew their Motion to Compel because it received copies of some of the questionnaires from the Contractor Gate Attendants and **learned that the**

---

[9] The relevant portions of the Rapstine deposition transcript are included in Exhibit A hereto.

**Secretary had misrepresented key evidence**.  For example, in her Partial Motion For Summary Judgment, the Secretary represented to the Court that "gate guards had no power to negotiate their daily rates of pay and had no say as to what that rate of pay would be." (Dkt. #111, p 5.)  Yet, this exact question was posed by the Secretary on her Form WH-31 Interview Statement that she refused to produce to GGS in this litigation. (Dkt. #126, Tab D, Ex. 70, Ex. A.)  On Gate Attendant Billy Reid's WH-31 form, which he voluntarily produced to GGS, he responded "yes" in response to the question, "were you able to negotiate your pay with GGS?" *Id.* The Secretary, the only entity with complete access to this vital evidence, chose to disregard this answer and conceal it.  The Secretary should have been forthcoming with the Court and represented the truth – which is that some Contractor Gate Attendants said they negotiated their rates.

Finally and perhaps most importantly, the Secretary ignored key evidence supporting independent contractor status from the very start of her investigation.    Her own investigators, for example, testified that that: there was no day-to-day supervision of the Contractor Gate Attendants; they could hire relief workers; and that they worked on average less than 4 months.  (Ex. A., Rapstine Dep. 137:13-17, 140:4-7; Ex. F, Ramirez Dep. 226:3-15, Ex. 19.)  The Secretary similarly ignored the precedent of this Court, including the recent decision of this Court in *Mack v. Talesek*, No. V-09-53, 2012 WL 1067398 (S.D. Tex. Mar. 28, 2012).  Most disingenuously, the Secretary disregarded the government's own independent contractor classification of the gate attendants that contract with the Army Corps of Engineers.

Had the Secretary conducted herself in a neutral, impartial fashion and considered all of the evidence pursuant to her own rules and policies, this litigation would not exist.

Unfortunately, she did not do so.  Her conduct clearly exhibits bad faith in every regard, and, for this reason, Plaintiffs respectfully request an award of attorneys' fees.

## III.   ARGUMENT AND CITATION TO AUTHORITY

### A.   Attorneys' Fees Standard Under the EAJA

Plaintiffs are entitled to recover their attorneys' fees incurred in prosecuting this action and defending against the Secretary's meritless and unreasonable counterclaims because she has acted in bad faith.  The Equal Access to Justice Act ("EAJA") was passed by Congress in 1980 in response to concerns that persons "**may be deterred from seeking review of, or defending against, unreasonable governmental action because of the expense involved in securing the vindication of their rights**." *Sullivan v. Hudson*, 490 U.S. 877, 109 S. Ct. 2248, 104 L. Ed. 2d 941 (1989) (emphasis added).  The EAJA, by permitting a party to recover attorneys' fees from the United States, effectuated a waiver of the government's sovereign immunity. *Owens v. Brock*, 860 F.2d 1363, 96 A.L.R. Fed. 323 (6th Cir. 1988).

There are two distinct methods for a district court to award attorneys' fees under the EAJA.  28 U.S.C. § 2412.  In the method applicable to this case, the EAJA permits a court in any civil action brought by or against the federal government to award attorneys' fees to the prevailing party to the same extent it may award fees in cases involving other parties, whether by statute or common law.  28 U.S.C. § 2412(b)*; see also McQuiston v. Marsh*, 707 F.2d 1082 (9th Cir. 1983).  Section 2412(b) reads:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common

> law or under the terms of any statute which specifically provides for such
> an award.

28 U.S.C. § 2412(b).  This provision makes the federal government subject to the "bad faith" exception to the "American Rule" on attorneys' fees. *Baker v. Bowen*, 839 F.2d 1075, 1080, n. 3 (5th Cir. 1988); *Hyatt v. Shalala*, 6 F.3d 250, 254 (4th Cir. 1993).  The bad-faith exception allows an award where the government has acted in "bad faith, vexatiously, wantonly or for oppressive reasons." *Baker*, 839 F.2d at 1081 (relying on legislative history of EAJA).  As noted above, the United States Supreme Court has ruled that the underlying congressional purpose of this statutory language was to protect citizens against an **unreasonable government**.  *See Sullivan v. Hudson*, 490 U.S. 877, 883 (1989).

Numerous courts have applied this section and awarded fees based on the government's bad faith similar to that shown by the Secretary in this action.  *See, e.g.*, *Baker v. Bowen*, 839 F.2d 1075 (5th Cir. 1988) (bad faith found where government denied social security disability benefits after failing to consider all the evidence available in the record); *Huda v. Barnhart*, 67 Fed. App'x 400 (9th Cir. 2003) (unreasonable 7-month delay in acting to cure erroneous decision made by administrative law judge was evidence of bad faith); *Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326 (11th Cir. 2001) (government acted in bad faith by unreasonably failing to include relevant evidence in the administrative record presented to the Court); *Mendenhall v. National Transp. Safety Board*, 92 F.3d 871 (9th Cir. 1996) (FAA acted in bad faith when it continued action it knew to be baseless in effort to coerce pilot's waiver of EAJA fees); *Hyatt v. Shalala*, 6 F.3d 250 (4th Cir. 1993) (government was previously found not to be substantially justified on central issue on which outcome of case depended, and

government's subsequent continued adherence to contrary position supported finding of bad faith); *Cazares v. Barber*, 959 F.2d 753 (9th Cir. 1992) (finding that the government's "arrogant" adherence to a frivolous litigation position constituted bad faith sufficient to justify fee award); *Cobell v. Norton*, 407 F. Supp. 2d 140, 169 (D.D.C. 2005) ("Defendants' pretrial conduct consistently contravened controlling authority and required plaintiffs to undertake otherwise unnecessary litigation to vindicate plain legal rights…" by making numerous illegitimate representations, failing to correct known misrepresentations, and neglecting to inform the court about self-inflicted obstacles to comply with its discovery obligations); *Gray Panthers Project Fund et al. v. Thompson*, 304 F. Supp. 2d 36 (D.D.C. 2004) (Secretary of Department of Health and Human Services acted in bad faith in extending of statutory deadline for Medicare+Choice Organizations to submit information about coverage options, and by announcing that HHS would not follow statutory directive requiring it to disseminate comparative plan information by mail); *Amber Refining, Inc. v. Permian Corp.*, 793 F. Supp. 1422 (N.D. Tex. 1991) (bad faith found where government failed to take important factors into account when refusing to approve settlement agreement); *H. Brown v. Sullivan*, 724 F. Supp. 76 (W.D.N.Y. 1989) (government acted in bad faith when litigating for the unreasonable and vexatious purpose of re-litigating legal propositions that are now well-settled).

**Bad faith, for the purposes of this exception, may be found either in the actions leading to the lawsuit or in the conduct of the litigation**. *Hall v. Cole*, 412 U.S. 1, 15, 93 S. Ct. 1943, 36 L. Ed. 2d 702 (1973).  In applying this exception, courts have found that subjective bad faith is not necessary so long as the moving party can

demonstrate that the losing party's actions were in fact objectively "frivolous, unreasonable, or without foundation," *Local 285, Serv. Emp. Int'l Union, AFL–CIO v. Nonotuck,* 64 F.3d 735, 737 (1st Cir. 1995) (quoting *Washington Hosp. Ctr. v. Serv. Emp. Int'l Union,* 746 F.2d 1503, 1510 (D.C. Cir. 1984)).  "A party acts in bad faith when the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights," such as here, where GGS and Mr. Steindorf had no choice but to file a declaratory judgment action when the Secretary misconstrued the law and demanded over $6 million.  *Amber Refining, Inc. v. The Permian Corp.,* 793 F. Supp. 1422, 1437 (N.D. Tex. 1991) (citing *Fitzgerald v. Hampton,* 545 F. Supp. 53, 57 (D.D.C. 1982)).

The decision to award attorneys' fees for bad faith under the EAJA is reviewed for abuse of discretion. *Perales v. Casillas*, 950 F.2d 1066, 1071 (5th Cir 1992).

**B.**     **The Secretary, via David Rapstine, Acted in Bad Faith by Admittedly Failing to Follow Her "[I]nternal [R]ules, [P]rocedures and [P]rocesses" During the Administrative Investigation**

The Secretary admittedly failed to follow her own internal rules, procedures and processes during the administrative investigation of GGS and its incorrect and unlawful assessment of a more than $6 million penalty against GGS and Mr. Steindorf.  These failures caused GGS to have to file a declaratory judgment action against the Secretary to seek vindication from a penalty so severe it could have put the Company out of business. According to the Court of Appeals for the Fifth Circuit, the United States acts in bad faith and is liable for market-rate attorneys' fees when a government agency ignores its own rules and regulations in litigation and pre-litigation actions.  *See Baker*, 839 F.2d at 1082.

In *Baker*, a consolidated appeal, the agency had denied one of the plaintiff's claims for social security disability benefits.  During the administrative appeals process, one of the administrative bodies upheld the denial of benefits without reviewing all of the

evidence in the hearing record, in violation of the Social Security Act, 42 U.S.C. § 405(b).  The Court of Appeals found that this conduct constituted bad faith in the litigation:

> We therefore hold that the Appeals Council failed to fulfill this statutory duty when it affirmed the ALJ, perfunctorily and automatically, without reviewing all the evidence, and that for purposes of awarding attorneys' fees this constitutes bad faith…. **Clearly, had the Appeals Council reviewed the [evidence] initially, as was its duty, there would have been no litigation in this case.**

*Id.* at 1082 (emphasis added).  The Court of Appeals in *Baker* found that the district court abused its discretion in not granting fees to this prevailing plaintiff under the EAJA's bad faith provisions.  The court remanded the case for a determination and award of the fees at prevailing market rates.  *See id.* at 1082.

The exact same situation is present here.  The Secretary concedes that Rapstine ignored the Department of Labor's own rules and policies in conducting his investigation, and despite the admitted flaws in the investigation, the Secretary has pursued this matter for nearly three years. As part of that pursuit, the Secretary continued to act the part of the proverbial ostrich with her head in the sand, ignoring the mountain of evidence before it and even went so far as to conceal certain evidence that pointed to independent contractor status as set forth herein in Section II.

The Secretary's first error was assigning an inexperienced investigator.  Rapstine, a nine-year veteran, admits he had little training in contractor misclassification cases. (Ex. A, Rapstine Dep. 115:15-117:3; 169:18-20; 321:4-6.).[10]   Of the approximately 300 to 400 investigations he had conducted, Rapstine estimated that a mere <u>five</u> involved contractor misclassification investigations. (*Id.* 119:18-20; 173:12-14.)  Of those five

---

[10] The relevant portions of the transcript of the deposition of David Rapstine are attached hereto as Exhibit A.

investigations, Rapstine specifically recalls only two, and in both of those cases he also found misclassification violations.  Rapstine testified that he had been "briefed and provided instruction from our management and given, you know, training and literature that talks about [independent contractor analysis]." (*Id.* 110:25-111:5.) Yet, he could only recall a single one or two-page memo which would evidence such "instruction," "training" and "literature" and freely admitted that his "Training History Report" did not reflect training in independent contractor misclassification analysis. (*Id.* 115:15-119:6; 166:11-14, Ex. 7.)

Rapstine's personal connection with the complainants calls into question the veracity of his investigation.  Interestingly, the Secretary's investigation was initiated not by a complaint from a Gate Attendant, but by complaints from two former service technicians – Daniel McDaniel, whose chest bears a "KKK" tattoo as a "joke," and Jerry Studlar, who was formerly convicted of indecency with a four-year old.  GGS only subsequently learned that the complainants, Studlar and McDaniel, were "friends" of Rapstine whom they knew "[f]rom the bars and stuff like that."[11]

Rapstine's first contact with GGS came via a July 15, 2010 letter which advised GGS that the "opening conference" would take place on July 29, 2010. (Ex. A, Rapstine Dep. 67:1-18, Ex. 5.)  But Rapstine did not wait for the initial conference, and arrived unannounced at GGS's office in Corpus Christi on July 19, 2010 and spoke to Sidney Smith, manager. (*Id.* 74:10-17, 77:17-78:1; 174:7-10.)  Rapstine did not provide any explanation for his early arrival and surprise appearance, but admitted that he had never

---

[11]*See* Exs. C, D, & E hereto.

appeared unannounced prior to an initial conference in any of his investigations in his "almost ten years" with the DOL. (*Id.* 79:8-23.)

Rapstine's initial conference began at 9:00 a.m. on July 29, 2010. (*Id.* 176:8-11; Ex. 5.) Within a couple of hours of beginning the initial conference, Rapstine sent an email to Sabrina Loudin, another Wage and Hour investigator, stating in pertinent part: "**Wish you could have been there, it was a good example of being quiet and letting them do all of the talking and consequently, digging their own grave.**" (*Id.* 105:25-108:14,178:7-24; Ex. 6 (emphasis supplied). During his deposition, Rapstine apologized for making this comment and agreed that it was inappropriate and unprofessional. (*Id.* 177:23-178:1, 335:13-23.) Without further investigation or evidence beyond his initial conference with GGS other than interviewing his friends McDaniel and Studlar, the complainants, Rapstine began his very detailed and massive back wages calculations. (*Id.* 22:22-24:20.)   Clearly, Rapstine rushed to judgment before his investigation was complete.

Indeed, Eden Ramirez, Rapstine's supervisor, admitted that before calculating back wages, an investigator should first establish that the employer is in fact covered under the FLSA so as not to waste time. (Ex. F, Ramirez Dep. 100:4-15.)  Rapstine did not do this. (Ex. A, Rapstine Dep. 178:25-180:3.)  It was only **after** calculating the substantial amount of back wages which were allegedly due that Rapstine first began to actually interview Gate Attendants. (*Id.* 189:19-190:6.)  He interviewed only 17 gate attendants/service technicians out of approximately 400 before concluding his investigation and demanding that GGS pay over $6,000,000 to the government. (*Id.* 206:15-18, Ex. 2.)

15

With regard to the steps that he took in supporting this astronomical figure, Rapstine could not recall whether he prepared a list of questions prior to the interviews of the 17 individuals, but that it was not his normal practice to do so. (*Id.* 236:13-19.) While he claims that he wrote down the answers to the questions he asked during the interviews that formed the foundation of his conclusion that the workers were employees, he unfortunately "destroyed" all of his notes taken between July and November 2010 by shredding them and/or putting them in a "burn barrel." (*Id.* 237:14-20; 243:4-244:5.) Rapstine agreed that logic and common sense would dictate that a seasoned investigator would keep such notes of a contested and potentially adversarial investigation, but he said that this was not his practice either. (*Id.* 328:5-329:25.)   His supervisor testified that Rapstine should not have destroyed his notes of his interviews. (Ex. F, Ramirez Dep. 139:19-23.)   Thus, the Secretary admitted to yet another violation of the Secretary's policies and procedures.

In addition to destroying this crucial evidence, Rapstine made errors in his interviews because he did not ask questions critical to the determination of independent contractor status. For example, he testified that he did not ask Gate Attendants whether they declared themselves as independent contractors to the IRS (and did not think it was important) (Ex. A, Rapstine Dep. 131:11-22); he did not know if the Gate Attendants were guaranteed any work beyond the project assigned (*id*. 137:2-12); he did not ask the Gate Attendants if they considered themselves to be independent contractors (*id.* 138:19-22); he did not ask the Gate Attendants if they maintained and repaired their motor homes and fifth wheels (*id*. 139:10-140:3); and he does not remember asking whether the Gate Attendants "were switching back and forth from Gate Guard Services to another

company" (*id.* 141:2-10).  Rapstine admitted he only asked "about half" of the Gate Attendants he interviewed about the cost of their R.V./motor home and he did not obtain the model and make of these homes or attempt to price them himself. (*Id.* 276:7-277:3.)

Moreover, Rapstine ignored evidence that weighed in favor of independent contractor status. For example, Rapstine admitted that the Gate Attendants: did not have day-to-day supervision by GGS (*id.* 137:13-17); provided their own food (*id.* 140:4-7); found and hired their own relief workers (*id.* 140:8-15); were not restricted from working for other companies (*id.* 140:16-21); were not provided with performance evaluations and were not disciplined (*id.* 210:19-211:1); and were free to and did reject assignments (*id.* 262:1-263:10).

On October 4, 2010, Rapstine issued his findings to GGS claiming that GGS was in violation of the Fair Labor Standards Act ("FLSA") because the Gate Attendants were employees, instead of independent contractors. (*Id.* 251:15-252:18.) The Secretary mandated that GGS compensate the Gate Attendants at the federal minimum wage rate for 24 hours for each day they were assigned to an oil field gate. (*Id.*) The Secretary advised GGS to pay an overwhelming **$6,192,752** in back wages and unpaid overtime to the Gate Attendants and service technicians as set forth on its "Summary of Unpaid Wages." (*Id.* at Ex. 3; Am. Compl., Ex. A ¶¶ 7-8 thereto.)  This amount would later be retracted by the Secretary because it was inaccurate.  (Ex. F, Ramirez Dep. 22.)

After Rapstine's closing conference with GGS on October 4, 2010, he submitted his file to his supervisor, Ramirez. (*Id.* at 18:2-14.) **Ramirez testified that Rapstine "did not follow the proper procedures" in presenting the multi-million dollar penalty to GGS**. (*Id.* 32:4-9.)  Ramirez said the proper procedure is to "first address

17

future compliance and then you proceed with presenting the findings, estimate of findings to the employer." (*Id.* 32:1-3.) Ramirez testified that "there's an expectation that [investigators] are familiar with the process and procedures to follow in the final conference" and that Rapstine was expected to comply with the DOL's Field Operations Handbook ("FOH"), but that he had deviated from the FOH without permission to do so. (*Id.* 37:19, 89:2-18.)  Nevertheless, Ramirez rubber-stamped Rapstine's findings despite the significant errors and violations of the Secretary's policies and procedures.  "**Clearly, had the [Secretary] reviewed the [evidence] initially, as was its duty, there would have been no litigation in this case.**"  *Baker* at 1082 (emphasis added).

> **C.**     **The Secretary Acted in Bad Faith by Forcing Plaintiffs to Undertake Unnecessary Litigation to Vindicate Its Plain Legal Rights to Classify Its Gate Attendants as Independent Contractors and to Escape a $6 Million Dollar Penalty**

Bad faith conduct may be found when an agency "confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights." *North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. of Transp.*, 151 F. Supp. 2d 661, 674 (M.D.N.C. 2001).  The Fifth Circuit and other circuits hold that fee awards at the prevailing market rate are appropriate when an individual is forced to litigate against a governmental agency that is ignoring the evidence and refusing to apply its own rules. *See Baker*, 839 F.2d at 1082.

This is exactly the case here.  The Secretary stubbornly pursued this litigation despite Rapstine's botched investigation and lack of support for her assertion that the workers at issue were employees rather than independent contractors.  Plaintiffs attempted to discuss the flawed results and the reasons they disagreed with the findings

with the Secretary in order to address the problems with the investigation, but the Secretary ignored Plaintiffs' overtures and took steps to initiate litigation against Plaintiffs. Specifically, the Secretary ignored letters and emails from GGS's counsel dated December 20, 2010 and February 14, 2011, in which GGS attempted to confirm that Rapstine's decision was final and sought to further discuss the outcome. (Dkt. #22, Ex. B.) At no time did the Secretary advise GGS that the results of Rapstine's investigation were not final.

Plaintiffs were left with no choice but to file suit to vindicate their rights. (Dkt. #1). Certainly, Plaintiffs were not going to pay the government $6 million dollars when it had done nothing wrong. The Secretary's failure to follow her own procedures and her recalcitrant refusal to properly evaluate the evidence in front of her before driving Plaintiffs into unnecessary litigation is a prime example of the type of unreasonable government bad faith warranting an attorneys' fee award. *See, e.g., Baker*, 839 F.2d at 1082.

Not only did the Secretary force GGS to litigate this case, but its actions in this litigation have unnecessarily expanded the proceedings and have been wanton and oppressive driving up Plaintiffs' legal fees. Before the Secretary was served with GGS's lawsuit, the Secretary initiated nearly identical litigation before the Honorable Janis Jack in the United States District Court, Southern District of Texas, Corpus Christi Division, alleging that GGS, Mr. Steindorf, and manager Sidney Smith owed back wages and unpaid overtime to the Gate Attendants and service technicians. (*See Solis v. Gate Guard Services, L.P. et al.*, 2:11-cv-00041, U.S. District Court for the Southern District of Texas, Corpus Christi Division.) The Secretary was then served with Plaintiffs'

declaratory judgment Complaint.  (Dkt. #6.)  Even though the Secretary is well aware of the "first to file" rule, she refused to dismiss her action in Corpus Christi and refused to consolidate the matters.  (Dkt. #24.)  **This forced GGS to prepare and file motions to consolidate both lawsuits and to transfer the Corpus Christi action to Victoria causing considerable and unwarranted expense.** (Dkt. #20, 22, 37.)  Then, once the matter was transferred by Judge Jack to this Court, the Secretary did not cease her expansion of the proceedings.  She sought to dismiss the declaratory judgment action forcing Plaintiffs to incur additional expense.  (Dkt. #21.)  Until these motions were ruled upon, GGS was forced to duplicate efforts and incur and fund legal fees for two separate lawsuits.

When these procedural matters were resolved four months later in GGS's favor and the parties finally began discovery, the Secretary continued to make things difficult for Plaintiffs.  She stonewalled GGS at the very first deposition – which was of David Rapstine – by objecting to nearly every question asked.  (Dkt. #41).  Plaintiffs were forced to end the deposition and seek the Court's assistance in setting parameters for the Secretary's conduct. *Id*.  By way of example, during the course of the initial **mere hour-and-a-half deposition, counsel for the Secretary interjected with objections** approximately **102 times**. (Dkt. #41).   Moreover, at least **eighteen (18) times** throughout the deposition, counsel for the Secretary repeatedly instructed Mr. Rapstine not to answer the most basic questions about his investigation on of the purported bases of both the government informant's privilege and for reasons entirely unrelated to any recognized privilege.  *Id.*  She also improperly coached the deponent by repeatedly raising her hand before counsel for Plaintiffs finished asking Mr. Rapstine the question. Given all of these

baseless objections, counsel for the Secretary spoke more than the deponent. *Id.* She had **537 speaking lines** as compared to **merely 421 speaking lines by Mr. Rapstine,** excluding his request that questions be re-read after an extensive colloquy by the Secretary's counsel. *Id.* In total, counsel for the Secretary spoke fifty-six percent (56%) of the time, as compared to the deponent, Mr. Rapstine, who spoke merely forty-four percent (44%) of the time. *Id.* Without the filing of the motion to compel, it is likely Plaintiffs would have continued to endure this litigation misconduct. The cancellation of Rapstine's deposition caused Plaintiffs to have to reschedule the deposition resulting in duplication of travel costs and deposition preparation. (Ex. B, Idalski Dec. ¶ 11.)

The Secretary also withheld evidence from Plaintiffs and the Court. On September 9, 2011, GGS was forced to file a Motion to Compel seeking the production of questionnaires, witness statements, and investigation notes supporting the representations contained in the Secretary's own FLSA Narrative. (Dkt. # 58.) This resulted in yet additional briefing and considerable expense to GGS. Later, Plaintiffs withdrew its Motion to Compel because it received copies of some of the questionnaires from the Contractor Gate Attendants and **learned that the Secretary had misrepresented key evidence**. For example, in her Partial Motion For Summary Judgment, the Secretary represented to the Court that "gate guards had no power to negotiate their daily rates of pay and had no say as to what that rate of pay would be." (Dkt. #111, p 5.) Yet, this exact question was posed by the Secretary on her Form WH-31 Interview Statement that she refused to produce to GGS in this litigation. (Dkt. #126, Tab D, Ex. 70, Ex. A.) On Gate Attendant Billy Reid's WH-31 form, which he voluntarily produced to GGS, he responded "yes" in response to the question, "were you able to

negotiate your pay with GGS?" (Id.) The Secretary, the only entity with complete access to this vital evidence, chose to disregard this answer and conceal it.  The Secretary should have been forthcoming with the Court and represented the truth – which is that some Contractor Gate Attendants said they negotiated their rates.  The lack of candor is further proof of the Secretary's bad faith.

This case should have ended at the administrative stage.  The Secretary's decision to litigate this case under the circumstances and the manner in which she conducted the litigation was unreasonable and unnecessary and caused Plaintiffs' to incur significant attorneys' fees in their quest for vindication.

### D.   The Secretary Acted in Bad Faith by Disregarding Evidence Establishing Independent Contractor Status and Misrepresenting Evidence to Support Her Claim of Employee Status

In applying the exception to sovereign immunity, courts have found that subjective bad faith is not necessary so long as the moving party can demonstrate that the losing party's actions were in fact objectively "frivolous, unreasonable, or without foundation," *Local 285, Serv. Emp. Int'l Union, AFL–CIO v. Nonotuck,* 64 F.3d 735, 737 (1st Cir. 1995) (quoting *Washington Hosp. Ctr. v. Serv. Emp. Int'l Union,* 746 F.2d 1503, 1510 (D.C. Cir. 1984)).  In an effort to manipulate the five factor test used to determine employee or independent contractor status, the Secretary made misrepresentations and pursued factual positions in this case which not only lacked evidentiary support, but contradicted her own evidence.  Worse, the Secretary ignored a case decided by this Court which is directly on point <u>and</u> she even balked at the government's own classification of gate attendants working for the Army Corps of Engineers as independent contractors.  All of these actions, either viewed separately or as a whole, were unreasonable and lacked foundation sufficient to amount to bad faith.

22

1.      **Five Factor Test**

First, the Secretary could only present evidence to establish that one of the five factors of this Circuit's test weighed in favor of employee status.  The Court found that three of the factors - control regarding details of the work; permanency of the workers' relationship and the worker's ability to make a profit and suffer a loss – weighed in favor of independent contractor status.  (Dkt. #135 p. 11, 15, 18.)  The Court found the fourth factor - the investment of the parties - to be neutral.  *Id.* at 13.  The fifth factor - skill and initiative – required no evidence as the Court noted that the parties did not dispute the fact that the gate attendants did not require skill and initiative to log vehicles in and out. *Id.* at 15.   A lack of evidence and foundation to support her claim is one thing, but disregarding contrary evidence is quite another.   This is the type of "unreasonable government" that warrants attorneys' fees.

Control.   The Secretary appears to have intentionally disregarded key evidence concerning the control factor.  The Secretary flatly ignored evidence that the Contractor Gate Attendants lacked day-to-day supervision.  (Dkt. #111, p. 19.)   The Secretary disregarded the testimony of her own investigators - Rapstine and Ramirez - who testified that there was no day-to-day supervision as well as the testimony of numerous Contractor Gate Attendants who swore that they are not supervised in any fashion (Dkt. #126, p. 19, fn. 35) and that no one tells them how to do their job.  (Dkt. #126, fn. 34; Tab D, Ex. 11, Clark Dec. ¶ 10; Tab N, Mack Dep. p. 58.)  The Secretary could not and did not dispute that the Contractor Gate Attendants are allowed to hire their own relief workers and, in fact, did hire and pay their own relief workers. (Dkt. #126, pp. 16-17, fns. 25, 26 and 28; Tab E, Steindorf Dep. p. 245; Tab A, Steindorf Dec. ¶8; Tab B, Brown Dep. pp. 7-11.) Although the Secretary contends that the Contractor Gate Attendants sometimes asked

GGS for help in finding relief, the Secretary reluctantly agrees that "otherwise, finding a relief guard was the responsibility of the individual gate guard." (Dkt. #111, p. 10.)  The Secretary overlooked other undisputed evidence establishing a lack of control including that: the Contractor Gate Attendants did not receive training from GGS (Dkt. #126, p. 19, fn. 34; *see also* Tab D, Ex. 11; Tab N, Mack Dep. p. 58); and the Contractor Gate Attendants did not have contact with anyone from GGS other than service technicians every couple of weeks who came to service the septic tanks or diesel generators.  (Dkt. #126, pp. 19-20, fn. 37).

It simply does not stand to reason that workers who were unsupervised, had no contact with GGS except every couple of weeks when they receive water,  and hire helpers at their leisure are being controlled by the company who contracted with them. The Secretary's position to demand $6 million dollars from Plaintiffs and classify these workers as independent contractors was **unreasonable, unfounded and frivolous**.[12]

<u>Relative Investment</u>.   The Secretary's argument regarding the "relative investment" factor was equally unfounded.  The Secretary wrongly argued that the RV's owned by the Gate Attendants were not investments because "some guards already owned the mobile homes before they ever worked for GGS." (Dkt. #123, p. 23.)  Out of the 28 declarations offered by the Secretary, however, only 1 stated that the Gate Attendant owned the RV prior to working for GGS. (Dkt. #135, n. 5.) Yet the Secretary

---

[12] The Secretary recklessly reached conclusions based on conclusory and vague allegations, which exhibits bad faith.  In this regard, the Secretary claimed that control existed because the Gate Attendants were allegedly required to complete an "application".  (Dkt. # 111, p. 3.)  The Secretary cited to the single declaration of Jose Coronel for this assertion. (Dkt. #123, p. 3 (citing to Ex. 3 Decl. of Jose Coronel ¶ 2). But, the declaration only vaguely states that he "filled out an application and other paperwork.*" Id.* (emphasis supplied).  The record evidence, on the other hand, was clear that the only "application" completed by the Gate Attendants was the Texas Department of Public Safety ("DPS") application used to obtain a license. (Dkt. #126, Tab F, Deposition of Sidney Smith ["Smith Dep."] 45:9-11; 70:7-11.) (Dkt. #123, p. 7, fn 16.)

did not dispute that the Contractor Gate Attendants bore the cost of their living quarters (e.g., R.V. and trailers) during the assignment as this is reflected in 90 declarations and hundreds of independent contractor agreements in the record.  (Dkt. #126, Tab A, Exs. 2-452; Tab D, Exs. 1-94.) The Secretary also did not dispute that the Contractor Gate Attendants are responsible for the fuel used to drive from assignment to assignment, maintenance of their R.V., and insurance.  (Dkt. #126, p. 23, fn. 49; Tab A, Steindorf Dec. ¶ 12; Tab J, Rapstine Dep. 139:17-22.) The Secretary merely relied on the internet research of its biased investigator, Rapstine, in arguing that the investment of the Gate Attendants was not substantial when compared to the investment by GGS.  (Dkt. #135 p. 12.)  Here again, the Secretary completely dismissed key evidence which should have been considered in analyzing this case.

Permanency of the Relationship**.**  The Secretary misstated the facts related to the "permanency of the relationship" factor **in the face of the very evidence she presented to the Court**. The Secretary represented to the Court that the nature of the Gate Attendant assignments made the relationship between GGS and the Gate Attendants "permanent," because the Gate Attendant contracts were "indefinite" with "few, if any breaks in service." (Dkt. #123, Ex. 5-20.)  However, the Secretary's own calculations via its District Director show that over half of the Contractor Gate Attendants worked sporadic assignments which were on and off for 15 weeks or less.  (Dkt. #126, Tab K, Ramirez Dep. Ex. 19; see also Tab A, Steindorf Dec. 14; Tab C, Brown Dec. Exs. 1-6.) Further, the majority of the declarations **prepared by the Secretary** reveal breaks in the assignments ranging from **one to nine months.**  (Dkt. #126, p. 29, fn. 60.)  Consistent with this, the "pay list" attached to Bookkeeper Pat Brown's declaration shows

significant breaks in service for the majority of the Gate Attendants. (Dkt. #126, Tab C, Brown Dec. Exs. 1-6.)  The Secretary's argument that the relationship is not permanent has no basis in fact or law and is frivolous.

_Profit and Loss_.  Once again, the Secretary ignored the evidence showing that Gate Attendants realize a profit or loss. Instead, the Secretary made the conclusory and speculative argument that "[n]one of the gate guards believed that they had an opportunity to make a profit" and "none believed that they could suffer a loss. (Dkt. # 123, p. 12.)   The record evidence which the Secretary chose to dismiss, however, included (1) testimony that the Contractor Gate Attendants were paid: $100, $125 and $175 a day (including Kevin Scrogum, the Secretary's declarant, who testified that he was paid additional amounts for working gates with multiple rigs and for performing extra work such as escorting duties) (Dkt. #126, Tab A, Steindorf Dec. ¶ 5; Dkt. #111, Ex. 29, K. Scrogum Dec. ¶¶ 8-9); (2) documentary evidence such as negotiated independent contractor agreements which show negotiable rates (Dkt. #126, Tab A, Exs. 31, 48 and 81); and (3) interview statements that the Secretary chose to withhold from the litigation under a claim of privilege: namely, Gate Attendant Billy Reid's WH-31 form, which he voluntarily produced to GGS, on which he responded "yes" to the question, "were you able to negotiate your pay with GGS?"  (Dkt. #126, Tab A, Exs. 41, 48, and 81; Tab D, Ex. 70, Ex. A.)  See also _Ruiz v. Affinity Logistics Corp._ 2012 WL 3672561 at *5 (S.D. Cal. August 27, 2012) (finding independent contractor status where delivery drivers were generally paid the same rate per delivery but could negotiate a higher payment if the delivery was particularly difficult).

The Secretary was willing to take any and all steps necessary to validate her investigation including misrepresenting evidence to support her claim and ignoring record evidence that was contrary to her position.  This is bad faith. See *Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326, 1333-35 (11th Cir. 2001) (government acted in bad faith by unreasonably failing to include relevant evidence in the administrative record presented to the Court); *Cobell v. Norton*, 407 F. Supp. 2d 140, 168 (D.D.C. 2005) ("Defendants' pretrial conduct consistently contravened controlling authority and required plaintiffs to undertake otherwise unnecessary litigation to vindicate plain legal rights…" by making numerous illegitimate representations, failing to correct known misrepresentations, and neglecting to inform the court about self-inflicted obstacles to comply with its discovery obligations) *See also, Lipsig v. National Student Marketing Corp.,* 663 F.2d 178, 182 (D.C. Cir. 1980) (*per curiam*); (finding "bad faith" for the purpose of a fee award, where party among other actions, on at least two occasions "seriously misled the Court by misquoting or omitting material portions of documentary evidence") (footnotes and internal quotation marks omitted).   By misrepresenting the evidence, the Secretary vexatiously caused Plaintiffs to incur additional fees by multiplying the amount of evidence the Plaintiffs needed to refute the Secretary's clearly unfounded positions.

### 2.    The Secretary Dismissed Case Law Which Was On Point

The parties in this case were in the unique position of litigating an issue that had already been decided by this Court. *See generally, Mack*, 2012 WL 1067398  In *Mack v. Talasek*, this Court decided the issue of the independent contractor status of oil field gate attendants such as those present in this case, finding that the attendants were independent contractors exempt from the FLSA.  **In many ways, the facts of the instant case**

**weighed more strongly in favor of independent contractor status**. Given the similarities between *Mack* and this case, the Court correctly found that Gate Attendants are clearly independent contractors under the FLSA. Yet, the Secretary chose to ignore *Mack* and conjure up distinctions that did not exist. The Secretary's attempts to re-litigate the questions already decided by this Court are evidence of her bad faith in the litigation. *See generally Hyatt v. Shalala*, 6 F.3d 250, 255-56 (4th Cir. 1993).

The Court of Appeals for the Fourth Circuit found that the United States acted in bad faith when it continued to press a litigation position despite controlling law in the other side's favor. *Id.* In *Hyatt*, the Court of Appeals found the Secretary of Health and Human Services acted in bad faith by refusing to apply the settled standard for what constitutes "pain" in disability benefit petitions. The Court stated, "The record and history of this case reflect a refusal to comply with circuit precedent with respect to the pain standard and support the district court's finding of bad faith." *Id.* at 255-56.

The Secretary also ignored the clear case law of this Circuit regarding the five factors used to determine independent contractor status. Instead, the Secretary disingenuously asserted that the Court should apply a sixth factor which is not recognized in this Circuit while relying on thirty-five year old case law: the integral nature of the work at issue. (Dkt. #123 p. 17.) Binding precedent decided subsequently to the cases relied on by the Secretary, however, makes it clear that the Fifth Circuit applies the five factor test to determine whether an individual is an employee or an independent contractor. *See Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332 (5th Cir. 1993). In attempting to insert a factor into the Court's consideration that runs contrary to the

binding precedent of this Circuit, the Secretary continued its pattern of bad faith dealings with Plaintiffs and the Court in its attempts to justify ifs flawed reasoning.

## IV.   **PLAINTIFFS' ATTORNEYS' FEES ARE REASONABLE**

When evaluating the proper amount of attorneys' fees to be awarded, the Court uses the lodestar method and multiplies the number of hours reasonably spent on the case by an appropriate hourly rate in the community for such work. *Saizan v. Delta Concrete Prods. Co.,* 448 F.3d 795, 799 (5th Cir. 2006). Then, after calculating the lodestar, the Court considers whether to adjust the fee upward or downward based on the relative weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The Johnson factors are: (1) the time and labor required to represent the client or clients; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.[13]

Plaintiffs have incurred more than $826,315.00 in attorneys' fees in connection with their prosecution of this matter and defense of the Secretary's counterclaims as a result of the Secretary's bad faith in pursing this matter.  Plaintiffs' counsel has compiled the invoices that reflect the attorneys' fees incurred by Plaintiffs, and the basis for the

---

[13] The Johnson factors closely mirror or expand upon the factors set forth in in Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct.

fees including a breakdown of the time spent on each task and the amount of each task. (Ex. B, Idalski Dec., Ex. 1.)   These invoices reveal attorney-client communications, attorney work-product, and legal strategy, and, as such, have been redacted to prevent disclosure of this information.

Here, as shown in the billing records submitted in support of this Motion, Plaintiffs' counsel was required to expend considerable time and effort as a result of the complexity of this matter. (Idalski Dec. ¶¶ 9-13.)   The case involved the prosecution, defense and eventual successful consolidation of parallel federal actions involving the substantial litigation machinery brought to bear on the case by the government, as well Plaintiffs' novel approach of filing a declaratory judgment action under the Administrative Procedures Act.  *Id.* ¶¶ 10-11.   Additionally, the litigation of this case involved a highly factual inquiry that required: expansive discovery including the exchange of nearly 20,000 pages of documents; the recorded testimony of over 100 Gate Attendants or factual witnesses who reside across the United States; and the preparation of extensive cross briefing in order to obtain the summary judgment award in Plaintiffs' favor.  *Id.* ¶¶ 11-13.   When faced with an unbending assault by the federal government seeking in excess of $6 million in alleged back pay and unpaid overtime, Plaintiffs were certainly reasonable in seeking out experienced and reputable counsel who specializes in this facet of the law. *See id.* ¶¶ 4-5, 7.

Moreover, Plaintiffs' counsel charged fees commensurate with their experience and the customary fees charged by attorneys of similar skill and experience. *Id.* ¶ 14-15. An award of fees based on bad faith is based on prevailing market rates.  *Baker*, 839 F.2d. at 1080 (noting that Section 2412(b) "permits a court to award attorney's fees and

costs against the government to the same extent that it may award fees in cases involving other parties (i.e., the market rate)"); *H. Brown v. Sullivan*, 724 F. Supp. 76, 78 (W.D.N.Y. 1989) ("Fees may be awarded under section 2412(b) of the EAJA, without regard for the statutory ceiling of section 2412(d)(2)(A) upon a finding of bad faith"). The prevailing market rate for similar services by similarly situated trained and experienced lawyers in the relevant legal community is the established basis for determining a reasonable hourly rate. *Tollett v. City of Kemah,* 285 F.3d 357, 368 (5th Cir. 2002).

While no single J*ohnson* factor is determinative on its own "[t]he most critical factor in determining an attorney's fee award is the degree of success obtained." *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 799 (5th Cir. 2006); *Singer v. City of Waco, Tex.*, 324 F.3d 813, 829 (5th Cir. 2003).  Here, the Secretary sought payment of back pay and unpaid overtime equal to $6,192,752.  Beyond the sheer size of the multi-million dollar assessment, the result sought by the Secretary would have fundamentally changed the nature of Plaintiffs' operations or closed them altogether.  (*See* Ex. B, Idalski Dec. ¶ 13.)  As a result of Plaintiffs' actions in this litigation, Plaintiffs now owe nothing and can continue to run their family-owned business.  There exists a strong presumption of the reasonableness of the lodestar amount. *Saizan*, 448 F.3d at 800; *Heidtman v. County of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999).

However, the lodestar may not be adjusted due to a *Johnson* factor if the creation of the lodestar amount already took that factor into account. *Migis v. Pearle Vision,* 135 F.3d 1041, 1047 (5th Cir. 1998).  For example, evidence of billing judgment that shows hours that have been written off as unproductive, excessive, or redundant weighs against

31

a reduction of the fees sought under the lodestar method.  *See Saizan*, 448 F.3d at 799; *Walker v. City of Mesquite*, 313 F.3d 246, 251 (5th Cir. 2002).  Here, Plaintiffs' counsel has exercised billing judgment both during the active litigation for this matter and in proactively reducing the amount of fees sought in connection with this Motion by eliminating attorneys' fees associated with the dismissal of Sidney Smith and the claims against the service technicians as well as fees charged for office conferences, review of the same document by multiple attorneys and administrative work. (Ex. B, Idalski Dec. ¶ 17.)  For all of these reasons, the attorneys' fees sought by Plaintiffs are reasonable.

## V.    CONCLUSION

The Secretary's rush to reach its desired outcome regardless of the actual facts of this matter provides the paradigm of the "unreasonable government" oppression against which the EAJA was intended to protect.  In its Memorandum Opinion and Order (Dkt. #135), the Court found that the Gate Attendants were independent contractors because nearly every factor weighed in favor of Plaintiffs' position.   This conclusion should have been facially apparent to the Secretary as the only logical outcome given the overwhelming evidence in this case.   The Secretary, however, elected to ignore the relevant case law and record evidence and to fabricate "facts" to support Rapstine's initial determination.  This willful ignorance of the facts and law in an effort to buttress an investigation that failed to follow the Secretary's own policies and procedures demonstrates the requisite level of bad faith required to award Plaintiffs their fees. *See L. Brown v. Sullivan*, 916 F.2d 492, 496 (9th Cir. 1990) (finding that the "cumulative effect" of the government's actions in handling a Social Security disability benefits case constituted bad faith for purposes of the EAJA section 2412(b)).

Respectfully submitted this 27th day of February, 2013.

**CHAMBERLAIN HRDLICKA**
**WHITE WILLIAMS & AUGHTRY**

By: */s/ Annette A. Idalski*
       Annette A. Idalski
       Texas Bar No. 00793235
       Federal I.D. No. 1130754
       191 Peachtree Street, 34th Floor
       Atlanta, GA  30303-1747
       Telephone:  (404) 588-3570

       Daniel D. Pipitone
       Texas Bar No. 16024600
       Federal I.D. 0294
       1200 Smith Street, 14th Floor
       Houston, TX 77002-4310
       Telephone: (713) 654-9670

       *Counsel for Plaintiffs/Counter-*
       *Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| GATE GUARD SERVICES, L.P. | ) | |
| and BERT STEINDORF, | ) | |
| | ) | |
| Plaintiffs/Counter-Plaintiffs, | ) | Civil Action File |
| | ) | No. 6:10-cv-91 |
| v. | ) | |
| | ) | JURY |
| HILDA L. SOLIS, SECRETARY OF LABOR, | ) | |
| UNITED STATES DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this date I have electronically filed the foregoing GATE GUARD SERVICES, L.P AND BERT STEINDORF'S MOTION TO RECOVER ATTORNEYS' FEES AGAINST HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR with the Clerk of Court via the CM/ECF system which will automatically send a copy of the same to:

UNITED STATES DEPARTMENT OF LABOR
Colleen B. Nabhan
Office of the Solicitor
525 Griffin Street, Suite 501
Dallas, Texas 75202
nabhan.colleen@dol.gov

OFFICE OF UNITED STATES ATTORNEY
John A. Smith
800 N Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
john.smith@usdoj.gov

This 27th day of February, 2013.

**CHAMBERLAIN HRDLICKA**
**WHITE WILLIAMS & AUGHTRY**

By:___*/s/ Annette A. Idalski*_____
      Annette A. Idalski
      Texas Bar No. 00793235