UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **GATE GUARD SERVICES L.P.** *et al.*, | § § | |
| Plaintiff/Counter–Defendants, | § § | |
| v. | § § | **CIVIL ACTION NO. V–10–91** |
| **HILDA L. SOLIS, Secretary of Labor, United States Dept. of Labor,** | § § § § | |
| Defendant/Counter–Plaintiff. | § | |

**MEMORANDUM OPINION & ORDER**

On February 13, 2013, the Court granted summary judgment in favor of Plaintiffs Gate Guard Services, L.P. and owner Bert Steindorf (collectively "GGS") in their Declaratory Judgment Action against Hilda L. Solis, Secretary of Labor, United States Department of Labor (hereinafter "the DOL"); dismissed all claims by the DOL in its FLSA Enforcement Action against GGS; and entered final judgment in favor of GGS and against the DOL. (Dkt. Nos. 135 & 136.) Now pending before the Court is GGS's Motion to Recover Attorneys' Fees against the DOL (Dkt. No. 137), to which the DOL has responded (Dkt. No. 142) and GGS has replied (Dkt. No. 144-1).[1]

**I. Factual and Procedural Background**

GGS is a Texas limited partnership that locates gate attendants for oilfield operators. GGS contracts with approximately 400 gate attendants that perform the job of logging in vehicles entering and departing oilfield operation sites.

---

1. On April 16, 2013, GGS filed a Motion for Leave to File their Reply in Support of their Motion for Attorneys' Fees (Dkt. No. 144). The motion is ripe for ruling and deemed unopposed because the submission date has passed and the DOL has not filed a response. *See* S.D. TEX. LOCAL RULES 7.3, 7.4 (providing that opposed motions will be submitted to the judge for ruling 21 days from filing, responses must be filed by the submission date, and failure to respond will be taken as a representation of no opposition). Accordingly, GGS's motion for leave to reply is **GRANTED**.

1

In July 2010, DOL Lead Wage and Hour Investigator David Rapstine ("Rapstine") began investigating GGS after receiving complaints from former GGS service technicians Danny McDaniel and Jerry Studlar, who was a "friend" of Rapstine from "parties" and "the bars and stuff like that." (Simmons Dep., Dkt. No. 137, Ex. E at 61:3–63:24.) Rapstine first contacted GGS via a July 15, 2010 letter advising GGS that an "opening conference" would take place on July 29, 2010. Rapstine then arrived unannounced at GGS's office on July 19, 2010 and spoke to manager Sidney Smith.

An opening conference was held as planned on July 29, 2010. Shortly after concluding the conference, Rapstine sent an email to Sabrina Loudin, another Wage and Hour Investigator, stating in part: "Wish you could have been there, it was a good example of being quiet and letting them do all of the talking and consequently, digging their own grave." (Dkt. No. 137, Ex. A-6.) Without further investigation beyond the opening conference and his interviews with McDaniel, Studlar, and one other GGS worker, Rapstine began his back wages calculations. After he was finished completing these calculations—which totaled more than $6 million—Rapstine began to interview other gate attendants. Rapstine could not recall whether he prepared a list of questions before conducting these interviews, but said that it was not his normal practice to do so. Rapstine also stated that he wrote down the answers to the questions he asked during the interviews; however, after he was finished turning the notes into witness interview statements, he "destroyed" all of his interview notes by shredding them and/or putting them in a "burn barrel." (Rapstine Dep., Dkt. No. 137, Ex. A at 237:14–20; 243:4–244:5.) After interviewing fewer than 17 gate attendants out of approximately 400, Rapstine concluded his investigation.

In October 2010, Rapstine informed GGS of the DOL's findings. Specifically, the DOL found GGS to be in violation of the FLSA because the gate attendants were employees, not

independent contractors. The DOL also mandated that GGS compensate the gate attendants at the federal minimum wage rate for 24 hours for each day they are assigned to an oilfield operation. Rapstine further advised GGS to pay $6,192,752.00 in back wages and unpaid overtime to the gate attendants and service technicians, as calculated in the "Summary of Unpaid Wages Due" he issued to GGS. On November 10, 2010, GGS's counsel spoke to DOL District Director Eden Ramirez ("Ramirez"), who confirmed that litigation was imminent because GGS refused to come into compliance with the FLSA. Then on November 19, 2010, GGS's counsel met with Ramirez, Targeted Enforcement Coordinator Michael Speer, and an attorney from the DOL's Office of the Solicitor for a final conference. The DOL insisted that GGS immediately come into compliance by re-classifying the gate attendants as employees and paying over $6 million in back wages to the gate attendants and service technicians.

Later that same day, November 19, 2010, GGS filed the above-captioned declaratory judgment action seeking a determination of whether it is in compliance with the FLSA ("Declaratory Judgment Action"). Specifically, GGS sought declaratory relief arising from the DOL's flawed classification of the gate attendants as employees instead of independent contractors, its calculation totaling over $6 million in back wages, and its allegation that GGS had not complied with recordkeeping requirements. On February 16, 2011—before GGS served the DOL with its complaint in the Declaratory Judgment Action—the DOL filed an enforcement action under the FLSA in the Southern District of Texas, Corpus Christi Division, which was assigned to U.S. District Judge Janis Graham Jack ("FLSA Enforcement Action"). *Hilda L. Solis, Secretary of Labor, United States Department of Labor v. Gate Guard Services, LP DBA Gate Guard Services, Bert Steindorf and Sidney L. Smith*, Civil Action No. 2:11-41 (S.D. Tex. 2011). The FLSA Enforcement Action sought back wages, liquidated damages, and injunctive relief against co-defendants GGS, owner Bert Steindorf, and manager Sidney Smith based on alleged

3

minimum wage, overtime, and record-keeping FLSA violations pertaining to at least 345 of the gate attendants, as well as for overtime and record-keeping violations regarding the service technicians.[2]

GGS immediately moved to dismiss the FLSA Enforcement Action, or in the alternative, to transfer the case to the Victoria Division pursuant to the first-to-file rule because the claims were substantially related, there was a likelihood of conflict if the two cases proceeded simultaneously, and the Victoria Division was the most convenient forum. The DOL opposed GGS's motion, claiming that the two actions were not substantially similar. Judge Jack granted GGS's motion to transfer, and on March 22, 2011, the FLSA Enforcement Action was transferred to the Victoria Division and assigned Civil Action No. 6:11-14.

While GGS's motion to dismiss or transfer the FLSA Enforcement Action was still pending, the DOL moved to dismiss the Declaratory Judgment Action on the grounds that the Court lacked subject matter jurisdiction over GGS's Amended Complaint, and that the case was neither ripe for judicial review, nor would it resolve all of the issues between the Parties. GGS opposed dismissal and instead moved the Court to consolidate the FLSA Enforcement Action into the first-filed Declaratory Judgment Action. The Court denied the DOL's motion to dismiss and further found that the two cases should be consolidated in the interests of judicial economy and to avoid excessive costs and duplication of effort, given the substantial overlap between the cases.

Once the cases were consolidated and discovery was underway, GGS filed a number of discovery-related motions during the course of the litigation. The first was a Motion to Compel Answers to Deposition Questions, Imposition of Sanctions, and Request for Guidelines on

---

2. The DOL later voluntarily dismissed all of the FLSA claims related to GGS's service technicians and all claims against Smith.

4

Deposition Conduct and for Magistrate Supervision of Depositions (Dkt. No. 41), based on disruptive conduct by the DOL's lead attorney, Colleen B. Nabhan, during the deposition of Rapstine.[3] GGS later withdrew the motion, but only after the DOL agreed that Ms. Nabhan would not defend any other depositions in the litigation going forward, all counsel for the DOL would refrain from coaching witnesses during the depositions, the DOL's counsel would appropriately limit the assertion of government privileges, and Rapstine would sit for an additional deposition as if the initial deposition had not taken place.

GGS next filed a Motion to Compel Production of Documents (Dkt. No. 58) seeking information that gate attendants provided to DOL Wage and Hour Investigators regarding their work for GGS in the form of questionnaires, witness statements, and investigation notes, as well as representations contained in the DOL's FLSA Narrative after the DOL asserted that the information was protected under the government informant privilege. GGS later moved to amend its motion to compel after the DOL filed some of the withheld questionnaires and witness statements as evidence with the Court, therefore waiving the privilege. GGS also filed a Motion for Protective Order after DOL investigators telephoned gate attendants and sent out mass mailings stating that it was "imperative" that the gate attendants complete a survey before a specified deadline, and the DOL refused to revise its cover letter and survey and refused to stop telephoning or otherwise contacting the gate attendants regarding their responses. Finally, GGS filed a Motion to Seal Portions of the Deposition Transcripts of Bert Steindorf and Sidney L. Smith and Motion for Protective Order (Dkt. No. 96) after the DOL refused GGS's request that it not disseminate publically portions of Steindorf's and Smith's deposition testimony regarding confidential company information and trade secrets, including GGS's client list and marketing

---

3. Specifically, during the course of the initial 45-minute deposition, Ms. Nabhan objected 102 times. At least 18 times, Ms. Nabhan instructed Rapstine not to answer basic questions about his investigation. She also coached Rapstine and repeatedly raised her hand before counsel for GGS finished asking the question. Given all her objections, Ms. Nabhan had more speaking lines than the deponent.

practices. The Court granted GGS's motion to seal in part and ordered that specific evidence related to confidential trade secrets be redacted or filed under seal.

The Court also held two telephone conferences concerning the Parties' various discovery disputes, after which GGS agreed to withdraw the majority of its discovery-related motions in order to focus on the Parties' cross-motions for summary judgment. After extensive briefing, the Court granted GGS's Cross Motion for Summary Judgment on its Declaratory Judgment Action, denied the DOL's Motion for Partial Summary Judgment, dismissed the DOL's counter-claims against GGS in the FLSA Enforcement Action, and entered final judgment in favor of GGS and against the DOL.

GGS now seeks to recover the attorneys' fees that it incurred in the prosecution of its Declaratory Judgment Action and in the defense of the FLSA Enforcement Action. According to GGS, as the prevailing party, it is entitled to attorneys' fees under the Equal Access to Justice Act because the DOL acted in bad faith both during its administrative investigation and in the course of litigation of this matter.

**II. Legal Standard**

The Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, was enacted in response to concerns that persons "may be deterred from seeking review of, or defending against, unreasonable governmental action because of the expense involved in securing the vindication of their rights." *Sullivan v. Hudson*, 490 U.S. 877, 883 (1989); *see also* H.R. Rep. No. 99-120 at 4 (1985). There are two distinct methods for a district court to award attorneys' fees under the EAJA.

Under the first method, the court is required to grant attorneys' fees to a prevailing party against the United States, unless there are special circumstances that make the award unjust or the government can show that it was substantially justified in its legal position. 28 U.S.C. §

2412(d)(1)(A); *Hyatt v. Shalala*, 6 F.3d 250, 253–54 (4th Cir. 1993).[4] "The test of whether or not a government action is substantially justified is essentially one of reasonableness." *Knights of the Ku Klux Klan v. East Baton Rouge Parish School Board*, 679 F.2d 64, 68 (5th Cir. 1982). "The government has the burden of showing that its position in every stage of the proceedings was substantially justified by demonstrating that its actions had a reasonable basis both in law and fact." *Baker v. Bowen*, 839 F.2d 1075, 1080 (5th Cir. 1988). Thus, the government's conduct must be substantially justified "both in its litigation position and its posture during the underlying administrative proceedings." *Id.*

The EAJA further permits a court to award attorneys' fees to the prevailing party to the same extent it may award fees in cases involving other parties, whether by statute or common law. 28 U.S.C. § 2412(b).[5] This provision makes the federal government subject to the "bad faith" exception to the "American Rule" on attorneys' fees. *Baker*, 839 F.2d at 1080, n.3. The bad-faith exception allows an award of attorneys' fees where the party seeking the award can show that the government has acted in "bad faith, vexatiously, wantonly or for oppressive

---

4. Subsection 2412(d)(1)(A) provides:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

5. Subsection 2412(b) provides:

Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

28 U.S.C. § 2412(b).

reasons." *Id.* at 1081. This showing may be based on the government's decision to file and maintain the lawsuit or by demonstrating "an abuse of the judicial process in the method of prosecution." *S.E.C. v. Cuban*, 2009 WL 4544178, *2 (N.D. Tex. Dec. 4, 2009) (citing *Batson v. Neal Spelce Assocs., Inc.*, 805 F.2d 546, 550 (5th Cir. 1986)). In order to constitute bad faith, the court must find that: (1) the government's position was meritless, (2) the meritlessness was known to the government, and (3) the government's position was advanced or maintained for an improper purpose, such as harassment. *Griffin Indus., Inc. v. E.P.A.*, 640 F.3d 682, 685 (6th Cir. 2011). *See also F.T.C. v. Freedom Commc'ns, Inc.*, 401 F.3d 1192, 1201 (10th Cir. 2005) ("The test is conjunctive; that is, both a complete lack of color and improper purpose must be present to support a fee award under § 2412(b)"); *Kerin v. Unites States Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000) ("[N]either meritlessness alone nor improper purpose alone will suffice."). "Most courts have applied the 'bad faith' exception very narrowly." *Baker*, 839 F.2d at 1080.

As recognized by the Fourth Circuit in *Hyatt v. Shalala*, "The distinction between [Subsections 2412(b) and 2412(d)] is of considerable consequence in the calculation of amount of fees." 6 F.3d at 254. Subsection 2412(d) imposes a presumptive $125 per hour cap on any award, unless it is adjusted for a special factor or the cost of living. 28 U.S.C. 2412(d)(2)(A). Under § 2412(b), however, the court may use a market rate to determine attorneys' fees. *Hyatt*, 6 F.3d at 254. Thus, § 2412(b) allows for attorneys fees "that can greatly exceed the cap placed on a § 2412(d) award." *Id.* Another significant distinction between these two subsections is that § 2412(d) "requires parties to qualify under statutorily prescribed net worth maximums." *Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326, 1332 (11th Cir. 2001) (citing 28 U.S.C. § 2412(d)(1)(C)(2)(B) (defining "party" for purposes of § 2412(d) by net worth)). Subsection 2412(b) is not limited in this respect. *Id.*

Here, GGS moves for attorneys fees solely under § 2412(b).

8

### III. Analysis

#### A. 28 U.S.C. § 2412(b)

GGS first argues that, acting on behalf of the DOL and motivated by a desire to help his friend, Rapstine ignored proper procedure and concluded that GGS was in violation of the FLSA without fairly and thoroughly investigating this matter. As evinced by the email Rapstine sent another investigator just hours after the opening conference stating that he had let GGS managers "dig[] their own grave," Rapstine appeared to have made up his mind before the investigation was even underway. Rapstine's supervisor, Ramirez, testified that before calculating back wages, it would be wise to first establish that the employer is covered under the FLSA so as not to waste time (Ramirez Dep., Dkt. No. 137, Ex. F at 100:4-15); however, Rapstine did not do this. Instead, Rapstine began calculating back wages immediately after the opening conference, before interviewing any gate attendants or service technicians beyond the initial three. Also unsettling is the fact that Rapstine destroyed all of his interview notes taken between July and November 2010 by shredding and/or burning them. The same supervisor testified that Rapstine should not have destroyed his notes. (*Id.* at 139:19-23.) After Rapstine's closing conference with GGS on October 4, 2010, he submitted his file to Ramirez, who testified that Rapstine again "did not follow the proper procedures" in presenting the $6 million penalty to GGS. (*Id.* at 32:4-9.) The proper procedure is to first address future compliance and then proceed with presenting the estimate of findings to the employer; however, Rapstine deviated from the DOL's Field Operations Handbook without permission to do so. Finally, after interviewing an additional 14 workers and reviewing Rapstine's investigation records after GGS filed its Declaratory Judgment Action, the DOL reduced its $6 million demand to $2 million, acknowledging that it erred by not excluding sleep and meal time from its initial demand. According to GGS, that the DOL would allow Rapstine to assess an erroneous penalty of more than $6 million against GGS—a penalty

9

so severe it could have put the company out of business—without the proper checks and balances to ensure its correctness shows the wanton disregard for GGS's rights that warrants a finding of bad faith.

GGS next argues that the manner in which the DOL conducted the litigation was unreasonable and unnecessary and caused GGS to incur significant attorneys' fees. For example, after being served with GGS's lawsuit, the DOL fought the transfer and consolidation of its later-filed FLSA Enforcement Action with the Declaratory Judgment Action, despite the significant overlap between the cases. Once these matters were resolved and the Parties began discovery, Ms. Nabhan stonewalled GGS at the first deposition by objecting to nearly every question asked, forcing GGS to end the deposition and seek the Court's assistance in setting parameters for the DOL's conduct. The cancellation of Rapstine's deposition forced GGS to reschedule the deposition, which resulted in a duplication of travel costs and deposition preparation. Finally, the DOL repeatedly withheld evidence from GGS based on the government informant privilege. As a result, GGS was forced to file a motion to compel, which resulted in yet additional briefing and considerable expense to GGS. According to GGS, the DOL's efforts to complicate the proceedings and impede discovery demonstrate the type of "harassing of the opposing party or delaying or disrupting litigation" tactics that are examples of conduct that demonstrate "bad faith or improper purpose." *Griffin Indus., Inc. v. EPA*, 640 F.3d 682, 686 (6th Cir. 2011) (internal alterations omitted). *See also Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648–49 (9th Cir. 1997) (district court may impose sanctions where a party demonstrates bad faith by raising frivolous arguments, harassing an opponent, delaying or disrupting litigation, or interfering with a court order).

GGS next argues that the DOL was unable to present sufficient evidence on each of the five factors of the independent contractor/employee analysis. As a result, the Court found that

three of the five factors in the analysis weighed in favor of independent contractor status, one factor was neutral, and only one factor weighed in favor of finding employee status. GGS further maintains that the DOL chose to ignore, hide, or mischaracterize facts contrary to its position, or to present only those facts that it found helpful. For example, with respect to the control factor, the DOL disregarded the testimony of its own investigators that there was no day-to-day supervision, as well as the testimony of numerous gate attendants who stated that they are not supervised and no one tells them how to do their job. The DOL further represented to the Court that the nature of the assignments made the relationship between GGS and the gate attendants permanent; however, the DOL's own evidence showed that over half of the gate attendants worked sporadic assignments that were on and off for 15 weeks or less with breaks in the assignments ranging from 1 to 9 months.

Finally, GGS complains that the DOL demonstrated bad faith in its refusal to dismiss the FLSA Enforcement Action after learning that the Army Corps of Engineers (ACE) uses the services of gate attendants at federal parks under similar circumstances as GGS and classifies these gate attendants as independent contractors.[6] Similarly, GGS complains that the DOL also chose to ignore the precedent of this Court in *Mack v. Talasek*, 2012 WL 1067398, *2 (S.D. Tex. Mar. 28, 2012), whereby the Court found that oilfield gate attendants were independent contractors under nearly identical circumstances.[7] Citing *Hyatt*, 6 F.3d at 255–56, GGS argues that the DOL's attempts to relitigate questions already decided by this Court are evidence of its bad faith.

---

6. The DOL explains that it was unaware of the ACE program until summary judgment briefing in this action; however, GGS has offered evidence that it produced information related to the ACE program to the DOL in December 2011.

7. The DOL responds that it could not have known about the *Mack* decision at the start of this litigation because the final order in *Mack* was not issued until March 28, 2012. GGS notes that the Magistrate's Memorandum & Recommendation (M&R) that was substantially adopted by the Court was entered on February 18, 2011, just two days after the DOL filed the FLSA Enforcement Action. Still, the DOL could not have known that the Court would adopt Magistrate Johnson's M&R.

Having reviewed the numerous cases cited by both Parties, the Court is unable to find that the DOL's conduct in this litigation is analogous to conduct found to constitute bad faith in other contexts. *See, e.g.*, *Huda v. Barnhart*, 67 Fed. App'x 400, 402 (9th Cir. 2003) (finding bad faith where Social Security Commissioner failed to follow the district court's order for seven months); *Mendenhall v. National Transportation Safety Board*, 92 F.3d 871, 877 (9th Cir. 1996) (FAA's continuation of baseless action against pilot, in effort to coerce pilot to waive her right to fees under the EAJA, was a "prime example of 'bad faith'"); *Cobell v. Norton*, 407 F. Supp. 2d 140, 168–69 (D.D.C. 2005) (finding bad faith where defendants abused the judicial process and "demonstrated an unprecedented level of defiance, both of the Rules of Civil Procedure and of this Court's orders," by refusing to comply with a court order to produce documents, making numerous illegitimate representations, failing to correct known misrepresentations, and neglecting to inform the court about self-inflicted obstacles to comply with its discovery obligations); *Gray Panthers Project Fund v. Thompson*, 304 F. Supp. 2d 36, 39 (D.D.C. 2004) (Department of Health and Human Services Secretary's repeated refusal to follow statutory mandates that implement the federal Medicare+Choice program constituted bad faith); *Lipsig v. Nat'l Student Mktg. Corp.*, 663 F.2d 178, 181 (D.C. Cir. 1980) (*per curiam*); (finding bad faith where party "engaged in dilatory tactics during discovery and courtroom hearings, consistently failed to meet scheduled filing deadlines, misused the discovery privilege and on at least two occasions 'seriously misled the Court by misquoting or omitting material portions of documentary evidence.'") (internal footnotes omitted).

Furthermore, while the Court did find that the oilfield gate attendants in *Mack* were independent contractors under nearly identical circumstances, this Court's opinion is not controlling law in the Fifth Circuit. *See Hyatt*, 6 F.3d at 255–56 (finding bad faith where government repeatedly failed to follow "controlling circuit precedent").

Finally, although the Court does not agree with the DOL's position that the gate attendants are employees, the DOL's arguments were not entirely frivolous. As the Court recognized in its Memorandum Opinion & Order on the Parties' cross motions for summary judgment, "as with most employee-status cases, there are facts pointing in both directions." (Dkt. No. 135 at 22.) Here, as in *Medica Rents*, the Court is not "convinced that the government brought claims that were either wholly unsupported or that were easily dispatched by cursory review of the evidence." *United States v. Medica Rents Co., Ltd.*, 2008 WL 3876307, *4 (5th Cir. 2008). Thus, even assuming that the DOL brought this action for an improper purpose, the Court is unable to make a finding of bad faith. *See Griffin Indus.*, 640 F.3d at 685 (6th Cir. 2011); *Freedom Commc'n*, 401 F.3d at 1201; *Kerin*, 218 F.3d at 190.

Accordingly, the Court finds that GGS has not satisfied its burden of showing bad faith on the part of the DOL in order to justify an award of attorneys' fees under 28 U.S.C. § 2412(b).

### B. Analysis under 28 U.S.C. § 2412(d)

As recognized in Part II, *supra*, § 2412(d) provides for mandatory attorneys' fees if the position of the United States was not substantially justified and the prevailing party meets certain financial eligibility requirements. The Fifth Circuit has made clear that "[a] prevailing party is eligible for fees and expenses only if he meets the statutory definition of a party[.]" *Tex. Food Indus. Ass'n v. U.S. Dept. of Agric.*, 81 F.3d 578, 580 (5th Cir. 1996). For purposes of § 2412(d):

> (B) "party" means (i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed . . .

28 U.S.C. § 2412(d)(2)(B).

To recover attorneys fees under § 2412(d), Steindorf must demonstrate that his net worth did not exceed $2,000,000 as of November 19, 2010. *See* 28 U.S.C. § 2412(d)(2)(B)(i). Likewise, GGS must demonstrate that its net worth did not exceed $7,000,000 as of November 19, 2010. *See Id.* § 2412(d)(2)(B)(ii). Steindorf and GGS have not presented any information regarding their net worth on the date the case was filed. Thus, even assuming the DOL's position was not substantially justified, the Court is unable to determine whether Steindorf and GGS are financially able to recover attorneys fees under § 2412(d).

**IV. Conclusion**

For the reasons set forth above, GGS's Motion to Recover Attorneys' Fees against Hilda L. Solis, Secretary of Labor, United States Department of Labor (Dkt. No. 137) filed pursuant to 28 U.S.C. § 2412(b) is **DENIED**. While the DOL's actions may not have constituted bad faith, the Court is not convinced that the DOL has shown that its actions were substantially justified. Thus, denial is without prejudice to refiling pursuant to 28 U.S.C. § 2412(d).

It is so **ORDERED**.

**SIGNED** this 24th day of July, 2013.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE